**FORRESTER & WORTH, PLLC**
3636 NORTH CENTRAL AVENUE, SUITE 700
PHOENIX, ARIZONA 85012
602.258.2729 — MAIN
602.271.4300 — FAX
S. CARY FORRESTER (006342)
JOHN R. WORTH (012950)
SCF@FORRESTERANDWORTH.COM
JRW@FORRESTERANDWORTH.COM

COUNSEL FOR THE DEBTOR

## IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| GV HOSPITAL MANAGEMENT, LLC, | Case 4:17-bk-03351-SHG |
| Debtor. | **EMERGENCY *EX PARTE* MOTION FOR ORDER (1) AUTHORIZING DEBTOR TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364; (2) GRANTING LIENS AND SUPERPRIORITY CLAIMS PURSUANT TO 11 U.S.C. § 364; (3) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (4) SCHEDULING A FINAL HEARING; AND (5) GRANTING RELATED RELIEF** |

Green Valley Hospital, LLC ("**GVH**"), GV Hospital Management, LLC ("**Management**") and GV II Holdings LLC ("**GVII**"),[1] debtors and debtors-in-possession (collectively, the "**Debtors**") in the above-captioned Chapter 11 bankruptcy proceedings ("**Cases**"), hereby move the Court, on an emergency basis, pursuant to Local Bankruptcy Rules ("**Local Rules**") 4001-4, and 9013-1, Federal Rules of Bankruptcy Procedure

---

[1] Debtors filed their petitions under Chapter 11 of the Bankruptcy Code on April 3, 2017, and have filed a motion for joint administration. Until that motion is granted, motions such as this will be filed in all three cases.

("**FRBP**") 2002, 4001, 6001 and 9014, and sections 105(a), 361, 362, 363, 364, 365 507 and 552 of title 11 of the United States Code §§ 101, *et seq.* (the "**Bankruptcy Code**"), for the entry of an interim order, substantially in the form attached hereto as Exhibit "A" (the "**Interim Order**") and a final order (the "**Final Order**" and, with the Interim Order, the "**Financing Orders**"):

(1)     Authorizing the Debtors to obtain post-petition financing up to the principal amount of $20,000,000 (the "**DIP Loan**") from an unaffiliated third-party, Lateral U.S. Credit Opportunities Fund ("**Lateral**") or its designee (collectively with Lateral, "**Lender**"), pursuant to the terms of a Debtor-in-Possession Credit Agreement ("**DIP Credit Agreement**") and related loan and collateral documents (collectively, the "**DIP Loan Documents**") (true and correct copies of the DIP Credit Agreement and DIP Collateral Agreements are attached hereto as Exhibits "B-1 and B-2"). The DIP Loan will be used to: (a) fund, among other things, ongoing working capital, general corporate expenses, and other financing needs; (b) refinance the Debtors' pre-existing credit facilities with Artemis Realty Capital Advisors, LLC ("**Artemis**") and SCM Specialty Finance Opportunities Fund, L.P. ("**SCM**"), and their equipment loan/lease with Cardinal Health; (c) pay pre-petition liabilities for critical vendors (if payments are approved by Court); (d) pay professional fees and transaction fees and other costs and expenses of administration of the Debtors' bankruptcy estates; (e) pay a $400,000 subordination fee to GVMI; and (f) pay interest, fees, and expenses to Lender under the DIP Loan Documents, all as set forth in the budget attached hereto as Exhibit "C", as may be amended from time to time (the "**Budget**").

(2)     Authorizing and empowering the Debtors to enter into the DIP Loan Documents and all other related documents and agreements and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

Case 4:17-bk-03351-SHG    Doc 7    Filed 04/03/17    Entered 04/03/17 18:35:33    Desc
Main Document    Page 2 of 244

(3)     Providing, pursuant to Sections 364(c) and (d), that the obligations under the DIP Loan Documents, including, without limitation, principal, accrued interest, and all other obligations and amounts due from time to time under the DIP Loan Documents:

    a.    have priority over any and all administrative expenses, diminution claims, and all other claims against the Debtors, including all administrative expenses of the kind specified in, or ordered pursuant to Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 726, or 1114 or otherwise, which allowed superpriority claims of the Lender (the "**DIP Superpriority Claims**") shall be payable from, and have recourse to, all prepetition and post-petition property of the Debtors (with the exception of the DIP Subordinate Collateral (as defined below) as will be provided in the DIP Loan Documents, <u>provided, however</u>, that the DIP Superpriority Claims shall be subject to: (i) the allowed, accrued, but unpaid administrative claims of professionals employed by the Debtors for capped fees and expenses not to exceed the aggregate amount of $800,000 as set forth in the Budget which may be paid from the DIP Loan or deposited into a segregated account as accrued; and (ii) payment of fees pursuant to 28 U.S.C. § 1930; and

    b.    granting Lender a valid, binding, continuing, enforceable, fully perfected, and unavoidable first priority security interest and lien (the "**DIP 1st Lien**") in and on all prepetition and post-petition property and assets of the Debtors, which shall be, and deemed to be, immediately secured (without any further filings) with the exception of: (i) until the DIP Loan is funded and the amounts owing to Artemis are fully paid, Artemis's first priority deed of trust on the Hospital land and structures and second priority lien in equipment

and accounts receivable; (ii) ) until the DIP Loan is funded and the amounts owing to SCM are fully paid, SCM's first priority lien on accounts receivable; (iii) until the DIP Loan is funded and the amounts owing to Cardinal Health are fully paid, Cardinal Health's lien on substantially all of Management's personal property; (iv) SQN's first priority lien on all of the Debtors' owned equipment and the real property owned by GVII, (collectively the "**SQN Collateral**"); (v) any personal property leased by GVH and/or Management; and (v) any personal property encumbered by a valid and perfected purchase money security interest (collectively, the "**DIP Subordinate Collateral**"); and

    c.    granting Lender a valid, binding, continuing, enforceable, fully perfected, and unavoidable *second* priority security interest and lien (the "**DIP 2nd Lien**") (the DIP 1st Lien and the DIP 2nd Lien are collectively the **"DIP Lien"**) encumbering the "**DIP Subordinate Collateral**") .

(4)    Authorizing the Debtors, pursuant to Sections 105, 361, 363, 541, and 553, and FRBP 2002, 4001, and 9014, to use Cash Collateral (as defined under Section 363) in accordance with terms of the DIP Loan Documents and the Budget, subject to any variance allowance provided by the DIP Loan Agreement and otherwise approved by Lender;

(5)    Vacating and modifying the automatic stay imposed by Section 362 solely to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and Financing Orders;

(6)    Finding that adequate notice of the Motion has been provided;

(7)    Finding that the Lender has acted in good faith in connection with the DIP Loan Documents and is entitled to the protections afforded under Section 364(e);

(8)     Scheduling, pursuant to FRBP 4001, a final hearing (the "**Final Hearing**") before this Court to consider entry of the Final Order approving the DIP Loan and authorizing the use of Cash Collateral on a final basis;

(9)     Waiving any applicable stay, including under FRBP 4001(b) and (c) and providing for the immediate effectiveness of the Interim Financing Order; and

(10)     Granting related relief.

## INFORMATION REQUIRED BY FRBP 4001

In addition to the summary of terms set forth above, the Debtors provide the following information regarding the principal terms of the proposed loan under the DIP Loan Documents as required by FRBP 4001 (c)(1)(B):

**Term**: 9 months

**Rate**: 12% simple

**Origination Fee**: $540,000

**Exit Fee**: equivalent to the interest payments due as if the loan were outstanding for 12 months in accordance with the following schedule:

| Repayment Period (from Closing) | Interest Rate |
| --- | --- |
| 0-119 Days | 12.00% |
| 120-179 Days | 13.50% |
| 180-270 Days | 15.00% |

**Effective Date**: Upon the entry of the Interim Order approving the DIP Loan, provided that the Interim Order is not subject to a stay pending appeal, the DIP Loan shall be effective and the Debtors shall be entitled to draw, and the Lender will be required to fund, amounts set forth in the Budget, provided that the Budget has been approved by Lender.

**Prepayment**: The Debtors can pre-pay the DIP Loan prior to the Maturity Date without penalty, provided they still pay the Exit Fee.

5

**Use of Proceeds**: The proceeds of the DIP Loan will be used in accordance with the Budget, provided that the Budget has been approved by Lender.

**Conditions Precedent**:

    (a)      Completion of a Reorganization Proposal acceptable to Lender;

    (b)      Bankruptcy Court approval of the Motion;

    (c)      Completion of an operating budget;

    (d)      Completion of a Chapter 11 Timeline with specific time milestones;

    (e)      Completion of a Quality of Earnings report satisfactory to Lender;

    (f)      Completion of an Appraisal of the Debtors satisfactory to Lender;

    (g)      Lender's review of the Debtors' material contracts;

    (h)      Lender's completion of background checks of Debtors' management team;

    (i)      Satisfactory completion of all documentation and all legal and other non-business due diligence;

    (j)      The consensual priming of the liens held by Green Valley Medical Investments, LLP; and

    (k)      The entry of the Financing Order containing a good faith finding as to the Lender and no stay pending appeal of the Financing Orders;

**Events of Default**: The following customary events of default will be events of default under the DIP Loan Agreement: (1) a default in the payment of any amounts due under the DIP Loan Agreement as and when the same shall become due and payable; (2) failure on the part of the Debtors to duly observe or perform any of the covenants or agreements on the part of the Debtors contained in the DIP Loan Agreement; (3) any representation, warranty, or statement made or deemed made by the Debtors in the DIP Loan Agreement shall prove to be false or misleading in any material respect when so made; (4) any new and additional liens being granted or placed upon the Collateral other than the DIP Lien of the Lender; (5) the appointment of an examiner with expanded

6

powers or a trustee in the Debtors' Cases, conversion of the cases to cases under Chapter 7 of the Bankruptcy Code, or dismissal of the Cases by order of the Court; (6) any order of the Court amending, modifying, superseding, staying, reversing or vacating the Financing Orders or having the effect of doing so without prior written consent of the Lender; (7) the failure of the Debtors to perform under Court orders in any material respect; and (8) any breach by the Debtors of any material term or condition of the Interim Order or Final Order, as applicable.

Pursuant to FRBP 4001, the Debtors hereby provide the following disclosures with respect to the terms of the DIP Loan Agreement, Interim Order and Final Order:

| | DIP Loan Agreement | Interim Order | Final Order |
|---|---|---|---|
| A grant of priority or lien on property of the estate under § 364(c) or (d) | § 2.16 | §2(e) | §____ |
| The providing of adequate protection or priority for a claim that arose before the commencement of the case, including the granting of a lien on property of the estate to secure the claim, or the use of property of the estate or credit obtained under § 364 to make cash payments on account of the claim | No | No | No |
| A determination of the validity, enforceability, priority, or amount of a claim that arose before the commencement of the case, or of any lien securing the claim | No | No | No |
| A waiver or modification of Code provisions or applicable rulings relating to the automatic stay | No | §13(c) | |
| A waiver or modification of any entity's authority or right to file a plan, seek an extension of time in which the debtor has the exclusive right to file a plan, request the use of cash collateral under § 363, or request authority to obtain credit under § 364 | §6.01(a) | §§ 9(b) and 13 | |

7

| | DIP Loan Agreement | Interim Order | Final Order |
|---|---|---|---|
| The establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | §5.13 | No | |
| A waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | ? | §5 | |
| A release, waiver, or limitation on any cl or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action | §§ 2.19, aim 9.02, 9.03, and 9.10 | §7 | N/A |
| The indemnification of an entity | §§ 2.11(d), 8.08, 8.09 and 9.03 | | |
| A release, waiver, or limitation of any right under Section 506(c) | §2.20 | § 7 | |
| The granting of any lien on any claim or cause of action arising under Sections 544, 545, 547, 548, 549, 553(b), 723(a) or 724(a) | No | No | No |

Pursuant to the Local Rule 4001-4, the Debtors hereby provide the following disclosures with respect to the DIP Loan Agreement, and Interim Order:

| | DIP Loan Agreement | Motion | Interim Order |
|---|---|---|---|
| Granting a prepetition creditor a lien or security interest in post-petition assets in which the creditor would not otherwise have a security interest by virtue of its prepetition security agreement and applicable law, other than replacement liens in the same kind of collateral | No | No | No |

| | | | |
|---|---|---|---|
| the creditor had prepetition in order to obtain the use of that creditor's cash collateral | | | |
| Findings, conclusions, holdings, or orders as to the amount of a secured debt or the validity, perfection, and scope of the security interests securing such debt, that purportedly affect the rights of the estate or anyone other than the debtor in possession and the secured creditor | N/A | N/A | N/A |
| Release, waiver, or abandonment of claims, setoff rights, surcharge rights, avoidance actions, and subordination actions against a secured creditor, or findings or stipulations that no such rights exist, that purportedly affect the rights of the estate or anyone other than the debtor in possession and the secured creditor | No | No | No |
| Granting of liens or security interests against rights and actions arising under Code §§ 544, 545, 547, 548, or 549 | No | No | No |
| The use of funds derived from post-petition financing to pay all or part of a pre-petition secured debt, or a provision that deems prepetition secured debt to be post-petition secured debt, other than as permitted by Code § 552(b) | Budget | Budget | Budget |
| Granting surcharge or carve out rights to a debtors' professionals without providing equivalent treatment to professionals engaged by an authorized committee, or any restrictions on the surcharge or carveout rights granted to such professionals other than the requirement for Court approval of the fees or expenses (e.g., a restriction against investigating or pursuing causes of action against the secured creditor) | | §14 | |
| Payment of pre-petition wages, salary, or other compensation to an employee in an amount in excess of the Code's priority amount, payment of any severance or vacation pay earned prepetition, or payment of any officer's, director's, or equity holder's prepetition wages, | No | No | No |

9

| | | | |
|---|---|---|---|
| salaries, commissions, benefits or other consulting fees | | | |
| Priming any secured creditor under Code § 364(d) without that creditor's consent | No | No | No |

## INFORMATION REGARDING OTHER PURPORTED SECURED CREDITORS

## AND NOTICE OF THE MOTION

The Debtors are informed and believe that SQN asserts that it has liens on the equipment owned by GVH and used by Management and the real property owned by GVII. In order to provide maximum notice of this Motion, concurrently with the filing of this Motion with the Court, the Debtors served by overnight mail, or NEF where applicable, a copy of the Motion upon: (1) SQN; (2) the Office of the United States Trustee for the District of Arizona; (3) Equipment Lessors; (4) secured creditors Artemis and SCM; and (3) any other party that has filed a request for notice pursuant to FRBP 2002 or is required to receive notice under the FRBP or Local Rules.

The Motion is supported by the exhibits hereto, the attached Memorandum of Points and Authorities, the Omnibus Declaration of John Matuska in Support of First Day Motions (the "**Omnibus Declaration**") filed on April 3, 2017, the Declaration of G. Grant Lyon, attached hereto as Exhibit "D", the papers and pleadings on file with the Court in this Case, and any oral arguments the Court may entertain at the hearing on this Motion.

The Debtors submit that an emergency hearing is warranted because: (1) they need to pay expenses set forth in the Budget and currently lack the funds to do so; and (2) they need to pay the expenses set forth in the Budget in order to maintain their cases pending the consummation of their plan of reorganization, which they believe will benefit all creditors and interest holders. Accordingly, the Debtors request that the Court set a hearing on the Motion as soon as is convenient for the Court.

Case 4:17-bk-03351-SHG    Doc 7    Filed 04/03/17    Entered 04/03/17 18:35:33    Desc
Main Document    Page 10 of 244

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

## I.  <u>JURISDICTION & VENUE</u>

This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory bases for the relief requested herein are 105(a), 361, 362, 363, and 364, Bankruptcy Rules 2002, 4001, and 9014, and Local Bankruptcy Rule 4001-3.

## II.  <u>BACKGROUND</u>

On April 3, 2017 (the "**Petition Date**"), Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code. Pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code, Debtors are managing their assets and properties as debtor-in-possession.

### A.  <u>History and Purpose of Debtors</u>

Management is an Arizona limited liability company with its principal operations in Green Valley, Arizona. Management owns and operates the Green Valley Hospital (the "**Hospital**"), a licensed and general acute care hospital open 24 hours a day, seven days a week. The Hospital cost over $75 million to construct and equip, and opened in May 2015. It is the only hospital in its local market, serving a community of approximately 100,000 people (including the city and surrounding region), with the next closest hospital facility located 26 miles to the north, or a 45-minute drive away. The Hospital is a 49-bed general acute care hospital with a 12-bed emergency department. It currently has approximately 337 employees and has credentialed over 232 physicians on its medical staff. The Employees include approximately: (i) 227 full-time employees; (ii) 102 part-time employees; and (iii) 8 contract employees.

The Hospital includes a surgical suite with four operating rooms, two procedure rooms and a 13 bed PACU, a cardiac catheterization laboratory, a full service laboratory and blood bank, diagnostic radiology services and emergency care. Its mission is to

deliver the highest quality of healthcare to surrounding communities, and to become the finest community-based regional hospital in Southern Arizona. It was awarded the 2015 "New Business of the Year" award at Green Valley's Annual Chamber Business Dinner, and averages 4.3 out of 5 stars from patients in online ratings.

### B. Debtors' Corporate Structure

Management is one of six subsidiaries of Green Valley Hospital, LLC ("**GVH**"). The other subsidiaries include GVH MOB I, LLC ("**MOB1**"), GVH MOB II, LLC ("**MOB2**"), GVH MOB III, LLC ("**MOB3**"), GV Campus Management, LLC ("**GVCM**"), and GV II Holdings, LLC ("**GVII**"). Management is wholly owned by GVH.

### C. Management's Assets & Liabilities

Management owns the real property where the Hospital is located and its accounts receivable. It owns some of the equipment used by the Hospital, with the balance owned by GVH, other than leased equipment. It also holds the Hospital license, employs staff, governs clinical operations, including medical staff credentialing, and contracts with third party payors including Medicare and Medicaid. Management's land and building have a liquidation value of approximately $59 million, and the equipment owned by it and GVH has a liquidation value of approximately $2.8 million.

### D. Management's Creditors

Management's total liabilities stood at approximately $95 million as of the Petition Date, of which approximately $85 million is secured debt. Details regarding Management's main secured creditors are as follows:

a. **Artemis Realty Capital Advisors, LLC ("Artemis").** Artemis is owed approximately $8.3 million as of the Petition Date. It holds a first-priority lien on the Hospital's land and building and on the equity ownership interests in Management, GVH, MOB1, MOB2, and MOB3, and second-priority liens on Management and GVH's equipment and accounts receivable.

Case 4:17-bk-03351-SHG    Doc 7    Filed 04/03/17    Entered 04/03/17 18:35:33    Desc
Main Document      Page 12 of 244

b.     **Green Valley Medical Investments, LLLP ("GVMI").** GVMI was GVH's original senior secured lender, having funded the construction of the Hospital through a $55 million loan to GVH. GVMI is also owed approximately $7.5 million by GVH for accrued interest, fees and costs. GVMI agreed to subordinate its debt to Artemis' loan in September 2016. As such, GVMI holds a second-priority lien on: (i) the Hospital's land and building; (ii) the equity interests in Management, MOB1, MOB2, and MOB3; (iii) the land and buildings owned by MOB1, MOB2, and MOB3; (iv) GV2's land; and (v) a third-priority lien on Management and GVH's equipment and accounts receivable.

c.     **SCM Special Finance Opportunities ("SCM").** SCM provided an accounts receivable loan to Management in the amount of $2.4 million. SCM holds a first-priority lien on Management's accounts receivable.

d.     **SQN Asset Finance (Guernsey) Limited ("SQN").** SQN loaned GVH approximately $13 million for the purchase of equipment. SQN holds a first-priority lien on Management and GVH's equipment, and on GV2's land.

Management has unsecured debts totaling approximately $9.9 million, attributable to two unsecured notes and trade and vendor payables.

**E.     Management of GVH and Management**

The business was under-capitalized, poorly governed and poorly managed from its inception. As a result, it suffered cumulative net losses from operations of approximately $35 million through its first 18 months of operations. In August 2016, GVH recruited a qualified turnaround management team and in November 2016, GVH's board of managers was restructured.

**F.     Purpose Behind Bankruptcy Filing and Strategy for Reorganization**

Despite the management restructuring, the debt load remains unsustainable.

Accordingly, Debtors filed for Chapter 11 relief in order to reorganize their debts, operate successfully, and maximize the recovery to their creditors

## III. RELIEF REQUESTED

The Debtors request the entry of the Interim Order and the Final Order:

### A. Authorization for Post-Petition Financing

1) Authorizing them, as borrowers, to obtain post-petition financing up to the principal amount of $20,000,000 from Lateral pursuant to the terms of the DIP Loan Documents. As noted above, the DIP Loan will be used to: (a) fund, among other things, ongoing working capital, general corporate expenses, and other financing needs of the Debtors; (b) refinance the Debtors' pre-existing credit facilities with Artemis, SCM, and Cardinal Health; (c) pay pre-petition liabilities to critical vendors (if payments are approved by Court); (d) pay certain transaction fees and other costs and expenses of administration of the Debtors' bankruptcy cases; and (e) pay interest, fees, and expenses owed to Lender under the DIP Loan Documents as set forth in the Budget.

2) Authorizing and empowering them to enter into the DIP Loan Documents and all other related documents and agreements and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

3) Providing, pursuant to Sections 364(c) and (d), that the obligations under the DIP Loan Documents, including, without limitation, principal, accrued interest, and all other obligations and amounts due from time to time under the DIP Loan Documents:

i. Shall be DIP Superpriority Claims, which will be payable from, and have recourse to, all prepetition and post-petition property of the Debtors (with the exception of the DIP Subordinate Collateral) as will be provided in the DIP Loan Documents, provided, however, that the DIP Superpriority Claims shall be subject to: (i) the allowed, accrued, but unpaid administrative claims of professionals employed by the Debtors for capped fees and expenses not to exceed the aggregate amount of $.8 million as set

forth in the Budget which may be paid from the DIP Loan or deposited into a segregated account as accrued; and (ii) payment of fees pursuant to 28 U.S.C. § 1930; and

ii.  With the exception of the DIP Subordinate Collateral, secured by the granting to Lender DIP Lien; and

iii.  The Collateral specifically excludes the Debtors' causes of action under Chapter 5 of the Bankruptcy Code, including without limitation Sections 502(d), 544, 547, 548, 549, and 550, any other avoidance actions under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, nonbankruptcy law, and the proceeds thereof, whether real or personal, tangible or intangible, and wherever located, and whether now existing or hereafter acquired, including proceeds, products, rents, and profits thereof.

### B.  Authorization to Use Cash Collateral

Authorizing the Debtors, pursuant to Sections 105, 361, 363, 541, and 553, and FRBP 2002, 4001, and 9014, to use Cash Collateral (as defined under Section 363) in accordance with terms of the DIP Loan Documents and the Budget, subject to any variance allowance provided by the DIP Loan Agreement and otherwise approved by Lender. The only parties who might be affected by the use of cash collateral, other than the Lender, are SCM, Artemis, and GVMI, who hold security interests in Management's accounts receivable. Artemis and GVMI have consented to the use of cash collateral and SCM, which holds the senior security interest, is over secured. Accordingly, even if the Court does not authorize the immediate payoff of Artemis and SCM from the DIP loan proceeds, it should authorize the immediate use of cash collateral.

### IV.  THE NEED FOR POST-PETITION FINANCING AND THE USE OF CASH COLLATERAL

The Debtors are in need of post-petition financing to fund their business

operations during the pendency of this case. The funds will be used (a) fund, among other things, ongoing working capital, general corporate expenses, and other financing needs; (b) refinance the Debtors' pre-existing credit facilities with Artemis Realty Capital Advisors, LLC ("**Artemis**") and SCM Specialty Finance Opportunities Fund, L.P. ("**SCM**"), and their equipment loan/lease with Cardinal Health; (c) pay pre-petition liabilities for critical vendors (if payments are approved by Court); (d) pay professional fees and transaction fees and other costs and expenses of administration of the Debtors' bankruptcy estates; (e) pay a $400,000 subordination fee to GVMI; and (f) pay interest, fees, and expenses to Lender under the DIP Loan Documents, all as set forth in the budget attached hereto as Exhibit "C", as may be amended from time to time (the "**Budget**"). In light of the foregoing, the Debtors sought debtor in possession financing from 22 other entities and individuals, not including the Lender. Ultimately, they decided that the Lender was the best party to provide the required financing on the expedited basis required by the Debtors.

The Lender agreed to provide the Debtors with a post-petition DIP Loan of up to $20,000,000 and to allow the Debtors to use the Lender's cash collateral subject to the terms of the DIP Loan Documents and the Budget. Based on the Debtors' Budget, which sets forth the Debtors' projected cash receipts and cash disbursements through the Maturity Date of the DIP Loan, the Debtors believe the proposed DIP Loan will provide them with sufficient funds to maintain their operations during the pendency of these bankruptcy cases.

The Debtors were unable to obtain sufficient interim and long-term financing in a timely manner from sources other than the Lender on terms and subject to conditions more favorable to the Debtors than under the DIP Loan Documents because lenders are not willing to lend to debtors in financial distress without obtaining superpriority claims and liens to protect and secure claims arising from post-petition financing. Accordingly, the Lender requested that the Debtors provide, and the Debtors agreed to provide, the

Case 4:17-bk-03351-SHG    Doc 7    Filed 04/03/17    Entered 04/03/17 18:35:33    Desc
Main Document    Page 16 of 244

Lender with the DIP Superpriority Claims and the DIP Lien pursuant to Sections 364(c) and (d). In consideration of other terms and conditions obtained by other debtors in possession borrowers in similar circumstances, the Debtors believe that the proposed terms and conditions of the DIP Loan are reasonable.

After considering the lack of better alternatives, the Debtors concluded, in the exercise of their sound business judgment, that the DIP Loan proposed to be provided by the Lender, when coupled with the authorization to use Cash Collateral to be provided by the Lender, represents the best financing presently available to them. The DIP Loan is the product of protracted arms' length negotiations between the Debtors and the Lender (which is not affiliated with, or an insider of the Debtors). Thus, any credit extended, loans made, and other financial accommodations extended to the Debtors by the Lender has been extended, issued, or made, as the case may be, in "good faith" within the meaning of Section 364(e).

## V. LEGAL ARGUMENT

### A. The Debtors Should Be Authorized to Obtain the Proposed DIP Loan from the Lender to Maintain their Business and Preserve the Value of their Assets.

Pursuant to Section 364(c), a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interest of the estate. *See e.g., In re Simasko Production Co.*, 47 B.E. 444, 448-9 (D. Colo. 1985) (authorizing interim financing agreement where the debtor's business judgment indicated financing was necessary and for the benefit of the estate); *In re Ames Dept. Stores*, 115 B.E. 34, 38 (Bankr. S.D.N.Y. 1990) (which respect to post-petition credit, courts "permit debtors-in-possession to exercise their basic business judgment consistent with their fiduciary duties"). Section 364(c) provides in pertinent part, that:

> (c)     If the trustee [or debtor in possession] is unable to obtain unsecured credit allowable under Section 503(b)(1) of this title as an administrative expense, the court, after notice

and a hearing, may authorize the obtaining of credit or the incurring of debt –

    (1) with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

    (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

    (3) secured by a junior lien on property of the estate that is subject to a lien.

Section 364(d)(1) governs the incurrence of senior secured debt or "priming" loans. Pursuant to Section 364(d)(1), the Court may, after notice and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien only if –

    (1) the trustee is unable to obtain such credit otherwise; and

    (2) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

Section 364 is structured with an escalating series of inducements which a debtor in possession may offer to attract credit during the post-petition period. *In re Photo Promotion Associates, Inc.*, 87 B.R. 835, 839 (Bankr. S.D.N.Y. 1988), *aff'd* 881 F.2d 6 (2d. Cir. 1989). Where a trustee or debtor in possession cannot otherwise obtain unsecured prepetition credit, such credit may be obtained under certain carefully proscribed conditions. *In re T.M. Sweeney & Sons LTL Services*, 131 B.R. 984, 989 (Bankr. N.D. Ill. 1991). For example, if creditors are unwilling to extend unsecured credit to a debtor in possession, further inducements are offered, with court approval after notice and a hearing, including, without limitation, liens equal to or senior to existing liens on encumbered property in accordance with 11 U.S.C. § 364(d). *In re Photo Promotion Associates, Inc.*, 87 B.R. at 839.

Section 364(c) also enumerates certain incentives that a court may grant to post-

Case 4:17-bk-03351-SHG   Doc 7   Filed 04/03/17   Entered 04/03/17 18:35:33   Desc
Main Document      Page 18 of 244

petition lenders. However, the list set forth Section 364(c) is not exhaustive. Courts have frequently authorized the use of inducements not specified in the statute. *See e.g., In re Ellingsen MacLean Oil Co.*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order which prohibited any challenges to the validity of already existing liens); *In re Defender Drug Stores*, 126 B.R. 76 (Bankr. D. Ariz. 1991) (authorizing enhancement fee to post-petition lender), *aff'd* 145 B.R. 312, 316 (9th Cir. B.A.P. 1992) ("[b]ankruptcy courts … have regularly authorized post-petition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in Section 364").

As discussed above, the Debtors' cash flow alone will be insufficient to pay their immediate and ongoing expenses, especially considering the added administrative costs that will be incurred by the Debtors in this case. Additional financing is necessary to maintain business operations pending the Debtors' plan of reorganization for the benefit of their creditors and interest holders. Subject to the approval of the Court, and in order to obtain the necessary DIP Loan, the Debtors have agreed to provide the Lender with (1) The DIP Superpriority Claims pursuant to Section 364(c)(1) for all amounts owed by the Debtors to the Lender under the DIP Loan; and (2) perfected first priority security DIP Lien on all of the Debtors' pre-petition and post-petition collateral (with the exception of liens on the DIP Subordinate Collateral) to secure all obligations under the DIP Loan pursuant to Section 364(c)(2). For all of the reasons explained herein, the Debtors believe that granting the Lender the foregoing protections is warranted, appropriate, and necessary given the circumstances of these Cases, where the Lender has agreed to provide the Debtors with a critically necessary emergency DIP Loan and to consensual use of Cash Collateral thereafter, without which the Debtors would be forced to cease operations.

Two facts courts consider in determining whether to authorize post-petition financing which contemplates the granting of a security interest in favor of the lender are: (1) whether the debtor is unable to obtain unsecured credit under Section 364(b), i.e., by

allowing a lender only an administrative claim under Section 364(b)(1)(A); ad (2) whether the terms of the transaction are fair, reasonable, and adequate, given the circumstances of the debtor-borrower and the proposed lender. *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D.Pa. 1987); *see also In re Aqua Assoc.*, 123 B.R. 192, 195 (Bankr. E.D.Pa. 1991). In addition to the foregoing, a debtor in possession seeking subordination of liens to new financing must establish adequate protection of the liens to be subordinated to the new financing. *In re C.B.G. Ltd.*, 150 B.R. 570, 571 (Bankr. M.D.Pa. 1992). The Debtors submit that all of these standards have been satisfied in this case.

    1.    <u>The Debtors Are Unable to Obtain Unsecured Credit or Secured Credit on a Junior Lien Basis</u>

In satisfying the standards of Section 364, a debtor need not seek credit from every available source, but should make a reasonable effort to seek other sources of credit available under § 364(a) and (b). *See In re Snowshoe Co.*, 789 F.2d 1085, 1089 (4th Cir. 1986) (trustee had demonstrated good faith effort that credit was not obtainable without senior lien by unsuccessfully contacting other financial institutions in the immediate geographic area; "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable"); *Ames, supra,* 115 B.R. at 40 (finding that debtors demonstrated the unavailability of unsecured financing where debtors approached four lenders).

To date, the best (and only current) post-petition financing commitment that has been provided to the Debtors is the one offered by the Lender. In order to avoid a complete shutdown of the Debtors' business, the immediate liquidation of the Debtors' assets, and the possible dismissal or conversion of the Debtors' Cases, the Debtors diligently sought other sources of additional financing before the Petition Date. Considering the circumstances and that lenders are likely not willing to lend to a debtor in financial distress without obtaining superpriority claims and liens to protect and secure claims arising from post-petition financing, the Debtors believed they would be

unable to obtain sufficient financing on a timely basis from sources other than the Lender on terms and subject to conditions more favorable than under the terms of the DIP Loan Documents.

The Lender offered to provide the Debtors with post-petition secured financing but solely on the terms and conditions outlined in the DIP Loan Documents. Accordingly, at the Lender's request, the Debtors agreed to provide the Lender with superpriority claims and senior DIP Lien pursuant to Sections 364(c) and (d), as well as the other customary protections set forth in the DIP Loan Documents and Financing Orders. The Debtors have little doubt that, even if there were another lender who was willing to provide them with the necessary post-petition financing, such lender would also require that its financing be secured by a senior lien against the Debtors' assets, upon terms that would be no more favorable than those offered by the Lender. Indeed most, if not all, of the other lenders that the Debtors contacted to provide post-petition financing that responded were also requiring superpriority claims and first priority liens to secure any loans provided to the Debtors. The terms and conditions set forth in the Commitment Letter were negotiated extensively, in good faith, and at arm's length by the parties.

After considering all of their alternatives, the Debtors have concluded, in the exercise of their sound business judgment, that the DIP Loan (particularly in conjunction with the authorization to use Cash Collateral to be provided by the Lender) represents the best financing presently available to the Debtors.

        2.     <u>The Terms of the Proposed Post-petition DIP Loan from the Lender Are Fair, Reasonable and Adequate.</u>

The Debtors submit that the terms of the proposed DIP Loan from the Lender are fair, reasonable, and adequate. As noted above, the terms and conditions set forth in the Term Sheet were negotiated extensively, in good faith, and at arms' length by the parties. The Lender is well aware of the fact that the Debtors would have very little chance of avoiding an immediate shutdown of their business if not for the DIP Loan offered by the

Lender. The Lender has agreed to provide the DIP Loan to the Debtors in an effort to assist the Debtors in preserving the going concern value of the Debtors' assets and to facilitate the successful consummation of the Debtors' reorganization. The Debtors submit that the benefits afforded to the Debtors by the DIP Loan justify the protections being afforded under the terms of the DIP Loan Documents. The DIP Loan offers the Debtors their best, and likely only, opportunity to maintain and preserve the value of their assets while pursuing their plan of reorganization, which will benefit all creditors and parties in interest.

Based on the foregoing, the Debtors believe that: (1) the terms and conditions of the proposed DIP Loan under the DIP Loan Documents are fair and reasonable, reflect the Debtors' exercise of their prudent business judgment in light of the current circumstances and are supported by reasonably equivalent value and fair consideration; (2) the DIP Loan has been negotiated in good faith and at arm's length by the Debtors and the Lender; and (3) any credit extended, loans made, and other financial accommodations extended to the Debtors by the Lender have been extended, issued, or made, as the case may be, in "good faith" within the meaning of Section 364.

3.   The Only Lender Being "Primed" Has Agreed to the Priming

The only creditor whose liens and interests are being primed is GVMI, and it has consented to being primed, subject to the terms of the DIP Loan Documents. Accordingly, priming is not to be an issue.

4.   The Proposed DIP Loan from the Lender is Necessary and Proper

While determining whether to approve such a transaction, a court is authorized to act in its informed discretion. *In re Ames Department Stores, Inc.*, 115 B.R. at 37, the Court should give broad deference to the business decision of a Chapter 11 debtor, particularly with respect to a debtor's business judgment regarding the need for and proposed use of funds. *Richmond Leasing Co. v. Capital Bank N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985). As

the court noted in the *In re Ames Dept. Stores, Inc., supra,* "the court's discretion under section 364 is to be utilized on the grounds that permit the reasonable business judgment [of the Debtor] to be exercised …" *In re Ames Department Stores, Inc.,* 115 B.R. at 40.

There is no dispute that, without substantial post-petition financing, the Debtors will be forced to immediately cease business operations and engage in a fire sale of their assets without the ability to maximize their value through their planned reorganization, which they plan to effectuate within the exclusivity period, if not sooner, and which will benefit all creditors and interest holders. In contrast, the proposed DIP Loan affords the Debtors the ability to maintain the going-concern value of their business and provides the Debtors with the time necessary to pursue an orderly reorganization. The Debtors have therefore concluded that obtaining the proposed DIP Loan from the Lender is critically important and is in the best interest of the Debtors' estates.

**B.** **The Debtors Should Be Authorized to Use Cash Collateral Provided by the DIP Loan to Pay Necessary Operating Expenses as Set Forth in the Budget.**

1. The Debtors Must be Authorized to Use Cash Collateral to Operate, Maintain, and Preserve Its Assets in Accordance with the Budget

The Debtors' use of property of the estate is governed by Section 363. 11 U.S.C. § 363(c). Section 363(c)(1) provides in pertinent part:

> If the business of the debtor is authorized to be operated under section … 1108 … of this title and unless the court orders otherwise, the trustee may enter into transactions, including the sale or lease of property of the estate, in the ordinary course of business, without notice or a hearing, and may use property of the estate in the ordinary course of business without notice or a hearing.

A debtor in possession has all of the rights and powers of a trustee with respect to property of the estate, including the right to use property of the estate in compliance with Section 363. 11 U.S.C. § 1107(a).

"Cash collateral" is defined as "cash, negotiable instruments, documents of title, securities, deposit accounts or other cash equivalents in which the estate and an entity

Case 4:17-bk-03351-SHG    Doc 7    Filed 04/03/17    Entered 04/03/17 18:35:33    Desc
Main Document    Page 23 of 244

other than the estate have an interest." 11 U.S.C. § 363(a). Section 363(c)(2) establishes a special requirement with respect to "cash collateral" providing that the trustee or debtor in possession may use "cash collateral" under subsection (c)(1) if:

> (A) each entity that has an interest in such cash collateral consents; or
>
> (B) the court, after notice and a hearing, authorizes such use, sale or lease in accordance with the provisions of this section.

11 U.S.C. §§ 363(c)(2)(A) and (B).

It is well settled that it is appropriate for a Chapter 11 debtor to use cash collateral for the purpose of maintaining and operating its property. 11 U.S.C. § 362(c)(2)(B); *In re Oak Glen R-Vee*, 8 B.R. 213, 216 (Bankr. C.D. Cal. 1981); *In re Tucson Industrial Partners*, 129 B.R. 614 (9th Cir. B.A.P. 1991). In addition, where the debtor is operating a business, it is extremely important that access to cash collateral be allowed in order to facilitate the goal of reorganization: "[T]he purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary to operate a business." *In re Dynaco Corp.*, 162 B.R. 389 (Bankr. D.N.H. 1993) (quoting *In re Stein*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982).

For all the reasons discussed herein, the Debtors have no ability to continue to maintain their business operations or preserve the value of their assets unless they: (1) obtain the DIP Loan from the Lender, which will result in the Debtors' cash becoming the Lender's Cash Collateral; and (2) have the ability to use Cash Collateral to pay the Debtors' projected expenses in accordance with the Budget. The Debtors' inability to pay those expenses would cause immediate and irreparable harm to their estates. Indeed the Debtors' inability to pay their expenses, including utilities, insurance, payroll, and other operating expenses set forth in the Budget would result in the immediate or near immediate shutdown of their business and the decimation of its value (going concern or otherwise). The maintenance of the Debtors' business and preservation of their assets are critical to maximizing value and providing for recoveries to creditors in these Cases.

2. The Lender Has Consented to the Debtors' Use of Cash Collateral and the Secured Creditors Are Adequately Protected

Pursuant to Section 363(c)(2), the Court may authorize a debtor in possession to use a secured creditor's cash collateral if the secured creditor consents to the use of cash collateral or is adequately protected. *In re Mellor*, 734 F.2d at 1400; *see also In re O'Connor*, 808 F.2d at 1398; *In re McCombs Properties VI, Ltd.*, 88 B.R. at 265.

Here, the Lender has consented to the Debtors' use of Cash Collateral to pay the expenses set forth in the Budget in accordance with the provisions of the Commitment Letter. As to the Secured Creditors, as set forth above, they are adequately protected by an equity cushion for any diminution of the value of their collateral resulting from the Debtors' use of Cash Collateral. Moreover, in the absence of the DIP Loan to be provided by the Lender, the Cash Collateral provided by the DIP Loan, which constitutes essentially all of the Debtors' funds, would not exist, so the Secured Creditors cannot argue that the use of the funds from the DIP Loan would cause a diminution in the value of their alleged collateral base.

Based on the foregoing, the Debtors submit that the requirements of Section 363(c)(2) have been satisfied and that they should be authorized to use Cash Collateral in accordance with the Budget.

**C.       The Waiver of Any Applicable Stay is Appropriate.**

For the reasons noted herein, the Debtors will suffer immediate and irreparable harm if the Debtors are not able to pay the expenses set forth in the Budget, pending a final hearing on the Motion. The terms of the Interim Order must become effective immediately to ensure that the Debtors will be able to obtain the proposed DIP Loan from the Lender and use the Cash Collateral provided by the DIP Loan to pay their urgent expenses. Based on the foregoing, the Debtors requests that any applicable stay, including the stay provided under FRBP 6004, be waived to allow the Interim Order to become immediately effective.

Case 4:17-bk-03351-SHG    Doc 7    Filed 04/03/17    Entered 04/03/17 18:35:33    Desc
Main Document       Page 25 of 244

## VI.    <u>CONCLUSION</u>

WHEREFORE, for all of the foregoing reasons, the Debtors respectfully request that the Court:

(1)     affirm the adequacy of the notice given;

(2)     grant the relief requested in the Motion on an interim basis;

(3)     enter the proposed Interim Order in substantially the form attached hereto as Exhibit A;

(4)     schedule a Final Hearing on the Motion to consider entry of a Final Order granting the relief requested in the Motion on a final basis; and

(5)     grant such further relief as the Curt deems just and proper.


DATED April 3, 2017.

FORRESTER & WORTH, PLLC


/s/ SCF (006342)
S. Cary Forrester
John R. Worth
Counsel for the Debtor


Copy of the foregoing emailed or
mailed on April 3, 2017, to the
following:

Dean Dinner
Nussbaum Gillis Dinner
14850 N. Scottsdale Rd. #450
Scottsdale AZ 85254
ddinner@ngdlaw.com

Genevieve G. Weiner
Samuel A. Newman
Gibson Dunn
333 S Grand Ave.
Los Angeles CA 90071-3197
GWeiner@gibsondunn.com
SNewman@gibsondunn.com

Larry Watson
Office of the U.S. Trustee
230 N. Central Ave. #204
Phoenix, AZ 85003
larry.watson@usdoj.gov

Robert A. Shull
Dickinson Wright PLLC
1850 N. Central Ave. # 1400
Phoenix AZ 85004
RShull@dickinsonwright.com

Steven Berger
Engelman Berger P.C.
3636 N Central Ave. #700
Phoenix AZ 85012
snb@eblawyers.com

Steven D. Jerome
Snell & Wilmer
One Arizona Center
400 E Van Buren
Phoenix AZ 85004-2202
sjerome@swlaw.com

Susan Freeman
Lewis Roca Rothgerber Christie
LLP
201 E. Washington Street, Suite
1200
Phoenix, AZ 85004
sfreeman@lrrc.com

/s/ Matthew Burns
Matthew Burns

# EXHIBIT "A"

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF ARIZONA

In re:

GV HOSPITAL MANAGEMENT, LLC,

Debtors.

Chapter 11

Case No. 4:17-bk-03351-SHG

**INTERIM ORDER (1) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364; (2) GRANTING LIENS AND SUPERPRIORITY CLAIMS PURSUANT TO 11 U.S.C. § 364; (3) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (4) SCHEDULING A FINAL HEARING; AND (5) GRANTING RELATED RELIEF**

Upon the motion, dated [April 3, 2017] [DE __ ] (the **"DIP Motion"**), of Green Valley Hospital, LLC ("**GVH**"), GV Hospital Management, LLC, ("**Management**" or "**Borrower**") and GV II Holdings, LLC ("**GVII**" and together with Management, the "**Debtors**"), as debtors and debtors in possession, in the above-referenced cases (the "**Chapter 11 Cases**"), seeking entry of an interim order (this **"Interim Order"**) pursuant to sections 105, 361, 362, 363(b), 363(c)(2), 364(c)(l), 364(c)(2), 364(c)(3), 364(d)(l), 364(e), 365, 507 and 552 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended, the **"Bankruptcy Code"**), and Rules 2002, 4001, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the **"Bankruptcy Rules"**) and Rule 4001-3 of the Local Rules of Bankruptcy Procedure for the District of Arizona (the "**Local Rules**"), that, among other things:

        (i)      authorizes Management, as Borrower, and GVH and GVII as guarantors (together, the "**Guarantors**") to enter into a senior secured, super-priority, multiple draw term

credit facility (such facility, the "**DIP Facility**") of up to $20,000,000 in aggregate principal amount pursuant to the terms of (x) this Interim Order, (y) that certain Senior Secured Super Priority Debtor in Possession Credit Agreement in substantially the form attached hereto as <u>Exhibit A</u> (as the same may be amended, restated, supplemented or otherwise modified from time to time and subject to the restrictions set forth herein, the "**DIP Credit Agreement**")[1] among the Debtors and Lateral U.S. Credit Opportunities Fund, L.P. as the lender (the "**DIP Lender**"), and Lateral Investment Management, not individually, but as the Agent for DIP Lender (the "**DIP Administrative Agent**" and together with the DIP Lender, the "**DIP Secured Parties**") and (z) any and all other Loan Documents (as defined in the DIP Credit Agreement) (together with the DIP Credit Agreement, collectively, the "**DIP Loan Documents**"), which, if approved on a final basis, would consist of $20,000,000 in new money funding (the "**DIP Loans**"), of which up to $450,000 shall be available upon entry of this Interim Order, plus the amount of any Lender Advances, subject to the terms and conditions of this Interim Order, the Final Order (as defined below) and the DIP Loan Documents (all DIP Loans made to or for the benefit or account of, and all guaranties issued by, any of the Debtors pursuant to the DIP Loan Documents, and all other obligations and liabilities of any of the Debtors arising under the DIP Loan Documents, including, without limitation, all Loan Document Obligations as defined in the DIP Credit Agreement, collectively, the "**DIP Obligations**");

(ii) approves the terms of, and authorizes and directs the Debtors to execute and deliver, and perform under, the DIP Loan Documents and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

---

[1] Unless otherwise specified, all capitalized terms used herein without definition shall have the respective meanings given such terms in the DIP Credit Agreement.

2

(iii)     authorizes and directs the Debtors to grant, in accordance with the relative priorities set forth herein (x) to the DIP Administrative Agent (for the benefit of itself and the other DIP Secured Parties) Liens on all of the DIP Collateral (as defined below) pursuant to sections 364(c) and (d) of the Bankruptcy Code, which Liens shall be senior to the Primed Liens (as defined below) but shall be junior to the Prepetition Senior Liens (as defined below) and (y) to the DIP Secured Parties super-priority administrative expense claims having recourse to all prepetition and post-petition property of the Debtors' estates, now owned or hereafter acquired (with the exception of Avoidance Actions (as defined below)) and proceeds thereof;

(iv)     authorizes the Debtors to use "cash collateral," as such term is defined in section 363 of the Bankruptcy Code (the "**<u>Cash Collateral</u>**"), including, without limitation, Cash Collateral in which the Prepetition First Lien Lender (as defined below) and/or the DIP Secured Parties have a Lien or other interest, in each case whether existing on the Petition Date, arising pursuant to this Interim Order or otherwise;

(v)     grants, as of the Petition Date and in accordance with the relative priorities set forth herein, certain adequate protection to the Prepetition First Lien Lender (as defined below), consisting of, among other things, Adequate Protection Liens (as defined below) and Adequate Protection Super-Priority Claims (as defined below);

(vi)     vacates the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of the DIP Loan Documents and this Interim Order;

(vii)     authorizes the DIP Secured Parties to exercise remedies upon the occurrence and continuance of an Event of Default (under and as defined in the DIP Loan Documents) after written notice and as further specified in this Interim Order;

3

(viii)    schedules a final hearing on the DIP Motion to be held within 30 days after the entry of this Interim Order (the **"Final Hearing"**) to consider entry of a final order acceptable in form and substance to the DIP Administrative Agent that grants all of the relief requested in the DIP Motion on a final basis (the **"Final Order"**); and

(ix)    waives any applicable stay (including under Bankruptcy Rule 6004) and provides for immediate effectiveness of this Interim Order.

Having considered the DIP Motion, the Omnibus Declaration of John Matuska in Support of First Day Motions , the DIP Credit Agreement and the evidence submitted at the interim hearing (the "**Interim Hearing**") on the DIP Motion; and in accordance with Bankruptcy Rules 2002, 4001(b), (c), and (d) and 9014 and all applicable Local Rules, notice of the DIP Motion and the Interim Hearing having been given; an Interim Hearing having been held and concluded on April [__], 2017; and it appearing that approval of the interim relief requested in the DIP Motion is necessary to avoid immediate and irreparable harm to the Debtors and their estates pending the Final Hearing and otherwise is fair and reasonable and in the best interests of the Debtors, their creditors, their estates and all parties in interest, and is essential for the continued operation of the Debtors' businesses; and after due deliberation and consideration, and for good and sufficient cause appearing therefor:

**IT IS FOUND, DETERMINED, ORDERED AND ADJUDGED[2], that:**

A.    **Petition Date**.    On [April 3, 2017] (the **"Petition Date"**), the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Arizona (the **"Bankruptcy Court"**).   The Debtors have continued in the management and operation of their business and property as debtors in possession

---

[2] Findings of fact shall be construed as conclusions of law, and conclusions of law shall be construed as findings of fact, pursuant to Bankruptcy Rule 7052.

4

pursuant to sections 1107 and 1108 of the Bankruptcy Code. No statutory committee of unsecured creditors (to the extent such committee is appointed, the "**Committee**"), trustee or examiner has been appointed in the Chapter 11 Cases.

B. **Jurisdiction and Venue**. The Bankruptcy Court has core jurisdiction over the Chapter 11 Cases, the DIP Motion and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Venue for the Chapter 11 Cases and proceedings on the DIP Motion is proper before the Bankruptcy Court pursuant to 28 U.S.C. §§ 1408 and 1409. The legal predicates for the relief sought herein are sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004 and 9014 and the Local Rules.

C. **Authority**. Each Debtor has duly authorized entry into the DIP Loan Documents to which it is a party by all necessary corporate action and, upon execution, the DIP Loan Documents will constitute a legal, valid and binding obligation of each Debtor in accordance with their terms.

D. **Notice**. The Interim Hearing was held pursuant to the authorization of Bankruptcy Rule 4001 and Local Bankruptcy Rule 4001-4. Notice of the Interim Hearing and the relief requested in the DIP Motion has been provided by the Debtors, whether by facsimile, electronic mail, overnight courier, hand delivery and/or telephone, on [April __, 2017], to certain parties in interest, including: (a) the Office of the United States Trustee for the District of Arizona (the "**U.S. Trustee**"); (b) counsel for the Prepetition First Lien Lender; (c) Permitted Senior Lenders (as defined below) (d) the Debtors' [twenty (20)] largest unsecured creditors; and (e) counsel to the Committee, if one is appointed. Such notice of the DIP Motion, the relief requested therein and the Interim Hearing is sufficient under the circumstances.

5

E. **Findings Regarding the DIP Facilities**.

(i)     <u>Need for Post-petition Financing</u>.  The Debtors have an immediate need to obtain the DIP Facility and use Cash Collateral, among other things, to permit the orderly continuation of the operation of their businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make capital expenditures, and to satisfy other working capital and operation needs.  The Debtors' access to sufficient working capital and liquidity through the use of borrowing under the DIP Facility and through the use of Cash Collateral is vital to the preservation and maintenance of the going concern value of the Debtors and their successful reorganization.

(ii)     <u>No Credit Available on More Favorable Terms</u>.  The Debtors have been and continue to be unable to obtain financing on more favorable terms from sources other than the DIP Secured Parties under the DIP Loan Documents.  The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense, or secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without incurring prohibitive litigation and/or execution expenses that would erode the value of the Debtors' estate and harm all parties in interest.  The Debtors are also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code without the Debtors granting to the DIP Secured Parties the rights, remedies, privileges, benefits and protections provided herein and in the DIP Loan Documents, including, without limitation, the DIP Liens and the DIP Super-Priority Claims (as defined below) (all of the foregoing, including the DIP Liens and the DIP Super-Priority Claims, collectively, the "**DIP Protections**").

6

(iii)

F.     **Adequate Protection for Prepetition Secured Parties**.  As of the Petition Date, GVH, as borrower, and Green Valley Medical Investments, LLLP, as lender, (the **"Prepetition First Lien Lender"**), were parties to that certain Loan and Security Agreement, dated as of January 10, 2012, (as amended, restated, supplemented or otherwise modified prior to the Petition Date, the "**Prepetition First Lien Credit Agreement**" and together with the other Loan Documents (as defined in the Prepetition First Lien Credit Agreement), in each case as amended, restated, supplemented or otherwise modified prior to the Petition Date, collectively, the **"Prepetition First Lien Loan Documents"** and the credit facility contemplated therein, the "**Prepetition First Lien Credit Facility**").  The Prepetition First Lien Credit Facility is secured by Liens granted to, or for the benefit of, the Prepetition First Lien Lender (the **"Prepetition First Liens"**) on the Debtors' property as provided for in the Prepetition Loan Documents (the "**Prepetition First Lien Collateral**").  The Prepetition First Lien Lender has consented to the DIP Liens and the use of Cash Collateral pursuant to the terms of the DIP Loan Documents, this Interim Order and the *Subordination and Intercreditor Agreement by and between Lateral U.S. Credit Opportunities Fund, L.P. and Green Valley Medical Investments, LLP* (the "**Subordination Agreement**").  The Prepetition First Lien Lender is entitled to the adequate protection as set forth herein pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code for any Diminution in Value (as defined below), to the extent permitted by the Subordination Agreement.  Based on the Motion and on the record presented to the Bankruptcy Court at the Interim Hearing, the terms of the proposed adequate protection arrangements and use of the Cash Collateral are fair and reasonable, reflect the Debtors' prudent exercise of business judgment and constitute reasonably equivalent value and fair consideration for the Prepetition First Lien Lender's consent thereto.  The

7

Prepetition First Lien Lender consented to the entry of this Interim Order and the relief provided herein.

G. **Business Judgment and Good Faith Pursuant to Section 364(e)**.

(i)     The DIP Secured Parties have indicated a willingness to provide post-petition secured financing via the DIP Facility to the Debtors in accordance with the DIP Loan Documents and this Interim Order.

(ii)     The terms and conditions of the DIP Facility pursuant to the DIP Loan Documents and this Interim Order, and the fees, costs, expenses and attorney fees paid and to be paid thereunder, are fair, reasonable, and the best available under the circumstances, reflect the Debtors' exercise of prudent business judgment consistent with their respective fiduciary duties, and are supported by reasonably equivalent value and consideration.

(iii)     Based on the record presented to the Bankruptcy Court at the Interim Hearing, the DIP Facility and the DIP Loan Documents were negotiated in good faith and at arms' length among the Debtors, on the one hand, and the DIP Secured Parties, on the other hand, each with the assistance and counsel of their respective advisors, and all of the DIP Obligations shall be deemed to have been extended by the DIP Secured Parties and their respective affiliates for valid business purposes and uses and in good faith, as that term is used in section 364(e) of the Bankruptcy Code, and in express reliance upon the protections offered by section 364(e) of the Bankruptcy Code, and the DIP Liens, the DIP Super-Priority Claims and the other DIP Protections shall be entitled to the full protection of section 364(e) of the Bankruptcy Code in the event this Interim Order or any other order or any provision hereof or thereof is vacated, reversed, amended or modified, on appeal or otherwise.

8

H.  **Relief Essential; Best Interest**.  For the reasons stated above, the Debtors have requested immediate entry of this Interim Order pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2) and the Local Rules.  Absent granting the relief set forth in this Interim Order, the Debtors' estates and their ability to successfully reorganize will be immediately and irreparably harmed. Consummation of the DIP Facility in accordance with this Interim Order and the DIP Loan Documents is therefore in the best interests of the Debtors' estates consistent with their respective fiduciary duties.

**NOW, THEREFORE**, on the DIP Motion and the record before the Bankruptcy Court with respect to the DIP Motion, and with the consent of the Debtors, the Prepetition First Lien Lender, and the DIP Secured Parties as to the form and entry of this Interim Order, and good and sufficient cause appearing therefor,

**IT IS ORDERED** that:

1.  **Motion Granted**.  The DIP Motion is granted in accordance with the terms and conditions set forth in this Interim Order and the DIP Loan Documents.  Any objections to the DIP Motion with respect to the entry of this Interim Order that have not been withdrawn, waived or settled, are hereby denied and overruled.

2.  **DIP Loan Documents and DIP Protections**.

(a)  <u>Approval of DIP Loan Documents</u>.  The Debtors are expressly and immediately authorized and directed to (i) establish the DIP Facility, (ii) execute, deliver and perform under the DIP Loan Documents and to incur the DIP Obligations in accordance with, and subject to, the terms of this Interim Order and the DIP Loan Documents, and (iii) execute, deliver and perform under all other instruments, certificates, agreements and documents which may be required or necessary for the performance by any of the Debtors under the DIP Facility and the

9

creation and perfection of the DIP Liens described in, and provided by, this Interim Order and the DIP Loan Documents. The Debtors are hereby authorized to do and perform all acts, pay the principal, interest, fees, costs, expenses, attorneys fees and other amounts described in the DIP Loan Documents as such have become due or become due pursuant to the DIP Loan Documents and this Interim Order, including, without limitation, all structuring fees, closing fees, administrative fees, arrangement fees, fronting fees, commitment or backstop fees, letter of credit fees and reasonable attorneys' and financial advisors' fees and disbursements arising under the DIP Loan Documents and this Interim Order, which amounts shall not be subject to further approval of the Bankruptcy Court and shall be non-refundable; provided, however, that the payment of the fees and expenses of the Lender Professionals (as defined below) incurred after the Petition Date shall be subject to the provisions of Paragraph [17(a)]. Upon their execution and delivery, the DIP Loan Documents shall represent valid and binding obligations of the Debtors enforceable against each Debtor in accordance with their terms. Each officer of any Debtor acting singly is hereby authorized to execute and deliver each of the DIP Loan Documents, such execution and delivery to be conclusive of their respective authority to act in the name of and on behalf of the respective Debtor.

(b)  **Authorization to Incur DIP Obligations**.  To enable the Debtors to continue to operate their businesses, during the period from the entry of this Interim Order through and including the earlier of (i) the entry of a Final Order or (ii) the date that is forty-five (45) days after the entry of this Interim Order if the Final Order Entry Date shall not have occurred by such date (the "**Interim Period**"), and subject to the terms and conditions of this Interim Order and the DIP Loan Documents, including, without limitation, Sections 3.14, 5.10 and 6.12 of the DIP Credit Agreement (as the same may be modified, supplemented or updated from time to time, the

"**Budget Covenants**"), the Borrower is hereby authorized to borrow DIP Loans under the DIP Facility in an aggregate outstanding principal amount not to exceed $450,000. Following the expiration of the Interim Period, the Borrower's authority to borrow further DIP Loans will be governed by the terms of the Final Order.

(c)       Application of DIP Facility and DIP Collateral Proceeds. The proceeds of the DIP Facility and DIP Collateral (in each case net of any amounts used to pay fees, principal, interest, costs and expenses of the DIP Facility pursuant to, and in accordance with, the DIP Loan Documents and this Interim Order) shall be used in accordance with the terms and conditions of the DIP Loan Documents and this Interim Order, including, without limitation, the Budget Covenants, solely for (i) working capital; (ii) other general corporate purposes of the Debtors (including intercompany loans and investments solely to the extent permitted by the Budget, the DIP Loan Documents and this Interim Order); and (iii) the costs of administration of the Chapter 11 Cases. Without limiting the foregoing, the Debtors shall not be permitted to make any payments on account of any prepetition debt or obligation prior to the effective date of any confirmed chapter 11 plan with respect to such Debtor, except with respect to the prepetition obligations as set forth in this Interim Order or as otherwise provided in any "first day" order entered by the Bankruptcy Court (which "first day" orders shall be in form and substance reasonably acceptable to the DIP Administrative Agent) or as otherwise provided in the DIP Credit Agreement. A copy of the initial approved Budget is attached as [Exhibit B].

(d)       Conditions Precedent. The DIP Secured Parties shall have no obligation to make any DIP Loan or make any other extension of credit or financial accommodation in respect of the DIP Facility or otherwise during the Interim Period unless and until all conditions precedent to the making of any such DIP Loan or other extension of credit or financial accommodation under

11

the DIP Loan Documents and this Interim Order have been satisfied in full or waived by the requisite DIP Secured Parties in accordance with the DIP Loan Documents and this Interim Order.

(e) <u>DIP Liens</u>. Effective immediately upon the entry of this Interim Order, and subject to the relative priorities among the DIP Secured Parties, the Prepetition First Lien Lender, and the Permitted Senior Lenders (as defined below), in each case as set forth more fully in this Interim Order, the DIP Administrative Agent is hereby granted, for the benefit of the DIP Secured Parties, the following Liens (which shall immediately, and without any further action by any Person, be valid, binding, permanent, perfected, continuing, enforceable and non-avoidable) on all property of the Debtors, now existing or hereafter acquired, including, without limitation, all cash and cash equivalents, and any investment in such cash or cash equivalents, money, motor vehicles and rolling stock, inventory, goods, accounts receivable, other rights to payment, intercompany loans and other investments, investment property, contracts, contract rights, properties, plants, equipment, machinery, general intangibles, payment intangibles, accounts, deposit accounts, documents, instruments, chattel paper, documents of title**,** letters of credit, letter of credit rights, supporting obligations, leases and other interests in leaseholds, real property, fixtures, patents, copyrights, trademarks, trade names, other intellectual property, intellectual property licenses, capital stock or equity interests of subsidiaries, tax refunds, insurance proceeds, commercial tort claims (without the need to comply with any requirement, under the Uniform Commercial Code or otherwise, to specifically identify any such commercial tort claim), membership interests and other equity ownership interests, all other Collateral (as defined in the DIP Credit Agreement) and all other "property of the estate" (within the meaning of the Bankruptcy Code) of any kind or nature, real or personal, tangible, intangible or mixed, now existing or hereafter acquired or created, and all rents, products, substitutions, accessions, profits, replacements and cash and non-

12

cash proceeds of all of the foregoing (all of the foregoing collateral collectively referred to as the

"**DIP Collateral**," and all such Liens granted to the DIP Administrative Agent as provided in the

DIP Loan Documents and for the benefit of the DIP Secured Parties in respect of the Secured

Obligations under, and as defined in the DIP Credit Agreement, each as pursuant to this Interim

Order and the DIP Loan Documents, the "**DIP Liens**"):

> (I)     pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected, binding, continuing, enforceable, non-avoidable, first priority Lien on all unencumbered DIP Collateral; provided, however, that DIP Collateral shall not include the proceeds of the Debtors' claims and causes of action under sections 502(d), 544, 545, 547, 548, 549, 550, 551 and 553 and 724(a) of the Bankruptcy Code, and any other avoidance or similar action under the Bankruptcy Code or similar state law ("**Avoidance Actions**"), whether received by judgment, settlement or otherwise;

> (II)    pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected junior Lien upon all DIP Collateral (including, without limitation, Cash Collateral) that is subject to a Permitted Senior Lien (as such term is defined in the DIP Loan Documents).[3] The holders of Permitted Senior Liens are sometimes referred to herein as the "**Permitted Senior Lenders**"; and

> (III)   pursuant to section 364(d)(1) of the Bankruptcy Code, a perfected first priority, senior priming Lien on all DIP Collateral that is senior to (x) the existing Prepetition First Liens in favor of the Prepetition First Lien Lender, or (y) to the maximum extent permitted under applicable law, any existing Liens in favor of any other person or entity (other than the Prepetition Senior Liens), including, without limitation, all Liens junior to the Prepetition First Liens (the Liens referenced in clauses (x) and (y), collectively, the "**Primed Liens**"), which Primed Liens, together with any Liens granted on or after the Petition Date to provide adequate protection in respect of any Primed Liens, shall be

---

[3]  "Permitted Senior Lien" is defined in the DIP Credit Agreement to mean: "[T]o the extent not subordinated or invalidated by order of the Bankruptcy Court, any valid, enforceable, and non-avoidable Lien that was perfected prior to the Petition Date and that secure obligations identified on Schedule 6.02, except to the extent the holders will be paid off on or prior to the Effective Date."

primed by and made subject and subordinate to the perfected first priority senior priming DIP Liens.

(f)     DIP Lien Priority.  Notwithstanding anything to the contrary contained in this Interim Order or the other DIP Loan Documents, and for the avoidance of doubt, the DIP Liens granted to the DIP Administrative Agent (for the DIP Secured Parties) shall in each and every case be first priority senior Liens that (i) are subject only to the Prepetition Senior Liens and to the extent provided in the provisions of this Interim Order and the DIP Loan Documents, shall also be subject to the Carve-Out, and (ii) except as provided in clause (i), are senior to all other post-petition Liens of any other person or entity (including, without limitation, the Primed Liens and the Adequate Protection Liens).  The DIP Liens on any real property or interests in real property owned by the Debtors shall be considered "First Mortgages" under that *Green Valley Hospital Campus Declaration of Covenants, Conditions, Easements and Restrictions*, recorded in Pima County, Arizona, County Recorder's Office as Document No. 20151380758, as amended.  The DIP Liens and the DIP Super-Priority Claims (i) shall not be subject to sections 510, 549, 550 or 551 of the Bankruptcy Code, or, subject to the entry of the Final Order, section 506(c) of the Bankruptcy Code, (ii) shall not be subordinate to, or *pari passu* with, (x) any Lien that is avoided and preserved for the benefit of the Debtors and their respective estates under section 551 of the Bankruptcy Code, (y) any Liens arising after the Petition Date, including, without limitation, any Liens granted or ordered by the Bankruptcy Court at any time in the Chapter 11 Cases, or (z) any intercompany or affiliate Liens of the Debtors, and (iii) shall be valid and enforceable against any trustee or any other estate representative appointed in any of the Chapter 11 Cases, upon the conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code or in any other proceedings related to any of the foregoing (each, a "**Successor Case**"), and/or upon the dismissal of any of the Chapter 11 Cases.

14

(g)    <u>Enforceable Obligations</u>.  The DIP Loan Documents shall constitute and evidence the valid and binding DIP Obligations of the Debtors, which DIP Obligations shall be enforceable against such Debtors, their estates and any successors thereto (including, without limitation, any trustee or other estate representative in any Successor Case), and their creditors, in accordance with their terms.  No obligation, payment, transfer or grant of security under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including, without limitation, under sections 502(d), 544, 547, 548 or 549 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any avoidance, reduction, setoff, recoupment, offset, recharacterization, subordination (whether equitable, contractual or otherwise) counterclaim, cross-claim, defense or any other challenge under the Bankruptcy Code or any applicable law or regulation by any person or entity.

(h)    <u>Super-Priority Administrative Expense Claim Status</u>.  In addition to the DIP Liens granted herein, (1) effective immediately upon entry of this Interim Order, all of the DIP Obligations authorized to be incurred by the Debtors pursuant to this Interim DIP Order and (2) effective immediately upon entry of the Final Order, all of the DIP Obligations shall constitute allowed super-priority administrative expense claims pursuant to section 364(c)(1) of the Bankruptcy Code, which shall have priority, subject only to the payment of the Carve-Out to the extent specifically provided in the DIP Loan Documents and this Interim Order, over all administrative expense claims, adequate protection and other diminution claims (including the Adequate Protection Super-Priority Claims), unsecured claims and all other claims against the any of the Debtors, now existing or hereafter arising, of any kind or nature whatsoever, including,

15

without limitation, administrative expenses or other claims of the kinds specified in, or ordered pursuant to, sections 105, 326, 328, 330, 331, 503(a), 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 and 1114 or any other provision of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment Lien or other non-consensual Lien, levy or attachment (the "**DIP Super-Priority Claims**"). The DIP Super-Priority Claims shall for purposes of section 1129(a)(9)(A) of the Bankruptcy Code be considered administrative expenses allowed under section 503(b) of the Bankruptcy Code and shall be payable from and have recourse to all prepetition and post-petition property of the Debtors and all proceeds thereof; provided, however, that the DIP Super-Priority Claims shall not have recourse to the Debtors' Avoidance Actions or the proceeds thereof. Other than as provided in the DIP Loan Documents and this Interim Order with respect to the Carve-Out, and, prior to the entry of a Final Order, any valid 506(c) claim, no costs or expenses of administration, including, without limitation, professional fees allowed and payable under sections 328, 330, 331 and 363 of the Bankruptcy Code, or otherwise, that have been or may be incurred in these proceedings, or in any Successor Case, and no priority claims are, or will be, senior to, prior to or on a parity with the DIP Liens, the DIP Super-Priority Claims, or the DIP Obligations, or with any other claims of the DIP Secured Parties arising hereunder.

3.     **Authorization to Use Proceeds of DIP Facility, Including Cash Collateral.**

Subject to the terms and conditions of this Interim Order and the DIP Loan Documents, including without limitation, the Budget Covenants, (a) the Debtors are authorized to use proceeds of DIP Loans from and after the Effective Date (as defined in the DIP Credit Agreement), and (b) the Debtors are authorized to use all Cash Collateral, and the Debtors shall be enjoined and prohibited from, at any time, using proceeds of DIP Loans or Cash Collateral except in accordance with the terms and conditions of this Interim Order and the DIP Loan Documents. The Debtors' right to use proceeds of DIP Loans, DIP Collateral, and Cash Collateral shall terminate (i)

16

automatically upon the occurrence of the Maturity Date (under and as defined in the DIP Credit Agreement) or (ii) immediately upon notice to such effect by the DIP Administrative Agent to any of the Debtors after the occurrence and during the continuance of an Event of Default (the applicable termination date specified in clause (i) or (ii) above, the "**Termination Date**").

4.      **Adequate Protection for Prepetition First Lien Lender**.  As adequate protection for the interests of the Prepetition First Lien Lender in the Prepetition First Lien Collateral (including Cash Collateral) for, and in an aggregate amount equal to, the diminution in value (collectively, "**Diminution in Value**") of such interests from and after the Petition Date, calculated in accordance with section 506(a) of the Bankruptcy Code, resulting from the use, sale or lease by any of the Debtors of the applicable Prepetition First Lien Collateral (including Cash Collateral), the granting of the DIP Liens, the subordination of the Prepetition First Liens thereto and to the Carve-Out, or the imposition or enforcement of the automatic stay of section 362(a), the Prepetition First Lien Lender shall receive the following adequate protection (collectively referred to as the "**Prepetition First Lien Lender' Adequate Protections**"):

(a)      Adequate Protection Liens.  Solely to the extent of any aggregate post-petition Diminution in Value of the prepetition interests of the Prepetition First Lien Lender in the Prepetition First Lien Collateral, the Prepetition First Lien Lender is hereby granted, subject to the terms and conditions set forth below, pursuant to sections 361, 363(e) and 364(d) of the Bankruptcy Code, valid, perfected and unavoidable senior Liens (including replacement Liens) upon all of the DIP Collateral (the "**Adequate Protection Liens**"), which Adequate Protection Liens on such DIP Collateral shall be subject and subordinate only to the DIP Liens, the Prepetition Senior Liens, and the payment of the Carve-Out to the extent expressly provided in the DIP Loan Documents and this Interim Order.

Case 4:17-bk-03351-SHG    Doc 7    Filed 04/03/17    Entered 04/03/17 18:35:33    Desc
Main Document    Page 46 of 244

(b)     <u>Adequate Protection Super-Priority Claims</u>.  Solely to the extent of any aggregate post-petition Diminution in Value, the Prepetition First Lien Lender is hereby granted, subject to the payment of the DIP Super-Priority Claims and the Carve-Out to the extent provided herein and in the DIP Loan Documents, allowed super-priority administrative expense claims (the "**Adequate Protection Super-Priority Claims**") as provided for in section 507(b) of the Bankruptcy Code, immediately junior to the DIP Super-Priority Claims and payable from and having recourse to all prepetition and post-petition property of the Debtors, with the exception of the Debtors' Avoidance Actions, and all proceeds thereof; <u>provided</u>, <u>however</u>, that the Prepetition First Lien Lender shall not receive or retain any payments, property or other amounts in respect of the Adequate Protection Super-Priority Claims unless and until (x) all DIP Obligations have indefeasibly been paid in full in cash, and (y) all Commitments under the DIP Loan Documents have been irrevocably terminated (the conditions described in clauses (x) and (y), collectively, "**Paid in Full**" or "**Payment in Full**").

(c)     <u>Right to Seek Additional Adequate Protection</u>.  Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Bankruptcy Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition First Lien Lender. However, the Prepetition First Lien Secured Party and any Prepetition Senior Lender may request further or different adequate protection, and the Debtors or any other party in interest may contest any such request (notwithstanding their agreement to otherwise consent to the terms of this Order); <u>provided</u> that any such further or different adequate protection shall at all times be subordinate and junior to the claims and Liens of the DIP Secured Parties granted under this Interim Order and the DIP Loan Documents.

(d)    <u>Consent to Priming and Adequate Protection</u>.  The Prepetition First Lien Lender consents to the adequate protection and the priming provided for herein.

5.    **Automatic Post-petition Lien Perfection**.  This Interim Order shall be sufficient and conclusive evidence of the validity, enforceability, perfection and priority of the DIP Liens and the Adequate Protection Liens without the necessity of (a) filing or recording any financing statement, deed of trust, mortgage, or other instrument or document which may otherwise be required under the law of any jurisdiction, (b) obtaining consents from any landlord, licensor, or other party in interest, (c) complying with any requirement, under the Uniform Commercial Code or otherwise, to specifically identify any commercial tort claim, or (d) taking any other action to validate or perfect the DIP Liens and the Adequate Protection Liens or to entitle the DIP Liens and the Adequate Protection Liens to the priorities granted herein.  Notwithstanding the foregoing, each of the DIP Administrative Agent and Prepetition First Lien Lender may, each in their sole discretion, file financing statements, mortgages, security agreements, notices of Liens and other similar documents, and is hereby granted relief from the automatic stay of section 362 of the Bankruptcy Code in order to do so, and all such financing statements, mortgages, security agreements, notices and other agreements or documents shall be deemed to have been filed or recorded at the time of and on the Petition Date.  Unless otherwise ordered by the Bankruptcy Court, the Debtors shall execute and deliver to the DIP Administrative Agent and/or the Prepetition First Lien Lender, as applicable, all such financing statements, mortgages, notices and other documents as such parties may reasonably request to evidence, confirm, validate or perfect, or to insure the contemplated priority of, the DIP Liens and the Adequate Protection Liens, as applicable, granted pursuant hereto.  Without limiting the foregoing, each of the DIP Administrative Agent and Prepetition First Lien Lender, each in its discretion, may file a

19

photocopy of this Interim Order as a financing statement with any recording officer designated to file financing statements or with any registry of deeds or similar office in any jurisdiction in which any of the Debtors has real or personal property, and in such event, the subject filing or recording officer shall be authorized to file or record such copy of this Interim Order. Any provision of any lease, loan document, easement, use agreement, proffer, covenant, license, contract, organizational document, or other instrument or agreement that requires the payment of any fees or obligations to any governmental entity or non-governmental entity in order for any Debtor to pledge, grant, mortgage, sell, assign, or otherwise transfer any fee or leasehold interest or the proceeds thereof or other DIP Collateral, is and shall be deemed to be inconsistent with the provisions of the Bankruptcy Code, and shall have no force or effect with respect to the Liens on such leasehold interests or other applicable DIP Collateral or the proceeds of any assignment and/or sale thereof by the respective Debtor, in favor of the DIP Secured Parties in accordance with the terms of the DIP Loan Documents and this Interim Order. To the extent that the Prepetition First Lien Lender is listed as loss payee under any of the Debtors' insurance policies or is the secured party under any Prepetition First Lien Loan Document, the DIP Administrative Agent shall also be deemed to be the loss payee under the Debtors' insurance policies and the secured party under each such Prepetition First Lien Loan Document, shall have all rights and powers attendant to that position (including, without limitation, rights of enforcement) and shall act in that capacity and distribute any proceeds recovered or received first, for the benefit of the DIP Secured Parties in accordance with the DIP Loan Documents and this Interim Order, and second, subsequent to indefeasible Payment in Full of all DIP Obligations, for the benefit of the Prepetition First Lien Lender. The Prepetition First Lien Lender shall serve as agent for the DIP Administrative Agent for purposes

20

of perfecting its Liens on all DIP Collateral that is of a type such that perfection of a Lien therein may be accomplished only by possession or control by a secured party.

6. **Carve Out**. Subject to the terms and conditions contained in this Paragraph [6], each of the DIP Liens, DIP Super-Priority Claims, Prepetition First Liens, Adequate Protection Liens and Adequate Protection Super-Priority Claims shall be subject and subordinate to payment of the Carve-Out (as defined below) solely in the event of the delivery of a Carve-Out Trigger Notice (as defined below) after the occurrence and during the continuance of an Event of Default under, and as defined in, the DIP Loan Documents:

(a) For purposes of this Interim Order, "**Carve-Out**" means (i) all unpaid fees required to be paid in the Chapter 11 Cases to the clerk of the Bankruptcy Court and to the Office of the United States Trustee under 28 U.S.C. § 1930(a)(6), in such amount agreed to by the Office of the United States Trustee or as determined by the Bankruptcy Court, whether arising prior to or after the delivery of the Carve-Out Trigger Notice; (ii) fees, disbursements, costs and expenses which are incurred after the Petition Date and before the delivery of a Carve-Out Trigger Notice in an amount not to exceed the amounts set forth in the Budget for each Professional (as defined below), less any amount actually paid to each such Professional, retained by the Debtors and any Committee pursuant to Bankruptcy Code sections 327, 330, 363 and 1103 (collectively, the "**Professionals**"), to the extent allowed at any time by the Bankruptcy Court and owed pursuant to such Professionals' respective engagement letters; (iii) the fees, disbursements, costs and expenses of Professionals in an aggregate amount not to exceed [$200,000] that are incurred after the delivery of a Carve-Out Trigger Notice and which are ultimately allowed by the Bankruptcy Court (the "**Carve-Out Cap**"). The term **"Carve-Out Trigger Notice"** shall mean a written notice delivered by the DIP Administrative Agent to the Debtors' lead counsel, the U.S.

Case 4:17-bk-03351-SHG   Doc 7   Filed 04/03/17   Entered 04/03/17 18:35:33   Desc
Main Document      Page 50 of 244

Trustee, and lead counsel to any Committee appointed in the Chapter 11 Cases, which notice may be delivered at any time following the occurrence and during the continuation of any Event of Default under the DIP Loan Documents, expressly stating that the Carve-Out (and the Carve-Out Cap) is invoked.

(b)     Following the delivery of the Carve-Out Trigger Notice after the occurrence and during the continuance of any Event of Default under the DIP Loan Documents, any payments actually made pursuant to Bankruptcy Code sections 327, 328, 330, 331, 363, 503 or 1103 or otherwise, to Professionals shall (i) not be paid from the proceeds of any DIP Loan, DIP Collateral, or Cash Collateral until such time as all retainers, if any, held by such Professionals have been reduced to zero, and (ii) in the case of any payments made on account of any fees and expenses described in clause (iii) of the definition of Carve-Out, reduce the Carve-Out Cap on a dollar-for-dollar basis.

(c)     Notwithstanding any provision in this Paragraph [6] to the contrary, no portion of the Carve-Out, Cash Collateral, DIP Collateral, or proceeds of the DIP Facility shall be utilized for the payment of fees and disbursements of Professionals to the extent restricted under Paragraph [14] hereof.

(d)     Nothing herein shall be construed as consent to the allowance of any Professional fees or expenses of any of the Debtors, any Committee, any other official or unofficial committee in the Chapter 11 Cases, or of any other person or entity, or shall affect the right of any DIP Secured Party to object to the allowance and payment of such fees and expenses.

7.     **Waiver of Section 506(c) Claims**.  Subject to entry of the Final Order, as a further condition of the DIP Facility and any obligation of the DIP Secured Parties to make credit extensions pursuant to the DIP Loan Documents (and their consent to the payment of the Carve-

Case 4:17-bk-03351-SHG    Doc 7    Filed 04/03/17    Entered 04/03/17 18:35:33    Desc
Main Document    Page 51 of 244

Out to the extent provided herein), no costs or expenses of administration of the Chapter 11 Cases or any Successor Case shall be charged against or recovered from or against any or all of the DIP Secured Parties, the DIP Collateral, and the Cash Collateral pursuant to section 506(c) of the Bankruptcy Code or otherwise, without the prior written consent of the DIP Administrative Agent, and no such consent shall be implied from any action, inaction, or acquiescence of any or all of the DIP Secured Parties.

8. **After-Acquired Property**. Except as otherwise provided in this Interim Order, pursuant to section 552(a) of the Bankruptcy Code, all property acquired by any of the Debtors on or after the Petition Date is not, and shall not be, subject to any Lien of any person or entity resulting from any security agreement entered into by any of the Debtors prior to the Petition Date including, without limitation, in respect of the Prepetition First Lien Credit Facility (other than with respect to the replacement Liens that form a portion of the Adequate Protection Liens), except to the extent that such property constitutes proceeds of property of any Debtor that is subject to a valid, enforceable, perfected, and unavoidable Lien as of the Petition Date which is not subject to subordination under the Bankruptcy Code or other provisions or principles of applicable law.

9. **Protection of DIP Secured Parties' Rights**.

(a) Until such time that all DIP Obligations have been Paid in Full, the Prepetition First Lien Lender shall (i) not exercise any right or remedy relating to the DIP Collateral, including without limitation, seeking relief from the automatic stay, seeking any sale, realization upon repossession or liquidation of any property, or taking any action to foreclose upon or recover in connection with the Liens granted in respect of the Prepetition First Lien Credit Facility (including, without limitation, the Prepetition First Liens and the Adequate Protection Liens), or otherwise exercise remedies against any DIP Collateral, (ii) be deemed to have

23

consented to any and all releases of DIP Collateral authorized under the DIP Loan Documents or otherwise consented to by the requisite DIP Secured Parties (provided that the Liens of the Prepetition First Lien Lender attach to the proceeds of any disposition of such released DIP Collateral with the same priorities as provided herein), and (iii) not file any further financing statements, trademark filings, copyright filings, mortgages, notices of Lien or similar instruments, or otherwise take any action to perfect their Liens on the DIP Collateral unless, solely as to this clause (iii) and solely with respect to the Adequate Protection Liens, the DIP Administrative Agent files financing statements or other documents to perfect the Liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable Liens as of the Petition Date.

(b)     Unless the DIP Administrative Agent shall have provided its prior written consent or all DIP Obligations have been indefeasibly Paid in Full (or will be indefeasibly Paid in Full upon entry of a final, non-appealable order approving indebtedness described in clause (i) of this subsection (b)), there shall not be entered in these proceedings, or in any Successor Case, any order which authorizes any of the following: (i) the obtaining of credit or the incurring of indebtedness that is secured by a security, mortgage, or collateral interest or other Lien on all or any portion of the DIP Collateral and/or that is entitled to administrative priority status, in each case which is superior to or *pari passu* with the DIP Liens, DIP Super-Priority Claims and other DIP Protections granted pursuant to this Interim Order to the DIP Secured Parties; or (ii) the use of Cash Collateral for any purpose other than to indefeasibly Pay in Full the DIP Obligations or as otherwise permitted in the DIP Loan Documents and this Interim Order.

(c)     The Debtors (and/or their respective legal and financial advisors in the case of clauses (ii) through (iv) below) will (i) maintain books, records and accounts to the extent and

Case 4:17-bk-03351-SHG    Doc 7    Filed 04/03/17    Entered 04/03/17 18:35:33    Desc
Main Document      Page 53 of 244

as required by the DIP Loan Documents, (ii) cooperate, consult with, and provide to the DIP Administrative Agent all such information as required or allowed under the DIP Loan Documents or the provisions of this Interim Order, (iii) permit representatives of the DIP Administrative Agent such rights to visit and inspect any of the Debtors' respective properties, to examine and make abstracts or copies from any of their books and records, to conduct a collateral audit and analysis of their inventory and accounts, to tour the Debtors' business premises and other properties, and to discuss, and provide advice with respect to, their affairs, finances, properties, business operations and accounts with any of the Debtors' respective officers, employees and independent public accountants as and to the extent required by the DIP Loan Documents, and (iv) permit representatives of the DIP Administrative Agent to consult with the Debtors' respective management and advisors on matters concerning the general status of the Debtors' businesses, financial condition and operations.

10. **Proceeds of Subsequent Financing**. Without limiting the provisions and protections of Paragraph [9] above, if at any time prior to the indefeasible Payment in Full of all DIP Obligations (including subsequent to the confirmation of a chapter 11 plan with respect to one or more of the Debtors), any of the Debtors' estates, any trustee, any examiner with enlarged powers or any responsible officer subsequently appointed, shall obtain credit or incur debt pursuant to sections 364(b), 364(c), 364(d) or any other provision of the Bankruptcy Code (except 506(c) until entry of a Final Order) in violation of the DIP Loan Documents, then all of the cash proceeds derived from such credit or debt and all Cash Collateral shall immediately be turned over to the DIP Administrative Agent, until indefeasible Payment in Full of the DIP Obligations in accordance with the DIP Loan Documents.

Case 4:17-bk-03351-SHG    Doc 7    Filed 04/03/17    Entered 04/03/17 18:35:33    Desc
Main Document    Page 54 of 244

11.     **Cash Collection**.   With the exception of Government Health-Care-Insurance Receivables, and except to the extent otherwise provided herein or in the DIP Loan Documents, all cash collections (including, but not limited to, payments from customers with respect to accounts receivable) constituting proceeds of DIP Collateral shall be directed to lock-box and/or deposit accounts ("**Cash Collection Accounts**") under the dominion and control of the DIP Administrative Agent pursuant to deposit account control agreements or other structure reasonably satisfactory to the DIP Administrative Agent and in compliance with the Cash Management Order (as defined below).   Upon the direction of the DIP Administrative Agent at any time after the occurrence of an Event of Default and the lapse of any notice period specified herein or in the DIP Loan Documents, all proceeds in the Cash Collection Accounts shall be remitted to the DIP Administrative Agent until Payment in Full of the DIP Obligations, and the DIP Administrative Agent shall take all action that is necessary or appropriate to effectuate the foregoing.   Unless otherwise agreed to in writing by the DIP Administrative Agent, the Debtors shall maintain no accounts except those identified in any order of the Bankruptcy Court approving the Debtors' cash management system (the "**Cash Management Order**").   The Debtors and the financial institutions where the Debtors' cash collection accounts are maintained (including those accounts identified in any Cash Management Order), are authorized and directed to remit funds in such Cash Collection Accounts upon receipt of any direction to that effect from the DIP Administrative Agent.   The Debtors are authorized to incur obligations and liabilities for treasury, depositary or cash management services, including without limitation, overnight overdraft services, controlled disbursement, automated clearinghouse transactions, return items, overdrafts and interstate depository network services provided on a post-petition basis by any financial institution at which any Cash Collection Account is maintained; provided, however, that (i) any Lien securing any

26

such obligations shall be junior to the DIP Lien on the funds in the cash collection accounts at such financial institution, and (ii) except to the extent otherwise required by the Bankruptcy Court, nothing herein shall require any DIP Secured Party to incur any overdrafts or provide any such services or functions to the Debtors. All account receivables and their proceeds comprising any of (i) Medicare and Medicaid receivables, (ii) third-party insurance payor receivables, or (iii) patient receivables, must be swept, on a daily basis, and deposited when received from any respective government or other "lock-box" account into a Cash Collection Account, as directed by the DIP Secured Parties, and subject to a deposit account control agreement(s) in form and substance satisfactory to the DIP Secured Parties. With the exception of the lockbox into which Government Health-Care Insurance Receivables are initially deposited, all of such Debtors' bank account(s) shall be deemed Cash Collection Accounts. As provided in the DIP Loan Documents and for the avoidance of doubt, it shall be an Event of Default under the DIP Loan Documents and this Interim Order if the United States, any governmental unit, or any agency or representative of the United States or any governmental unit, asserts or threatens to assert an "administrative freeze," other stay, or cessation of Medicare and/or Medicaid receivable payments, which Event of Default shall entitle the DIP Secured Parties to deliver an Enforcement Notice (as defined below) in accordance with the terms of the DIP Loan Documents and this Interim Order.

12. **Disposition of DIP Collateral**. The Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the DIP Collateral without the prior written consent of the DIP Administrative Agent under the DIP Loan Documents (and no such consent shall be implied from any other action, inaction or acquiescence by any DIP Secured Party or any order of this Bankruptcy Court), except for sales of inventory in the ordinary course of business or except as otherwise permitted in the DIP Loan Documents and this Interim Order and approved

27

by the Bankruptcy Court to the extent required under applicable bankruptcy law. Except to the extent otherwise expressly provided in the DIP Loan Documents, all proceeds from the sale, transfer, lease, encumbrance or other disposition of any DIP Collateral outside the ordinary course of business shall be remitted to the DIP Administrative Agent until Payment in Full of the DIP Obligations in accordance with the terms of the DIP Loan Documents. Proceeds from the sale of any DIP Collateral in the ordinary course of business shall be promptly deposited into one or more Cash Collection Accounts.

13. **Events of Default**.

(a) <u>Rights and Remedies Upon Event of Default</u>. Any automatic stay otherwise applicable to the DIP Secured Parties is hereby modified, without requiring prior notice to or authorization of the Bankruptcy Court, to the extent necessary to permit the DIP Secured Parties to exercise (i) immediately upon the occurrence and during the continuance of an Event of Default, all rights and remedies under this Interim Order and the DIP Loan Documents, other than those rights and remedies against the DIP Collateral as provided in clause (ii) below, including, without limitation, seeking appointment of a chapter 11 trustee, chief restructuring officer or other responsible person to act on behalf of any of the Debtors (and the Debtors agree not to oppose any such appointment) and (ii) upon the occurrence and during the continuance of an Event of Default and the giving of [three] business days' prior written notice (the "**<u>Enforcement Notice</u>**") to the Debtors (with a copy to the United States Trustee, the respective lead counsel to any Committee, and counsel for the Prepetition First Lien Lender), all rights and remedies against the DIP Collateral provided for in any DIP Loan Documents or applicable law including, without limitation, the right to enforce the DIP Liens through state law foreclosure proceedings; <u>provided</u>, <u>however</u>, that notwithstanding anything to the contrary in clause (ii) above, immediately following

Case 4:17-bk-03351-SHG    Doc 7    Filed 04/03/17    Entered 04/03/17 18:35:33    Desc
Main Document    Page 57 of 244

the giving of an Enforcement Notice by the DIP Administrative Agent any obligation otherwise imposed on any of the DIP Secured Parties to provide any loan or other financial accommodation to the Debtors pursuant to the DIP Facility (other than to permit the Debtors to use Cash Collateral in accordance with the Budget) shall immediately be suspended. Following the giving of an Enforcement Notice by the DIP Administrative Agent, the Debtors and any Committee shall be entitled to an emergency hearing before the Bankruptcy Court; provided, however, that any such emergency hearing shall be limited to the issue of whether or not an Event of Default has occurred, and the Debtors shall not have any right to contest whether or not the automatic stay shall be lifted or modified as provided herein or the DIP Loan Documents. Upon entry of the Final Order, neither any Committee nor the Debtors shall have any right to contest whether or not the automatic stay shall be lifted or modified as provided herein or the DIP Loan Documents. Subject to any order of the Bankruptcy Court that is entered during such three business-day period, the automatic stay, as to the DIP Secured Parties, shall automatically terminate at the end of such notice period.

(b)     Subject to the provisions of Paragraph [13(a)], upon the occurrence of an Event of Default, the DIP Administrative Agent and the other DIP Secured Parties are authorized to exercise their rights and remedies and to proceed against any or all of the DIP Collateral under or pursuant to the DIP Loan Documents, this Interim Order and applicable law, including without limitation, exercising any of the Debtors' rights with respect to any of the Debtors' equity interests in any subsidiaries and any of the Debtors' interests in leaseholds, including without limitation, selling, leasing or otherwise transferring any of the Debtors' interests in any subsidiary or leasehold notwithstanding any contractual provision that would otherwise prohibit, restrict, condition or delay any or all of the DIP Secured Parties from taking any such action. All proceeds realized in connection with the exercise of the rights and remedies of the DIP Secured Parties shall be turned

29

over to the DIP Administrative Agent until indefeasible Payment in Full of the DIP Obligations in accordance with the terms of the DIP Loan Documents; provided, that in the event of the liquidation of any of the Debtors' estates after an Event of Default, the unused amount of the Carve-Out shall be funded into a segregated account exclusively (i) first, from proceeds of any unencumbered assets of the Debtors, and (ii) then from Cash Collateral received by the DIP Administrative Agent prior to the distribution of any such Cash Collateral to any other parties in interest.

(c)     Subject to the limitations in this Paragraph [13], the automatic stay imposed under Bankruptcy Code section 362(a) is hereby modified pursuant to the terms of the DIP Credit Agreement as necessary to (i) permit the Debtors to grant the Adequate Protection Liens and the DIP Liens and to incur all liabilities and obligations to the DIP Secured Parties and the Prepetition First Lien Lender under the DIP Loan Documents, the DIP Facility, and this Interim Order, (ii) authorize the DIP Secured Parties, to retain and apply payments hereunder, and (iii) otherwise to the extent necessary to implement and effectuate the provisions of this Interim Order.

14.     **<u>Restriction on Use of Proceeds</u>**.  Notwithstanding anything herein to the contrary, no proceeds from the DIP Facility, DIP Collateral, Cash Collateral or proceeds thereof, or any portion of the Carve-Out may be used by any of the Debtors, any Committee, and any trustee or other estate representative appointed in the Chapter 11 Cases or any Successor Case, or any other person, party or entity to (or to pay any professional fees and disbursements incurred in connection therewith) (a) request authorization to obtain post-petition loans or other financial accommodations pursuant to Bankruptcy Code section 364(c) or (d), or otherwise, other than (i) from the DIP Secured Parties or (ii) with the express written consent of the DIP Administrative Agent; (b) investigate, assert, join, commence, support or prosecute any action for any claim,

Case 4:17-bk-03351-SHG    Doc 7    Filed 04/03/17    Entered 04/03/17 18:35:33    Desc
Main Document    Page 59 of 244

counter-claim, action, proceeding, application, motion, objection, defense, or other contested matter seeking any order, judgment, determination or similar relief against, or adverse to the interests of, in any capacity, any or all of the DIP Secured Parties, and their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, with respect to any transaction, occurrence, omission, action or other matter (including formal discovery proceedings in anticipation thereof), including, without limitation, (i) any Claims and Defenses, any Avoidance Actions or other actions arising under chapter 5 or section 724(a) of the Bankruptcy Code; (ii) any so-called "lender liability" claims and causes of action; (iii) any action with respect to the validity, enforceability, priority and extent of the DIP Obligations, or the validity, extent, and priority of the DIP Liens, (or the value of any of the DIP Collateral); (iv) any action seeking to invalidate, set aside, avoid or subordinate, in whole or in part, the DIP Liens or the other DIP Protections; (v) any action seeking, or having the effect of, preventing, hindering or otherwise delaying any or all of the DIP Secured Parties' assertion, enforcement or realization on the Cash Collateral or the DIP Collateral in accordance with the DIP Loan Documents or this Interim Order; and/or (vi) any action seeking to modify any of the rights, remedies, priorities, privileges, protections and benefits granted to any or all of the DIP Secured Parties hereunder or under the DIP Loan Documents.

15.     **Proofs of Claim**.  The DIP Secured Parties shall not be required to file proofs of claim evidencing the DIP Obligations or the DIP Protections, in the Chapter 11 Cases or in any Successor Case.

16.     **Preservation of Rights Granted under the Order**.

(a)     <u>No Non-Consensual Modification or Extension of Interim Order</u>.  Unless all DIP Obligations shall have been indefeasibly been Paid in Full, the Debtors shall not seek, and it shall constitute an Event of Default (resulting, among other things, in the termination of the

31

Debtors' right to use Cash Collateral), if there is entered (i) an order amending, supplementing, extending or otherwise modifying this Interim Order or (ii) an order converting or dismissing any of the Chapter 11 Cases, in each case, without the prior written consent of the DIP Administrative Agent, and no such consent shall be implied by any other action, inaction or acquiescence.

(b) <u>Dismissal</u>. If any order dismissing any of the Chapter 11 Cases (under section 1112 of the Bankruptcy Code or otherwise) is at any time entered, (i) such order shall have no effect on the DIP Protections, and the DIP Protections shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations have been indefeasibly Paid in Full, and all DIP Protections, shall, notwithstanding such dismissal, remain binding on all parties in interest, and (ii) the Bankruptcy Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing such DIP Protections.

(c) <u>Modification of Interim Order</u>. Based on the findings set forth in this Interim Order and in accordance with section 364(e) of the Bankruptcy Code, which is applicable to the DIP Facility, in the event any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed by a subsequent order of the Bankruptcy Court or any other court, the DIP Secured Parties shall be entitled to the protections provided in section 364(e) of the Bankruptcy Code, and no such reversal, modification, vacatur or stay shall affect (i) the validity, priority or enforceability of any DIP Protections granted or incurred prior to the actual receipt of written notice by the DIP Administrative Agent of the effective date of such reversal, modification, vacatur or stay or (ii) the validity or enforceability of any Lien or priority authorized or created hereby or pursuant to the DIP Loan Documents. Notwithstanding any such reversal, modification, vacatur or stay, any DIP Protections incurred or granted by any of the Debtors prior to the actual receipt of written notice by the DIP Administrative Agent of the effective date of such reversal,

modification, vacatur or stay shall be governed in all respects by the original provisions of this Interim Order, and the DIP Secured Parties shall be entitled to all of the DIP Protections and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted in section 364(e) of the Bankruptcy Code, this Interim Order and pursuant to the DIP Loan Documents.

(d)     Survival of Interim Order.  The provisions of this Interim Order and the DIP Loan Documents, any actions taken pursuant hereto or thereto, all of the DIP Protections, and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted to any or all of the DIP Secured Parties shall survive, and shall not be modified, impaired or discharged by, the entry of any order confirming any plan of reorganization in any of the Chapter 11 Cases, converting any of the Chapter 11 Cases to a case under chapter 7, dismissing any of the Chapter 11 Cases, withdrawing of the reference of any of the Chapter 11 Cases or any Successor Case or providing for abstention from handling or retaining of jurisdiction of any of the Chapter 11 Cases in the Bankruptcy Court, or by any other act or omission.  The terms and provisions of this Interim Order, including all of the DIP Protections, and all other rights, remedies, Liens, priorities, privileges, protections and benefits granted to any or all of the DIP Secured Parties, shall continue in full force and effect notwithstanding the entry of any such order, and such DIP Protections shall continue in these proceedings and in any Successor Case, and shall maintain their respective priorities as provided by this Interim Order.  The DIP Obligations shall not be discharged by the entry of an order confirming any chapter 11 plan in any of the Chapter 11 Cases, each Debtor having waived such discharge pursuant to section 1141(d)(4) of the Bankruptcy Code.

17.     **Other Rights and Obligations**.

(a)     Expenses.  As provided in the DIP Loan Documents, the Debtors will pay all reasonable expenses incurred by the DIP Administrative Agent (including, without limitation,

33

the reasonable fees and disbursements of all counsel and financial advisors for the DIP Administrative Agent) in connection with the preparation, execution, delivery and administration of the DIP Loan Documents, this Interim Order, any Final Order and any other agreements, instruments, pleadings or other documents prepared or reviewed in connection with any of the foregoing, whether or not any or all of the transactions contemplated hereby or by the DIP Loan Documents are consummated. Notwithstanding anything contained in the DIP Loan Documents, and without limiting the foregoing, upon entry of the Interim Order, the DIP Lender may use the Lender Advances (as such term is defined in the DIP Loan Documents) to satisfy fees and costs of the Lender Professionals (as defined below) incurred or to be incurred through closing of the DIP Loan, including fees and costs incurred prior to the Petition Date. Except as set forth in this paragraph, payment of such fees shall not be subject to allowance by the Bankruptcy Court. Professionals for the DIP Administrative Agent ("**Lender Professionals**") shall not be required to comply with the U.S. Trustee fee guidelines or submit invoices to the Bankruptcy Court. Copies of invoices submitted to the Debtors by such Lender Professionals shall be forwarded by the Debtors to the U.S. Trustee, counsel for any Committee, and such other parties as the Bankruptcy Court may direct. If the Debtors, U.S. Trustee or counsel for any Committee object to the reasonableness of the fees and expenses of any of the Lender Professionals and cannot resolve such objection within 10 days of receipt of such invoices, the Debtors, U.S. Trustee or the Committee, as the case may be, shall file and serve on such Lender Professionals an objection with the Bankruptcy Court (the "**Fee Objection**") limited to the issue of reasonableness of such fees and expenses. The Debtors shall timely pay the Lender Professionals' invoices after the expiration of the ten (10) day notice period if no Fee Objection is received in such ten (10) day period. If a Fee Objection is timely received, the Debtors shall only be required to pay the undisputed amount

34

of the invoice and the Bankruptcy Court shall have jurisdiction to determine the disputed portion of such invoice if the parties are unable to resolve the dispute.

(b)     <u>Binding Effect</u>.  The provisions of this Interim Order, including all findings herein, and the DIP Loan Documents shall be binding upon all parties in interest in the Chapter 11 Cases, including, without limitation, the DIP Secured Parties, the Prepetition First Lien Lender, any Committee, and the Debtors and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for any of the Debtors' estates, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary or responsible person appointed as a legal representative of any of the Debtors or with respect to the property of the estate of any of the Debtors), whether in any of the Chapter 11 Cases, in any Successor Case, or upon dismissal of any of the Chapter 11 Cases or any such Successor Case; <u>provided</u>, <u>however</u>, that the DIP Secured Parties shall have no obligation to permit the use of Cash Collateral or to extend any financing to any chapter 7 or chapter 11 trustee or other responsible person appointed for the estate of any of the Debtors in the Chapter 11 Cases or any Successor Case.

(c)     <u>No Waiver</u>.  Neither the failure of the DIP Secured Parties to seek relief or otherwise exercise their respective rights and remedies under this Interim Order, the DIP Loan Documents, or otherwise (or any delay in seeking or exercising same), shall constitute a waiver of any of such parties' rights hereunder, thereunder, or otherwise.  Except as expressly provided herein, nothing contained in this Interim Order (including, without limitation, the authorization of the use of any Cash Collateral) shall impair or modify any rights, claims or defenses available in law or equity to any DIP Secured Party, including, without limitation, rights of a party to a swap agreement, securities contract, commodity contract, forward contract or repurchase agreement with any of the Debtors to assert rights of setoff or other rights with respect thereto as permitted

by law (or the right of any of the Debtors to contest such assertion). Except as prohibited by this Interim Order, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair the DIP Secured Parties under the Bankruptcy Code or under non-bankruptcy law, to (i) request conversion of any of the Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, dismissal of any of the Chapter 11 Cases, or the appointment of a trustee in any of the Chapter 11 Cases, (ii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, any chapter 11 plan with respect to any of the Debtors, or (iii) exercise any of the rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Secured Parties.

(d)     No Third Party Rights. Except as explicitly provided for herein, this Interim Order does not create any rights for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary. In determining to make any loan or financial accommodation (whether under the DIP Credit Agreement or otherwise) or to permit the use of Cash Collateral or in exercising any rights or remedies as and when permitted pursuant to this Interim Order or the DIP Loan Documents, the DIP Secured Parties shall not (i) be deemed to be in control of the operations of any of the Debtors, or (ii) owe any fiduciary duty to any of the Debtors, their respective creditors, equity holders or estates.

(e)     No Marshaling. None of the DIP Secured Parties shall be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the DIP Collateral.

(f)     Amendments. The Debtors are authorized and empowered, without further notice and hearing or approval of the Bankruptcy Court, to amend, modify, supplement or waive any provision of the DIP Loan Documents in accordance with the provisions thereof, in each case

unless such amendment, modification, supplement or waiver (i) increases the interest rate (other than as a result of the imposition of the default rate), (ii) increases the aggregate lending commitments of the DIP Lender in respect of the DIP Facility, (iii) changes the Maturity Date (under and as defined in the DIP Credit Agreement) or (iv) adds or amends (in any respect unfavorable to the Debtors) any Event of Default. No waiver, modification, or amendment of any of the provisions hereof shall be effective unless set forth in writing, signed by or on behalf of all the Debtors, the DIP Administrative Agent, and, except as provided herein, approved by the Bankruptcy Court.

(g)     Inconsistency.  In the event of any inconsistency between the terms and conditions of the DIP Loan Documents and of this Interim Order, the provisions of this Interim Order shall govern and control.

(h)     Enforceability.  This Interim Order shall constitute findings of fact and conclusions of law pursuant to the Bankruptcy Rule 7052 and shall take effect and be fully enforceable *nunc pro tunc* to the Petition Date immediately upon execution hereof. Notwithstanding Bankruptcy Rules 4001(a)(3), 6004(h), 6006(d), 7062 or 9024 or any other Bankruptcy Rule, or Rule 62(a) of the Federal Rules of Civil Procedure, this Interim Order shall be immediately effective and enforceable upon its entry, and there shall be no stay of execution or effectiveness of this Interim Order.

(i)     Headings.  Paragraph headings used herein are for convenience only and are not to affect the construction of or to be taken into consideration in interpreting this Interim Order.

18.     **Final Hearing**.

(a)     The Final Hearing to consider entry of the Final Order and final approval of the DIP Facility will be held on _____, 2017, at _____ (Mountain Standard Time), before the Hon. _____, at the United States Bankruptcy Court, 38 S. Scott Avenue, Courtroom ___, Tucson, Arizona, Courtroom No. ___.  The proposed Final Order shall be substantially the same as the Interim Order except that those provisions in the Interim Order that are subject to the entry of the Final Order shall be included in the Final Order without such qualification.  If no objections to the relief sought in the Final Hearing are filed and served in accordance with this Interim Order, no Final Hearing may be held, and a separate Final Order may be presented by the Debtors and entered by the Bankruptcy Court.

(b)     <u>Final Hearing Notice</u>.  On or before _____, 2017, the Debtors shall serve, by United States mail, first-class postage prepaid, (such service constituting adequate notice of the Final Hearing) (i) notice of the entry of this Interim Order and of the Final Hearing (the **"<u>Final Hearing Notice</u>"**) and (ii) a copy of this Interim Order, on the parties having been given notice of the Interim Hearing and to any other party that has filed a request for notices with the Bankruptcy Court and to any Committee after the same has been appointed, or Committee counsel, if the same shall have been appointed.  The Final Hearing Notice shall state that any party in interest objecting to the entry of the proposed Final Order shall file written objections with the Clerk of the Bankruptcy Court no later than _____, 2017, which objections shall be served so that the same are received on or before such date by:  (a) counsel for the Debtors, Forrester & Worth, PLLC, 3636 N. Central Avenue, Suite 700, Phoenix, Arizona 85012, Attn: S. Cary Forrester; (b) counsel for the DIP Administrative Agent, Gibson, Dunn & Crutcher, LLP, 333 S. Grand Ave., Los Angeles, California 90071, Attn: Samuel A. Newman; and Squire Patton Boggs, 1 E. Washington St., Suite 2700, Phoenix, Arizona 85004, Attn: Kelly E. Singer; (c) counsel to

38

the Prepetition First Lien Lender, (d) counsel to any Committee; and (e) the Office of the United States Trustee for the District of Arizona and shall be filed with the Clerk of the United States Bankruptcy Court for the District of Arizona, in each case to allow actual receipt of the foregoing no later than _____, 2017, at 5:00 p.m. (Mountain Standard Time).

(c) <u>Retention of Jurisdiction</u>. The Bankruptcy Court has and will retain jurisdiction to enforce this Interim Order according to its terms.

# EXHIBIT "B-1"

SENIOR SECURED SUPER PRIORITY
DEBTOR IN POSSESSION CREDIT AGREEMENT

dated as of

[●], 2017

among

GREEN VALLEY HOSPITAL, LLC,
as Holdings,

GV HOSPITAL MANAGEMENT, LLC,
as Borrower,

The Lenders Party Hereto

and

LATERAL U.S. CREDIT OPPORTUNITIES FUND, L.P.,
as Administrative Agent

# TABLE OF CONTENTS

## ARTICLE I

## DEFINITIONS

Section 1.01    Defined Terms .......................................................................................... 2
Section 1.02    Terms Generally ................................................................................... 27
Section 1.03    Accounting Terms; GAAP .................................................................. 27

## ARTICLE II

## THE CREDITS

Section 2.01    Commitments........................................................................................ 27
Section 2.02    Loans and Borrowings ......................................................................... 29
Section 2.03    Requests for Borrowings ..................................................................... 29
Section 2.04    Funding of Borrowings ....................................................................... 29
Section 2.05    Repayment of Loans; Evidence of Debt .............................................. 29
Section 2.06    Repayment of Loans on the Maturity Date.......................................... 30
Section 2.07    Prepayment of Loans ........................................................................... 30
Section 2.08    Fees ..................................................................................................... 31
Section 2.09    Interest ................................................................................................ 31
Section 2.10    [Intentionally Omitted] ....................................................................... 32
Section 2.11    Taxes................................................................................................... 32
Section 2.12    Payments Generally; Pro Rata Treatment; Sharing of Setoffs............. 35
Section 2.13    Mitigation Obligations ........................................................................ 37
Section 2.14    Defaulting Lenders ............................................................................. 37
Section 2.15    Application of Payments and Proceeds................................................ 38
Section 2.16    Super Priority Nature of Obligations and Liens................................... 38
Section 2.17    Payment of Obligations ...................................................................... 39
Section 2.18    No Discharge; Survival of Claims ...................................................... 39
Section 2.19    Release ................................................................................................ 39
Section 2.20    Waiver of any Priming Rights and Non-Consensual Use of Cash Collateral.................. 39
Section 2.21    Extension Option. ............................................................................... 40

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Section 3.01    Organization; Powers........................................................................... 41
Section 3.02    Authorization; Enforceability ............................................................. 41
Section 3.03    Governmental Approvals; No Conflicts .............................................. 41
Section 3.04    Properties; Good Title.......................................................................... 42
Section 3.05    Litigation and Environmental Matters ................................................ 42
Section 3.06    Compliance with Laws and Agreements ............................................. 43
Section 3.07    Investment Company Status ................................................................ 44
Section 3.08    Taxes................................................................................................... 44
Section 3.09    ERISA.................................................................................................. 44
Section 3.10    Disclosure .......................................................................................... 44

Section 3.11    Subsidiaries ................................................................................. 45
Section 3.12    Intellectual Property; Licenses, Etc. ....................................... 45
Section 3.13    Federal Reserve Regulations..................................................... 45
Section 3.14    Use of Proceeds .......................................................................... 45
Section 3.15    Labor Matters.............................................................................. 45
Section 3.16    Reorganization Matters.............................................................. 46

ARTICLE IV

CONDITIONS

Section 4.01    Effective Date .............................................................................. 49
Section 4.02    Final Order Entry Date and Final Funding Loans.................. 52

ARTICLE V

AFFIRMATIVE COVENANTS

Section 5.01    Financial Statements and Other Information ......................... 53
Section 5.02    Notices of Material Events......................................................... 55
Section 5.03    Information Regarding Collateral ............................................. 55
Section 5.04    Existence; Conduct of Business ................................................ 56
Section 5.05    Payment of Taxes, etc. ............................................................... 56
Section 5.06    Maintenance of Properties ........................................................ 56
Section 5.07    Insurance ...................................................................................... 56
Section 5.08    Books and Records; Inspection and Audit Rights ................. 57
Section 5.09    Compliance with Laws; Compliance with Health Care Laws ...... 57
Section 5.10    Use of Proceeds .......................................................................... 58
Section 5.11    Additional Subsidiaries.............................................................. 58
Section 5.12    Further Assurances ..................................................................... 59
Section 5.13    Case Milestones .......................................................................... 59
Section 5.14    Certain Post-Closing Obligations ............................................ 59
Section 5.15    Cash Management; Excluded Receivables Account................. 59

ARTICLE VI

NEGATIVE COVENANTS

Section 6.01    Indebtedness; Certain Equity Securities ................................ 60
Section 6.02    Liens .............................................................................................. 61
Section 6.03    Fundamental Changes................................................................. 62
Section 6.04    Investments, Loans, Advances, Guarantees and Acquisitions.......... 62
Section 6.05    Asset Sales ................................................................................... 63
Section 6.06    Sale and Leaseback Transactions.............................................. 63
Section 6.07    Swap Agreements ....................................................................... 63
Section 6.08    Restricted Payments; Certain Payments of Indebtedness ...... 63
Section 6.09    Transactions with Affiliates....................................................... 64
Section 6.10    Restrictive Agreements.............................................................. 64
Section 6.11    Certain Amendments; Changes in Business ........................... 64
Section 6.12    Financial Covenants................................................................... 64
Section 6.13    Changes in Fiscal Periods ......................................................... 65

ii

Section 6.14    Chapter 11 Claims .................................................................................... 65
Section 6.15    Critical Vendor and Other Payments ........................................................ 66
Section 6.16    Healthcare Permits .................................................................................... 66

## ARTICLE VII

## EVENTS OF DEFAULT

Section 7.01    Events of Default ....................................................................................... 67

## ARTICLE VIII

## ADMINISTRATIVE AGENT

Section 8.01    Appointment and Authority ........................................................................ 70
Section 8.02    Rights as a Lender ...................................................................................... 71
Section 8.03    Exculpatory Provisions .............................................................................. 71
Section 8.04    Reliance by Administrative Agent .............................................................. 72
Section 8.05    Delegation of Duties .................................................................................. 72
Section 8.06    Resignation of Administrative Agent ........................................................ 72
Section 8.07    Non-Reliance on Administrative Agent and Other Lenders ...................... 73
Section 8.08    No Waiver; Cumulative Remedies; Enforcement ...................................... 73
Section 8.09    Withholding Taxes ..................................................................................... 74

## ARTICLE IX

## MISCELLANEOUS

Section 9.01    Notices ....................................................................................................... 75
Section 9.02    Waivers; Amendments ............................................................................... 76
Section 9.03    Expenses; Indemnity; Damage Waiver ...................................................... 78
Section 9.04    Successors and Assigns ............................................................................. 80
Section 9.05    Survival ...................................................................................................... 83
Section 9.06    Counterparts; Integration; Effectiveness ................................................... 83
Section 9.07    Severability ................................................................................................ 84
Section 9.08    Right of Setoff ........................................................................................... 84
Section 9.09    Governing Law; Jurisdiction; Consent to Service of Process ................... 84
Section 9.10    WAIVER OF JURY TRIAL ..................................................................... 85
Section 9.11    Headings .................................................................................................... 85
Section 9.12    Confidentiality ........................................................................................... 85
Section 9.13    USA Patriot Act ......................................................................................... 86
Section 9.14    Release of Liens and Guarantees ............................................................... 87
Section 9.15    No Advisory or Fiduciary Responsibility .................................................. 87
Section 9.16    Interest Rate Limitation ............................................................................. 88
Section 9.17    Conflicts with Other Loan Documents, Interim Order or Final Order ...... 88
Section 9.18    Acknowledgement and Consent to Bail-In of EEA Financial Institutions ...... 88

4852-4630-2277.1

Case 4:17-bk-03351-SHG    Doc 7    Filed 04/03/17    Entered 04/03/17 18:35:33    Desc
Main Document    Page 73 of 244

<u>SCHEDULES</u>:

| | | |
|---|---|---|
| Schedule 2.01 | - | Commitments |
| Schedule 3.03 | - | Governmental Approvals; Material Contracts |
| Schedule 3.04(a) | - | Owned and Leased Real Properties |
| Schedule 3.05 | - | Litigation |
| Schedule 3.06 | - | Compliance with Laws |
| Schedule 3.08 | - | Taxes |
| Schedule 3.11 | - | Subsidiaries |
| Schedule 3.17 | - | Excluded Receivables Accounts |
| Schedule 5.14 | - | Certain Post-Closing Obligations |
| Schedule 6.01 | - | Existing Indebtedness |
| Schedule 6.02 | - | Permitted Senior Liens |
| Schedule 6.10 | - | Restrictive Agreements |
| Schedule 9.01 | - | Notices |
| Schedule B-1 | - | Initial Budget |
| Schedule D-1 | - | Designated Pre-Petition Liabilities |

<u>EXHIBITS</u>:

| | | |
|---|---|---|
| Exhibit A-1 | - | Form of Assignment and Assumption |
| Exhibit B-1 | - | Form of Borrowing Request |
| Exhibit C-1 | - | Form of Collateral Agreement |
| Exhibit C-2 | - | Form of Compliance Certificate |
| Exhibit C-3 | - | Form of Collection Account Agreement |
| Exhibit G-1 | - | Form of Guarantee Agreement |
| Exhibit I-1 | - | Form of Interim Order |
| Exhibit P-1 | - | Form of Perfection Certificate |
| Exhibit S-1 | - | Form of Subordination Agreement |
| Exhibit 2.11-1 | - | Form of Tax Status Certificate 1 |
| Exhibit 2.11-2 | - | Form of Tax Status Certificate 2 |
| Exhibit 2.11-3 | - | Form of Tax Status Certificate 3 |
| Exhibit 2.11-4 | - | Form of Tax Status Certificate 4 |

4852-4630-2277.1

SENIOR SECURED SUPER PRIORITY DEBTOR IN POSSESSION CREDIT AGREEMENT dated as of [●], 2017 (this "Agreement") among GREEN VALLEY HOSPITAL, LLC, an Arizona limited liability company ("Holdings"), GV HOSPITAL MANAGEMENT, LLC, an Arizona limited liability company (the "Borrower"), the LENDERS party hereto and LATERAL U.S. CREDIT OPPORTUNITIES FUND, L.P. ("Lateral"), as Administrative Agent.

## RECITALS

WHEREAS, on March [●], 2017 (the "Petition Date"), Holdings, GV II Holdings, LLC, an Arizona limited liability company ("GV II Holdings"), and the Borrower (together with Holdings and GV II Holdings, the "Debtors") commenced chapter 11 cases administratively consolidated as Chapter 11 Case No. [_____] (collectively, the "Chapter 11 Cases") by filing separate voluntary petitions for reorganization pursuant to chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Arizona (the "Bankruptcy Court"). Debtors have moved the Bankruptcy Court to order the joint administration of the Chapter 11 Cases. The Debtors continue to operate their businesses and manage their properties as debtors and debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Borrower has requested that Lenders provide a senior secured, super-priority term loan facility of Twenty Million Dollars ($20,000,000) in aggregate principal amount to fund the working capital requirements, fees, costs and expenses of the Debtors during the pendency of the Chapter 11 Cases;

WHEREAS, Lenders are willing to make the certain post-petition loans described herein to Borrower of up to such amount and upon the terms and conditions set forth herein;

WHEREAS, the Borrower has agreed to secure all of its Loan Document Obligations under the Loan Documents by granting to the Administrative Agent and the Lenders a security interest in and lien upon substantially all of its existing and after-acquired personal and real property, subject to the terms of the Interim Order and Final Order;

WHEREAS, Holdings and its Subsidiaries are willing to guarantee all of the Loan Document Obligations of Borrower under the Loan Documents and to secure all of their obligations under their guarantee by granting to the Administrative Agent and the Lenders a security interest in and lien upon all of their existing and after-acquired personal and real property including, without limitation, all of the Equity Interests of Borrower, subject to the terms of the Interim Order and Final Order;

WHEREAS, Holdings and its Subsidiaries are entering into the Loan Documents in order to facilitate a comprehensive restructuring which will allow the Loan Parties to avoid one or more defaults and maintain the value of their assets; and

WHEREAS, each Subsidiary will receive substantial direct and indirect benefits by reason of the making of loans and other financial accommodations to the Borrower as provided in this Agreement.

NOW, THEREFORE, in consideration of the premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

# ARTICLE I

## DEFINITIONS

**Section 1.01    Defined Terms**.    As used in this Agreement, the following terms have the meanings specified below:

"Account" has the meaning set forth in the Uniform Commercial Code in effect in the State of New York.

"Accrediting Organization" means any Person from which Borrower has received an accreditation as of the date of this Agreement or thereafter.

"Administrative Agent" means Lateral, in its capacity as administrative agent hereunder and under the other Loan Documents, and its successors in such capacity as provided in Article VIII.

"Administrative Questionnaire" means an administrative questionnaire in a form supplied by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly or indirectly Controls or is Controlled by or is under common Control with the Person specified.

"Agent Parties" has the meaning given to such term in Section 9.01(c).

"Agreement" has the meaning given to such term in the preamble.

"Applicable Account" means, with respect to any payment to be made to the Administrative Agent hereunder, the account specified by the Administrative Agent from time to time for the purpose of receiving payments of such type.

"Applicable Rate" means (a) if the Stated Maturity Date is on or prior to [●],[1] 12.0% *per annum*, and (b) if the Stated Maturity Date is after [●],[2] 15.0% *per annum*.

"Approved Bank" has the meaning assigned to such term in the definition of the term "Permitted Investments."

"Approved Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or investing in commercial loans and similar extensions of credit in the ordinary course of its activities and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any Person whose consent is required by Section 9.04), substantially in the form of Exhibit A-1 or any other form reasonably approved by the Administrative Agent.

---

[1]    NTD: Nine month anniversary of the Effective Date.

[2]    NTD: Nine month anniversary of the Effective Date.

2

"<u>Bail-In Action</u>" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"<u>Bail-In Legislation</u>" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"<u>Bankruptcy Code</u>" means Title 11 of the United State Code, as amended, or any similar federal or state law for the relief of debtors.

"<u>Bankruptcy Court</u>" has the meaning assigned thereto in the recitals.

"<u>Board of Directors</u>" means, with respect to any Person:

        (a)   in the case of any corporation, the board of directors of such Person or any committee thereof duly authorized to act on behalf of such board;

        (b)   in the case of any limited liability company, the board of managers of such Person;

        (c)   in the case of any partnership, the board of directors or board of managers of the general partner of such Person; and

        (d)   in any other case, the functional equivalent of the foregoing.

"<u>Board of Governors</u>" means the Board of Governors of the Federal Reserve System of the United States of America.

"<u>Borrower</u>" has the meaning assigned to such term in the preamble.

"<u>Borrower Materials</u>" has the meaning assigned to such term in Section 5.01.

"<u>Borrowing</u>" means the making of Loans hereunder.

"<u>Borrowing Request</u>" means a request by the Borrower for a Borrowing in accordance with Section 2.03, substantially in the form of <u>Exhibit B-1</u>.

"<u>Budget</u>" means the financial projections for the Loan Parties covering the 26 week period commencing on the Petition Date on a weekly basis, which projections shall include, at a minimum, cash receipts, operating disbursements, payroll disbursements, a reasonably detailed professional fee budget, non-operating disbursements for the period covered thereby, substantially in the form of the initial Budget attached hereto as <u>Schedule B-1</u>, and any subsequent projections furnished pursuant to Section 5.01 hereof, in each case, in form and substance reasonably satisfactory to the Administrative Agent in its sole discretion.

"<u>Business Day</u>" means any day that is not a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to remain closed.

"<u>Capital Lease Obligations</u>" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as

3

4852-4630-2277.1

capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases; provided, that for all purposes hereunder the amount of obligations under any Capitalized Lease shall be the amount thereof accounted for as a liability in accordance with GAAP.

"Carve-Out" has the meaning assigned thereto in the Interim Order and, when effective, the Final Order.

"Cash Disbursements" means, for any period, the amount of cash operating and non-operating disbursements for Holdings and the Borrower during such period, on a consolidated basis, as set forth in the applicable approved Budget or Variance Report for such period.

"Cash Receipts" means, for any period, the cumulative amount of cash receipts for Holdings and the Borrower during such period, on a consolidated basis, as set forth in the applicable approved Budget or Variance Report for such period.

"Casualty Event" means any event that gives rise to the receipt by Holdings, the Borrower or any Subsidiary of any insurance proceeds or condemnation awards or in respect of any equipment, fixed assets or real property (including any improvements thereon) to replace or repair such equipment, fixed assets or real property.

"Change in Control" means:

      (a)   the failure of Holdings, directly or indirectly through wholly owned subsidiaries, to own all of the Equity Interests of each other Loan Party;

      (b)   the failure by the Permitted Holders to own, directly or indirectly through one or more holding company parents of Holdings, beneficially and of record, Equity Interests in Holdings representing at least a majority of the aggregate ordinary voting power for the election of directors of Holdings represented by the issued and outstanding Equity Interests in Holdings; or

      (c)   the occupation of a majority of the seats (other than vacant seats) on the Board of Directors of Holdings by Persons who were neither (i) nominated, designated or approved by the Board of Directors of Holdings or the Permitted Holders nor (ii) appointed by directors so nominated, designated or approved.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided, that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"<u>Change in Management</u>" shall mean that either John Matuska or John Moore shall have for any reason ceased to function for any Loan Party, in the same or similar capacities as in existence on the Effective Date and that a replacement acceptable to the Administrative Agent in the exercise of its reasonable business judgment has not been retained within fifteen (15) days of the date of such event; provided, that the Administrative Agent's approval shall not be unreasonably withheld, delayed or conditioned.

"<u>Chapter 11 Cases</u>" has the meaning assigned thereto in the recitals.

"<u>CMS</u>" means the federal Centers for Medicare & Medicaid Services and any successor Governmental Authority.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended from time to time.

"<u>Collateral</u>" means any and all assets, whether real or personal, tangible or intangible, on which Liens are purported to be granted pursuant to the Security Documents as security for the Secured Obligations.

"<u>Collateral Agreement</u>" means the Senior Secured Super Priority Debtor in Possession Collateral Agreement among the Borrower, each other Loan Party and the Administrative Agent, substantially in the form of <u>Exhibit C-1</u>.

"<u>Collateral and Guarantee Requirement</u>" means, at any time, the requirement that:

    (a)   the Administrative Agent shall have received from (i) each Loan Party (other than the Borrower) either (x) a counterpart of the Guarantee Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes a Loan Party after the Effective Date, a supplement to the Guarantee Agreement, in the form specified therein, duly executed and delivered on behalf of such Person and (ii) each Loan Party either (x) a counterpart of the Collateral Agreement duly executed and delivered on behalf of such Person or (y) in the case of any Person that becomes a Subsidiary Loan Party after the Effective Date, a supplement to the Collateral Agreement, in the form specified therein, duly executed and delivered on behalf of such Person, in each case under this clause (a) together with, in the case of any such Loan Documents executed and delivered after the Effective Date, to the extent reasonably requested by the Administrative Agent, documents and opinions of the type referred to in Section 4.01(d);

    (b)   all outstanding Equity Interests of each Subsidiary owned by any other Loan Party shall have been pledged to the Administrative Agent pursuant to the Collateral Agreement, all Equity Interests in Borrower and owned by Holdings shall have been certificated (and, as necessary, appropriate elections have been made under Article 8 of the UCC to treat such Equity Interests as securities), and the Administrative Agent shall have received, within ten (10) Business Days of the Effective Date all certificates or other instruments representing such Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank; <u>provided</u> that upon request by the Administrative Agent, all Equity Interests of Subsidiaries owned by any Loan Party shall be certificated (and, as necessary, appropriate elections be made under Article 8 of the UCC to treat such Equity Interests as securities), and the Administrative Agent shall receive, within ten (10) Business Days of the date of such request, all certificates or other instruments representing such Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

5

(c) all certificates, agreements, documents and instruments, including Uniform Commercial Code financing statements and account control agreements with respect to each deposit account, securities account and commodity account, required by the Security Documents, Requirements of Law and as reasonably requested by the Administrative Agent to be filed, delivered, registered or recorded to create the Liens intended to be created by the Security Documents and perfect such Liens to the extent required by, and with the priority required by, the Security Documents and the other provisions of the term "Collateral and Guarantee Requirement," shall have been filed, registered or recorded or executed and delivered to the Administrative Agent, as applicable; and

(d) the Administrative Agent shall have received (i) counterparts of a Mortgage with respect to each Owned Real Property duly executed and delivered by the record owner of such Owned Real Property, (ii) a policy or policies of title insurance in the amount equal to the lesser of (i) $20,000,000 or (ii) the fair market value of the Borrower's Owned Real Property and fixtures issued by a nationally recognized title insurance company reasonably acceptable to the Administrative Agent insuring the Lien of such Mortgage as a first priority Lien on the Owned Real Property of Borrower and described therein, free of any Liens other than such Liens and other Permitted Encumbrances, together with such endorsements as the Administrative Agent may reasonably request, (iii) such affidavits, certificates, information (including financial data) and instruments of indemnification as shall be reasonably required to induce the title company to issue the title policy/ies and endorsements contemplated above and which are reasonably requested by such title company, (iv) a completed "Life-of-Loan" Federal Emergency Management Agency Standard Flood Hazard Determination with respect to each Owned Real Property (together with a notice about special flood hazard area status and flood disaster assistance duly executed by the Borrower and each Loan Party relating to such Owned Real Property), (v) if any Owned Real Property is located in an area determined by the Federal Emergency Management Agency to have special flood hazards, evidence of such flood insurance as may be required under applicable law, including Regulation H of the Board of Governors and the other Flood Insurance Laws and as required under Section 5.07, and (vi) such legal opinions as the Administrative Agent may reasonably request with respect to any such Mortgage or Mortgaged Property, in each case, in form and substance reasonably satisfactory to the Administrative Agent.

The Administrative Agent in its sole discretion may grant extensions of time for the creation and perfection of security interests in or the obtaining of title insurance, legal opinions or other deliverables with respect to particular assets or the provision of any Guarantee.

"Collection Account Agreement" has the meaning assigned to such term in Section 5.15(b).

"Commitment" means, with respect to each Lender, the commitment, if any, of such Lender to make Loans hereunder on any Funding Date, expressed as an amount representing the maximum principal amount of Loans to be made by such Lender hereunder on such Funding Date or in the aggregate, as the context may require, as such commitment may be (a) reduced upon the making of Loans pursuant to Section 2.01, and (b) reduced or increased from time to time pursuant to assignments by or to such Lender pursuant to an Assignment and Assumption. The amount of each Lender's Commitment, for each Funding Date and in the aggregate, as of the Effective Date is set forth on Schedule 2.01 or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Commitment, as the case may be. The aggregate principal amount of the Commitments hereunder as of the Effective Date is $20,000,000.

6

"Compliance Certificate" means a Compliance Certificate required to be delivered pursuant to Section 5.01, substantially in the form of Exhibit C-2.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies, or the dismissal or appointment of the management, of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Control Agreement" means, with respect to any deposit account, securities account, commodity account, securities entitlement or commodity contract, an agreement, in form and substance reasonably satisfactory to the Administrative Agent, among the Administrative Agent, the financial institution or other Person at which such account is maintained or with which such entitlement or contract is carried and the Loan Party maintaining such account or owning such entitlement or contract, effective to grant "control" (within the meaning of Articles 8 and 9 under the applicable UCC) over such account to the Administrative Agent.

"Controlled Deposit Account" has the meaning assigned to such term in Section 5.15(a).

"Debtor Relief Laws" means the Bankruptcy Code, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Debtors" has the meaning assigned to such term in the recitals.

"Default" means any event or condition that constitutes an Event of Default or that upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means, subject to Section 2.14(b), any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Borrower in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Borrower or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Borrower, to confirm in writing to the Administrative Agent and the Borrower that it will comply with its prospective funding obligations hereunder (provided, that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Borrower), or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law, (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided, that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental

7

Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender, or (iii) become the subject of a Bail-In Action. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.14(b)) upon delivery of written notice of such determination to the Borrower and each Lender.

"Designated Pre-Petition Lender(s)" means (a) the holder of the loan payable to Artemis Realty Capital Advisors, LLC, (b) SCM Specialty Finance Opportunities Fund, L.P. and (c) Cardinal Health.

"Designated Pre-Petition Liabilities" means the Indebtedness and other liabilities described on Schedule D-1.

"Disclosure Statement" has the meaning assigned to such term in Section 5.13(a).

"Disposition" has the meaning assigned to such term in Section 6.05.

"Disqualified Equity Interest" means, with respect to any Person, any Equity Interest in such Person that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, either mandatorily or at the option of the holder thereof), or upon the happening of any event or condition:

> (a)   matures or is mandatorily redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests), whether pursuant to a sinking fund obligation or otherwise;

> (b)   is convertible or exchangeable, either mandatorily or at the option of the holder thereof, for Indebtedness or Equity Interests (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests); or

> (c)   is redeemable (other than solely for Equity Interests in such Person that do not constitute Disqualified Equity Interests and cash in lieu of fractional shares of such Equity Interests) or is required to be repurchased by such Person or any of its Affiliates, in whole or in part, at the option of the holder thereof;

in each case, on or prior to the date 91 days after the Maturity Date; provided, however, that (i) an Equity Interest in any Person that would not constitute a Disqualified Equity Interest but for terms thereof giving holders thereof the right to require such Person to redeem or purchase such Equity Interest upon the occurrence of an "asset sale" or a "change of control" shall not constitute a Disqualified Equity Interest if any such requirement becomes operative only after repayment in full of all the Loans and all other Loan Document Obligations that are accrued and payable and the termination of the Commitments and (ii) if an Equity Interest in any Person is issued pursuant to any plan for the benefit of employees of Holdings (or any direct or indirect parent thereof) or any of its subsidiaries or by any such plan to such employees, such Equity Interest shall not constitute a Disqualified Equity Interest solely because it may be required to be repurchased by Holdings (or any direct or indirect parent company thereof) or any of its subsidiaries in order to satisfy applicable statutory or regulatory obligations of such Person.

"Dollars", "dollars" or "$" refers to lawful money of the United States of America.

8

"<u>EEA Financial Institution</u>" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a Subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"<u>EEA Member Country</u>" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"<u>EEA Resolution Authority</u>" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>EU Bail-In Legislation Schedule</u>" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"<u>Effective Date</u>" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"<u>Eligible Assignee</u>" means (a) a Lender, (b) an Affiliate of a Lender, (c) an Approved Fund and (d) any other Person (other than Holdings, the Borrower or any of their Subsidiaries or Affiliates or any natural person).

"<u>Environmental Laws</u>" means the applicable common law and treaties, rules, regulations, codes, ordinances, judgments, orders, decrees and other applicable Requirements of Law, and all applicable injunctions or binding agreements issued, promulgated or entered into by or with any Governmental Authority, in each instance relating to the protection of the environment, to preservation or reclamation of natural resources, to Release or threatened Release of any Hazardous Material or to the extent relating to exposure to Hazardous Materials, to health or safety matters.

"<u>Environmental Liability</u>" means any liability, obligation, loss, claim, action, order or cost, contingent or otherwise (including any liability for damages, costs of medical monitoring, costs of environmental remediation or restoration, administrative oversight costs, consultants' fees, fines, penalties and indemnities), of Holdings, the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) any actual or alleged violation of any Environmental Law or permit, license or approval issued thereunder, (b) the generation, use, handling, transportation or storage treatment of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) the Release or threatened Release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"<u>Equity Interests</u>" means shares of capital stock, partnership interests, membership interests in a limited liability company, beneficial interests in a trust or other equity ownership interests in a Person.

"<u>ERISA</u>" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"<u>ERISA Affiliate</u>" means any trade or business (whether or not incorporated) that, together with Holdings, is treated as a single employer under Section 414(b) or 414(c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

9

"ERISA Event" means (a) any "reportable event," as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to an ERISA Plan (other than an event for which the 30-day notice period is waived); (b) prior to the effectiveness of the applicable provisions of the Pension Act, the existence with respect to any ERISA Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA) or, on and after the effectiveness of the applicable provisions of the Pension Act, any failure by any ERISA Plan to satisfy the minimum funding standard (within the meaning of Section 412 of the Code or Section 302 of ERISA) applicable to such ERISA Plan, in each case whether or not waived; (c) the filing pursuant to, prior to the effectiveness of the applicable provisions of the Pension Act, Section 412(d) of the Code or Section 303(d) of ERISA or, on and after the effectiveness of the applicable provisions of the Pension Act, Section 412(c) of the Code or Section 302(c) of ERISA, of an application for a waiver of the minimum funding standard with respect to any ERISA Plan; (d) on and after the effectiveness of the applicable provisions of the Pension Act, a determination that any ERISA Plan is, or is expected to be, in "at-risk" status (as defined in Section 303(i)(4) of ERISA or Section 430(i)(4) of the Code); (e) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any ERISA Plan; (f) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any ERISA Plan or ERISA Plans or to appoint a trustee to administer any ERISA Plan; (g) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any ERISA Plan or Multiemployer Plan; or (h) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA or, on and after the effectiveness of the applicable provisions of the Pension Act, in endangered or critical status, within the meaning of Section 305 of ERISA.

"ERISA Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Exchange Act" means the United States Securities Exchange Act of 1934, as amended from time to time.

"Excluded Assets" means:

> (a)   the Excluded Receivables Account;

> (b)   any lease, license or other agreement with any Person if, to the extent and for so long as, the grant of a Lien thereon to secure the Secured Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party or Subsidiary thereof) to, such lease, license or other agreement (but only to the extent any of the foregoing is not rendered ineffective by, or is otherwise unenforceable under, the Uniform Commercial Code or any Requirements of Law); provided, that the security interest under the Collateral Agreement shall attach immediately to any such asset (x) at the time the provision of such agreement containing such restriction ceases to be in effect and (y) to the extent any such breach or default is not rendered ineffective by, or is otherwise unenforceable pursuant to the UCC or any other applicable Requirement of Law;

4852-4630-2277.1

(c) any intent-to-use trademark applications filed in the United States Patent and Trademark Office; and

(d) assets subject to capital leases or purchase money financing to the extent such capital leases, purchase money financing or letters of credit are permitted hereunder and prohibit the granting of a Lien including any asset owned by any Loan Party that is subject to a Lien of the type permitted by Section 6.02(e) (whether or not incurred pursuant to such Section) if to the extent and for so long as the grant of a Lien thereon hereunder to secure the Secured Obligations constitutes a breach of or a default under, or creates a right of termination in favor of any party (other than any Loan Party or any Subsidiary thereof) to, any agreement pursuant to which such Lien has been created; provided, that the security interest under the Collateral Agreement shall attach immediately to any such asset (x) at the time the provision of such agreement containing such restriction ceases to be in effect and (y) to the extent any such breach or default is not rendered ineffective by, or is otherwise unenforceable pursuant to the UCC or any other applicable Requirement of Law.

"Excluded Receivables Account" means the deposit account of a Loan Party set forth on Schedule 3.17 into which such Loan Party's Government Health-Care-Insurance Receivables are deposited.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.11, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.11(f) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Exit Fee" means, with respect to any payment of principal made in respect of the Loans, a fee equal to (a) the amount of interest that would have accrued and been payable hereunder on the principal amount of the Loans to be paid for the period commencing on the Effective Date and ending on the Assumed Repayment Date, assuming (i) the principal amount of the Loans to be repaid was advanced on the Effective Date and (ii) the interest rate payable thereon was the Assumed Applicable Rate rather than the Applicable Rate, minus (b) the amount of interest that accrued and was paid in cash on or prior to the applicable payment date in respect of the principal amount of the Loans to be paid. For purposes of the foregoing:

The "Assumed Applicable Rate" means an interest rate *per annum* equal to the percentage set forth below corresponding to the applicable principal payment date:

Payment Date:                              Assumed Interest Rate:

| If the payment date is after the Effective Date but prior to [●]³ | 12.0% *per annum* |
| If the payment date is on or after [●]⁴ but on prior to [●]⁵ | 13.5% *per annum* |
| If the payment date is on or after [●]⁶ | 15.0% *per annum* |

The "Assumed Repayment Date" means (a) if the date of determination is prior to the date that the Stated Maturity Date has been extended in accordance with the terms of Section 2.21 hereof, the one year anniversary of the Effective Date, and (b) in all other cases, the Stated Maturity Date.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.

"Fee Letter" means the letter agreement dated the Effective Date among Holdings, the Borrower and Lateral Investment Management.

"Final Order" has the meaning set forth in Section 4.02.

"Final Order Entry Date" means the date on which the Final Order is entered by the Bankruptcy Court.

"Financial Officer" means the chief financial officer, principal accounting officer, treasurer or controller of Holdings.

"Flood Insurance Laws" means, collectively, (i) the National Flood Insurance Act of 1968 as now or hereafter in effect or any successor statute thereto, (ii) the Flood Disaster Protection Act of 1973 as now or hereafter in effect or any successor statue thereto, (iii) the National Flood Insurance Reform Act of 1994 as now or hereafter in effect or any successor statute thereto and (iv) the Flood Insurance Reform Act of 2004 as now or hereafter in effect or any successor statute thereto.

---

³ NTD: The date that is 119 days after the Effective Date.

⁴ NTD: The date that is 119 days after the Effective Date.

⁵ NTD: The date that is 179 days after the Effective Date.

⁶ NTD: The date that is 180 days after the Effective Date.

12

4852-4630-2277.1

"Foreign Lender" means (a) if the Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes.

"Funding Date" means (a) the Effective Date or (b) the Final Order Entry Date (or such later date as designated by the Borrower on no less than five (5) Business Days' prior written notice to the Administrative Agent).

"GAAP" means generally accepted accounting principles in the United States of America, as in effect from time to time but subject to Section 1.03.

"Government Health-Care-Insurance Receivables" means "Health-Care-Insurance Receivables" (as such term is defined in the Uniform Commercial Code in effect in the State of New York) which are payable by Medicare, Medicaid or any other similar governmental health insurance program.

"Governmental Approvals" means all authorizations, consents, approvals, permits, provider numbers, supplier numbers, licenses and exemptions of, registrations and filings with, and reports to, Governmental Authorities including, without limitation, Healthcare Permits.

"Governmental Authority" means the government of the United States of America or any other nation, or of any political subdivision thereof, whether state or local, and any agency (including, but not limited to, CMS) authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business or customary and reasonable indemnity obligations in effect on the Effective Date or entered into in connection with any acquisition or disposition of assets permitted under this Agreement (other than such obligations with respect to Indebtedness). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined in good faith by a Financial Officer. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantee Agreement" means the Master Guarantee Agreement among the Guarantors and the Administrative Agent, substantially in the form of Exhibit G-1.

"Guarantors" means, collectively, Holdings and the Subsidiary Loan Party.

"Hazardous Materials" means all substances, wastes, pollutants or contaminants, materials, constituents, chemicals or compounds in any form regulated under any Environmental Law, including petroleum or petroleum by-products or distillates, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated as hazardous or toxic, or any other term of similar import, pursuant to any Environmental Law.

"Health Care Laws" means all federal and state laws regulating health services or payment (including, but not limited to, regulating the possession, control, warehousing, marketing, sale and distribution of pharmaceuticals, the operation of medical facilities, patient healthcare, patient healthcare information, patient abuse, licensure, privacy, security, the quality, adequacy and safety of medical care, rate setting, equipment, personnel and operating policies), including, but not limited to, (a) all federal and state fraud and abuse laws, including but not limited to, the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), the Stark Law (42 U.S.C. § 1395nn), the Anti-Inducement Law (42 U.S.C. § 1320a-7a(a)(5)), the civil False Claims Act (31 U.S.C. § 3729 et seq.), the administrative False Claims Law (42 U.S.C. § 1320a-7b(a)), the exclusion laws (42 U.S.C. § 1320a-7) and the civil monetary penalty laws (42 U.S.C. § 1320a-7a), (b) HIPAA, (c) Medicare (Title XVIII of the Social Security Act), (d) Medicaid (Title XIX of the Social Security Act), (e) TRICARE, (f) the Patient Protection and Affordable Care Act (P.L. 111-1468), (g) The Health Care and Education Reconciliation Act of 2010 (P.L. 111-152), (h) quality, safety and accreditation standards and requirements of all applicable state laws or regulatory bodies, (i) all laws, policies, procedures, requirements and regulations pursuant to which Healthcare Permits are issued, and (j) any and all other applicable health care laws, regulations, manual provisions, program memoranda, opinion letters, policies and administrative guidance, each of (a) through (j) as may be amended from time to time.

"Healthcare Permit" means a Governmental Approval (a) issued or required under Health Care Laws applicable to the business of Borrower or necessary in the possession, ownership, warehousing, marketing, promoting, sale, labeling, furnishing, distribution or delivery of goods or services under Health Care Laws applicable to the business of Borrower, (b) issued by any Person from which Borrower has received an accreditation, and/or (c) issued or required under Health Care Laws applicable to the ownership or operation of any business location of Borrower.

"Health Care Reportable Event" means (a) Holdings, the Borrower or any of their Subsidiaries becomes subject to any civil or criminal investigations, or any material inquiries, validation reviews, program integrity reviews, reimbursement audits or statements of deficiencies, involving and/or related to its compliance with Health Care Laws; (b) any material exclusion, voluntary disclosure, notice of claim to recover material overpayments, revocation, suspension, termination, probation, restriction, limitation, denial, or non-renewal affecting the Borrower or any of its Subsidiaries with respect to any material Third Party Payor Program; (c) the occurrence of any reportable event under any settlement agreement or corporate integrity agreement involving and/or related to its compliance with Health Care Laws entered into with any Governmental Authority or (d) Holdings, the Borrower or any of their Subsidiaries becomes aware that any representation or warranty contained in Section 3.17 is not true or correct.

"HIPAA" means the Health Insurance Portability and Accountability Act of 1996, as the same may be amended, modified or supplemented from time to time, and any successor statute thereto, and any and all rules or regulations promulgated from time to time thereunder.

"HIPAA Compliant" shall mean that the applicable Person is in material compliance with each of the applicable requirements of the so-called "Administrative Simplification" provisions of HIPAA, and is not and could not reasonably be expected to become the subject of any civil or criminal penalty, process, claim, action or proceeding, or any administrative or other regulatory review, survey, process or

proceeding (other than routine surveys or reviews conducted by any government health plan or other accreditation entity) that could reasonably be expected to result in any of the foregoing or that could reasonably be expected to materially adversely affect such Person's business, operations, assets, properties or condition (financial or otherwise), in connection with any actual or potential violation by such Person of the provisions of HIPAA.

"Holdings" has the meaning assigned to such term in the preamble.

"Indebtedness" of any Person means, without duplication:

> (a) all obligations of such Person for borrowed money;

> (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments;

> (c) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person;

> (d) all obligations of such Person in respect of the deferred purchase price of property or services (excluding (i) trade accounts payable, (ii) other accrued liabilities and (iii) deferred compensation in each case incurred in the ordinary course of business);

> (e) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed;

> (f) all Guarantees by such Person of Indebtedness of others;

> (g) all Capital Lease Obligations of such Person;

> (h) all obligations, contingent or otherwise, of such Person in respect of any surety bonds or as an account party in respect of letters of credit and letters of guaranty; and

> (i) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances.

The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. The amount of Indebtedness of any Person for purposes of clause (e) above shall (unless such Indebtedness has been assumed by such Person) be deemed to be equal to the lesser of (A) the aggregate unpaid amount of such Indebtedness and (B) the fair market value of the property encumbered thereby as determined by such Person in good faith.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 9.03(b).

4852-4630-2277.1

"<u>Information</u>" has the meaning assigned to such term in Section 9.12(a).

"<u>Intellectual Property</u>" has the meaning assigned to such term in the Collateral Agreement.

"<u>Interest Payment Date</u>" means the last Business Day of each calendar month.

"<u>Interim Order</u>" means that certain interim order (a) authorizing each of the Loan Parties who are Debtors (i) to obtain post-petition financing pursuant to 11 U.S.C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3)(1) and 364(e), and (ii) to utilize cash collateral pursuant to 11 U.S.C. § 363, (b) granting adequate protection to pre-petition secured parties pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, (c) scheduling a final hearing pursuant to Bankruptcy Rule 4001(b), and (d) to be entered by the Bankruptcy Court in the Chapter 11 Cases in accordance with Section 4.01(m), substantially in the form of <u>Exhibit I-1</u> or otherwise satisfactory in form and substance to the Administrative Agent in its sole discretion.

"<u>Interim Order Entry Date</u>" means the date on which the Interim Order is entered by the Bankruptcy Court.

"<u>Investment</u>" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt or other securities of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of any obligations of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of all or substantially all of the property and assets or business of another Person or assets constituting a business unit, line of business or division of such Person.

"<u>knowledge</u>" and other similar words, when used to describe the state of knowledge of Holdings, the Borrower or any of its Subsidiaries, should be limited to the actual knowledge of John Matuska, John Moore and Mona Rae Smith.

"<u>Lenders</u>" means the Persons listed on <u>Schedule 2.01</u> and any other Person that shall have become a party hereto pursuant to an Assignment and Assumption, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Assumption.

"<u>Lien</u>" means, with respect to any asset, (a) any mortgage, deed of trust, lien, pledge, hypothecation, encumbrance, charge or security interest in, on or of such asset and (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset.

"<u>Loan Document Obligations</u>" means (a) the due and punctual payment by the Borrower of (i) the principal of and interest at the applicable rate or rates provided herein (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations of the Borrower under or pursuant to this Agreement and each of the other Loan Documents, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual payment and performance of all other obligations of the Borrower under or pursuant to each of the Loan Documents

16

and (c) the due and punctual payment and performance of all the obligations of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding).

"Loan Documents" means this Agreement, the Guarantee Agreement, the Collateral Agreement, the other Security Documents, any Notes, the Subordination Agreement, the Fee Letter and each other agreement, document, instrument or supplement executed and delivered in connection with any of the foregoing from time to time.

"Loan Parties" means Holdings, the Borrower and the Subsidiary Loan Party.

"Loans" means the loans made by the Lenders to the Borrower pursuant to this Agreement, as well as any Lender Advances made pursuant to Section 2.01(c).

"Material Adverse Effect" means any event, circumstance or condition that has had, or would reasonably be expected to have, a materially adverse effect on (a) the business, financial condition, or results of operations of Holdings, the Borrower and its Subsidiaries, taken as a whole, (b) the ability of the Borrower and the other Loan Parties, taken as a whole, to perform their payment obligations under the Loan Documents or (c) the rights and remedies of the Administrative Agent and the Lenders under the Loan Documents.

"Maturity Date" means the earliest of:

(a)    the Stated Maturity Date;

(b)    the effective date of any chapter 11 plan of the Debtors;

(c)    the date that is forty-five (45) days after the Interim Order Entry Date if the Final Order Entry Date shall not have occurred by such date; and

(d)    the date of acceleration of the Loans and termination of the Commitments hereunder (including, without limitation, as a result of the occurrence of any Event of Default).

"Maximum Rate" has the meaning assigned to such term in Section 9.17.

"Medicaid" means, collectively, the health care assistance program established by Title XIX of the Social Security Act (42 U.S.C. 1396 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders, guidelines or requirements pertaining to such program including (a) all federal statutes (whether set forth in Title XIX of the Social Security Act or elsewhere) affecting such program; (b) all state statutes and plans for medical assistance enacted in connection with such program and federal rules and regulations promulgated in connection with such program; and (c) all applicable provisions of all rules, regulations, manuals, orders and administrative, reimbursement, guidelines and requirements of all government authorities promulgated in connection with such program (whether or not having the force of law), in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Medicare" means, collectively, the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 U.S.C. 1395 et seq.) and any statutes succeeding thereto, and all laws, rules, regulations, manuals, orders or guidelines pertaining to such program including (a) all federal statutes (whether set forth in Title XVIII of the Social Security Act or elsewhere)

affecting such program; and (b) all applicable provisions of all rules, regulations, orders and requirements of all governmental authorities promulgated in connection with such program, in each case as the same may be amended, supplemented or otherwise modified from time to time.

"Moody's" means Moody's Investors Service, Inc. and any successor to its rating agency business.

"Mortgage" means a mortgage, deed of trust, assignment of leases and rents, leasehold mortgage or other security document granting a Lien on any Mortgaged Property to secure the Secured Obligations. Each Mortgage shall be in form and substance satisfactory to the Administrative Agent.

"Mortgaged Property" means each Owned Real Property together with the improvements thereto with respect to which a Mortgage is granted pursuant to the Collateral and Guarantee Requirement, Section 5.11, Section 5.12 or Section 5.14.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Net Proceeds" means, with respect to any event, the proceeds received in respect of such event in cash or Permitted Investments, including (a) any cash or Permitted Investments received in respect of any non-cash proceeds (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or purchase price adjustment or earn-out, but excluding any interest payments), but only as and when received, (b) in the case of a Casualty Event, insurance proceeds, and (c) in the case of a condemnation or similar event, condemnation awards and similar payments, minus the sum of (i) the reasonable fees and out-of-pocket expenses paid by Holdings, the Borrower and the Guarantors in connection with such event and (ii) if the proceeds constitute proceeds required to be applied to Indebtedness that is secured by a Permitted Senior Lien, the amount required to be applied to repay such Indebtedness (so long as such proceeds are actually so applied).

"Non-Consenting Lender" has the meaning assigned to such term in Section 9.02(c).

"Note" means a promissory note made by the Borrower in favor of a Lender evidencing Loans made by such Lender.

"Organizational Documents" means, with respect to any Person, the charter, articles or certificate of organization or incorporation and bylaws or other organizational or governing documents of such Person.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

18

"Owned Real Property" means each parcel of real property together with the improvements thereto owned by a Loan Party.

"Participant" has the meaning assigned to such term in Section 9.04(c)(ii).

"Participant Register" has the meaning assigned to such term in Section 9.04(c)(ii).

"Patient Receivables" means, with respect to any Loan Party, the patient accounts receivable of such Loan Party existing or hereafter created, any and all rights to receive payments due on such accounts receivable from any Governmental Authority payor under or in respect of such accounts receivable (including, without limitation, Medicare and Medicaid), and all proceeds of or in any way derived, whether directly or indirectly, from any of the foregoing (including, without limitation, all interest, finance charges and other amounts payable by any Governmental Authority obligor, directly or indirectly, in respect thereof).

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Pension Act" means the Pension Protection Act of 2006, as amended from time to time.

"Perfection Certificate" means a certificate substantially in the form of Exhibit P-1.

"Permitted Encumbrances" means:

    (a)   The Permitted Senior Lien;

    (b)   Liens for Taxes that are not overdue for a period of more than 30 days or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

    (c)   Liens with respect to outstanding motor vehicle fines and Liens imposed by law, such as carriers', warehousemen's, mechanics', materialmen's, repairmen's or construction contractors' Liens and other similar Liens arising in the ordinary course of business that secure amounts not overdue for a period of more than 30 days or, if more than 30 days overdue, are unfiled and no other action has been taken to enforce such Lien or that are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP, in each case so long as such Liens do not individually or in the aggregate have a Material Adverse Effect;

    (d)   Liens incurred or deposits made in the ordinary course of business (i) in connection with workers' compensation, unemployment insurance and other social security legislation and (ii) securing liability for reimbursement or indemnification obligations of insurance carriers providing property, casualty or liability insurance to Holdings, the Borrower or any Guarantor;

    (e)   Liens incurred or deposits made to secure the performance of bids, trade contracts, governmental contracts and leases (including Liens in favor of Governmental Authorities on equipment purchased by a Loan Party for purposes of fulfilling its obligations under a contract with such Governmental Authorities), statutory obligations, surety, stay,

19

customs and appeal bonds, performance bonds and other obligations of a like nature (including those to secure health, safety and environmental obligations) incurred in the ordinary course of business;

(f) easements, rights-of-way, restrictions, encroachments, protrusions, zoning restrictions and other similar encumbrances and minor title defects affecting real property that, in the aggregate, do not in any case materially interfere with the ordinary conduct of the business of Holdings, the Borrower and its Subsidiaries, taken as a whole;

(g) Liens securing, or otherwise arising from, judgments not constituting an Event of Default under Section 7.01(i); and

(h) Liens arising from precautionary Uniform Commercial Code financing statements or similar filings made in respect of operating leases entered into by Holdings, the Borrower or any of its Subsidiaries.

"Permitted Holders" means Green Valley Medical Investments, LLLP.

"Permitted Investments" means any of the following:

(a) readily marketable obligations issued or directly and fully guaranteed or insured by the government or any agency or instrumentality of the United States, having average maturities of not more than 12 months from the date of acquisition thereof; provided, that the full faith and credit of the United States is pledged in support thereof;

(b) time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) is a Lender or (ii) has combined capital and surplus of at least $250,000,000 (any such bank in the foregoing clause (i) or (ii) being an "Approved Bank"), in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(c) commercial paper and variable or fixed rate notes issued by an Approved Bank (or by the parent company thereof) or any variable or fixed rate note issued by, or guaranteed by, a corporation rated A-2 (or the equivalent thereof) or better by S&P or P-2 (or the equivalent thereof) or better by Moody's, in each case with average maturities of not more than 12 months from the date of acquisition thereof;

(d) marketable short-term money market and similar highly liquid funds either (i) having assets in excess of $250,000,000 or (ii) having a rating of at least A-2 or P-2 from either S&P or Moody's, respectively (or, if at any time neither S&P nor Moody's shall be rating such obligations, an equivalent rating from another nationally recognized rating service); and

(e) investments, classified in accordance with GAAP as current assets of the Borrower or any Subsidiary, in money market investment programs that are registered under the Investment Company Act of 1940 or that are administered by financial institutions having capital of at least $250,000,000, and, in either case, the portfolios of which are limited such that substantially all of such investments are of the character, quality and maturity described in clauses (a) through (d) of this definition.

4852-4630-2277.1

"**Permitted Refinancing**" means, with respect to any Person, any modification, refinancing, refunding, renewal or extension of any Indebtedness of such Person; <u>provided</u>, that (a) the principal amount (or accreted value, if applicable) thereof does not exceed the principal amount (or accreted value, if applicable) of the Indebtedness so modified, refinanced, refunded, renewed or extended except by an amount equal to unpaid accrued interest and premium thereon plus other amounts paid, and fees and expenses incurred, in connection with such modification, refinancing, refunding, renewal or extension and by an amount equal to any existing commitments unutilized thereunder, (b) Indebtedness resulting from such modification, refinancing, refunding, renewal or extension has a final maturity date equal to or later than the final maturity date of, and has a Weighted Average Life to Maturity equal to or greater than the Weighted Average Life to Maturity of, the Indebtedness being modified, refinanced, refunded, renewed or extended, (c) immediately after giving effect thereto, no Event of Default shall have occurred and be continuing, and (d) if the Indebtedness being modified, refinanced, refunded, renewed or extended is subordinated in right of payment to the Loan Document Obligations, Indebtedness resulting from such modification, refinancing, refunding, renewal or extension is subordinated in right of payment to the Loan Document Obligations on terms at least as favorable to the Lenders as those contained in the documentation governing the Indebtedness being modified, refinanced, refunded, renewed or extended.

"**Permitted Senior Lien**" means, to the extent not subordinated or invalidated by order of the Bankruptcy Court, any valid, enforceable, and non-avoidable Lien that was perfected prior to the Petition Date and that secure obligations identified on Schedule 6.02, except to the extent the holders will be paid off on or prior to the Effective Date.

"**Person**" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"**Petition Date**" has the meaning assigned to such term in the recitals.

"**Plan**" has the meaning assigned to such term in Section 5.13(a).

"**Platform**" has the meaning assigned to such term in Section 5.01.

"**Post-Petition**" shall mean the time period subsequent to the filing of the Chapter 11 Cases.

"**Prepayment Event**" means:

> (a)  the receipt by any Loan Party of the proceeds of any sale, transfer or other disposition of any property or asset of Holdings or any of its Subsidiaries, other than any such sale, transfer or other disposition permitted by Section 6.05;

> (b)  the receipt by any Loan Party of the proceeds of any Casualty Event, loss of property or assets or other insured damage to, or any taking under power of eminent domain or by condemnation or similar proceeding;

> (c)  the receipt by any Loan Party or Subsidiary thereof any amounts not in the ordinary course of business, including: (i) tax refunds; (ii) pension plan reversions; (iii) proceeds of business interruption insurance; (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action; (v) indemnity payments; and (vi) any purchase price adjustment received in connection with any purchase agreement; and

> (d)  the incurrence by any Loan Party or Subsidiary thereof of any Indebtedness, other than Indebtedness permitted under Section 6.01.

"Pre-Petition" shall mean the time period prior to the filing of the Chapter 11 Cases.

"Project" means the hospital from which Holdings or Borrower provides or furnishes goods or services.

"Proposed Change" has the meaning assigned to such term in Section 9.02(c).

"Public Lender" has the meaning assigned to such term in Section 5.01.

"Qualified Cash" means, as of any date of determination, the amount of unrestricted cash and Permitted Investments of Holdings, Borrower and their Subsidiaries that is in deposit accounts or in securities accounts, or any combination thereof, and which such deposit account or securities account is the subject of a Control Agreement and is subject to a first priority (other than liens in favor of the depositary bank or securities intermediary for ordinary course bank charges as reflected in the Control Agreement) security interest in favor of the Administrative Agent perfected in accordance with applicable law.

"Recipient" means (a) the Administrative Agent or (b) any Lender, as applicable.

"Register" has the meaning assigned to such term in Section 9.04(b)(iv).

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the partners, directors, officers, employees, trustees, agents, controlling persons, advisors and other representatives of such Person and of each of such Person's Affiliates and permitted successors and assigns.

"Release" means any release, spill, emission, leaking, dumping, injection, emptying, pumping, escaping, pouring, deposit, disposal, discharge, dispersal, leaching or migration into or through the environment (including ambient air, indoor air, surface water, groundwater, land surface or subsurface strata) and including the environment within any building, or any occupied structure, facility or fixture.

"Released Parties" has the meaning assigned to such term in Section 2.19.

"Required Lenders" means at any time, Lenders having outstanding Loans and unused Commitments representing more than 50% of the aggregate outstanding Loans and unused Commitments at such time; provided, that to the extent set forth in Section 9.02, (a) whenever there are one or more Defaulting Lenders, the total outstanding Loans and unused Commitments of each Defaulting Lender shall in each case be excluded for purposes of making a determination of Required Lenders.

"Requirements of Law" means, with respect to any Person, any statutes, laws, treaties, rules, regulations, orders, decrees, writs, injunctions or determinations of any arbitrator or court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject, including but not limited to, Health Care Laws.

"Responsible Officer" means the chief executive officer, president, vice president, chief financial officer, treasurer or assistant treasurer, or other similar officer, manager or a director of a Loan Party and with respect to certain limited liability companies or partnerships that do not have officers, any manager, sole member, managing member or general partner thereof, and as to any document delivered on the Effective Date or thereafter pursuant to clause (a)(i) of the definition of the term "Collateral and Guarantee Requirement," any secretary or assistant secretary of a Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have

22

been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any Equity Interests in Holdings or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any Equity Interests in Holdings or any Subsidiary or any option, warrant or other right to acquire any such Equity Interests in Holdings or any Subsidiary.

"Retained Rights"  with respect to any Patient Receivable owing from any Governmental Authority, the rights of any payee granted by applicable law and regulation over such Patient Receivable, which in the absence of a court order in the manner expressly contemplated by applicable state and federal law are subject to restrictions on assignment, pledging or are otherwise encumbered by applicable law or regulation, including, without limitation, and as applicable, restrictions on the collection thereof and discretion over the transfer thereof, to any party and restrictions on any such party's ability to enforce the claim giving rise to such Patient Receivable against such Governmental Authority.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and any successor to its rating agency business.

"Secured Obligations" has the meaning assigned to such term in the Collateral Agreement.

"Security Documents" means the Collateral Agreement, the Mortgages and each other security agreement or pledge agreement executed and delivered pursuant to the Collateral and Guarantee Requirement, Section 5.11, Section 5.12 or Section 5.14 to secure any of the Secured Obligations.

"SQN ILA" means the Interim Loan Agreement, dated as of February 3, 2015, as amended and in effect as of the Effective Date, between SQN Asset Finance (Guernsey) Limited and Holdings.

"SQN Loan Documents" means the SQN ILA and all security agreements, notes, deeds of trust, and other documents and instruments executed in connection with the SQN ILA.

"Stated Maturity Date" means, subject to extension in accordance with Section 2.21, [●].[7]

"Subordination Agreement" means the Subordination and Intercreditor Agreement between the Administrative Agent and Green Valley Medical Investments, LLLP, substantially in the form of Exhibit S-1.

"subsidiary" means, with respect to any Person (the "parent") at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned,

---

[7] NTD: Nine month anniversary of the Effective Date.

Case 4:17-bk-03351-SHG    Doc 7    Filed 04/03/17    Entered 04/03/17 18:35:33    Desc
Main Document      Page 97 of 244

controlled or held, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent or by the parent and one or more subsidiaries of the parent.

"Subsidiary" means any subsidiary of Holdings.

"Subsidiary Loan Party" means GV II Holdings, LLC.

"Swap Agreement" means any agreement with respect to any swap, forward, future or derivative transaction or option or similar agreement or contract involving, or settled by reference to, one or more rates, currencies, commodities, equity or debt instruments or securities, or economic, financial or pricing indices or measures of economic, financial or pricing risk or value or any similar transaction or any combination of these transactions; provided, that no phantom stock or similar plan providing for payments only on account of services provided by current or former directors, officers, employees or consultants of Holdings, the Borrower or the other Subsidiaries shall be a Swap Agreement.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Third Party Payor" means Medicare, Medicaid, TRICARE, and other state or federal health care programs, private insurers, managed care plans and any other Person or entity which presently or in the future maintains Third Party Payor Programs.

"Third Party Payor Programs" means all payment and reimbursement programs, sponsored by a Third Party Payor, in which Borrower or Holdings participates.

"Transaction Costs" means all fees, costs and expenses incurred or payable by Holdings, the Borrower or any other Subsidiary Loan Party in connection with the Transactions.

"Transactions" means:

      (a) the execution, delivery and performance by each Loan Party of the Loan Documents to which it is to be a party, the borrowing of Loans and the use of the proceeds thereof, including without limitation (i) the payment of the Designated Pre-Petition Liabilities, and (ii) the payment of the Transaction Costs; and

      (b) the Chapter 11 Cases.

"TRICARE" means the program administered pursuant to 10 U.S.C. Section 1071 et. seq), Sections 1320a-7 and 1320a-7a of Title 42 of the United States Code and the regulations promulgated pursuant to such statutes.

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 2.11(f)(ii)(B)(3).

"<u>Weighted Average Life to Maturity</u>" means, when applied to any Indebtedness at any date, the number of years obtained by dividing: (a) the sum of the products obtained by multiplying (i) the amount of each then remaining installment, sinking fund, serial maturity or other required payments of principal, including payment at final maturity, in respect thereof, by (ii) the number of years (calculated to the nearest one-twelfth) that will elapse between such date and the making of such payment; by (b) the then outstanding principal amount of such Indebtedness.

"<u>Wholly Owned Subsidiary</u>" means, with respect to any Person at any date, a subsidiary of such Person of which securities or other ownership interests representing 100% of the Equity Interests (other than (a) directors' qualifying shares and (b) nominal shares issued to foreign nationals to the extent required by applicable Requirements of Law) are, as of such date, owned, controlled or held by such Person or one or more Wholly Owned Subsidiaries of such Person or by such Person and one or more Wholly Owned Subsidiaries of such Person.

"<u>Write-Down and Conversion Powers</u>" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

"<u>Withdrawal Liability</u>" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"<u>Withholding Agent</u>" means the Borrower and the Administrative Agent.

**Section 1.02    Terms Generally**.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."   Unless the context requires otherwise, (a) any definition of or reference to any agreement (including this Agreement and the other Loan Documents), instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, amended and restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns (subject to any restrictions on assignment set forth herein) and, in the case of any Governmental Authority, any other Governmental Authority that shall have succeeded to any or all functions thereof, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

**Section 1.03    Accounting Terms; GAAP**.  Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; <u>provided</u>, <u>however</u>, that if the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision (including any definitions) hereof to eliminate the effect of any change occurring after the Effective Date in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given

4852-4630-2277.1

before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith. Notwithstanding any other provision contained herein, all terms of an accounting or financial nature used herein shall be construed, and all computations of amounts and ratios referred to herein shall be made, without giving effect to any election under Financial Accounting Standards Codification No. 825— Financial Instruments, or any successor thereto (including pursuant to the Accounting Standards Codification), to value any Indebtedness of Holdings, the Borrower or any Subsidiary Loan Party at "fair value" as defined therein. Notwithstanding any other provision contained herein, any lease that is treated as an operating lease for purposes of GAAP as of the date hereof shall continue to be treated as an operating lease (and any future lease, if it were in effect on the date hereof, that would be treated as an operating lease for purposes of GAAP as of the date hereof shall be treated as an operating lease), in each case for purposes of this Agreement, notwithstanding any change in GAAP after the date hereof.

## ARTICLE II

## THE CREDITS

**Section 2.01    Commitments; Lender Advances**.  Subject to the terms and conditions set forth herein:

(a)    on and as of the Effective Date and subject to the conditions set forth in Section 4.01, each Lender agrees to make Loans to the Borrower denominated in dollars in an aggregate principal amount not exceeding the portion of its Commitment set forth on Schedule 2.01 to be available as of the Effective Date, up to an aggregate principal amount for all Lenders of $[●][8] on such date; and

(b)    on and as the Final Order Entry Date (or such later Funding Date as may be designated by the Borrower on no less than five (5) Business Days' prior written notice to the Administrative Agent) and subject to the conditions set forth in Section 4.02, each Lender agrees to make Loans to the Borrower denominated in dollars in an aggregate principal amount not exceeding the portion of its Commitment set forth on Schedule 2.01 to be available as of the Final Order Entry Date, up to an aggregate principal amount for all Lenders of $[●][9] on such date.

(c)    (i) The Administrative Agent (or its designee) is authorized by the Borrower, the other Loan Parties and the Lenders to, from time to time in the Administrative Agent's sole discretion (but the Administrative Agent shall not have any obligation to), make disbursements and advances to or for the account of the Borrower, on behalf of all Lenders, which the Administrative Agent, in its sole discretion, deems necessary or desirable (i) to preserve or protect the Collateral, or any portion thereof, (ii) to enhance the likelihood of, or maximize the amount of, repayment of the Loans and other Obligations, (iii) to pay or settle any assessment or other amount due or payable, as determined by the Administrative Agent, to Medicaid, Medicare, CMS or any other Governmental Authority, or (iv) to pay any other amount

---

[8]    TBD

[9]    An amount equal to $20.0 million, minus initial advance, minus lender reserved amounts for budgeted contingencies, interest and legal expenses.

4852-4630-2277.1

chargeable to or required to be paid by a Loan Party pursuant to the terms of a Loan Document, including payments of interest, expenses, fees, Taxes, and other sums payable under the Loan Documents (any of such loans are herein referred to as "Lender Advances"); provided, however, the aggregate principal amount of Lender Advances shall not exceed $[●]; provided, further, the Administrative Agent agrees to make Lender Advances in an aggregate amount not to exceed $[●], the proceeds of which shall be applied to pay interest on the Loans outstanding hereunder in accordance with Section 2.09 hereof and to pay fees in accordance with Section 2.08 hereof, in each case in accordance with the Budget. Lender Advances shall be made even if any applicable conditions precedent to the making of any Loan have not been satisfied. Lender Advances shall constitute Loans (and Obligations) hereunder and shall be secured by the Liens in favor of the Administrative Agent in and to the Collateral.

(ii)    Upon the making of a Lender Advance by the Administrative Agent (whether before or after the occurrence of a Default), each Lender shall be deemed, without further action by any party hereto, to have unconditionally and irrevocably purchased from the Administrative Agent without recourse or warranty, an undivided interest and participation in such Lender Advance in proportion to its ratably percentage of the Commitments as in effect on the Effective Date, payable on demand of the Administrative Agent. From and after the date, if any, on which any Lender is required to fund its participation in any Lender Advance purchased hereunder, the Administrative Agent shall promptly distribute to such Lender, such Lender's ratably percentage of all payments of principal and interest and all proceeds of Collateral received by the Administrative Agent in respect of such Lender Advance.

**Section 2.02    Loans and Borrowings**. Each Loan shall be made by the Lenders ratably in accordance with their respective Commitments.

**Section 2.03    Requests for Borrowings**.  To request a Borrowing as of any Funding Date, the Borrower shall notify the Administrative Agent of such request not later than 11:00 a.m., San Mateo, California time, one Business Day before the date of the proposed Borrowing. The requested Borrowing shall be evidenced by a written Borrowing Request signed by the Borrower and shall be irrevocable once made. Promptly following receipt of a Borrowing Request in accordance with this Section, the Administrative Agent shall advise each Lender of the details thereof and of the amount of such Lender's Loan to be made as part of the requested Borrowing.

**Section 2.04    Funding of Borrowings**.

(a)    Each Lender shall make each Loan to be made by it hereunder on the proposed Funding Date thereof and in the amount for such Lender set forth on Schedule 2.01 for such Lender on such Funding Date by wire transfer of immediately available funds by 12:00 noon, New York City time, to the Applicable Account of the Administrative Agent most recently designated by it for such purpose by notice to the Lenders. The Administrative Agent will make such Loans available to the Borrower by promptly crediting the amounts so received, in like funds, to an account of the Borrower designated by the Borrower in the applicable Borrowing Request.

(b)    The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 9.03(c) are several and not joint. The failure of any Lender to make any Loan or to make any payment under Section 9.03(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan or to make its

4852-4630-2277.1

payment under Section 9.03(c). Notwithstanding anything in this paragraph to the contrary, the failure of any Lender to make any Loan or to make any payment under Section 9.03(c) on any date required hereunder, if not cured by the other Lenders, shall be a default of the Lenders' funding obligations under this Agreement.

**Section 2.05    Repayment of Loans; Evidence of Debt**.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of each Loan of such Lender as provided in this Agreement.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(c)    The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(d)    The entries made in the accounts maintained pursuant to paragraph (b) or (c) of this Section shall be prima facie evidence of the existence and amounts of the obligations recorded therein, provided that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to pay any amounts due hereunder in accordance with the terms of this Agreement. In the event of any inconsistency between the entries made pursuant to paragraphs (b) and (c) of this Section, the accounts maintained by the Administrative Agent pursuant to paragraph (c) of this Section shall control.

(e)    Any Lender may request through the Administrative Agent that Loans made by it be evidenced by a promissory note. In such event, the Borrower shall execute and deliver to such Lender a promissory note payable to the order of such Lender (or, if requested by such Lender, to such Lender and its registered assigns) and in a form provided by the Administrative Agent and approved by the Borrower.

**Section 2.06    Repayment of Loans on the Maturity Date**.    To the extent not previously paid, all Loans shall be due and payable on the Maturity Date. Any prepayment of a Borrowing pursuant to Section 2.07 shall be applied to reduce the final repayments of the Borrowings on the Maturity Date. Repayments of any Borrowing shall be accompanied by accrued interest on, and the Exit Fee in respect of, the amount repaid and shall be applied in accordance with Section 2.15.

**Section 2.07    Prepayment of Loans**.

(a)    The Borrower may prepay outstanding Loans in whole or in part from time to time; provided, that any Loan that is prepaid may not be reborrowed; provided, further, that any prepayment after [●][10] shall be of all (and not in part) of the Loans outstanding hereunder.

---

[10] NTD:  Nine month anniversary of the Effective Date.

The Borrower shall make such prepayment at the Administrative Agent's Office in immediately available funds not later than 11:00 a.m. (New York City time) on the date of prepayment and all such prepayments shall be applied to repay the Loans in full on a pro rata basis among the Lenders holding such Loans. Each Loan so prepaid shall be accompanied by (i) all accrued and unpaid interest on the par principal amount so prepaid up to, but not including, the date of prepayment, and (ii) the corresponding Exit Fee.

(b)     In the event and on each occasion that any Net Proceeds are received by or on behalf of Holdings, the Borrower or any Subsidiary Loan Party in respect of any Prepayment Event, the Borrower shall, within two (2) Business Days after such Net Proceeds are received (or, in the case of a Prepayment Event described in clause (a) or clause (d) of the definition of the term "Prepayment Event," on the date of such Prepayment Event), prepay Borrowings in an aggregate amount equal to 100% of the amount of such Net Proceeds. Notwithstanding the foregoing, (i) any Net Proceeds in respect of a Prepayment Event described in clause (b) of the definition of the term "Prepayment Event" shall not be required to be so applied to the extent that the Borrower invests such Net Proceeds in new or existing properties or assets used in the Loan Parties' business and constituting Collateral hereunder, in accordance with the Budget, within 180 days after such Net Proceeds are received.

(c)     The Borrower shall notify the Administrative Agent by telephone (confirmed by facsimile or email) of any prepayment hereunder not later than 11:00 a.m., San Mateo, California time one Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid and, in the case of a mandatory prepayment, a reasonably detailed calculation of the amount of such prepayment; provided, that a notice of optional prepayment may state that such notice is conditional upon the effectiveness of other credit facilities or the receipt of the proceeds from the issuance of other Indebtedness or the occurrence of some other identifiable event or condition, in which case such notice of prepayment may be revoked by the Borrower (by notice to the Administrative Agent on or prior to the specified date of prepayment) if such condition is not satisfied.

(d)     Each repayment made pursuant to this Section 2.07 shall be accompanied by (i) all accrued and unpaid interest on the par principal amount repaid up to, but not including, the date of prepayment, and (ii) the corresponding Exit Fee, and shall be applied in accordance with Section 2.15.

(e)     Provisions contained in this Section 2.07 for application of proceeds of certain transactions shall not be deemed to constitute consent of the Lenders to transactions that are not otherwise permitted by the terms hereof or the other Loan Documents.

**Section 2.08     Fees**.

(a)     The Borrower agrees to pay to the Administrative Agent, for its own account, fees payable in the amounts and at the times separately agreed upon between the Borrower and the Administrative Agent.

(b)     The Borrower agrees to pay to Lateral Investment Management, for its own account, fees payable in the amounts and at the times set forth in the Fee Letter.

(c)     The Borrower agrees to pay the Exit Fee as and when contemplated by this Agreement.

29

(d)    All fees under this Section 2.08 will be fully earned in all respects on the Effective Date and non-refundable and non-creditable thereafter, and such fees may be paid using proceeds of Lender Advances.

**Section 2.09    <u>Interest</u>**.

(a)    Each Loan shall bear interest on the outstanding principal amount thereof at a rate *per annum* equal to the Applicable Rate; <u>provided</u>, <u>however</u>, for purposes of determining interest accrued and payable hereunder, $20.0 million in aggregate principal amount of Loans (representing the aggregate principal amount of Loans and Lenders Advances that may be advanced hereunder pursuant to Section 2.01 hereof) shall be deemed to have been advanced and outstanding on the Effective Date, notwithstanding any such amounts were not advanced on that date and may not thereafter be advanced. The Borrower agrees to pay an effective rate of interest equal to the Applicable Rate and the additional rate, if any, resulting from any charge or fee in the nature of interest paid or to be paid by the Borrower in connection with the Loan Documents.

(b)    The foregoing notwithstanding, while any Event of Default exists, the Borrower shall pay interest on all outstanding Loan Document Obligations hereunder at a fluctuating interest rate *per annum* at all times equal to 3.00% *per annum* plus the Applicable Rate.

(c)    Accrued interest on each Loan shall be paid in cash in arrears on each Interest Payment Date, <u>provided</u>, that (i) interest accrued pursuant to paragraph (b) of this Section 2.09 shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) such interest payment may be made using proceeds of Lender Advances.

(d)    All interest hereunder shall be computed on the basis of a year of 360 days and shall be payable for the actual number of days elapsed (including the first day but excluding the last day). All such computations shall be made by the Administrative Agent and such computations shall be conclusive absent manifest error.

**Section 2.10    [Intentionally Omitted]**.

**Section 2.11    <u>Taxes</u>**.

(a)    Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable law.  If any applicable law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

30

(b)     The Loan Parties shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(c)     The Loan Parties shall jointly and severally indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that any Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.04(c)(ii) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this paragraph (d).

(e)     As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 2.11, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(f)     (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Administrative Agent, at the time or times reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.11(f)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such

4852-4630-2277.1

Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing,

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), whichever of the following is applicable:

(1)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2)     executed copies of IRS Form W-8ECI;

(3)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit 2.11-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of the Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN; or

(4)     to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.11-2 or Exhibit 2.11-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided, that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit 2.11-4 on behalf of each such direct and indirect partner;

32

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit the Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Administrative Agent at the time or times prescribed by law and at such time or times reasonably requested by the Borrower or the Administrative Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Administrative Agent as may be necessary for the Borrower and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Administrative Agent in writing of its legal inability to do so.

(g)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.11 (including by the payment of additional amounts pursuant to this Section 2.11), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out of pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this Section 2.11(g) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this Section 2.11(g), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this Section 2.11(g) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This Section 2.11(g) shall not be construed to require any indemnified party

33

to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(h)     Each party's obligations under this Section 2.11 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

**Section 2.12     Payments Generally; Pro Rata Treatment; Sharing of Setoffs**.

(a)     The Borrower shall make each payment required to be made by it under any Loan Document (whether of principal, interest, fees or of amounts payable under Section 2.10 or 2.11 or otherwise) prior to the time expressly required hereunder or under such other Loan Document for such payment (or, if no such time is expressly required, prior to 2:00 p.m., New York City time), on the date when due, in immediately available funds, without condition or deduction for any counterclaim, recoupment or setoff. Any amounts received after such time on any date may, in the discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon. All such payments shall be made to such account as may be specified by the Administrative Agent, and except that payments pursuant to Sections 2.10, 2.11 and 9.03 shall be made directly to the Persons entitled thereto and payments pursuant to other Loan Documents shall be made to the Persons specified therein. The Administrative Agent shall distribute any such payments received by it for the account of any other Person to the appropriate recipient promptly following receipt thereof. Except as otherwise provided herein, if any payment under any Loan Document shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day. In the case of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate for the period of such extension. All payments or prepayments of any Loan shall be made in dollars, all payments of accrued interest payable on a Loan shall be made in dollars, and all other payments under each Loan Document shall be made in dollars.

(b)     Payments received by and available to the Administrative Agent shall be applied in accordance with the priorities set forth in Section 2.15.

(c)     If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; provided, that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to (A) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender), (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant or (C) any disproportionate payment obtained by a Lender as a result of the extension by Lenders of the maturity date or expiration date of some but not all Loans or any increase in the

4852-4630-2277.1

Applicable Rate in respect of Loans of Lenders that have consented to any such extension. The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)     Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption and in its sole discretion, distribute to the Lenders the amount due. In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Effective Rate and a rate determined by the Administrative Agent in accordance with banking industry rules on interbank compensation.

Section 2.13     **Mitigation Obligations**. If any Lender requests compensation under Section 2.10, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.11, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder affected by such event, or to assign and delegate its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment and delegation (i) would eliminate or reduce amounts payable pursuant to Section 2.10 or 2.11, as the case may be, and (ii) would not subject such Lender to any unreimbursed cost or expense and would not be inconsistent with the internal policies of, or otherwise be disadvantageous to such Lender. The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 2.14     **Defaulting Lenders**.

(a)     Adjustments.     Notwithstanding anything to the contrary contained in this Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable law:

(i)     Waivers and Amendments.  Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 9.02.

(ii)     Reallocation of Payments.  Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of that Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VII or otherwise, and including any amounts made available to the Administrative Agent by that Defaulting Lender pursuant to Section 9.08), shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to the Administrative Agent hereunder; second, to the funding of any Loan in respect of which that Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative

35

Agent; <u>third</u>, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; <u>fourth</u>, so long as no Default or Event of Default exists, to the payment of any amounts owing to the Borrower as a result of any judgment of a court of competent jurisdiction obtained by the Borrower against that Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Agreement; and <u>fifth</u>, to that Defaulting Lender or as otherwise directed by a court of competent jurisdiction. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender shall be deemed paid to and redirected by that Defaulting Lender, and each Lender irrevocably consents hereto.

(b)  <u>Defaulting Lender Cure</u>.  If the Borrower and the Administrative Agent agree in writing in their sole discretion that a Defaulting Lender should no longer be deemed to be a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash Collateral), such Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders, whereupon that Lender will cease to be a Defaulting Lender; <u>provided</u>, that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender.

**Section 2.15      <u>Application of Payments and Proceeds</u>.**

(a)  Except as otherwise provided in the Interim Order or Final Order, as applicable, so long as no Event of Default has occurred and is continuing, any voluntary prepayments received by the Administrative Agent shall be applied to the Loan Document Obligations as directed by the Borrower.

(b)  During the continuance of an Event of Default, the Administrative Agent shall upon the direction of the Required Lenders apply any and all payments received by the Administrative Agent in respect of any Loan Document Obligation and all proceeds received by the Administrative Agent as a result of the exercise of its remedies under the Security Documents in accordance with the clauses first through sixth below. Anything to the contrary contained herein notwithstanding, all proceeds of Collateral and all amounts collected or received by Administrative Agent, including all payments made by Loan Parties to Administrative Agent, after any or all of the Obligations have been accelerated (so long as such acceleration has not been rescinded), shall be applied as follows:

<u>first</u>, to payment of fees and expenses of the Administrative Agent payable or reimbursable by the Loan Parties under this Agreement;

<u>second</u>, ratably, to payment of all accrued unpaid interest on the Loans and to payment of any fees (including any applicable Exit Fee) of the Lenders payable by the Loan Parties under this Agreement;

<u>third</u>, to payment of principal on the Loans;

36

4852-4630-2277.1

> fourth, to payment of all other Loan Document Obligations then outstanding;

> > fifth, to payment of all other obligations and liabilities required by the terms of the Interim Order and Final Order, as then in effect; and

> > sixth, any remainder shall be for the account of and paid to whomever may be lawfully entitled thereto.

In carrying out the foregoing, (i) amounts received shall be applied in the numerical order provided above until exhausted prior to the application to the next succeeding category and (ii) each of the Administrative Agent, Lenders or other Persons entitled to payment under any of the clauses above shall receive an amount equal to its pro rata share of amounts available to be applied pursuant to such clauses above.

**Section 2.16    Super Priority Nature of Obligations and Liens**. The priority of the Liens of the Administrative Agent and the Lenders on the Collateral owned by the Loan Parties shall be set forth in the Interim Order and the Final Order. Notwithstanding anything in the Loan Documents to the contrary, the Liens held by the Administrative Agent on the Collateral shall be for the benefit of the Administrative Agent and the Lenders.

**Section 2.17    Payment of Obligations**. Upon the maturity (whether by acceleration or otherwise) of any of the Loan Document Obligations under this Agreement or any of the other Loan Documents, the Administrative Agent and the Lenders shall be entitled to immediate payment of such Loan Document Obligations without further application to or order of the Bankruptcy Court.

**Section 2.18    No Discharge; Survival of Claims**. Each of Holdings and Borrower, on behalf of itself and its Subsidiaries, agrees that (a) the Loan Document Obligations hereunder shall not be discharged by the entry of an order confirming a chapter 11 plan in any Chapter 11 Case (and the Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the superpriority administrative claim granted to the Administrative Agent and the Lenders pursuant to the Interim Order and Final Order and described therein and the Liens granted to the Administrative Agent pursuant to the Interim Order and Final Order and described therein shall not be affected in any manner by the entry of an order confirming a chapter 11 plan in any Chapter 11 Case.

**Section 2.19    Release**.  Subject to the terms of the Interim Order and the Final Order, each of Holdings and Borrower, on behalf of itself and its Subsidiaries, hereby acknowledges that neither Holdings, Borrower nor any of its Subsidiaries has any defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of the Loan Parties' liability to repay the Administrative Agent and the Lenders as provided in this Agreement or to seek affirmative relief or damages of any kind or nature from the Administrative Agent or any Lender. Subject to the terms of the Interim Order and the Final Order, Holdings and Borrower, in their own right and with respect to its Subsidiaries and the Loan Parties' bankruptcy estates, and on behalf of all their respective successors, assigns, Subsidiaries and any Affiliates and any Person acting for and on behalf of, or claiming through them, hereby fully, finally and forever release and discharge the Administrative Agent and each Lender and all of the Related Parties of any of them (collectively, the "Released Parties") of and from any and all past or present actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 502(d), 544, 545, 547, 548, 549, 550, 551 and 553 and 724(a) of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third

4852-4630-2277.1

parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Loan Documents, the Interim Order, the Final Order and the transactions contemplated hereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing.

**Section 2.20** **Waiver of any Priming Rights and Non-Consensual Use of Cash Collateral**. Upon the Effective Date, and for so long as any Loan Document Obligations shall be outstanding, each of Holdings and Borrower, on behalf of itself, its Subsidiaries and its estate, hereby irrevocably waives (i) any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Liens securing the Loan Document Obligations, or to approve a claim of equal or greater priority than the Loan Document Obligations, except as permitted under the Interim Order and Final Order, (ii) any right, pursuant to Section 363 of the Bankruptcy Code or otherwise, to use Collateral proceeds or any other cash collateral (as defined in the Bankruptcy Code) in any manner not permitted by the Loan Documents or otherwise without the consent of the Administrative Agent and the Required Lenders, and (iii) any right to surcharge the Collateral pursuant to section 506(c) of the Bankruptcy Code.

**Section 2.21** **Extension Option.**

(a) The Borrower may, by written notice to the Administrative Agent, elect to exercise two extensions (each, an "Extension") of the Stated Maturity Date. The effectiveness of each Extension shall be subject to the satisfaction of the following conditions precedent:

(i) the Borrower shall have delivered a written notice to the Administrative Agent evidencing the Borrower's unconditional exercise of the Extension option contemplated hereby; such notice, if in respect of the initial exercise of the Extension option, shall have been delivered to the Administrative Agent no earlier than [●][11] and no later than [●][12] and, if in respect of the second exercise of the Extension option, shall have been delivered to no earlier than [●][13] and no later than [●];[14]

(ii) the Confirmation Order shall have become final and non-appealable and all conditions to the effectiveness of the Plan have been satisfied other than the funding of the exit financing contemplated by the Plan;

---

[11] NTD: 210 days from the Effective Date

[12] NTD: 240 days from the Effective Date

[13] NTD: 480 days from the Effective Date

[14] NTD: 510 days from the Effective Date

38

(iii)    on the then effective Stated Maturity Date (before giving effect to applicable Extension), no Default or Event of Default shall have occurred and be continuing;

(iv)    after giving effect to such Extension, no Default or Event of Default shall have occurred and be continuing;

(v)    the representations and warranties set forth this Agreement and in each other Loan Document shall be deemed to be made and shall be true and correct in all material respects on and as of the effective date of such Extension;

(vi)    the Borrower shall have delivered to the Administrative Agent a certificate duly executed by a Responsible Officer of the Borrower certifying as to the satisfaction of the conditions precedent described in the preceding clauses (ii), (iii), and (iv); and

(vii)    the Borrower shall have paid to each Lender a fee equal to 3.0% of the outstanding principal balance of such Lender's Loans as of the then current Stated Maturity Date (which fee shall be paid (assuming all other conditions precedent have been satisfied) on the then current Stated Maturity Date by being added to the outstanding principal balance of such Lender's Loans, and thereafter shall be treated as principal (and accrue interest) for all purposes hereunder).

(b)    In the event the conditions precedent to the initial exercise of the Extension option contemplated hereby have been satisfied timely the Stated Maturity Date shall thereafter be deemed to be [●][15]. In the event the conditions precedent to the second (and final) exercise of the Extension option contemplated hereby have been satisfied timely the Stated Maturity Date shall thereafter be deemed to be [●][16].

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES

Each of Holdings and the Borrower hereby represents and warrants, on behalf of itself and each of its respective Subsidiaries, to the Lenders that:

**Section 3.01    Organization; Powers**. Each Loan Party is duly organized, validly existing and in good standing (to the extent such concept exists in the relevant jurisdictions) under the laws of the jurisdiction of its organization, has the corporate or other organizational power and authority to carry on its business as now conducted and as proposed to be conducted and to execute, deliver and perform its obligations under each Loan Document to which it is a party and to effect the Transactions and, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

---

[15] NTD: Eighteen month anniversary of the Effective Date

[16] NTD:  Twenty four month anniversary of the Effective Date

4852-4630-2277.1

**Section 3.02    Authorization; Enforceability**.  The Transactions to be entered into by each Loan Party have been duly authorized by all necessary corporate or other action and, if required, action by the holders of such Loan Party's Equity Interests.  This Agreement has been duly executed and delivered by each of Holdings and the Borrower and constitutes, and each other Loan Document to which any Loan Party is to be a party, when executed and delivered by such Loan Party and upon entry of the Interim Order or the Final Order, will constitute, a legal, valid and binding obligation of Holdings, the Borrower or such Loan Party, as the case may be, enforceable against it in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

**Section 3.03    Governmental Approvals; No Conflicts**.  Except as set forth in Schedule 3.03 and the entry of the Interim Order or the Final Order, the Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect and except filings necessary to perfect Liens created under the Loan Documents, (b) will not violate (i) the Organizational Documents of, or (ii) any Requirements of Law applicable to, Holdings, the Borrower or any Guarantor, (c) will not violate or result in a default under any indenture or other agreement or instrument binding upon Holdings, the Borrower or any Guarantor or their respective assets, or give rise to a right thereunder to require any payment, repurchase or redemption to be made by Holdings, the Borrower or any Guarantor, or give rise to a right of, or result in, termination, cancellation or acceleration of any obligation thereunder and (d) will not result in the creation or imposition of any Lien on any asset of Holdings, the Borrower or any Guarantor, except Liens created under the Loan Documents, except (in the case of each of clauses (a), (b)(ii) and (c)) to the extent that the failure to obtain or make such consent, approval, registration, filing or action, or such violation, as the case may be, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect. Schedule 3.03 sets forth all Governmental Approvals required to conduct the businesses of the Loan Parties as such businesses are conducted on the Effective Date or proposed to be conducted thereafter and all material contracts, including material indentures, agreements and instruments, binding upon Holdings, the Borrower or any Guarantor or their respective assets.

**Section 3.04    Properties; Good Title**.

(a)    Schedule 3.04(a) sets forth all of the Owned Real Properties and leased or sub-leased Real Properties of the Loan Parties as of the Effective Date.

(b)    Each Loan Party has good title to all the Owned Real Properties listed on Schedule 3.04 as owned by it, (i) free and clear of all Liens except for Liens permitted by Section 6.02 and (ii) except for minor defects in title that do not interfere in any material respect with its ability to conduct its business as currently conducted or as proposed to be conducted or to utilize such properties for their intended purposes.

(c)    No Mortgage encumbers any Owned Real Property that is located in an area that has been identified by the Secretary of Housing and Urban Development as an area having special flood hazards within the meaning of the National Flood Insurance Act of 1968 unless flood insurance available under such Act has been obtained in accordance with Section 5.07.

(d)    No affiliate of the Borrower holds any interests in any personal property or real property required to conduct the business of the Borrower as such business is conducted on the Effective Date or proposed to be conducted thereafter.

40

(e)   The Loan Parties, collectively, have good title to all material personal property required to conduct their business as such business is conducted on the Effective Date or proposed to be conducted thereafter.

**Section 3.05** <u>**Litigation and Environmental Matters**</u>.

(a)   Except the Chapter 11 Cases and as disclosed on <u>Schedule 3.05</u>, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, to the knowledge of Holdings or the Borrower, threatened in writing against or affecting Holdings, the Borrower or any Subsidiary Loan Party that could reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect.

(b)   Except with respect to any other matters that, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect, none of Holdings, the Borrower or any Guarantor (i) has failed to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, (ii) has, to the knowledge of Holdings or the Borrower, become subject to any Environmental Liability, (iii) has received written notice of any claim with respect to any Environmental Liability, (iv) has, to the knowledge of Holdings or the Borrower, any basis to reasonably expect that Holdings, the Borrower or any Guarantor will become subject to any Environmental Liability, (v) the properties currently or to the knowledge of Holdings, the Borrower or any Guarantor formerly owned leased or operated by Holdings, the Borrower or any Guarantor do not contain any Hazardous Materials in amounts or concentrations which constitute a violation of, require response or other corrective action by Holdings, the Borrower or any Guarantor under applicable Environmental Laws and (vi) to the knowledge of Holdings or the Borrower, all Hazardous Materials transported from any property currently or formerly owned or operated by any of Holdings, the Borrower or any Guarantor for off-site disposal have been disposed of in a manner which would not reasonably be expected to result, individually or in the aggregate, in a Material Adverse Effect.

**Section 3.06** <u>**Compliance with Laws and Agreements**</u>.

(a)   The Borrower is in compliance with (i) its Organizational Documents, (ii) all Requirements of Law applicable to it or its property and (iii) all Post-Petition agreements and instruments binding upon it or its property, except in the case of clauses (ii) and (iii) of this Section, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b)   Holdings and the Subsidiary Loan Party are in compliance with (i) its Organizational Documents, (ii) all Requirements of Law applicable to it or its property and (iii) all agreements and instruments binding upon it or its property, except in the case of clauses (ii) and (iii) of this Section, where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(c)   [Intentionally omitted].

(d)   Except as disclosed on <u>Schedule 3.06</u>, none of Holdings, the Borrower or any Subsidiary Loan Party thereof has received notice, and no such Person has knowledge, that any Governmental Authority or accreditation organization is considering limiting, suspending, terminating, or revoking any Governmental Approval required to conduct the businesses of the Loan Parties as such businesses are conducted on the Effective Date or proposed to be

41

conducted thereafter, except such actions that would not reasonably be expected to result in a Material Adverse Effect. All such Governmental Approvals are valid and in full force and effect.

**Section 3.07** **Investment Company Status**.

(a)   No Loan Party is an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940, as amended from time to time.

(b)   No Loan Party is an EEA Financial Institution.

**Section 3.08** **Taxes**.   Except as described on <u>Schedule 3.08</u>, Holdings, the Borrower and each Guarantor (a) have timely filed or caused to be filed all Tax returns and reports required to have been filed and (b) have paid or caused to be paid all material Taxes levied or imposed on their properties, income or assets (whether or not shown on a Tax return) including in their capacity as tax withholding agents, except any Taxes that are being contested in good faith by appropriate proceedings, <u>provided</u> that Holdings, the Borrower or such Guarantor, as the case may be, has set aside on its books adequate reserves therefore in accordance with GAAP. Except as described on <u>Schedule 3.08</u>, there is no material proposed Tax assessment, deficiency or other claim against Holdings, the Borrower or any Guarantor except those being actively contested by such Loan Party in good faith and by appropriate proceedings diligently conducted that stay the enforcement of the Tax in question and for which adequate reserves have been provided in accordance with GAAP.

**Section 3.09** **ERISA**.

(a)   Except as could not, individually or in the aggregate, reasonably be expected to result in a Material Adverse Effect, each ERISA Plan is in compliance with the applicable provisions of ERISA, the Code and other federal or state laws.

(b)   Except as could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect, (i) no ERISA Event has occurred or is reasonably expected to occur, (ii) neither Holdings nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability under Title IV of ERISA with respect to any ERISA Plan (other than premiums due and not delinquent under Section 4007 of ERISA), (iii) neither Holdings nor any ERISA Affiliate has incurred, or reasonably expects to incur, any liability (and no event has occurred which, with the giving of notice under Section 4219 of ERISA, would result in such liability) under Sections 4201 or 4243 of ERISA with respect to a Multiemployer Plan and (iv) neither Holdings nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or 4212(c) of ERISA.

**Section 3.10** **Disclosure**.   None of the reports, financial statements, certificates or other written information furnished by or on behalf of any Loan Party to the Administrative Agent or any Lender in connection with the negotiation of any Loan Document or delivered thereunder (as modified or supplemented by other information so furnished) when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; <u>provided</u>, that, with respect to projected financial information, Holdings and the Borrower represent only that such information was prepared in good faith based upon assumptions believed by them to be reasonable at the time delivered and, if such projected financial information was delivered prior to the Effective Date, as of the Effective Date, it being understood that any such projected financial information may vary from actual results and such variations could be material. The Loan Parties have not failed to disclose to the

42

Administrative Agent or any Lender any material assumptions made with respect to, or in connection with, the Budget and all reports or other information contained in the Budget are true, correct, complete and accurate in all material respects (except for that information which represents forecasts, which represent Borrower's good faith estimates).

**Section 3.11** **Subsidiaries**. Schedule 3.11 sets forth the name of, and the ownership interest of Holdings and each Subsidiary in, each Subsidiary of Holdings.

**Section 3.12** **Intellectual Property; Licenses, Etc.** Except as could not reasonably be expected to have a Material Adverse Effect, Holdings, the Borrower and the Guarantors own, license or possess the right to use, all Intellectual Property that is necessary for the operation of their businesses as currently conducted, without conflict in any material respect with the Intellectual Property of any Person. No material Intellectual Property used by Holdings, the Borrower or any Guarantor in the operation of its business as currently conducted infringes in any material respect upon any rights held by any Person. Except as set forth on Schedule 3.12, no claim or litigation regarding any of the Intellectual Property is pending or, to the knowledge of Holdings and the Borrower, threatened against Holdings, the Borrower or any Guarantor.

**Section 3.13** **Federal Reserve Regulations**. None of Holdings, the Borrower or any other Guarantor is engaged or will engage, principally or as one of its important activities, in the business of purchasing or carrying margin stock (within the meaning of Regulation U of the Board of Governors), or extending credit for the purpose of purchasing or carrying margin stock. No part of the proceeds of the Loans will be used, directly or indirectly, to purchase or carry any margin stock or to refinance any Indebtedness originally incurred for such purpose, or for any other purpose that entails a violation (including on the part of any Lender) of the provisions of Regulations U or X of the Board of Governors.

**Section 3.14** **Use of Proceeds**.

(a) The Borrower will use the proceeds of the Loans solely in accordance with the Budget to (i) pay Transaction Costs, (ii) pay the Designated Pre-Petition Liabilities, (iii) adequate protection payments in the amount required by a court order entered by the Bankruptcy Court; and (iv) provide for the ongoing working capital needs of the Borrower during the pendency of the Chapter 11 Cases, including payment of professional fees and expenses incurred, amounts paid to the United States Trustee and Bankruptcy Court clerk's fees paid, in each case, in connection with the Chapter 11 Cases.

(b) No proceeds of the Loans, any Collateral or any cash of any Loan Party may be used for any fees or expenses incurred in connection with the investigation, initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against (i) the Administrative Agent, or any Lender or (ii) in connection with challenging, invalidating, disallowing, recharacterizing, setting aside, avoiding, subordinating, in whole or in part, or taking or attempting to take any other action to render unenforceable, the Liens, claims, interests and adequate protection of the Administrative Agent and the Lenders.

**Section 3.15** **Labor Matters**. There are no strikes, lockouts or slowdowns against Holdings, the Borrower or any Guarantor pending or, to the knowledge of Holdings or the Borrower, threatened. The hours worked by and payments made to employees of Holdings, the Borrower and the Guarantors have not been in violation of the Fair Labor Standards Act or any other applicable Federal, state, local or foreign law dealing with such matters, except for such violations that could not reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect. All payments due from Holdings, the Borrower or any Guarantor, or for which any claim may be made against Holdings, the Borrower or

43

any Guarantor, on account of wages and employee health and welfare insurance and other benefits, have been paid or accrued as a liability on the books of Holdings, the Borrower or such Guarantor.

**Section 3.16** **Reorganization Matters**.

(a)    The Chapter 11 Cases were commenced on the Petition Date and proper notice has been given of (i) the motion seeking approval of the Loan Documents and the Interim Order and Final Order, (ii) the hearing for the approval of the Interim Order, and (iii) promptly after the scheduling thereof, the hearing for the approval of the Final Order.

(b)    After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Loan Document Obligations will constitute allowed administrative expense claims in the Chapter 11 Cases having priority over all administrative expense claims and unsecured claims against the Loan Parties now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(a), 503(b), 507(a), 507(b), 546, 726, 1113, 1114, as provided under Section 364(c)(l) of the Bankruptcy Code, subject, as to priority only to the Carve-Out, in the priorities set forth in the Interim Order and the Final Order.

(c)    The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended.

**Section 3.17** **Healthcare Matters.**

(a)    Government Health-Care-Insurance Receivables. Schedule 3.17 sets forth a complete and accurate list of each Loan Party's deposit account(s) into which the proceeds of any such Loan Party's Government Health-Care-Insurance Receivables are deposited. None of the proceeds of a Loan Party's Government Health-Care-Insurance Receivables have been deposited into any deposit account other than such Loan Party's Excluded Receivables Account, which, in each case, is subject to a Collection Account Agreement. None of the proceeds of any Health-Care Insurance Receivables, Accounts or payment intangibles of a Loan Party, which are not Government Health-Care-Insurance Receivables, have been deposited into such Loan Party's Excluded Receivables Account.

(b)    Healthcare Permits. Holdings, Borrower and each Subsidiary Loan Party thereof has (i) each Healthcare Permit and other rights from, and has made all declarations and filings with, all applicable Governmental Authorities necessary to engage in the ownership, management and operation of the Project or its assets, except where the failure to take such action would not be reasonably expected, individually or in the aggregate, to result in a Material Adverse Effect, and (ii) no knowledge that any Governmental Authority is considering limiting, suspending or revoking any such material Healthcare Permit. All such Healthcare Permits are valid and in full force and effect and Holdings, Borrower and/or the applicable Subsidiary Loan Party thereof is in compliance with the terms and conditions of all such Healthcare Permits except where the failure to so comply would not be reasonably expected, individually or in the aggregate, to result in a Material Adverse Effect.

(c)    Specific Licensing. Each Project is duly licensed under the applicable laws of the State of Arizona. Neither Holdings, Borrower nor any Subsidiary Loan Party thereof has granted to any third party the right to reduce the number of licensed beds in the Project or the

4852-4630-2277.1

right to apply for approval to move any and all of the licensed beds in the Project to any other location and, except as described in Schedule 3.17, there are no proceedings or contemplated to reduce the number of licensed beds in the Projects.

(d)     Accreditation.    Borrower has received and maintains accreditation in good standing and without impairment by all applicable Accrediting Organizations, to the extent required by law (including any equivalent regulation) or the terms of any agreement pertaining to the Project. None of Holdings, Borrower or any Subsidiary Loan Party thereof has received any notice or communication from any Accrediting Organization that the Project is in danger of losing its accreditation due to a failure to comply with a plan of correction.

(e)     Participation Agreements/Provider Status/Cost Reports.

(i)     Except as described on Schedule 3.17, there is no investigation, audit, claim review, or other action pending or, to the knowledge of Holdings, Borrower or any Subsidiary Loan Party thereof, threatened which could result in a revocation, suspension, termination, probation, restriction, limitation, or non-renewal of any Third Party Payor participation agreement or provider number or other Healthcare Permit or result in exclusion of Holdings or Borrower from any Third Party Payor Program, nor has any Third Party Payor Program made any decision not to renew any participation agreement or provider agreement or other Healthcare Permit related to the Project, nor has Holdings or Borrower made any decision not to renew any participation agreement or provider agreement or other Healthcare Permit, nor is there any action pending or threatened to impose material intermediate or alternative sanctions with respect to any Project.

(ii)     Holdings and Borrower and, to the knowledge of Holdings and Borrower, each of its contractors have properly and legally billed all intermediaries and Third Party Payors for services rendered with respect to the Projects and have maintained their records to reflect such billing practices.  No funds relating to Holdings or Borrower are now, or, to the knowledge of Holdings or Borrower, will be withheld by any Third Party Payor.

(iii)     Each of Holdings, Borrower and each Subsidiary Loan Party thereof has the requisite valid participation agreement or provider number or other Healthcare Permit to bill (A) the Medicare program, (B) the Medicaid programs in the state of Arizona and (C) all other Third Party Payor Programs which have historically accounted for more than __% [17] the revenues of such Person.  Borrower has the right to receive and retain funds received from Medicaid for services and goods provided or furnished at the Project.

(iv)     All Medicare, Medicaid, and private insurance cost reports and financial reports submitted by Holdings or Borrower are and will be materially accurate and complete and have not been and will not be misleading in any material respects.  No cost reports for the Projects remain "open" or unsettled and there are no current, pending or outstanding Medicare, Medicaid or other Third Party Payor Program reimbursement audits or appeals pending with respect to the Project, Holdings or Borrower, except as my have occurred in the ordinary course of business and consistent with general past practices.

---

[17] Please provide.

4852-4630-2277.1

(f)     No Violation of Health Care Laws.

(i)     None of the Project, Holdings nor Borrower are in violation of any Health Care Laws.

(ii)     The Borrower is HIPAA Compliant.

(iii)     No Project is currently subject to any plan of correction that has not been accepted by or is currently the subject of a review by the applicable state authority. Borrower has not received notice of any charges of current or recent patient abuse at any Project.

(g)     Proceedings.  Neither Holdings, Borrower nor any Subsidiary Loan Party thereof nor any Project is subject to any proceeding, suit or, to Holdings, Borrower or any Subsidiary Loan Party thereof's knowledge, investigation by any federal, state or local government or quasi-governmental body, agency, board or authority or any other administrative or investigative body (including the Office of the Inspector General of the United States Department of Health and Human Services):  (i) which may result in the imposition of a fine, alternative, interim or final sanction, or a lower reimbursement rate for services rendered to eligible patients; (ii) which could result in the revocation, transfer, surrender, suspension or other impairment of the operating certificate, provider agreement or Healthcare Permits of Holdings or Borrower or the Project; (iii) which pertains to or requests any voluntary disclosure pertaining to a potential overpayment matter involving the submission of claims to such payor by Holdings, Borrower or any Subsidiary Loan Party thereof; or (iv) which pertains to any state or federal Medicare or Medicaid cost reports or claims filed by Holdings or Borrower (including, without limitation, any reimbursement audits), or any disallowance by any commission, board or agency in connection with any audit of such cost reports.

(h)     Hill-Burton.  Holdings, Borrower and each Subsidiary Loan Party thereof is not nor will be a participant in any federal program whereby any federal, state or local government or quasi-governmental body, agency, board or other authority may have the right to recover funds by reason of the advance of federal funds, including, without limitation, those authorized under the Hill-Burton Act (42 U.S.C. 291, et seq.).

(i)     Fraud and Abuse.

(i)     Each of Holdings, Borrower and each Subsidiary Loan Party thereof has not, nor to its knowledge has been threatened to have, and no owner, officer, manager, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in Holdings, Borrower or any Subsidiary Loan Party thereof has, engaged in any of the following:  (A) knowingly and willfully making or causing to be made a false statement or representation of a material fact in any application for any benefit or payment under any Health Care Laws; (B) knowingly and willfully making or causing to be made any false statement or representation of a material fact for use in determining rights to any benefit or payment under any Health Care Laws; (C) failing to disclose knowledge by a claimant of the occurrence of any event affecting the initial or continued right to any benefit or payment under any Health Care Laws on its own behalf or on behalf of another, with intent to secure such benefit or payment fraudulently; (D) knowingly and willfully soliciting or receiving any remuneration (including any kickback, bribe or rebate), directly or indirectly, overtly or covertly, in cash or in kind or offering to pay such remuneration (I) in return for referring an

46

individual to a Person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part by any Health Care Laws, or (II) in return for purchasing, leasing or ordering or arranging for or recommending the purchasing, leasing or ordering of any good, facility, service, or item for which payment may be made in whole or in part by any Health Care Laws; (E) presenting or causing to be presented a claim for reimbursement for services that is for an item or services that was known or should have been known to be (I) not provided as claimed, or (II) false or fraudulent; or (F) knowingly and willfully making or causing to be made or inducing or seeking to induce the making of any false statement or representation (or omitting to state a fact required to be stated therein or necessary to make the statements contained therein not misleading) of a material fact with respect to (I) a Project in order that the Project may qualify for Governmental Authority certification, or (II) information required to be provided under 42 U.S.C. § 1320a-3. All contractual arrangements to which Holdings, Borrower or any Subsidiary Loan Party thereof is a party are in compliance with all Health Care Laws, except where the failure to so comply would not be reasonably expected, individually or in the aggregate, to result in a Material Adverse Effect.

(ii) Each of Holdings, Borrower and each Subsidiary Loan Party thereof has not, nor to its knowledge has been threatened to have, and no owner, officer, manager, employee or Person with a "direct or indirect ownership interest" (as that phrase is defined in 42 C.F.R. §420.201) in Holdings, Borrower or any Subsidiary Loan Party thereof has, or to its knowledge has been threatened to have: (A) had a civil monetary penalty assessed against him or her pursuant to 42 U.S.C. §1320a-7a or is the subject of a proceeding seeking to assess such penalty; (B) been excluded from participation in a Federal Health Care Program (as that term is defined in 42 U.S.C. §1320a-7b) or is the subject of a proceeding seeking to assess such penalty, or has been "suspended" or "debarred" from selling products to the U.S. government or its agencies pursuant to the Federal Acquisition Regulation, relating to debarment and suspension applicable to federal government agencies generally (48 C.F.R. Subpart 9.4), or other applicable laws or regulations; or (C) been convicted (as that term is defined in 42 C.F.R. §1001.2) of any of those offenses described in 42 U.S.C. §1320a-7b or 18 U.S.C. §§669, 1035, 1347, 1518 or is the subject of a proceeding seeking to assess such penalty.

## ARTICLE IV

## CONDITIONS

Section 4.01 **Effective Date**. The obligations of the Lenders to make the Loans set forth on Schedule 2.01 as to be made on and as of the Effective Date hereunder shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a) The Administrative Agent (or its counsel) shall have received on or before the Effective Date duly executed counterparts of the following Loan Documents:

(i) this Agreement;

(ii) the Guarantee Agreement;

(iii) the Collateral Agreement;

(iv)    the Mortgages;

(v)    the Subordination Agreement; and

(vi)    the Fee Letter.

(b)    The Collateral and Guarantee Requirement shall have been satisfied and the Administrative Agent and the Lenders shall have received a completed Perfection Certificate in form and substance satisfactory to the Administrative Agent and the Lenders three (3) days prior to the Effective Date (or such shorter period as determined by the Administrative Agent in its sole discretion) and signed by a Responsible Officer of the Borrower, together with all attachments contemplated thereby.

(c)    The Administrative Agent shall have received a fully executed pay-off letter reasonably satisfactory to the Administrative Agent confirming that all obligations owing by any Loan Party to Designated Pre-Petition Lenders will be repaid in full from the proceeds of the Loans proposed to be advanced on the Effective Date and all Liens upon any of the properties of the Loan Parties or any of their Subsidiaries in favor of the Designated Pre-Petition Lenders shall be terminated by the Designated Pre-Petition Lenders immediately upon such payment.

(d)    [Intentionally omitted]

(e)    The Administrative Agent shall have received a copy of (i) each Organizational Document of each Loan Party certified, to the extent applicable, as of a recent date by the applicable Governmental Authority, (ii) signature and incumbency certificates of the Responsible Officers of each Loan Party executing the Loan Documents to which it is a party, (iii) resolutions of the board of directors and/or similar governing bodies of each Loan Party approving and authorizing the execution, delivery and performance of Loan Documents to which it is a party, certified as of the Effective Date by its secretary, an assistant secretary or a Responsible Officer as being in full force and effect without modification or amendment, and (iv) a good standing certificate (to the extent such concept exists) from the applicable Governmental Authority of each Loan Party's jurisdiction of incorporation, organization or formation.

(f)    All material third party and governmental consents necessary in connection with the Transactions, the financing contemplated thereunder and all other related transactions contemplated thereby shall have been obtained.

(g)    The Administrative Agent shall have received all fees and other amounts contemplated by the Loan Documents due and payable to the Lenders (or their affiliates) on or prior to the Effective Date, including reimbursement or payment of all out-of-pocket expenses (including all reasonable fees, charges and disbursements of counsel and any financial advisor) required to be reimbursed or paid by any Loan Party.

(h)    Certificates of insurance, including without limitation flood insurance policies, shall be delivered to the Administrative Agent evidencing the existence of insurance to be maintained by Holdings, the Borrower and its Subsidiaries pursuant to Section 5.07 and, if applicable, the Administrative Agent shall be designated as an additional insured and loss payee or mortgagee endorsement as its interest may appear thereunder, or solely as the additional insured, as the case may be, thereunder.

48

(i)   The Administrative Agent and the Lenders shall have received (i) the Budget, and (ii) a forecast for the period of [●] months following the Effective Date.

(j)   No Default or Event of Default shall exist or would result from the extension of the Loans on the Effective Date.

(k)   The representations and warranties set forth in Article III shall be true and correct on and as of the Effective Date, and the Administrative Agent shall have received a certificate of a Responsible Officer of the Borrower certifying as to the satisfaction of the matters described in Sections 4.01(j) and (k).

(l)   The Administrative Agent shall have received, at least five (5) days prior to the Effective Date, all documentation and other information about the Loan Parties as shall have been reasonably requested by the Administrative Agent under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the USA Patriot Act.

(m)  The Bankruptcy Court shall have entered, upon motion in form and substance reasonably satisfactory to the Administrative Agent, on such prior notice as may be reasonably satisfactory to the Administrative Agent, the Interim Order as to the Loans to be made on the Effective Date no later than five (5) Business Days after the date of commencement of the Chapter 11 Cases, approving and authorizing this Agreement and the other Loan Documents and the priorities and liens granted under Bankruptcy Code Section 364(c) and (d), as applicable, in form and substance satisfactory to the Administrative Agent and its counsel;

(n)   The Interim Order shall not have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the Administrative Agent and the Lenders.

(o)   The Loan Parties shall be in compliance in all respects with the Interim Order.

(p)   The Chapter 11 Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings to be entered at the time of commencement of the Chapter 11 Cases or shortly thereafter but in no event later than three (3) Business Days after the Petition Date shall have been reviewed in advance by the Administrative Agent and the Lenders and shall be reasonably satisfactory in form and substance to the Administrative Agent and the Lenders.

(q)   No trustee or examiner shall have been appointed with respect to the Debtors or their respective properties.

(r)   A cash management order satisfactory to the Administrative Agent and the Lenders shall be in full force and effect, and cash management arrangements satisfactory to the Administrative Agent and the Lenders shall have been implemented.

(s)   No material adverse change in the operations, assets, revenues, financial condition, profits or prospects of the Loan Parties (other than by virtue of the commencement of the Chapter 11 Cases) shall have occurred.

(t)   All corporate and judicial proceedings and all instruments and agreements in connection with the Transactions among the Loan Parties and the Lenders contemplated by the

49

Loan Documents shall be satisfactory in form and substance to the Administrative Agent and the Lenders, and the Lenders shall have received all information and copies of all documents or papers requested by any of them.

**Section 4.02** <u>**Final Order Entry Date and Final Funding Loans**</u>.  The obligations of the Lenders to make the Loans set forth on <u>Schedule 2.01</u> as to be made on and as of the Final Order Entry Date hereunder shall not become effective until the date on which each of the following conditions shall be satisfied (or waived in accordance with Section 9.02):

(a)  The representations and warranties of each Loan Party set forth in the Loan Documents shall be true and correct in all material respects on and as of the date of such Borrowing; <u>provided</u>, that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; <u>provided</u>, <u>further</u> that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language shall be true and correct in all respects on the date of such credit extension or on such earlier date, as the case may be.

(b)  At the time of and immediately after giving effect to such Borrowing, no Default or Event of Default shall have occurred and be continuing.

(c)  The Administrative Agent shall have received all fees and other amounts contemplated by the Loan Documents due and then payable to the Lenders as of the Final Order Entry Date, including reimbursement or payment of all out-of-pocket expenses (including all reasonable fees, charges and disbursements of counsel and any financial advisor) required to be reimbursed or paid by any Loan Party.

(d)  The Lenders shall have received the required periodic updates of the Budget and Variance Reports, each in form and substance satisfactory to the Administrative Agent and the Lenders, and the Loan Parties shall be in compliance with the updated Budget as qualified by Section 6.12(b).

(e)  No Default or Event of Default shall exist or result from the extension of any Loans on such Funding Date.

(f)  Not later than forty-five (45) days following the Interim Order Entry Date, the Final Order in form and substance satisfactory to the Administrative Agent including, without limitation, the provisions identified in Section 4.01(n) hereof, which Final Order shall have been entered on no less than three (3) Business Days' prior written notice to the Administrative Agent, approving and authorizing on a final basis the matters and containing the provisions described in the Interim Order (the "<u>Final Order</u>").

(g)  The Final Order shall not have been reversed, modified, amended, stayed or vacated.

(h)  The Loan Parties shall be in compliance in all respects with the Final Order.

Each Borrowing shall be deemed to constitute a representation and warranty by Holdings and the Borrower on the date thereof as to each of the matters specified in this Section.

50

# ARTICLE V

## AFFIRMATIVE COVENANTS

Until the Commitments shall have expired or been terminated and the principal of and interest on each Loan and all fees, expenses and other amounts (other than contingent amounts not yet due) payable under any Loan Document shall have been indefeasibly paid in full, each of Holdings and the Borrower covenants and agrees with the Lenders that:

**Section 5.01    Financial Statements and Other Information**.  Holdings or the Borrower will furnish to the Administrative Agent, on behalf of each Lender:

(a)    on or before the date that is 120 days after the end of each fiscal year of Holdings, commencing with the fiscal year ending December 31, 2017, audited consolidated balance sheet and audited consolidated statements of operations and comprehensive income, stockholders' equity and cash flows of Holdings as of the end of and for such year, and related notes thereto, setting forth in each case in comparative form the figures for the previous fiscal year, all reported on by independent public accountants of recognized national standing reasonably acceptable to the Administrative Agent to the effect that such consolidated financial statements present fairly in all material respects the financial condition as of the end of and for such year and results of operations and cash flows of Holdings on a consolidated basis in accordance with GAAP consistently applied;

(b)    on or before the date that is 30 days after the end of each fiscal month of Holdings, commencing with the financial statements for the month ending March 31, 2017, monthly combined financial statements of the Debtors, including an unaudited consolidated balance sheet and unaudited consolidated statements of operations and cash flows as of the end of and for such preceding monthly period and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year, all certified by a Financial Officer as presenting fairly in all material respects the combined financial condition as of the end of and for such monthly period and such portion of the fiscal year and results of operations and cash flows of the Debtors (on a combined basis) in accordance with GAAP consistently applied, year-end adjustments and the absence of footnotes;

(c)    concurrently with the delivery of financial statements under paragraph (a) or (b) above, a Compliance Certificate;

(d)    not later than five (5) days after any delivery of financial statements under paragraph (a) above, if any are delivered, a certificate of the accounting firm that reported on such financial statements stating whether it obtained knowledge during the course of its examination of such financial statements of any Default relating to Section 6.12 and, if such knowledge has been obtained, describing such Default (which certificate may be limited to the extent required by accounting rules or guidelines);

(e)    not later than 30 days after the commencement of each fiscal year of Holdings, a detailed consolidated budget of the Debtors for such fiscal year (including a projected consolidated balance sheet and consolidated statements of projected operations, comprehensive income and cash flows as of the end of and for such fiscal year and setting forth the material assumptions used for purposes of preparing such budget);

4852-4630-2277.1

(f)    every thirteen (13) weeks, commencing with the date that is thirteen (13) weeks after the Petition Date, a proposed revised Budget, which shall be subject to the reasonable approval of the Administrative Agent and substantially in the form of the then existing approved Budget, it being further agreed that, if such proposal (or any further revision thereof) does not receive such approval, (A) the Borrower shall use its commercially reasonable efforts to revise and resubmit such proposal in response to comments received thereon from the Administrative Agent and (B) until such time as the revised Budget is approved, the then existing Budget will remain in effect as the approved Budget;

(g)    not later than Wednesday of each week (commencing on the Wednesday that is four (4) weeks after the Petition Date):

(i)    weekly line-by-line variance reports (each, a "<u>Variance Report</u>"), in form and substance acceptable to the Administrative Agent, for the preceding weekly period and on a cumulative basis for the first reporting week of each new Budget to the report date (with a reconciliation of the aggregate variance for the period from the Petition Date to the report date), comparing actual Cash Receipts and Cash Disbursements to amounts projected in the approved Budget and showing on a line-by-line basis any variance to the corresponding line item of the approved Budget together with an explanation for such variance; and

(ii)    a weekly business report, in form and substance satisfactory to the Administrative Agent;

(h)    no less than three (3) days prior to filing drafts of all pleadings, motions, applications, judicial information, financial information and any other documents (including the Interim Order and the Final Order, each of which must be in form and substance satisfactory to the Administrative Agent and the Lenders) filed by or on behalf of the Debtor with the Bankruptcy Court or delivered to the U.S. Trustee in the Chapter 11 Cases, or distributed by or on behalf of the Debtor to any official committee in the Chapter 11 Cases (except in the case of any such documents filed on an expedited basis in connection with an emergency proceeding, which shall be delivered as soon as practicable and in any event prior to the filing thereof); and

(i)    promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of Holdings, the Borrower or any of their respective Subsidiaries, or compliance with the terms of any Loan Document, as the Administrative Agent on its own behalf or on behalf of any Lender may reasonably request, including, without limitation, standalone financial statements of any Subsidiary of Holdings that is not a Loan Party.

The Borrower hereby acknowledges that (a) the Administrative Agent may make available to the Lenders materials and/or information provided by or on behalf of the Borrower hereunder (collectively, "<u>Borrower Materials</u>") by posting the Borrower Materials on IntraLinks or another similar electronic system (the "<u>Platform</u>") and (b) certain of the Lenders (each, a "<u>Public Lender</u>") may have personnel who do not wish to receive material non-public information with respect to the Borrower or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market-related activities with respect to such Persons' securities. The Borrower hereby agrees to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking

52

Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to the Borrower or its securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 9.12); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information"; and (z) the Administrative Agent shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information." Each Loan Party hereby acknowledges and agrees that, unless the Borrower notifies the Administrative Agent in advance, all financial statements and certificates furnished pursuant to Sections 5.01(a), (b) and (c) above are hereby deemed to be suitable for distribution, and to be made available, to all Lenders and may be treated by the Administrative Agent and the Lenders as not containing any material nonpublic information.

**Section 5.02    Notices of Material Events**. Promptly after any Responsible Officer of Holdings or the Borrower obtains knowledge thereof, Holdings or the Borrower will furnish to the Administrative Agent written notice of the following:

(a)    the occurrence of any Default or Event of Default;

(b)    to the extent permissible by law, the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or, to the knowledge of a Financial Officer or another executive officer of Holdings, the Borrower or any Subsidiary Loan Party, affecting Holdings, the Borrower or any Subsidiary Loan Party or the receipt of a notice of an Environmental Liability that could reasonably be expected to result in a Material Adverse Effect;

(c)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(d)    of the occurrence of (i) any Health Care Reportable Event and (ii) any ERISA Event; and

(e)    of any material change in accounting policies or financial reporting practices by any Loan Party.

Each notice delivered under this Section 5.02 shall be accompanied by a written statement of a Responsible Officer of Holdings or the Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

**Section 5.03    Information Regarding Collateral**.

(a)    Holdings or the Borrower will furnish to the Administrative Agent written notice, no later than ten (10) Business Days prior to the occurrence of any such change, of any change (i) in any Loan Party's legal name (as set forth in its certificate of organization or like document), (ii) in the jurisdiction of incorporation or organization of any Loan Party or in the form of its organization or (iii) in any Loan Party's organizational identification number.

(b)    Not later than five days after delivery of financial statements pursuant to Section 5.01(a) or (b), Holdings or the Borrower shall deliver to the Administrative Agent a certificate executed by a Responsible Officer of Holdings or the Borrower (i) setting forth the

4852-4630-2277.1

information required pursuant to the Perfection Certificate or confirming that there has been no change in such information since the date of the Perfection Certificate delivered on the Effective Date or the date of the most recent certificate delivered pursuant to this Section, and (ii) certifying that all notices required to be given prior to the date of such certificate by this Section 5.03 have been given.

Section 5.04  **Existence; Conduct of Business**.  Each of Holdings and the Borrower will, and will cause each Guarantor to, do or cause to be done all things necessary to obtain, preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except to the extent (other than with respect to the preservation of the existence of Holdings and the Borrower) that the failure to do so could not reasonably be expected to have a Material Adverse Effect; provided, that the foregoing shall not prohibit any merger permitted by Section 6.03 or any Disposition permitted by Section 6.05.

Section 5.05  **Payment of Taxes, etc.**  Each of Holdings and the Borrower will, and will cause each Guarantor to, pay its obligations and liabilities in respect of Taxes imposed upon it or its income or properties or in respect of its property or assets, before the same shall become delinquent or in default, except to the extent any such Taxes will be provided for in the Plan, are not required to be paid when due under provisions of the Bankruptcy Code, or are being contested in good faith and by appropriate proceedings diligently conducted that stay the enforcement of the Tax in question and for which adequate reserves have been provided in accordance with GAAP.

Section 5.06  **Maintenance of Properties**.  Each of Holdings and the Borrower will, and will cause each Guarantor to, keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

Section 5.07  **Insurance**.

(a)  Each of Holdings and the Borrower will, and will cause each Guarantor to, maintain, with insurance companies that Holdings believes (in the good faith judgment of the management of Holdings) are financially sound and responsible at the time the relevant coverage is placed or renewed, insurance in at least such amounts (after giving effect to any self-insurance which Holdings believes (in the good faith judgment of management of Holdings) is reasonable and prudent in light of the size and nature of its business) and against at least such risks (and with such risk retentions) as Holdings believes (in the good faith judgment or the management of Holdings) are reasonable and prudent in light of the size and nature of its business, and will furnish to the Lenders, upon written request from the Administrative Agent, information presented in reasonable detail as to the insurance so carried. Each such policy of insurance shall (i) name the Administrative Agent, on behalf of the Lenders, as an additional insured thereunder as its interests may appear and (ii) in the case of each casualty insurance policy, contain a loss payable clause or mortgagee endorsement that names the Administrative Agent, on behalf of the Lenders as the loss payee or mortgagee thereunder.

(b)  If any portion of any Owned Real Property is at any time located in an area identified by the Federal Emergency Management Agency (or any successor agency) as a Special Flood Hazard Area  with respect to which flood insurance has been made available under the National Flood Insurance Act of 1968 (as now or hereafter in effect or successor act thereto), then the Borrower shall, or shall cause each Loan Party to (i) maintain, or cause to be maintained, with a financially sound and reputable insurer, as determined in the Borrower's

54

reasonable discretion, flood insurance in an amount and otherwise sufficient to comply with all applicable rules and regulations promulgated pursuant to the Flood Insurance Laws and (ii) deliver to the Administrative Agent evidence of such compliance in form and substance reasonably acceptable to the Administrative Agent.

**Section 5.08** **Books and Records; Inspection and Audit Rights**. Each of Holdings and the Borrower will, and will cause each Subsidiary Loan Party to, maintain proper books of record and account in which entries that are full, true and correct in all material respects and are in conformity with GAAP consistently applied shall be made of all material financial transactions and matters involving the assets and business of Holdings, the Borrower or any Subsidiary Loan Party, as the case may be. Each of Holdings and the Borrower will, and will cause each Subsidiary Loan Party to, permit any representatives or advisors designated by the Administrative Agent or any Lender, upon reasonable prior notice, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested; *provided*, that, when an Event of Default exists, the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrower at any time during normal business hours and upon reasonable advance notice. Upon request by the Administrative Agent or any Lender from time to time, the senior management and advisors of Holdings and its Subsidiaries will agree to hold a conference with the Administrative Agent and the Lenders.

**Section 5.09** **Compliance with Laws; Compliance with Health Care Laws**.

(a) Each of Holdings and the Borrower will, and will cause each Subsidiary Loan Party to, comply with its Organizational Documents and all Requirements of Law (including Environmental Laws) with respect to it, its property and operations, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(b) Without limiting the prior clause (a), each of Holdings and the Borrower will, and will cause each Subsidiary Loan Party to, comply in all material respects with all Healthcare Laws, except where the failure to do so, individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(c) Each of Holdings, Borrower and each Subsidiary Loan Party thereof will:

(i) timely file or caused to be timely filed (after giving effect to any extension duly obtained), all notifications, reports, submissions, renewals and reports of every kind whatsoever required by Health Care Laws (which reports will be materially accurate and complete in all respects and not misleading in any material respect and shall not remain open or unsettled); and

(ii) timely file or caused to be timely filed (after giving effect to any extension duly obtained), all cost reports required by Health Care Laws, which reports shall be materially accurate and complete in all respects and not misleading in any material respect and which shall not remain open or unsettled, except in accordance with applicable settlement appeals procedures that are timely and diligently pursued and except for any processing delays of any Governmental Authority.

(d) Each of Holdings, Borrower and each Subsidiary Loan Party thereof will maintain in full force and effect, and free from restrictions, probations, conditions or known

4852-4630-2277.1

conflicts which would materially impair the use or operation of the Project for its current use, all Healthcare Permits necessary under Health Care Laws to carry on the business of Holdings, Borrower and each Subsidiary Loan Party thereof.

(e) Borrower will maintain a corporate health care regulatory compliance program ("**CCP**") generally consistent with those maintained by rural hospitals and which includes at least the following components and that reasonably allows Administrative Agent and/or any outside consultants engaged by Administrative Agent from time to time to review such CCP: (i) standards of conduct and procedures that describe compliance policies regarding laws with an emphasis on prevention of fraud and abuse; (ii) specific officer identified as having overall responsibility for compliance with such standards and procedures; (iii) training and education programs which effectively communicate the compliance standards and procedures to employees and agents, including, without limitation, fraud and abuse laws and illegal billing practices; (iv) auditing and monitoring systems and reasonable steps for achieving compliance with such standards and procedures including, without limitation, publicizing a report system to allow employees and agents to anonymously report criminal or suspect conduct and potential compliance problems; (v) disciplinary guidelines and consistent enforcement of compliance policies including, without limitation, discipline of individuals responsible for the failure to detect violations of the CCP; and (vi) mechanisms to immediately respond to detected violations of the CCP.

(f) Borrower will at all times be HIPAA Compliant.

(g) If the Project is currently accredited by an Accrediting Organization, Borrower will (i) maintain such accreditation in good standing and without limitation or impairment, (ii) promptly submit to the Accrediting Organization a plan of correction for any deficiencies listed on any accreditation survey report, and (iii) cure all such deficiencies within such time frame as is necessary to preserve and maintain in good standing and without limitation or impairment such accreditation.

**Section 5.10    Use of Proceeds**.  The Borrower will, and will cause each Guarantor to, use the proceeds of the Loans in accordance with Section 3.14.

**Section 5.11    Additional Subsidiaries**.  If any additional Subsidiary Loan Party is formed or acquired after the Effective Date, Holdings and the Borrower will, no later than three (3) Business Days prior to the date such newly formed or acquired Subsidiary Loan Party is formed or acquired, notify the Administrative Agent thereof, and will cause such Person to satisfy the Collateral and Guarantee Requirement with respect to such Person and with respect to any Equity Interest in or Indebtedness of such Person owned by or on behalf of any Loan Party within ten (10) Business Days after the date of such formation or acquisition (or such longer period as the Administrative Agent shall reasonably agree and the Administrative Agent shall have received a completed Perfection Certificate with respect to such Person signed by a Responsible Officer, together with all attachments contemplated thereby).

**Section 5.12    Further Assurances**.

(a) Each of Holdings and the Borrower will, and will cause each Loan Party to, execute any and all further documents, financing statements, agreements and instruments, and take all such further actions (including the filing and recording of financing statements, fixture filings, mortgages, deeds of trust and other documents), that may be required under any applicable law and that the Administrative Agent or the Lenders may reasonably request, to

56

cause the Collateral and Guarantee Requirement to be and remain satisfied, all at the expense of the Loan Parties.

(b)   If, after the Effective Date, any material assets (including any owned real property or improvements thereto or any interest therein with a fair market value in excess of $100,000) are acquired by the Borrower or any other Loan Party   (other than assets constituting Collateral under a Security Document that become subject to the Lien created by such Security Document upon acquisition thereof or constituting Excluded Assets), the Borrower will notify the Administrative Agent thereof, and, if requested by the Administrative Agent, the Borrower will cause such assets to be subjected to a Lien securing the Secured Obligations and will take and cause the other Loan Parties to take, such actions as shall be necessary and reasonably requested by the Administrative Agent to grant and perfect such Liens, including actions described in paragraph (a) of this Section and as required pursuant to the "Collateral and Guarantee Requirement," at the expense of the Loan Parties and subject to the last paragraph of the definition of the term "Collateral and Guarantee Requirement."

**Section 5.13**   **Case Milestones**.  The Loan Parties shall comply with the following milestones with respect to the Chapter 11 Cases:

(a)   The disclosure statement (the "Disclosure Statement") shall have been filed pursuant to Section 1125 of the Bankruptcy Code and a chapter 11 plan for all Debtors (the "Plan") on or prior to 120 days after the Petition Date, the terms of which Plan shall have the consent of the Administrative Agent unless the exclusivity period shall have been extended, in which case the Disclosure Statement and Plan shall have been filed within such extended exclusivity period;

(b)   The Bankruptcy Court shall have entered an order approving the Disclosure Statement on or before the date which is 90 days after its filing;

(c)   The Bankruptcy Court shall have entered an order confirming the Plan on or prior to the date which is nine (9) months after the Petition Date (the "Confirmation Order"); and

(d)   The effective date of the Plan shall have occurred on or prior to the date which is thirty (30) days after entry of the Confirmation Order.

**Section 5.14**   **Certain Post-Closing Obligations**.  As promptly as practicable, and in any event within the time periods after the Effective Date specified in Schedule 5.14 or such later date as the Administrative Agent agrees to in writing, Holdings and the Borrower shall deliver the documents or take the actions specified on Schedule 5.14.

**Section 5.15**   **Cash Management; Excluded Receivables Account**.

(a)   Subject to the orders of the Bankruptcy Court with respect to the Debtors' cash management, Holdings, the Borrower and each Subsidiary Loan Party shall maintain deposit and securities accounts with banks and securities intermediaries reasonably acceptable to the Administrative Agent and (except in the case of the Excluded Receivables Account and the deposit accounts segregated for payroll, tax and other employee related matters subject to the reasonable discretion of the Administrative Agent) maintain at all times Control Agreements over such accounts (the foregoing deposit accounts, each a "Controlled Deposit Account" and collectively, the "Controlled Deposit Accounts"). No Loan Party shall open, maintain or

4852-4630-2277.1

permit to exist any deposit or securities account, unless such Loan Party shall have provided the Administrative Agent with five (5) Business Days' prior written notice thereof and, unless otherwise consented to in writing by the Administrative Agent, shall have provided a Control Agreement over each such account.

(b)     Each Loan Party shall maintain at all times (i) an Excluded Receivables Account and (ii) a collection account agreement (the "Collection Account Agreement"), substantially in the form of Exhibit C-3 hereto or otherwise in substance and form satisfactory to the Administrative Agent, pursuant to which the full amount of collected and available balance in such Loan Party's Excluded Receivables Account is automatically transferred on a daily basis to a Controlled Deposit Account of such Loan Party. Holdings and the Borrower further covenant and agree that (1) the proceeds of any Loan Party's Government Health-Care-Insurance Receivables shall be deposited directly into such Loan Party's Excluded Receivables Account and (ii) the proceeds of any Loan Party's Accounts and payment intangibles, other than Government Health-Care-Insurance Receivables, shall be deposited directly into a Controlled Deposit Account of such Loan Party.

## ARTICLE VI

## NEGATIVE COVENANTS

Until the Commitments have expired or been terminated and the principal of and interest on each Loan and all fees, expenses and other amounts payable (other than contingent amounts not yet due) under any Loan Document have been indefeasibly paid in full, each of Holdings and the Borrower covenants and agrees with the Lenders that:

**Section 6.01     Indebtedness; Certain Equity Securities.**

(a)     Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, create, incur, assume or permit to exist any Indebtedness, except:

(i)     Indebtedness of the Borrower and any of the Guarantors under the Loan Documents;

(ii)     Indebtedness outstanding on the date hereof and listed on Schedule 6.01 and any Permitted Refinancing thereof;

(iii)     (A) Indebtedness (including Capitalized Lease Obligations) of a Loan Party financing the acquisition, construction, repair, replacement or improvement of fixed or capital assets; provided, that such Indebtedness is incurred concurrently with or within 90 days after the applicable acquisition, construction, repair, replacement or improvement, and (B) any Permitted Refinancing of any Indebtedness set forth in the immediately preceding clause (A); provided, further that, at the time of any such incurrence or Permitted Refinancing of such Indebtedness and after giving pro forma effect thereto and the use of the proceeds thereof, the aggregate principal amount of Indebtedness that is outstanding in reliance on this clause (v) shall not exceed $[●]; and

(iv)     Indebtedness relating to cash management and other arrangements with a depository institution in respect of netting services, ACH arrangements, overdraft protections and similar arrangements; and

4852-4630-2277.1

(v)    obligations in respect of appeal and surety bonds in each case in the ordinary course of business.

(b)   Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, issue any preferred Equity Interests or any Disqualified Equity Interests.

**Section 6.02**    **Liens**.  Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, create, incur, assume or permit to exist any Lien on any property or asset now owned or hereafter acquired by it, except:

(a)    Liens created under the Loan Documents;

(b)    Permitted Encumbrances;

(c)    Retained Rights;

(d)    Permitted Senior Liens and any modifications, replacements, renewals or extensions thereof; provided, that (i) such modified, replacement, renewal or extension Lien does not extend to any additional property in which Administrative Agent does not also have a lien, and (ii) the obligations secured or benefited by such modified, replacement, renewal or extension Lien are permitted by Section 6.01;

(e)    Liens securing Indebtedness permitted under Section 6.01(a)(iii); provided, that (i) such Liens attach concurrently with or within 90 days after the acquisition, repair, replacement, construction or improvement (as applicable) of the property subject to such Liens, (ii) such Liens do not at any time encumber any property other than the property financed by such Indebtedness except for accessions to such property and the proceeds and the products thereof and (iii) with respect to Capitalized Lease Obligations, such Liens do not at any time extend to or cover any assets (except for accessions to or proceeds of such assets) other than the assets subject to such Capitalized Lease Obligations; provided, further, that individual financings of equipment provided by one lender may be cross collateralized to other financings of equipment provided by such lender;

(f)    leases, licenses, subleases or sublicenses granted to others that do not (i) interfere in any material respect with the business of the Borrower and its Subsidiaries, taken as a whole, or (ii) secure any Indebtedness;

(g)    Liens (i) of a collection bank arising under Section 4-210 of the Uniform Commercial Code on items in the course of collection and (ii) in favor of a banking institution arising as a matter of law encumbering deposits (including the right of setoff) and that are within the general parameters customary in the banking industry;

(h)    any interest or title of a lessor under leases (other than leases constituting Capitalized Lease Obligations) entered into by any of Holdings, the Borrower or any Guarantors in the ordinary course of business; and

(i)    Liens that are contractual rights of setoff (i) relating to the establishment of depository relations with banks not given in connection with the incurrence of Indebtedness, and (ii) relating to pooled deposit or sweep accounts to permit satisfaction of overdraft or similar obligations incurred in the ordinary course of business of Holdings, the Borrower and its Subsidiaries.

59

**Section 6.03**     **Fundamental Changes**. Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or liquidate or dissolve.

**Section 6.04**     **Investments, Loans, Advances, Guarantees and Acquisitions**.  Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, make or hold any Investment, except:

(a)   Permitted Investments and other Investments existing on the date hereof and set forth on Schedule 6.04;

(b)   loans or advances to officers, directors and employees of Holdings, the Borrower and the Guarantors for reasonable and customary business-related travel, entertainment, relocation and analogous ordinary business purposes in an aggregate principal amount outstanding at any time not to exceed $10,000;

(c)   Investments consisting of extensions of trade credit, prepaid expenses or security or utility deposits in each case made in the ordinary course of business;

(d)   promissory notes and other non-cash consideration received in connection with Dispositions permitted by Section 6.05;

(e)   Investments in the ordinary course of business consisting of Uniform Commercial Code Article 3 endorsements for collection or deposit and Uniform Commercial Code Article 4 customary trade arrangements with customers consistent with past practices; and

(f)   Investments (including debt obligations and Equity Interests) received in connection with the bankruptcy or reorganization of suppliers and customers or in settlement of delinquent obligations of, or other disputes with, customers and suppliers or upon the foreclosure with respect to any secured Investment or other transfer of title with respect to any secured Investment.

**Section 6.05**     **Asset Sales**.  Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, (i) sell, transfer, lease or otherwise dispose of any asset, including any Equity Interest owned by it or (ii) issue any additional Equity Interest (each, a "Disposition"), except:

(a)   Dispositions of obsolete or worn out property, whether now owned or hereafter acquired, in the ordinary course of business;

(b)   Dispositions of inventory in the ordinary course of business;

(c)   Dispositions constituting Liens permitted by Section 6.02, Investments permitted by Section 6.04, and Restricted Payments permitted by Section 6.08;

(d)   Issuances of Equity Interests by a Subsidiary Loan Party of Holdings to a Loan Party; and

(e)   leases, subleases, licenses or sublicenses in each case in the ordinary course of business and that do not materially interfere with the business of Holdings and its Subsidiaries, taken as a whole;

60

provided, that any Disposition of any property pursuant to this Section 6.05 shall be (i) authorized by the Bankruptcy Code, and (ii) for no less than the fair market value of such property at the time of such Disposition.

Section 6.06    **Sale and Leaseback Transactions**.  Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, enter into any arrangement, directly or indirectly, whereby it shall sell or transfer any property, real or personal, used or useful in its business, whether now owned or hereafter acquired, and thereafter rent or lease such property or other property that it intends to use for substantially the same purpose or purposes as the property sold or transferred.

Section 6.07    **Swap Agreements**.  Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, enter into any Swap Agreement.

Section 6.08    **Restricted Payments; Certain Payments of Indebtedness**.

(a)    Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, except each Subsidiary Loan Party may declare and make dividend payments or other distributions payable solely in the Equity Interests of such Person to a Loan Party.

(b)    Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, optionally prepay, redeem, defease, purchase, or otherwise acquire any Indebtedness, other than:

(i)    Indebtedness constituting a Permitted Refinancing permitted by Section 6.01; and

(ii)    the Loan Document Obligations in accordance with this Agreement.

(c)    Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, make or agree to pay or make, directly or indirectly, any payment or other distribution (whether in cash, securities or other property) of or in respect of principal of or interest on any Pre-Petition Indebtedness of the Borrower, except as expressly provided therefor in the Budget or pursuant to "first day" or other orders entered upon pleadings in form and substance satisfactory to the Administrative Agent and the Lenders or in connection with a Plan.

Section 6.09    **Transactions with Affiliates**.  Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except on terms substantially as favorable to Holdings, the Borrower or such Subsidiary Loan Party as could reasonably be obtainable by such Person at the time in a comparable arm's-length transaction with a Person other than an Affiliate.

Section 6.10    **Restrictive Agreements**.  Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of Holdings, the Borrower or any other Loan Party to create, incur or permit to exist any Lien upon any of its property or assets to secure the Secured Obligations or (b) the ability of Holdings, the Borrower or any Subsidiary Loan Party to pay dividends or other distributions with respect to any of its Equity Interests or to make or repay loans or advances to any Loan Party or to Guarantee Indebtedness of any Guarantor;

4852-4630-2277.1

provided, that the foregoing clauses (a) and (b) shall not apply to any such restrictions that (i) exist on the date hereof and are listed on Schedule 6.10, (ii) are customary restrictions that arise in connection with any Disposition permitted by Section 6.05 applicable pending such Disposition solely to the assets subject to such Disposition, (iii) are imposed by Requirements of Law, and (iv) are customary restrictions contained in leases, subleases, licenses or asset sale agreements otherwise permitted hereby so long as such restrictions relate only to the assets subject thereto.

Section 6.11    Certain Amendments; Changes in Business.  Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, (a) amend, modify, waive, terminate or release the documentation governing any other Indebtedness, in each case if the effect of such amendment, modification, waiver, termination or release is adverse to the Lenders, (b) amend or otherwise modify its Organizational Documents, except as required by the Bankruptcy Court or (c) change or modify the nature and type of its business or the manner in which such business is conducted from the business conducted by such Person as of the Effective Date, except as required by the Bankruptcy Court.

Section 6.12    Financial Covenants.

(a)    Minimum Liquidity.  The Loan Parties shall not permit Qualified Cash as of any date set forth below to be less than the minimum amount set forth in the table below opposite such date:

| Through the month of: | Minimum Qualified Cash |
|---|---|
| April 2017 | $2,500,000 |
| May 2017 | $1,900,000 |
| June 2017 | $1,400,000 |
| July 2017 | $1,100,000 |
| August 2017 | $400,000 |
| Thereafter | $250,000 |

(b)    Performance within Budget. At all times following the Effective Date, strictly perform in accordance with the approved Budget, including having made all scheduled payments required to be made to Administrative Agent as and when required, subject to the following (the "Permitted Variances"):

(i)    the Cash Receipts (as reflected in the approved Budget) shall be at least equal to (A) determined on a line item basis, 90% of the cumulative amounts reflected in the approved Budget for (1) the 30 day period ended on the date of determination, and (2) the period commencing with the Effective Date and ending on the date of determination, and (B) determined on an aggregate basis, 95% of the cumulative amounts reflected in the approved Budget for (1) the 30 day period ended on the date of determination, and (2) the period commencing with the Effective Date and ending on the date of determination;

(ii)    the Cash Disbursements (as reflected in the approved Budget) shall be not more than (A) determined on a line item basis, 110% of the cumulative amounts reflected in the approved Budget for (1) the 30 day period ended on the date of determination, and (2) the period commencing with the Effective Date and ending on the date of determination, and (B) determined on an aggregate basis, 105% of the cumulative amounts reflected in the approved Budget for (1) the 30 day period ended on the date of determination, and (2) the period commencing with the Effective Date and ending on the date of determination; and

4852-4630-2277.1

(iii)     in the event the Permitted Variances of the Cash Receipts or the Cash Disbursements are not in compliance with the terms of Section 6.12(b)(i) or (ii), as the case may be, such failure shall not be deemed to be an Event of Default under this Agreement if, within five (5) Business Days following the occurrence of such failure, Holdings receives a common cash equity contribution and contributes such amount to the Borrower in an amount (if constructively recharacterized as a Cash Receipt or (as applicable) netted against the Cash Disbursements) would have resulted in the Loan Parties being in compliance with Section 6.12(a) or (b), as applicable; provided, further, that in no event shall (x) the aggregate principal amount of equity contributions made in reliance upon the foregoing provisions of this Section 6.12(b)(iii) exceed $1,000,000 in the aggregate during the term of this credit facility and (y) more than three (3) such equity contributions be made at any time while any Loans are outstanding.

**Section 6.13     Changes in Fiscal Periods**.  Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, make any change in its fiscal year.

**Section 6.14     Chapter 11 Claims**.  Holdings and the Borrower will not, and will not permit any Subsidiary Loan Party to, incur, create, assume, suffer to exist or permit any other superpriority administrative claim which is pari passu with or senior to the claims of the Administrative Agent and Lenders against the Loan Parties, except as set forth in the Interim Order and Final Order, as then in effect.

**Section 6.15     Critical Vendor and Other Payments**.  Borrower will not make (a) any Pre-Petition "critical vendor" payments or other payments on account of creditors' Pre-Petition unsecured claims except as permitted by the Interim Order or the Final Order and relating to adequate protection payments payable as described in Section 3.14, (b) payments on account of claims or expenses arising under Section 503(b)(9) of the Bankruptcy Code, (c) payments related to pre-petition wage claims and related tax and withholding obligations and employment benefit programs, (d) payments in respect of a reclamation program or (e) payments under any management incentive plan or on account of claims or expenses arising under Section 503(c) of the Bankruptcy Code, except in each case in amounts and on terms and conditions that (i) are approved by order of the Bankruptcy Court and (ii) are expressly permitted by the Budget (subject to Section 6.12(b).

**Section 6.16     Healthcare Permits**.

(a)     Neither Holdings, Borrower nor any Subsidiary Loan Party thereof will suffer or permit to occur any of the following:

(i)     any transfer of a Healthcare Permit or rights thereunder to any Person (other than Administrative Agent and/or its assignee) or to any location other than a Project approved by Administrative Agent in advance in writing;

(ii)     any pledge or hypothecation of any Healthcare Permit as collateral security for any indebtedness other than the Loans; or

(iii)     any rescission, withdrawal, revocation, amendment or modification of or other alteration to the nature, tenor or scope of any Healthcare Permit, including, without limitation, (A) any change to the authorized beds capacity of any Project and/or the number of authorized beds approved by the applicable Governmental Authority, and (B) any transfer all or any part of any Project's authorized beds to another site or location.

4852-4630-2277.1

(b)     Neither the Projects nor any of Holdings, Borrower or any Subsidiary Loan Party thereof, shall, other than in the ordinary course of business, change the terms of any Third Party Payor Programs or its normal billing payment and reimbursement policies and procedures with respect thereto (including, without limitation, the amount and timing of finance charges, fees and write-offs). Each of Holdings, Borrower and each Subsidiary Loan Party thereof will (a) maintain in full force and effect, and free from restrictions, probations, conditions or known conflicts which would materially impair the use or operation of any Project for its current use, all Healthcare Permits necessary under Health Care Laws to continue to receive reimbursement under all Third Party Payor Programs in which Holdings, Borrower or any Subsidiary Loan Party thereof or any Project participates as of the date of this Agreement, and (b) provide to Administrative Agent upon request, an accurate, complete and current list of all participation agreements with Third Party Payors with respect to the business of Holdings, Borrower and each Subsidiary Loan Party thereof.  Each of Holdings, Borrower and each Subsidiary Loan Party thereof shall at all times comply with all applicable requirements, contracts, conditions and stipulations in order to maintain in good standing and without default or limitation all such participation agreements.

## ARTICLE VII

## EVENTS OF DEFAULT

**Section 7.01     Events of Default**.  If any of the following events (any such event, an "Event of Default") shall occur:

(a)   any Loan Party shall fail to pay any principal of any Loan when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise;

(b)   any Loan Party shall fail to pay any interest on any Loan or any fee or any other amount (other than an amount referred to in paragraph (a) of this Section) payable under any Loan Document, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of two (2) Business Days;

(c)   any representation or warranty made or deemed made by or on behalf of Holdings, the Borrower or any of its Subsidiaries in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)   Holdings, the Borrower or any of its Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in Section 5.01, 5.02, 5.04 (with respect to the existence of Holdings, the Borrower or such Guarantor), 5.10, 5.13, 5.14, 5.15 or in Article VI;

(e)   Holdings, the Borrower or any of its Subsidiaries shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in paragraph (a), (b) or (d) of this Section), and such failure shall continue unremedied for a period of 10 Business Days;

(f)   other than with respect to any Debtor, an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, court protection, reorganization or other relief in respect of Holdings, the Borrower or any Subsidiary Loan Party or its debts, or of a material part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, examiner, sequestrator, conservator or similar official for Holdings, the Borrower or any Subsidiary Loan Party or for a material part of its assets, and, in any such case, such proceeding or petition shall continue undismissed or unstayed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(g)   Holdings, the Borrower or any other Subsidiary Loan Party (other than a Debtor) shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, court protection, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in paragraph (h) of this Section, (iii) apply for or consent to the appointment of a receiver, trustee, examiner, custodian, sequestrator, conservator or similar official for Holdings, the Borrower or any Subsidiary Loan Party or for a material part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding or (v) make a general assignment for the benefit of creditors;

(h)   (i) an ERISA Event occurs that has resulted or could reasonably be expected to result in liability of any Loan Party in an aggregate amount that could reasonably be expected to result in a Material Adverse Effect, or (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount that could reasonably be expected to result in a Material Adverse Effect;

(i)   any Lien purported to be created under any Security Document shall cease to be, or shall be asserted by any Loan Party not to be, a valid and perfected Lien on any Collateral having, in the aggregate, a fair market value in excess of $250,000, with the priority required by the applicable Security Document;

(j)   any material provision of any Loan Document or any Guarantee of the Loan Document Obligations shall for any reason be asserted by any Loan Party not to be a legal, valid and binding obligation of any Loan Party thereto other than as expressly permitted hereunder or thereunder;

(k)   any Guarantees of the Loan Document Obligations by any Loan Party pursuant to the Guarantee Agreement shall cease to be in full force and effect (in each case, other than in accordance with the terms of the Loan Documents);

(l)   a Change in Control shall occur;

(m)   Holdings shall (i) engage in any material activities other than those activities incidental to its ownership of the Equity Interests of the Borrower and its other Subsidiaries and the Indebtedness referred to in clause (ii) of this paragraph or (ii) incur, create or assume any Indebtedness other than obligations pursuant to the Loan Documents to which it is a party;

65

(n)  entry of an order (i) approving additional financing under Section 364(c) or (d) of the Bankruptcy Code, (ii) granting any Lien upon or affecting any Collateral other than Liens permitted under this Agreement, (iii)  permitting the use of cash collateral, except as permitted hereby or with the prior written consent of the Administrative Agent, or (iv) authorizing or approving any other action adverse to the Administrative Agent or their rights and remedies or their interest in the Collateral, or any Loan Party seeking the entry of an order in furtherance of any of the foregoing if any proceeds of the Loans provided hereunder are proposed to be used in such additional financing;

(o)  entry of an order dismissing, or any Loan Party seeking the dismissal of, any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a Chapter 7 case;

(p)  entry of an order, or any Loan Party seeking the entry of an order, appointing a chapter 11 trustee or an examiner in any of the Chapter 11 Cases having enlarged powers (beyond those set forth under Sections 1106(a)(3) and (4) of the Bankruptcy Code);

(q)  entry of an order granting, or any Loan Party filing a motion or any other pleading seeking the entry of an order granting, or any Person with the support of any Loan Party filing a motion or any other pleading seeking the entry of an order granting any other superpriority administrative expense claim, modifying the Loan Documents, the Interim Order or the Final Order, or granting relief from the automatic stay to permit any secured creditor (other than the Administrative Agent or any Lender) to enforce or otherwise take action with respect to any Collateral, or any breach by any Loan Party of any provision of either the Interim Order or Final Order, in each case, except as consented to in writing by the Administrative Agent and the Required Lenders in accordance with this Agreement;

(r)  the payment by the Borrower of any Pre-Petition claim unless such payment is permitted by the Budget or made pursuant to any order entered by the Bankruptcy Court in form and substance acceptable to the Administrative Agent;

(s)  the commencement of any action against the Administrative Agent or any Lender or any Related Party of any of them by or on behalf of any Loan Party or any of its Affiliates, officers or employees;

(t)  the Interim Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to a stay pending appeal, in the case of any modification or amendment, without the prior written consent of the Administrative Agent;

(u)  the Final Order shall not have been entered by the Bankruptcy Court on or before the date that is 45 days after the entry of the Interim Order;

(v)  the Final Order shall cease to be in full force and effect or shall have been reversed, modified, amended, stayed, vacated or subject to stay pending appeal, in the case of any modification or amendment, without the prior written consent of the Administrative Agent and the Lenders;

(w)  from and after entry of the Final Order, if a waiver of claims under Section 506(c) of the Bankruptcy Code is granted in the Final Order, allowance of any claim under Section 506(c) of the Bankruptcy Code or otherwise against the Administrative Agent, any Lender and the Collateral;

(x)   the filing of any chapter 11 plan or any amendment thereto or related disclosure statement, or the entry of an order confirming any such chapter 11 plan or approving any such disclosure statement or any such amendment, in each case that is not reasonably acceptable to the Administrative Agent and the Lenders, other than as provided in Section 5.13(a);

(y)   any termination or modification of the exclusivity periods set forth in section 1121 of the Bankruptcy Code unless consented to by the Administrative Agent;

(z)   without the prior written consent of the Administrative Agent, any amendment, termination, waiver, rescission, revocation or modification of any Collection Account Agreement;

(aa) the institution of a payment freeze by Medicare, Medicaid or any other Governmental Authority against any Loan Party;

(bb) the exclusive right of any of the Debtors to file a plan pursuant to section 1121 of the Bankruptcy Code lapses or is otherwise terminated;

(cc) a Change in Management shall occur;

(dd) any Loan Party shall fail, upon 30 days prior written notice from the Administrative Agent, to cause any property that is necessary or convenient to the operation of the business of Borrower to be transferred to Borrower; provided that such 30 day period shall be extended by an additional 14 days if the approval of the Bankruptcy Court is necessary to effect such transfer; or

(ee) any Loan Party shall fail, within 10 days prior written notice from the Administrative Agent, to cause any Equity Interest held by such Loan Party to be certificated (and, as necessary, appropriate elections be made under Article 8 of the UCC to treat such Equity Interests as securities), and to deliver to the Administrative Agent all certificates or other instruments representing such Equity Interests, together with undated stock powers or other instruments of transfer with respect thereto endorsed in blank;

then, and in every such event (other than an event with respect to Holdings or the Borrower described in paragraph (h) or (i) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take either or both of the following actions, at the same or different times: (i) terminate the Commitments, and thereupon the Commitments shall terminate immediately, and (ii) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all fees (including the Exit Fee) and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower; and in case of any event described in paragraph (h) or (i) of this Article, the Commitments shall automatically terminate and the principal of the Loans then outstanding, together with accrued interest thereon and all fees (including the Exit Fee) and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower. Notwithstanding the foregoing, prior to the exercise of any enforcement or liquidation remedies against the Collateral, the Administrative Agent shall provide three (3) Business Days' prior written notice thereof to the Borrower.

4852-4630-2277.1

Holdings and the Borrower agree that the Lenders have the right to maintain their investments in the Loans free from repayment by any Loan Party, and that the provision for payment of the Exit Fee in the event that the Loans are repaid or are accelerated as a result of an Event of Default, is intended to provide compensation for the deprivation of such right under such circumstances.

## ARTICLE VIII

## ADMINISTRATIVE AGENT

**Section 8.01** **Appointment and Authority**.

(a) Each of the Lenders hereby irrevocably appoints Lateral to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article are solely for the benefit of the Administrative Agent and the Lenders, and the Borrower shall not have rights as a third party beneficiary of any of such provisions.

(b) The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Secured Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 8.05 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Security Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article VIII and Article IX (including Section 9.03 as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

**Section 8.02** **Rights as a Lender**. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary Loan Party or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

**Section 8.03** **Exculpatory Provisions**. The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent:

(a) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

4852-4630-2277.1

(b) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided, that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable law;

(c) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity;

(d) shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 9.02 and in the last paragraph of Section 7.01) or (ii) in the absence of its own gross negligence or willful misconduct; provided, that the Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice describing such Default is given to the Administrative Agent by the Borrower or a Lender; and

(e) shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document, or the creation, perfection or priority of any Lien purported to be created by the Security Documents, (v) the value or the sufficiency of any Collateral, or (vi) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

**Section 8.04** **Reliance by Administrative Agent**. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

**Section 8.05** **Delegation of Duties**. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any

69

4852-4630-2277.1

one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

**Section 8.06** **Resignation of Administrative Agent**. The Administrative Agent may resign at any time upon 30 days' notice to the Lenders and the Borrower. If the Administrative Agent becomes a Defaulting Lender and is not performing its role hereunder as Administrative Agent, the Administrative Agent may be removed as the Administrative Agent hereunder at the request of the Borrower and the Required Lenders. Upon receipt of any such notice of resignation or upon such removal, the Required Lenders shall have the right to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, then the retiring Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent, which shall be an Approved Bank with an office in the United States, or any Affiliate of any such Approved Bank; provided, that if the Administrative Agent shall notify the Borrower and the Lenders that no qualifying Person has accepted such appointment, then such resignation shall nonetheless become effective in accordance with such notice and (a) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (b) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this Section. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) Administrative Agent, and the retiring Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this Section). The fees payable by the Borrower to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the retiring Administrative Agent's resignation hereunder and under the other Loan Documents, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring Administrative Agent was acting as Administrative Agent.

**Section 8.07** **Non-Reliance on Administrative Agent and Other Lenders**. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

**Section 8.08** **No Waiver; Cumulative Remedies; Enforcement**. No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege hereunder or under any other Loan Document shall operate as a waiver

70

thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

Notwithstanding anything to the contrary contained herein or in any other Loan Document, the authority to enforce rights and remedies hereunder and under the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Article VII for the benefit of all the Lenders; provided, however, that the foregoing shall not prohibit (a) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) hereunder and under the other Loan Documents, (b) any Lender from exercising setoff rights in accordance with Section 9.08 (subject to the terms of Section 2.12), or (c) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided, further, that if at any time there is no Person acting as Administrative Agent hereunder and under the other Loan Documents, then (i) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Article VII and (ii) in addition to the matters set forth in clauses (b) and (c) of the preceding proviso and subject to Section 2.12, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

To the extent required by any applicable law, the Administrative Agent may deduct or withhold from any payment to any Lender an amount equivalent to any applicable withholding Tax. If the Internal Revenue Service or any other authority of the United States or other jurisdiction asserts a claim that the Administrative Agent did not properly withhold Tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not properly executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding Tax ineffective, or for any other reason), such Lender shall indemnify and hold harmless the Administrative Agent (to the extent that the Administrative Agent has not already been reimbursed by the Borrower pursuant to Section 2.11 and without limiting any obligation of the Borrower to do so pursuant to such Sections) fully for all amounts paid, directly or indirectly, by the Administrative Agent as Taxes or otherwise, together with all expenses incurred, including legal expenses and any other out-of-pocket expenses, whether or not such Tax was correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due to the Administrative Agent under this Article VIII. The agreements in this Article VIII shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender, the termination of this Agreement and the repayment, satisfaction or discharge of all other obligations.

**Section 8.09** **Withholding Taxes**. To the extent required by any applicable law, the Administrative Agent may withhold from any payment to any Lender an amount equivalent to any applicable withholding tax. Without limiting or expanding the provisions of Section 2.11, each Lender shall, and does hereby, indemnify the Administrative Agent against, and shall make payable in respect thereof within 30 days after demand therefor, any and all Taxes and any and all related losses, claims, liabilities and expenses (including fees, charges and disbursements of any counsel for the Administrative Agent) incurred by or asserted against the Administrative Agent by the Internal Revenue Service or any

other Governmental Authority as a result of the failure of the Administrative Agent to properly withhold tax from amounts paid to or for the account of any Lender for any reason (including, without limitation, because the appropriate form was not delivered or not property executed, or because such Lender failed to notify the Administrative Agent of a change in circumstance that rendered the exemption from, or reduction of withholding tax ineffective). A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under this Agreement or any other Loan Document against any amount due the Administrative Agent under this paragraph. The agreements in this paragraph shall survive the resignation and/or replacement of the Administrative Agent, any assignment of rights by, or the replacement of, a Lender and the repayment, satisfaction or discharge of all other obligations under any Loan Document.

**ARTICLE IX**

**MISCELLANEOUS**

**Section 9.01** <u>Notices</u>.

(a)    Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by fax or other electronic transmission, as follows:

(i)    if to Holdings, the Borrower, the Administrative Agent to the address, fax number, e-mail address or telephone number specified for such Person on <u>Schedule 9.01</u>; and

(ii)    if to any other Lender, to it at its address (or fax number, telephone number or e-mail address) set forth in its Administrative Questionnaire (including, as appropriate, notices delivered solely to the Person designated by a Lender on its Administrative Questionnaire then in effect for the delivery of notices that may contain material non-public information relating to the Borrower).

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b)    <u>Electronic Communications</u>.  Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures reasonably approved by the Administrative Agent, <u>provided</u> that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other

72

4852-4630-2277.1

written acknowledgement), <u>provided</u> that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)   <u>The Platform</u>.   THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE." THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE BORROWER MATERIALS OR THE ADEQUACY OF THE PLATFORM, AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS IN OR OMISSIONS FROM THE BORROWER MATERIALS. NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY ANY AGENT PARTY IN CONNECTION WITH THE BORROWER MATERIALS OR THE PLATFORM. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "<u>Agent Parties</u>") have any liability to Holdings, the Borrower, any Lender or any other Person for losses, claims, damages, liabilities or expenses of any kind (whether in tort, contract or otherwise) arising out of the Borrower's or the Administrative Agent's transmission of Borrower Materials through the Internet, except to the extent that such losses, claims, damages, liabilities or expenses are determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of such Agent Party; <u>provided</u>, <u>however</u>, that in no event shall any Agent Party have any liability to Holdings, the Borrower, any Lender or any other Person for indirect, special, incidental, consequential or punitive damages (as opposed to direct or actual damages).

(d)   <u>Change of Address, Etc.</u>  Each of Holdings, the Borrower and the Administrative Agent may change its address, electronic mail address, fax or telephone number for notices and other communications or website hereunder by notice to the other parties hereto. Each other Lender may change its address, fax or telephone number for notices and other communications hereunder by notice to the Borrower and the Administrative Agent. In addition, each Lender agrees to notify the Administrative Agent from time to time to ensure that the Administrative Agent has on record (i) an effective address, contact name, telephone number, fax number and electronic mail address to which notices and other communications may be sent and (ii) accurate wire instructions for such Lender.

(e)   <u>Reliance by Administrative Agent and Lenders</u>.  The Administrative Agent and the Lenders shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Borrower even if (i) such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein, or (ii) the terms thereof, as understood by the recipient, varied from any confirmation thereof. The Borrower shall indemnify the Administrative Agent, each Lender and the Related Parties from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower in the absence of gross negligence or willful misconduct as determined in a final and non-appealable judgment by a court of competent jurisdiction. All telephonic notices to and other telephonic communications with the Administrative Agent may be recorded by the Administrative Agent and each of the parties hereto hereby consents to such recording.

73

**Section 9.02**     **Waivers; Amendments**.

(a)   No failure or delay by the Administrative Agent or any Lender in exercising any right or power under this Agreement or any Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or any Loan Document or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time. No notice or demand on the Borrower or Holdings in any case shall entitle the Borrower or Holdings to any other or further notice or demand in similar or other circumstances.

(b)   Neither this Agreement, any Loan Document nor any provision hereof or thereof may be waived, amended or modified except, in the case of this Agreement, pursuant to an agreement or agreements in writing entered into by Holdings, the Borrower and the Required Lenders or, in the case of any other Loan Document, pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Loan Party or Loan Parties that are parties thereto, in each case with the consent of the Required Lenders, provided that no such agreement shall (i) increase the Commitment of any Lender without the written consent of such Lender (it being understood that a waiver of any condition precedent set forth in Section 4.02 or the waiver of any Default, mandatory prepayment or mandatory reduction of the Commitments shall not constitute an extension or increase of any Commitment of any Lender), (ii) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender directly and adversely affected thereby, provided that only the consent of the Required Lenders shall be necessary to waive any obligation of the Borrower to pay default interest pursuant to Section 2.13(c), (iii) postpone the maturity of any Loan, or the date of any scheduled amortization payment of the principal amount of any Loan under Section 2.10 or any date for the payment of any interest or fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender directly and adversely affected thereby, (iv) change Section 2.18(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender directly and adversely affected thereby, (v) change any of the provisions of this Section without the written consent of each Lender directly and adversely affected thereby, (vi) change the percentage set forth in the definition of "Required Lenders" or any other provision of any Loan Document specifying the number or percentage of Lenders required to waive, amend or modify any rights thereunder or make any determination or grant any consent thereunder, without the written consent of each Lender, (vii) release all or substantially all the value of the Guarantees under the Guarantee Agreement (except as expressly provided in the Guarantee Agreement) without the written consent of each Lender (other than a Defaulting Lender) (except as expressly provided in the Security Documents), or (viii) release all or substantially all the Collateral from the Liens of the Security Documents, without the written consent of each Lender (other than a Defaulting Lender); provided, further that (A) no such agreement shall amend, modify or otherwise affect

74

the rights or duties of the Administrative Agent without the prior written consent of the Administrative Agent, and (B) any provision of this Agreement or any other Loan Document may be amended by an agreement in writing entered into by Holdings, the Borrower and the Administrative Agent to cure any ambiguity, omission, defect or inconsistency so long as, in each case, the Lenders shall have received at least five Business Days' prior written notice thereof and the Administrative Agent shall not have received, within five Business Days of the date of such notice to the Lenders, a written notice from the Required Lenders stating that the Required Lenders object to such amendment.

(c) In connection with any proposed amendment, modification, waiver or termination (a "Proposed Change") requiring the consent of all Lenders or all directly and adversely affected Lenders, if the consent of the Required Lenders to such Proposed Change is obtained, but the consent to such Proposed Change of other Lenders whose consent is required is not obtained (any such Lender whose consent is not obtained as described in paragraph (b) of this Section being referred to as a "Non-Consenting Lender"), then, so long as the Lender that is acting as Administrative Agent is not a Non-Consenting Lender, the Borrower may, at its sole expense and effort, upon notice to such Non-Consenting Lender and the Administrative Agent, require such Non-Consenting Lender to assign and delegate, without recourse, provided, that (a) the Borrower shall have received the prior written consent of the Administrative Agent to the extent such consent would be required under Section 9.04(b) for an assignment of Loans or Commitments, as applicable, which consent shall not unreasonably be withheld, (b) such Non-Consenting Lender shall have received payment of an amount equal to the outstanding par principal amount of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder (including pursuant to Section 2.11(a)(i)) from the Eligible Assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts) and (c) unless waived, the Borrower or such Eligible Assignee shall have paid to the Administrative Agent the processing and recordation fee specified in Section 9.04(b).

(d) Notwithstanding anything in this Agreement or the other Loan Documents to the contrary, the Commitments and Loans of any Lender that is at the time a Defaulting Lender shall not have any voting or approval rights under the Loan Documents and shall be excluded in determining whether all Lenders, all affected Lenders, or the Required Lenders have taken or may take any action hereunder (including any consent to any amendment or waiver pursuant to this Section 9.02); provided, that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

**Section 9.03**      **Expenses; Indemnity; Damage Waiver**.

(a) Holdings and the Borrower agree, jointly and severally, to pay, on a monthly basis, all reasonable out-of-pocket costs and expenses incurred by the Administrative Agent in connection with (i) the preparation and administration of this Agreement and the other Loan Documents or in connection with any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions hereby or thereby contemplated shall be consummated) or incurred by the Administrative Agent or any Lender in connection with the enforcement or protection of its rights in connection with this Agreement and the other Loan Documents or in connection with the Loans made hereunder, including in each case the fees and disbursements of Gibson, Dunn & Crutcher LLP, counsel for the Administrative Agent

4852-4630-2277.1

and any financial advisor engaged by the Administrative Agent, and, in connection with any such enforcement or protection, the reasonable fees and disbursements of any counsel for the Administrative Agent and one other transaction counsel acting on behalf of the Lenders, together with one other local and special counsel reasonably required in connection with such enforcement or protection, (ii) (A) the obtaining of approval of the Loan Documents by the Bankruptcy Court and (B) the preparation and review of pleadings, documents and reports related to any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, attendance at meetings, court hearings or conferences related to any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, and general monitoring of any Chapter 11 Case and any subsequent case under Chapter 7 of the Bankruptcy Code, and (iii) any valuations of the Loans and\or any Equity Interests of Holdings or any Subsidiary Loan Party held by any Lender.

(b)  Holdings and the Borrower hereby, jointly and severally, indemnify the Administrative Agent, each Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and reasonable and documented or invoiced out-of-pocket fees and expenses of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee by any third party or by the Borrower, Holdings or any Subsidiary Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any Loan Document or any other agreement or instrument contemplated hereby or thereby, the performance by the parties to the Loan Documents of their respective obligations thereunder or the consummation of the Transactions or any other transactions contemplated thereby, (ii) any Loan or the use of the proceeds therefrom, (iii) to the extent in any way arising from or relating to any of the foregoing, any actual or alleged presence or Release or threat of Release of Hazardous Materials on, at, to or from any Owned Real Property or any other property currently or formerly owned or operated by Holdings, the Borrower or any Subsidiary Loan Party, or any other Environmental Liability related in any way to Holdings, the Borrower or any Subsidiary Loan Party, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower, Holdings or any Subsidiary Loan Party and regardless of whether any Indemnitee is a party thereto; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, costs or related expenses resulted from the gross negligence, bad faith or willful misconduct of, or a material breach of the Loan Documents by, such Indemnitee or its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

(c)  To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent or any Lender under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent or such Lender, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent or such Lender in its capacity as such. For purposes hereof, a Lender's "pro rata share" shall be determined based upon its share of the aggregate outstanding Loans and unused Commitments at such time. The obligations of the Lenders under this paragraph (c) are subject to the last sentence of Section 2.02(a) (which shall apply mutatis mutandis to the Lenders' obligations under this paragraph (c)).

(d)   To the extent permitted by applicable law, neither Holdings nor the Borrower shall assert, and each hereby waives, any claim against any Indemnitee (i) for any direct or actual damages arising from the use by unintended recipients of information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems (including the Internet) in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such direct or actual damages are determined by a court of competent jurisdiction by final, non-appealable judgment to have resulted from the gross negligence or willful misconduct of, or a material breach of the Loan Documents by, such Indemnitee or its Related Parties or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof.

(e)   All amounts due under this Section shall be payable not later than ten (10) Business Days after written demand therefor; provided, however, that any Indemnitee shall promptly refund an indemnification payment received hereunder to the extent that there is a final judicial determination that such Indemnitee was not entitled to indemnification with respect to such payment pursuant to this Section 9.03.

**Section 9.04**   **Successors and Assigns**.

(a)   The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void), (ii) no assignment shall be made to any Defaulting Lender or any of its Subsidiaries, or any Persons who, upon becoming a Lender hereunder, would constitute any of the foregoing Persons described in this clause (ii) and (iii) no Lender may assign or otherwise transfer its rights or obligations hereunder except in accordance with this Section. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants (to the extent provided in paragraph (c) of this Section), the Indemnitees and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.  Nothing herein shall limit or otherwise modify the rights of Borrower under Section 2.21 to exercise any extension option.

(b)   (i)      Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may, with the consent of the Borrower (so long as no Event of Default has occurred and is ongoing), assign to one or more Eligible Assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent  not to be unreasonably withheld or delayed) of  the Administrative Agent; provided, that no consent of the Administrative Agent shall be required for an assignment of a Loan to a Lender, an Affiliate of a Lender or an Approved Fund.

(ii)      Assignments shall be subject to the following additional conditions: (A) except in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund or an assignment of the entire remaining amount of the assigning

4852-4630-2277.1

Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the trade date specified in the Assignment and Assumption with respect to such assignment or, if no trade date is so specified, as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $1,000,000 (and integral multiples thereof), unless the Administrative Agent otherwise consents (such consent not to be unreasonably withheld or delayed); provided, that simultaneous assignments by or to two or more Approved Funds shall be combined for purposes of determining whether the minimum assignment requirement is met, (B) each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement; provided, that this clause (B) shall not be construed to prohibit assignment of a proportionate part of all the assigning Lender's rights and obligations in respect of any Commitments or Loans, (C) the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption via an electronic settlement system acceptable to the Administrative Agent or, if previously agreed with the Administrative Agent, manually execute and deliver to the Administrative Agent and Assignment and Assumption, and, in each case, together (unless waived or reduced by the Administrative Agent) with a processing and recordation fee of $3,500; provided, that the Administrative Agent, in its sole discretion, may elect to waive or reduce such processing and recordation fee; provided, further that assignments made pursuant to Section 2.19(b) or Section 9.02(c) shall not require the signature of the assigning Lender to become effective, and (D) the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent any tax forms required by Section 2.11(f) and an Administrative Questionnaire in which the assignee designates one or more credit contacts to whom all syndicate-level information (which may contain material non-public information about the Borrower, the Loan Parties and their Related Parties or their respective securities) will be made available and who may receive such information in accordance with the assignee's compliance procedures and applicable laws, including Federal and state securities laws.

(iii)    Subject to acceptance and recording thereof pursuant to paragraph (b)(v) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of (and subject to the obligations and limitations of) Sections 2.10, 2.11 and 9.03 and to any fees payable hereunder that have accrued for such Lender's account but have not yet been paid). Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c)(i) of this Section.

(iv)    The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of, and principal and interest amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The

4852-4630-2277.1

entries in the Register shall be conclusive absent manifest error, and Holdings, the Borrower, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary. In addition, the Administrative Agent shall maintain on the Register information regarding the designation, and revocation of designation, of any Lender as a Defaulting Lender. The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)     Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire and any tax forms required by Section 2.11(f) (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section 9.04 and any written consent to such assignment required by paragraph (b) of this Section 9.04, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register. No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(vi)     The words "execution," "signed," "signature" and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act or any other similar state laws based on the Uniform Electronic Transactions Act.

(c)     (i)     Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other Persons (other than (A) a natural person, (B) a Defaulting Lender, (C) Holdings, (D) the Borrower or (E) any of the Borrower's Subsidiaries or Affiliates) (any such non-excluded Person, a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided, that (A) such Lender's obligations under this Agreement shall remain unchanged, (B) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (C) Holdings, the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and any other Loan Documents and to approve any amendment, modification or waiver of any provision of this Agreement and any other Loan Documents. Subject to paragraph (c)(iii) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.10 and 2.11 (subject to the obligations and limitations of such Sections, including Section 2.11(f)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section. To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender; provided, that such Participant agrees to be subject to Section 2.12(c) as though it were a Lender.

4852-4630-2277.1

(ii)     Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and related interest amounts) of each participant's interest in the Loans or other obligations under this Agreement (the "Participant Register"); provided, that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any Loans or other obligations to any Person except to the extent that such disclosure is necessary to establish that such obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive, absent manifest error, and such Lender shall treat each person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.

(iii)     A Participant shall not be entitled to receive any greater payment under Section 2.10 or Section 2.11 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.

Any Lender may, without the consent of the Borrower or the Administrative Agent, at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or other "central" bank, and this Section shall not apply to any such pledge or assignment of a security interest, provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(d)     In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Borrower and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (x) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any Lender hereunder (and interest accrued thereon) and (y) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

(e)     No Lender may, at any time, assign all or a portion of its rights and obligations under this Agreement to Holdings, the Borrower or any of their respective Affiliates.

**Section 9.05     Survival**.  All covenants, agreements, representations and warranties made by the Loan Parties in the Loan Documents and in the certificates or other instruments delivered in connection with or pursuant to any Loan Document shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of the Loan Documents and the making

4852-4630-2277.1

of any Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as the Commitments have not expired or terminated. The provisions of Sections 2.10, 2.11 and 9.03 and Article VIII shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

**Section 9.06    Counterparts; Integration; Effectiveness**.  This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement, the other Loan Documents and any separate letter agreements with respect to fees payable to the Administrative Agent or the syndication of the Loans and Commitments constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or other electronic means shall be effective as delivery of a manually executed counterpart of this Agreement. Time is of the essence.

**Section 9.07    Severability**.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 9.07, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

**Section 9.08    Right of Setoff**.  If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower then due and owing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although (i) such obligations may be contingent or unmatured and (ii) such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness; provided, that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.22 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Secured Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The applicable Lender shall notify the Borrower and the Administrative Agent of such setoff and application; provided, that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section. The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender and their respective Affiliates may have.

4852-4630-2277.1

**Section 9.09** <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.

(a)    This Agreement shall be construed in accordance with and governed by the laws of the State of New York and to the extent applicable, the Bankruptcy Code.

(b)    Each party hereto hereby irrevocably and unconditionally submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents  to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, to the non-exclusive general jurisdiction of any State or Federal court of competent jurisdiction sitting in New York County, New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement against any Loan Party or its respective properties in the courts of any jurisdiction.

(c)    Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to any Loan Document in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)    Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 9.01. Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

**Section 9.10**    <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 9.11**    <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

**Section 9.12**    <u>Confidentiality</u>.

(a)    Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be

4852-4630-2277.1

disclosed (i) to its and its Affiliates' directors, officers, employees, trustees and agents, including accountants, legal counsel and other agents and advisors, and any numbering, administration or settlement service providers (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential and any failure of such Persons acting on behalf of the Administrative Agent or the relevant Lender to comply with this Section 9.12 shall constitute a breach of this Section 9.12 by the Administrative Agent or the relevant Lender, as applicable), (ii) to the extent requested by any regulatory authority or self-regulatory authority, required by applicable law or by any subpoena or similar legal process; provided, that solely to the extent permitted by law and other than in connection with routine audits and reviews by regulatory and self-regulatory authorities, each Lender and the Administrative Agent shall notify the Borrower as promptly as practicable of any such requested or required disclosure in connection with any legal or regulatory proceeding; provided, further that in no event shall any Lender or the Administrative Agent be obligated or required to return any materials furnished by the Borrower or any Subsidiary Loan Party of Holdings, (iii) to any other party to this Agreement, (iv) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (v) subject to an agreement containing confidentiality undertakings substantially similar to those of this Section, to (A) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (B) any actual or prospective counterparty (or its advisors) to any Swap Agreement or derivative transaction relating to any Loan Party or its Subsidiaries and its obligations under the Loan Documents or (C) any pledgee referred to in Section 9.04(d), (vi) if required by any rating agency; provided, that prior to any such disclosure, such rating agency shall have agreed in writing to maintain the confidentiality of such Information or (vii) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings or the Borrower. For the purposes hereof, "Information" means all information received from Holdings or the Borrower relating to Holdings, the Borrower, any other Subsidiary Loan Party or their business, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by Holdings, the Borrower or any Subsidiary Loan Party; provided, that, in the case of information received from Holdings, the Borrower or any Subsidiary Loan Party after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

(b) EACH LENDER ACKNOWLEDGES THAT INFORMATION AS DEFINED IN SECTION 9.12(a) FURNISHED TO IT PURSUANT TO THIS AGREEMENT MAY INCLUDE MATERIAL NON-PUBLIC INFORMATION CONCERNING HOLDINGS, THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES AND CONFIRMS THAT IT HAS DEVELOPED COMPLIANCE PROCEDURES REGARDING THE USE OF MATERIAL NON-PUBLIC INFORMATION AND THAT IT WILL HANDLE SUCH MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH THOSE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

4852-4630-2277.1

(c) ALL INFORMATION, INCLUDING REQUESTS FOR WAIVERS AND AMENDMENTS FURNISHED BY THE BORROWER OR THE ADMINISTRATIVE AGENT PURSUANT TO, OR IN THE COURSE OF ADMINISTERING, THIS AGREEMENT, WILL BE SYNDICATE-LEVEL INFORMATION, WHICH MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION ABOUT HOLDINGS, THE BORROWER, THE LOAN PARTIES AND THEIR RELATED PARTIES OR THEIR RESPECTIVE SECURITIES. ACCORDINGLY, EACH LENDER REPRESENTS TO THE BORROWER AND THE ADMINISTRATIVE AGENT THAT IT HAS IDENTIFIED IN ITS ADMINISTRATIVE QUESTIONNAIRE A CREDIT CONTACT WHO MAY RECEIVE INFORMATION THAT MAY CONTAIN MATERIAL NON-PUBLIC INFORMATION IN ACCORDANCE WITH ITS COMPLIANCE PROCEDURES AND APPLICABLE LAW, INCLUDING FEDERAL AND STATE SECURITIES LAWS.

**Section 9.13     USA Patriot Act**.  Each Lender that is subject to the USA Patriot Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the USA Patriot Act.

**Section 9.14     Release of Liens and Guarantees**.

(a)     Upon any sale or other transfer by any Loan Party (other than to Holdings, the Borrower or any other Loan Party) of any Collateral in a transaction permitted under this Agreement, or upon the effectiveness of any written consent to the release of the security interest created under any Security Document in any Collateral or the release of Holdings or any Subsidiary Loan Party from its Guarantee under the Guarantee Agreement pursuant to Section 9.02, the security interests in such Collateral created by the Security Documents or such guarantee shall be automatically released. Upon termination of the aggregate Commitments and payment in full of all Secured Obligations (other than contingent indemnification obligations), all obligations under the Loan Documents and all security interests created by the Security Documents shall be automatically released. In connection with any termination or release pursuant to this Section, the Administrative Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release so long as the Borrower or applicable Loan Party shall have provided the Administrative Agent such certifications or documents as the Administrative Agent shall reasonably request in order to demonstrate compliance with this Agreement.

(b)     The Administrative Agent will, at the Borrower's expense, execute and deliver to the applicable Loan Party such documents as such Loan Party may reasonably request to subordinate the Administrative Agent's Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 6.02(iii).

(c)     Each of the Lenders irrevocably authorizes the Administrative Agent to provide any release or evidence of release, termination or subordination contemplated by this Section 9.14. Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release its interest in particular types or items of property, or to release any Loan Party from its obligations under any Loan

84

Document, in each case in accordance with the terms of the Loan Document and this Section 9.14.

**Section 9.15    No Advisory or Fiduciary Responsibility**.  In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each of the Borrower and Holdings acknowledges and agrees that (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent and the Lenders are arm's-length commercial transactions between the Borrower, Holdings and their respective Affiliates, on the one hand, and the Administrative Agent and the Lenders, on the other hand, (B) each of the Borrower and Holdings has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Borrower and Holdings is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated hereby and by the other Loan Documents; (ii) (A) each of the Administrative Agent and the Lenders is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not and will not be acting as an advisor, agent or fiduciary for the Borrower, Holdings, any of their respective Affiliates or any other Person and (B) none of the Administrative Agent or the Lenders has any obligation to the Borrower, Holdings or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth herein and in the other Loan Documents; and (iii) the Administrative Agent, the Lenders and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Borrower, Holdings and their respective Affiliates, and none of the Administrative Agent or the Lenders has any obligation to disclose any of such interests to the Borrower, Holdings or any of their respective Affiliates. To the fullest extent permitted by law, each of the Borrower and Holdings hereby waives and releases any claims that it may have against the Administrative Agent or the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

**Section 9.16    Interest Rate Limitation**.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrower. In determining whether the interest contracted for, charged or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable law, (a) characterize any payment that is not principal as an expense, fee or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the obligations hereunder.

**Section 9.17    Conflicts with Other Loan Documents, Interim Order or Final Order**.  In the event there is a conflict or inconsistency between this Agreement and any other Loan Document, the terms of this Agreement shall control; provided that any provision of the Security Documents which imposes additional burdens on the Loan Parties or further restricts the rights of the Loan Parties or gives the Administrative Agent or Lenders additional rights, in each case, with respect to the Collateral, shall not be deemed to be in conflict or inconsistent with this Agreement and shall be given full force and effect. In the event of any inconsistency between the terms and conditions of this Agreement and the Interim Order or the Final Order (whichever is then in effect), the provisions of the Interim Order or the Final Order (whichever is then in effect) shall govern and control.

**Section 9.18    Acknowledgement and Consent to Bail-In of EEA Financial Institutions**. Solely to the extent any Lender that is an EEA Financial Institution is a party to this Agreement and

85

notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any Lender that is an EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

> (a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any Lender or L/C Issuer that is an EEA Financial Institution; and

> (b) the effects of any Bail-In Action on any such liability, including, if applicable:

> (i) a reduction in full or in part or cancellation of any such liability;

> (ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

> (iii) the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

**Section 9.19** <u>Consent to Service of Process</u>. EACH PARTY HERETO IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 9.01. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF ANY PARTY HERETO TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW. WITHOUT LIMITING THE FOREGOING, EACH LOAN PARTY HEREBY IRREVOCABLY APPOINTS HOLDINGS AS ITS AUTHORIZED AGENT WITH ALL POWERS NECESSARY TO RECEIVE ON ITS BEHALF SERVICE OF COPIES OF THE SUMMONS AND COMPLAINT AND ANY OTHER PROCESS WHICH MAY BE SERVED IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THE LOAN DOCUMENTS IN ANY OF SUCH COURTS IN AND OF THE STATE OF NEW YORK. SUCH SERVICE MAY BE MADE BY MAILING OR DELIVERING A COPY OF SUCH PROCESS TO A LOAN PARTY IN CARE OF HOLDINGS AT ITS ADDRESS FOR NOTICES PROVIDED FOR IN SCHEDULE 9.01, AND EACH LOAN PARTY HEREBY IRREVOCABLY AUTHORIZES AND DIRECTS HOLDINGS TO ACCEPT SUCH SERVICE ON ITS BEHALF AND AGREES THAT THE FAILURE OF HOLDINGS TO GIVE ANY NOTICE OF ANY SUCH SERVICE TO SUCH LOAN PARTY SHALL NOT IMPAIR OR AFFECT THE VALIDITY OF SUCH SERVICE OR OF ANY JUDGMENT RENDERED IN ANY ACTION OR PROCEEDING BASED THEREON. HOLDINGS HEREBY IRREVOCABLY ACCEPTS SUCH APPOINTMENT AS PROCESS AGENT.

[Signature Pages Follow]

4852-4630-2277.1

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

HOLDINGS:                                    **GREEN VALLEY HOSPITAL, LLC**


By: _____
Name:
Title:


BORROWER:                                    **GV HOSPITAL MANAGEMENT, LLC**


By: _____
Name:
Title:

ADMINISTRATIVE AGENT:    **LATERAL U.S. CREDIT OPPORTUNITIES FUND, L.P.,** as Administrative Agent

By:  Lateral Credit Opportunities, LLC, its General Partner

By:  _____
     Richard de Silva, Manager

LENDER:                                **LATERAL U.S. CREDIT OPPORTUNITIES FUND, L.P.,** as a Lender

By:  Lateral Credit Opportunities, LLC, its General Partner

By: _____
     Richard de Silva, Manager

| Schedule 2.01 | | |
|---|---|---|
| **Commitments** | | |
| Lateral U.S. Credit Opportunities Fund, L.P. | Aggregate Commitment | $20,000,000 |
| | Available on Effective Date | **$TBD** |
| | Available on Final Order Entry Date | **$TBD** |

EXHIBIT "B-2"

SENIOR SECURED SUPER PRIORITY
DEBTOR IN POSSESSION COLLATERAL AGREEMENT

dated as of

[●], 2017

among

GREEN VALLEY HOSPITAL, LLC,

GV HOSPITAL MANAGEMENT, LLC,

THE OTHER GRANTORS PARTY HERETO

and

LATERAL U.S. CREDIT OPPORTUNITIES FUND, L.P.
as Administrative Agent

# TABLE OF CONTENTS

## ARTICLE I

### DEFINITIONS

Section 1.01 Defined Terms ............................................................................................................ 1
Section 1.02 Other Defined Terms .................................................................................................. 2

## ARTICLE II

### PLEDGE OF SECURITIES

Section 2.01 Pledge ........................................................................................................................ 4
Section 2.02 Delivery of the Pledged Collateral ............................................................................. 5
Section 2.03 Representations, Warranties and Covenants .............................................................. 5
Section 2.04 Registration in Nominee Name; Denominations ....................................................... 7
Section 2.05 Voting Rights; Dividends and Interest ....................................................................... 7

## ARTICLE III

### SECURITY INTERESTS IN PERSONAL PROPERTY

Section 3.01 Security Interest ......................................................................................................... 8
Section 3.02 Representations and Warranties ................................................................................. 9
Section 3.03 Covenants ................................................................................................................. 11
Section 3.04 Other Actions ........................................................................................................... 12
Section 3.05 Covenants Regarding Patent, Trademark and Copyright Collateral ........................ 13

## ARTICLE IV

### REMEDIES

Section 4.01 Remedies upon Default ............................................................................................. 14
Section 4.02 Application of Proceeds ............................................................................................ 16
Section 4.03 Grant of License to Use Intellectual Property ........................................................... 16
Section 4.04 Securities Act ........................................................................................................... 16

## ARTICLE V

### MISCELLANEOUS

Section 5.01 Notices ...................................................................................................................... 17
Section 5.02 Waivers; Amendment ............................................................................................... 17
Section 5.03 Administrative Agent's Fees and Expenses; Indemnification .................................. 18
Section 5.04 Successors and Assigns ............................................................................................ 19
Section 5.05 Survival of Agreement ............................................................................................. 19
Section 5.06 Counterparts; Effectiveness; Several Agreement ..................................................... 19
Section 5.07 Severability ............................................................................................................... 19

i

Section 5.08    Right of Set-Off .............................................................................................. 19
Section 5.09    Governing Law; Jurisdiction; Consent to Service of Process; Appointment of
                Service of Process Agent ................................................................................ 20
Section 5.10    WAIVER OF JURY TRIAL ........................................................................... 20
Section 5.11    Headings ........................................................................................................ 21
Section 5.12    Security Interest Absolute .............................................................................. 21
Section 5.13    Termination or Release .................................................................................. 21
Section 5.14    Additional Subsidiaries .................................................................................. 21
Section 5.15    Administrative Agent Appointed Attorney-in-Fact ....................................... 21
Section 5.16    Conflicts ......................................................................................................... 22

SCHEDULES:

| | | |
|---|---|---|
| Schedule I | -- | Grantors |
| Schedule II | -- | Pledged Equity Interests; Pledged Debt Securities |
| Schedule III | -- | Intellectual Property |
| Schedule IV | -- | Commercial Tort Claims |
| Schedule V | -- | Deposit Accounts, Securities Accounts, Commodity Accounts |

EXHIBITS:

| | | |
|---|---|---|
| Exhibit I | -- | Form of Supplement |
| Exhibit II | -- | Form of Copyright Security Agreement |
| Exhibit III | -- | Form of Patent Security Agreement |
| Exhibit IV | -- | Form of Trademark Security Agreement |

SENIOR SECURED SUPER PRIORITY DEBTOR IN POSSESSION COLLATERAL AGREEMENT, dated as of [●], 2017 (this "<u>Agreement</u>"), among GREEN VALLEY HOSPITAL, LLC, an Arizona limited liability company ("<u>Holdings</u>"), GV Hospital Management, LLC, an Arizona limited liability company (the "<u>Borrower</u>"), the other GRANTORS from time to time party hereto and LATERAL U.S. CREDIT OPPORTUNITIES FUND, L.P., as Administrative Agent (the "<u>Administrative Agent</u>"), on behalf of the Secured Parties (as defined below).

## RECITALS

WHEREAS, the Borrower has requested that Lenders provide a senior secured, super-priority term loan facility of Twenty Million Dollars ($20,000,000) in the aggregate to fund the working capital requirements, fees, costs and expenses of Holdings, GV II Holdings, LLC, an Arizona limited liability company ("<u>GV II Holdings</u>") and the Borrower (collectively with Holdings and GV II Holdings, the "<u>Debtors</u>") during the pendency of the Chapter 11 Cases;

WHEREAS, pursuant to the Senior Secured Super Priority Debtor in Possession Credit Agreement dated as of [●], 2017 (as amended, supplemented or otherwise modified from time to time, the "<u>DIP Credit Agreement</u>"), among Holdings, the Borrower, the Lenders party thereto and the Administrative Agent, the Lenders have agreed to make certain post-petition loans to Borrower upon the terms and conditions set forth in the DIP Credit Agreement;

WHEREAS, Borrower has agreed to secure all of its Loan Document Obligations under the Loan Documents by granting to the Administrative Agent and the Lenders a security interest and lien upon all of its existing and after-acquired personal and real property, subject to the terms of the Interim Order and Final Order;

WHEREAS, Holdings and its Subsidiaries are willing to guarantee all of the Loan Document Obligations of Borrower under the Loan Documents and to secure all of their obligations under their guarantee by granting to the Administrative Agent and the Lenders a security interest in and lien upon all of their existing and after-acquired personal and real property including, without limitation, all of the Equity Interests of Borrower, subject to the terms of the Interim Order and Final Order; and

WHEREAS, Holdings and the Subsidiaries of the Borrower are affiliates of the Borrower, will derive substantial benefits from the extension of credit to the Borrower pursuant to the DIP Credit Agreement and are willing to execute and deliver this Agreement in order to induce the Lenders to extend credit.

NOW, THEREFORE, in consideration of the premises and the agreements hereinafter set forth, the parties hereto hereby agree as follows:

## ARTICLE I

## DEFINITIONS

**Section 1.01**    **Defined Terms**. (a)  Each capitalized term used but not defined herein shall have the meaning assigned thereto in the DIP Credit Agreement; <u>provided</u>, that each term defined in the New York UCC (as defined herein) and not defined in this Agreement or the DIP Credit Agreement shall have the meaning specified in the New York UCC.

(b)     The rules of construction specified in Section 1.02 and 1.03 of the DIP Credit Agreement also apply to this Agreement, <u>mutatis</u> <u>mutandis</u>.

**Section 1.02     <u>Other Defined Terms</u>**. As used in this Agreement, the following terms have the meanings specified below:

"<u>Account Debtor</u>" means any Person that is or may become obligated to any Grantor under, with respect to or on account of an Account.

"<u>Agreement</u>" has the meaning assigned to such term in the preamble to this Agreement.

"<u>Article 9 Collateral</u>" has the meaning assigned to such term in Section 3.01.

"<u>Borrower</u>" has the meaning assigned to such term in the preamble to this Agreement.

"<u>Collateral</u>" means Article 9 Collateral and Pledged Collateral.

"<u>Commodity Exchange Act</u>" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"<u>Copyright License</u>" means any written agreement, now or hereafter in effect, granting to any Person any right under any Copyright now or hereafter owned by any other Person or that such other Person otherwise has the right to license, and all rights of any such Person under any such agreement.

"<u>Copyright Security Agreement</u>" means the Copyright Security Agreement substantially in the form of <u>Exhibit II</u>.

"<u>Copyrights</u>" means, with respect to any Person, all of the following now owned or hereafter acquired by such Person:  (a) all copyright rights in any work arising under the copyright laws of the United States, whether as author, assignee, transferee or otherwise, and (b) all registrations and applications for registration of any such copyright in the United States, including registrations, supplemental registrations and pending applications for registration in the United States Copyright Office, including, in the case of any Grantor, the Copyrights set forth next to its name on <u>Schedule III</u> hereto.

"<u>DIP Credit Agreement</u>" has the meaning assigned to such term in the recitals of this Agreement.

"<u>Federal Securities Laws</u>" has the meaning assigned to such term in Section 4.04.

"<u>Grantors</u>" means (a) the Borrower, (b) Holdings, (c) each Subsidiary identified on <u>Schedule I</u> hereto and (e) each Subsidiary that becomes a party to this Agreement as a Grantor after the Effective Date.

"<u>Intellectual Property</u>" means, with respect to any Person, all intellectual and similar property of every kind and nature now owned or hereafter acquired by any such Person, including inventions, designs, Patents, Copyrights, Licenses, Trademarks, trade secrets, domain names, confidential or proprietary technical and business information, know-how, show-how or other data or information, software and databases and all embodiments or fixations thereof and related documentation, registrations and franchises, and all additions, improvements and accessions to, and books and records describing or used in connection with, any of the foregoing.

2

"License" means any Patent License, Trademark License, Copyright License or other license or sublicense agreement to which any Person is a party, including those exclusive Copyright Licenses under which any Grantor is a licensee listed on Schedule III hereto.

"Loan Document Obligations" means (a) the due and punctual payment by the Borrower of (i) the principal of and interest at the applicable rate or rates provided in the DIP Credit Agreement (including interest accruing during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding) on the Loans, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (ii) all other monetary obligations of the Borrower under or pursuant to the DIP Credit Agreement and each of the other Loan Documents, including obligations to pay fees, expense reimbursement obligations and indemnification obligations, whether primary, secondary, direct, contingent, fixed or otherwise (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding), (b) the due and punctual payment and performance of all other obligations of the Borrower under or pursuant to each of the Loan Documents and (c) the due and punctual payment and performance of all the obligations of each other Loan Party under or pursuant to this Agreement and each of the other Loan Documents (including monetary obligations incurred during the pendency of any bankruptcy, insolvency, receivership or other similar proceeding, regardless of whether allowed or allowable in such proceeding).

"New York UCC" means the Uniform Commercial Code as from time to time in effect in the State of New York.

"Patent License" means any written agreement, now or hereafter in effect, granting to any Person any right to make, use or sell any invention on which a Patent, now or hereafter owned by any other Person or that any other Person now or hereafter otherwise has the right to license, is in existence, and all rights of any such Person under any such agreement.

"Patent Security Agreement" means the Patent Security Agreement substantially in the form of Exhibit III hereto.

"Patents" means, with respect to any Person, all of the following now owned or hereafter acquired by such Person:  (a) all letters patent of the United States and all registrations thereof and all applications for letters patent of the United States, including registrations and pending applications in the United States Patent and Trademark Office, including those listed on Schedule III hereto, and (b) all reissues, continuations, divisions, continuations-in-part, renewals or extensions thereof, and the inventions disclosed or claimed therein, including the right to make, use and/or sell the inventions disclosed or claimed therein.

"Perfection Certificate" means the Perfection Certificate dated the Effective Date delivered to the Administrative Agent pursuant to Section 4.01(b) of the DIP Credit Agreement.

"Pledged Collateral" has the meaning assigned to such term in Section 2.01.

"Pledged Debt Securities" has the meaning assigned to such term in Section 2.01.

"Pledged Equity Interests" has the meaning assigned to such term in Section 2.01.

"Pledged Securities" means any promissory notes, stock certificates, unit certificates, limited or unlimited liability membership certificates or other securities now or hereafter included in the Pledged

3

Collateral, including all certificates, instruments or other documents representing or evidencing any Pledged Collateral.

"<u>Secured Obligations</u>" means the Loan Document Obligations.

"<u>Secured Parties</u>" means (a) each Lender, (b) the Administrative Agent, (c) the beneficiaries of each indemnification obligation undertaken by any Loan Party under any Loan Document and (d) the permitted successors and assigns of each of the foregoing.

"<u>Security Interest</u>" has the meaning assigned to such term in Section 3.01(a).

"<u>Supplement</u>" means an instrument in the form of <u>Exhibit I</u> hereto, or any other form approved by the Administrative Agent, and in each case reasonably satisfactory to the Administrative Agent.

"<u>Trademark License</u>" means any written agreement, now or hereafter in effect, granting to any Person any right to use any Trademark now or hereafter owned by any other Person or that any other Person otherwise has the right to license, and all rights of any such Person under any such agreement.

"<u>Trademark Security Agreement</u>" means the trademark security agreement in the form of <u>Exhibit IV</u> hereto.

"<u>Trademarks</u>" means, with respect to any Person, all of the following now owned or hereafter acquired by such Person: (a) all trademarks, service marks, trade names, corporate names, company names, business names, fictitious business names, trade styles, trade dress, logos, other source or business identifiers, designs and general intangibles of like nature, now existing or hereafter adopted or acquired, all registrations thereof, and all registration and applications filed in connection therewith, including registrations and applications in the United States Patent and Trademark Office, and all extensions or renewals thereof, including, in the case of any Grantor, any of the foregoing set forth next to its name on <u>Schedule III</u> hereto, (b) all goodwill associated therewith or symbolized thereby and (c) all other assets, rights and interests that uniquely reflect or embody such goodwill.

"<u>UCC</u>" shall mean the New York UCC; <u>provided</u>, <u>however</u>, that, at any time, if by reason of mandatory provisions of law, any or all of the perfection or priority of the Administrative Agent's and the Secured Parties' security interest in any item or portion of the Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, the term "UCC" shall mean the Uniform Commercial Code as in effect, at such time, in such other jurisdiction for purposes of the provisions hereof relating to such perfection or priority and for purposes of definitions relating to such provisions.

**ARTICLE II**

**PLEDGE OF SECURITIES**

**Section 2.01    <u>Pledge</u>**. As security for the payment or performance, as the case may be, in full of the Secured Obligations, each Grantor hereby assigns and pledges to the Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, and hereby grants to the Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest in, all of such Grantor's right, title and interest in, to and under (a)(i) the shares of capital stock and other Equity Interests owned by such Grantor, including those listed opposite the name of such Grantor on <u>Schedule II</u> hereto, (ii) any other Equity Interests obtained in the future by such Grantor and (iii) the certificates or other instruments representing all such Equity Interests (if any) together with undated stock powers or

4

other instruments of transfer with respect thereto endorsed in blank; (collectively, the "Pledged Equity Interests"); (b)(i) the debt securities owned by such Grantor, including those listed opposite the name of such Grantor on Schedule II hereto, (ii) any debt securities in the future issued to or otherwise acquired by such Grantor and (iii) the promissory notes and any other instruments evidencing all such debt securities (collectively, the "Pledged Debt Securities"); (c) all other property that may be delivered to and held by the Administrative Agent pursuant to the terms of this Section 2.01 and Section 2.02; (d) subject to Section 2.05, all payments of principal or interest, dividends, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of, in exchange for or upon the conversion of, and all other Proceeds received in respect of, the securities referred to in clauses (a) and (b) above; (e) subject to Section 2.05, all rights and privileges of such Grantor with respect to the securities and other property referred to in clauses (a), (b), (c) and (d) above; and (f) all Proceeds of any of the foregoing to the extent such Proceeds would constitute property referred to in clauses (a) through (e) above (the items referred to in clauses (a) through (f) above being collectively referred to as the "Pledged Collateral"; provided, that Pledged Collateral shall not include any Excluded Assets).

Section 2.02    **Delivery of the Pledged Collateral**. (a)  Each Grantor agrees to deliver or cause to be delivered to the Administrative Agent any and all available Pledged Securities (i) on the date hereof, in the case of any such Pledged Securities owned by such Grantor on the date hereof, and (ii) promptly (and in any event within 5 Business Days after receipt by such Grantor or such longer period agreed to by the Administrative Agent in its sole discretion) after the acquisition thereof, in the case of any such Pledged Securities acquired by such Grantor after the date hereof.

(b)    Upon delivery to the Administrative Agent, (i) any certificate or promissory note representing Pledged Securities shall be accompanied by undated stock or note powers, as applicable, duly executed in blank or other undated instruments of transfer duly executed in blank and reasonably satisfactory to the Administrative Agent and by such other instruments and documents as the Administrative Agent may reasonably request and (ii) all other property comprising part of the Pledged Collateral shall be accompanied by undated proper instruments of assignment duly executed in blank by the applicable Grantor and such other instruments and documents as the Administrative Agent may reasonably request. Each delivery of Pledged Securities shall be accompanied by a schedule describing such Pledged Securities, which schedule shall be deemed attached to, and shall supplement, Schedule II hereto and be made a part hereof; provided, that failure to provide any such schedule hereto shall not affect the validity of such pledge of such Pledged Securities. Each schedule so delivered shall supplement any prior schedules so delivered.

(c)    Borrower shall (i) include in its operative documents a provision that its Equity Interests be a "security" as defined under Article 8 of the Uniform Commercial Code, and (ii) certificate its Equity Interests.

(d)    Upon request by the Administrative Agent, each Grantor shall cause any limited liability company and any partnership controlled by such Grantor to (i) include in its operative documents a provision that the Equity Interests in such limited liability company or such partnership be a "security" as defined under Article 8 of the Uniform Commercial Code, and (ii) certificate the Equity Interests in any such limited liability company or such partnership.

Section 2.03    **Representations, Warranties and Covenants**. The Grantors jointly and severally represent, warrant and covenant to and with the Administrative Agent, for the benefit of the Secured Parties, that:

(a)    as of the Effective Date, Schedule II hereto sets forth a true and complete list, with respect to each Grantor, of (i) all the Equity Interests owned by such Grantor in the Borrower or any

5

Subsidiary and the percentage of the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Pledged Equity Interests owned by such Grantor and (ii) all the Pledged Debt Securities owned by such Grantor;

(b)      the Pledged Equity Interests and the Pledged Debt Securities have been duly and validly authorized and issued by the issuers thereof and (i) in the case of Pledged Equity Interests, are fully paid and nonassessable (except as such rights that may arise under mandatory provisions of applicable statutory law that may not be waived or otherwise agreed and not as a result of any rights contained in any organizational document) and (ii) in the case of Pledged Debt Securities, are legal, valid and binding obligations of the issuers thereof, except to the extent that enforceability of such obligations may be limited by applicable bankruptcy, insolvency, and other similar laws affecting creditor's rights generally; provided, that the foregoing representations, insofar as they relate to the Pledged Debt Securities issued by a Person other than Holdings, the Borrower or any Wholly Owned Subsidiary, are made to the knowledge of the Grantors;

(c)      except for the security interests granted hereunder and under any other Loan Documents, each of the Grantors (i) is and, subject to any transfers made in compliance with the DIP Credit Agreement, will continue to be the direct owner, beneficially and of record, of the Pledged Securities indicated on Schedule II hereto as owned by such Grantor, (ii) holds the same free and clear of all Liens, (iii) will make no further assignment, pledge, hypothecation or transfer of, or create or permit to exist any security interest in or other Lien on, the Pledged Collateral, and (iv) will defend its title or interest thereto or therein against any and all Liens (other than the Liens created by this Agreement and the other Loan Documents), however arising, of all Persons whomsoever;

(d)      except for restrictions and limitations imposed by the Loan Documents or securities laws generally, the Pledged Equity Interests and, to the extent issued by Holdings, the Borrower or any Subsidiary, the Pledged Debt Securities are and will continue to be freely transferable and assignable, and none of the Pledged Equity Interests and, to the extent issued by Holdings, the Borrower or any Subsidiary, none of the Pledged Debt Securities are or will be subject to any option, right of first refusal, shareholders agreement, charter, by-law or other organizational document provisions or contractual restriction of any nature that might prohibit, impair, delay or otherwise affect in any manner adverse to the Secured Parties in any material respect the pledge of such Pledged Collateral hereunder, the sale or disposition thereof pursuant hereto or the exercise by the Administrative Agent of rights and remedies hereunder;

(e)      each of the Grantors has the power and authority to pledge the Pledged Collateral pledged by it hereunder in the manner hereby done or contemplated;

(f)      by virtue of the execution and delivery by the Grantors of this Agreement, when any Pledged Securities are delivered to the Administrative Agent in accordance with this Agreement, the Administrative Agent will obtain a legal, valid and perfected first priority lien upon and security interest in such Pledged Securities, free of any adverse claims, under the New York UCC to the extent such lien and security interest may be created and perfected under the New York UCC, as security for the payment and performance of the Secured Obligations; and

(g)      subject to the terms of this Agreement and to the extent permitted by applicable law, each Grantor hereby agrees that upon the occurrence and during the continuance of an Event of Default, it will comply with instructions of the Administrative Agent with respect to the Equity Interests in such Grantor that constitute Pledged Equity hereunder that are not certificated without further consent by the applicable owner or holder of such Equity Interests.

6

**Section 2.04** **Registration in Nominee Name; Denominations**. If an Event of Default shall have occurred and is continuing, the Administrative Agent, on behalf of the Secured Parties, shall have the right (in its sole and absolute discretion) to hold the Pledged Securities in the name of the applicable Grantor, endorsed or assigned in blank or in favor of the Administrative Agent or in its own name as pledgee or in the name of its nominee (as pledgee or as sub-agent), and each Grantor will promptly give to the Administrative Agent copies of any notices or other communications received by it with respect to Pledged Securities registered in the name of such Grantor. Upon the occurrence and during the continuance of an Event of Default, the Administrative Agent shall at all times have the right to exchange the certificates representing Pledged Securities for certificates of smaller or larger denominations for any reasonable purpose consistent with this Agreement.

**Section 2.05** **Voting Rights; Dividends and Interest**. (a) Unless and until an Event of Default shall have occurred and be continuing:

(i)      each Grantor shall be entitled to exercise any and all voting and/or other consensual rights and powers inuring to an owner of Pledged Securities or any part thereof for any purpose not in violation of the terms of this Agreement, the DIP Credit Agreement and the other Loan Documents; provided, that such rights and powers shall not be exercised in any manner that could adversely affect the rights inuring to a holder of any Pledged Securities or the rights and remedies of any of the Administrative Agent or the other Secured Parties under this Agreement or any other Loan Document or the ability of the Secured Parties to exercise the same, unless such exercise of rights and powers is in connection with an action permitted under the DIP Credit Agreement;

(ii)      each Grantor shall be entitled to receive and retain any and all dividends, interest, principal and other distributions paid on or distributed in respect of the Pledged Securities to the extent and only to the extent that such dividends, interest, principal and other distributions are permitted by, and are otherwise paid or distributed in accordance with, the terms and conditions of the DIP Credit Agreement, the other Loan Documents and applicable laws; provided, that any noncash dividends, interest, principal or other distributions that would constitute Pledged Equity Interests or Pledged Debt Securities, whether resulting from a subdivision, combination or reclassification of the outstanding Equity Interests in the issuer of any Pledged Securities or received in exchange for Pledged Securities or any part thereof, or in redemption thereof, or as a result of any merger, consolidation, acquisition or other exchange of assets to which such issuer may be a party or otherwise, shall be and become part of the Pledged Collateral and, if received by any Grantor, shall not be commingled by such Grantor with any of its other funds or property but shall be held separate and apart therefrom, shall be held in trust for the benefit of the Administrative Agent and the other Secured Parties and shall be forthwith delivered to the Administrative Agent in the same form as so received (with any necessary endorsements, stock or note powers and other instruments of transfer reasonably requested by the Administrative Agent).

(b)      Upon the occurrence and during the continuance of an Event of Default, all rights of any Grantor to dividends, interest, principal or other distributions that such Grantor is authorized to receive pursuant to paragraph (a)(ii) of this Section 2.05 shall cease, and all such rights shall thereupon become vested in the Administrative Agent, which shall have the sole and exclusive right and authority to receive and retain such dividends, interest, principal or other distributions. All dividends, interest, principal or other distributions received by any Grantor contrary to the provisions of this Section 2.05 shall be held in trust for the benefit of the Administrative Agent and the other Secured Parties and shall be segregated from other property or funds of such Grantor and shall be forthwith delivered to the Administrative Agent in the same form as so received (with any necessary endorsements, stock or note powers and other instruments of transfer reasonably requested by the Administrative Agent).

7

(c)      Upon the occurrence and during the continuance of an Event of Default, all rights of any Grantor to exercise the voting and consensual rights and powers it is entitled to exercise pursuant to paragraph (a)(i) of this Section 2.05 shall cease, and all such rights shall thereupon become vested in the Administrative Agent, which shall have the sole and exclusive right and authority to exercise such voting and consensual rights and powers.

## ARTICLE III

## SECURITY INTERESTS IN PERSONAL PROPERTY

Section 3.01      Security Interest. (a)  As security for the payment or performance, as the case may be, in full of the Secured Obligations, each Grantor hereby grants to the Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest (the "Security Interest") in all of such Grantor's right, title and interest in, to and under any and all of the following assets now owned or at any time hereafter acquired by such Grantor or in which such Grantor now has or at any time in the future may acquire any right, title or interest (collectively, the "Article 9 Collateral"):

(i)      all Accounts;

(ii)      all Chattel Paper;

(iii)      all Documents;

(iv)      all Equipment;

(v)      all General Intangibles, including all Intellectual Property;

(vi)      all Instruments;

(vii)      all Inventory;

(viii)      all other Goods;

(ix)      all Investment Property;

(x)      all Letter-of-Credit Rights;

(xi)      all Commercial Tort Claims specifically described on Schedule IV hereto, as such schedule may be supplemented from time to time pursuant to Section 3.04(d);

(xii)      all Deposit Accounts, Securities Accounts and Commodity Accounts;

(xiii)      all Moneys;

(xiv)      all Motor Vehicles;

(xv)      all books and records pertaining to the Article 9 Collateral; and

(xvi)      to the extent not otherwise included, all Proceeds and products of any and all of the foregoing and all Supporting Obligations, collateral security and guarantees given by any Person with respect to any of the foregoing;

8

<u>provided</u>, that in no event shall the Security Interest attach to any Excluded Assets.

(b)     Each Grantor hereby irrevocably authorizes the Administrative Agent for the benefit of the Secured Parties at any time and from time to time to file in any relevant jurisdiction any financing statements (including fixture filings) with respect to the Article 9 Collateral or any part thereof and amendments thereto that (i) describe the collateral covered thereby in any manner that the Administrative Agent reasonably determines is necessary or advisable to ensure the perfection of the security interest in the Article 9 Collateral granted under this Agreement, including indicating the Collateral as "all assets" of such Grantor or words of similar effect, and (ii) contain the information required by Article 9 of the UCC or the analogous legislation of each applicable jurisdiction for the filing of any financing statement or amendment, including (A) whether such Grantor is an organization, the type of organization and, if required and if available, any organizational identification number issued to such Grantor and (B) in the case of a financing statement filed as a fixture filing, a sufficient description of the real property to which such Article 9 Collateral relates. Each Grantor agrees to provide such information to the Administrative Agent promptly upon request. The Administrative Agent is further authorized to file with the United States Patent and Trademark Office or United States Copyright Office (or any successor office) such documents as may be reasonably necessary or advisable for the purpose of perfecting, confirming, continuing, enforcing or protecting the Security Interest in Article 9 Collateral consisting of Patents, Trademarks or Copyrights granted by each Grantor and naming any Grantor or the Grantors as debtors and the Administrative Agent as secured party.

(c)     The Security Interest and the security interest granted pursuant to Article II are granted as security only and shall not subject the Administrative Agent or any other Secured Party to, or in any way alter or modify, any obligation or liability of any Grantor with respect to or arising out of the Collateral.

**Section 3.02     <u>Representations and Warranties</u>.**  The Grantors jointly and severally represent and warrant to the Administrative Agent, for the benefit of the Secured Parties, that:

(a)     Each Grantor has good and valid rights in and title to the Article 9 Collateral with respect to which it has purported to grant a Security Interest hereunder, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or as proposed to be conducted or to utilize such properties for their intended purposes, and has full power and authority to grant to the Administrative Agent, for the benefit of the Secured Parties, the Security Interest in such Article 9 Collateral pursuant hereto and to execute, deliver and perform its obligations in accordance with the terms of this Agreement, without the consent or approval of any other Person other than any consent or approval that has been obtained.

(b)     The Perfection Certificate has been duly prepared, completed and executed and the information set forth therein, including the exact legal name and jurisdiction of organization of each Grantor, is correct and complete as of the Effective Date, except for any errors or omissions that will not materially impact Administrative Agent's liens on the primary collateral securing the Loan or the exercise of remedies by the Administrative Agent.  Subject to entry of the Interim Order and the Final Order, the Uniform Commercial Code financing statements (including fixture filings, as applicable) prepared by the Administrative Agent are all the filings, recordings and registrations (other than filings required to be made in the United States Patent and Trademark Office and the United States Copyright Office in order to perfect the Security Interest in Article 9 Collateral consisting of United States Patents, Trademarks and Copyrights) that are necessary to establish a legal, valid and perfected security interest in favor of the Administrative Agent, for the benefit of the Secured Parties, in respect of all Article 9 Collateral in which the Security Interest may be perfected by filing, recording or registration in the United States, and no further or subsequent filing, refiling, recording, rerecording, registration or reregistration is necessary, except as provided under applicable law with respect to the filing of continuation statements (other than

such actions as are necessary to perfect the Security Interest with respect to any Article 9 Collateral consisting of registered or applied for Patents, Trademarks and Copyrights acquired or developed by a Grantor after the date hereof).

(c)       The Security Interest constitutes (i) a legal and valid security interest in all the Article 9 Collateral securing the payment and performance of the Secured Obligations, (ii) subject to the entry of the orders and the filings described in paragraph (b) of this Section 3.02, a perfected security interest in all Article 9 Collateral in which a security interest may be perfected by filing, recording or registering a financing statement or analogous document in the applicable jurisdiction in the United States pursuant to the Uniform Commercial Code and (iii) subject to the entry of the orders and the filings described in paragraph (b) of this Section 3.02, a security interest that shall be perfected in all Article 9 Collateral in which a security interest may be perfected upon the receipt and recording of a Patent Security Agreement, a Trademark Security Agreement and a Copyright Security Agreement with the United States Patent and Trademark Office and the United States Copyright Office, as applicable, within the three-month period after the date hereof pursuant to 35 U.S.C. § 261 or 15 U.S.C. § 1060 or the one-month period after the date hereof pursuant to 17 U.S.C. § 205.

(d)       The Article 9 Collateral is owned by the Grantors free and clear of any Lien, except for Liens expressly permitted pursuant to Section 6.02 of the DIP Credit Agreement. None of the Grantors has filed or consented to the filing of (i) any financing statement or analogous document under the Uniform Commercial Code or any other applicable laws covering any Article 9 Collateral or (ii) any assignment in which any Grantor assigns any Article 9 Collateral or any security agreement or similar instrument covering any Article 9 Collateral with the United States Patent and Trademark Office or the United States Copyright Office, except, in each case, for Liens expressly permitted pursuant to Section 6.02 of the DIP Credit Agreement.

(e)       Each Debtor warrants and covenants that, except as otherwise expressly provided in this paragraph, upon the entry of the Interim Order and continuing pursuant to the Final Order, the Obligations of such Debtor under the Loan Documents:

(i)       pursuant to Sections 361, 362, 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the Security Documents and UCC financing statements, shall, subject to entry of the Final Order, be secured by, and such Debtor is hereby granting to the Administrative Agent, on behalf of the Secured Parties, a continuing, valid, binding, enforceable, non-avoidable and automatically properly perfected post-petition security interest and first priority (subject only to Permitted Encumbrances, Permitted Senior Liens and the Carve-Out) Lien on all of such Debtor's rights in all rights, claims and the proceeds thereof, including property received thereby whether by judgment, settlement or otherwise; and

(ii)       to the extent applicable, pursuant to Sections 364(d)(1) of the Bankruptcy Code, shall at all times be secured by, and such Debtor is hereby granting to the Administrative Agent, on behalf of the Secured Parties, a continuing, valid, binding, enforceable, non-avoidable and automatically properly perfected post-petition security interest and first priority (subject only to Permitted Encumbrances, Permitted Senior Liens and the Carve-Out) Lien on all of such Debtor's rights in the Collateral existing and after acquired, whether now owned by or owing to, or hereafter acquired by or arising in favor of such Debtor, and any proceeds thereof.

Such Debtor further warrants and covenants that, upon the entry of the Interim Order and continuing pursuant to the Final Order, the Liens referred to in Section 3.01 above shall be senior in priority to all other Liens on the assets and properties of such Debtor other than Permitted Senior Liens and the Carve-Out.

**Section 3.03**    **Covenants**. (a)  Each Grantor shall, at its own expense, take any and all actions reasonably necessary to defend title to the Article 9 Collateral against all Persons, except with respect to Article 9 Collateral that is no longer necessary or beneficial to the conduct of such Grantor's business (as determined by the Administrative Agent in its sole discretion), and to defend the Security Interest of the Administrative Agent in the Article 9 Collateral and the priority thereof against any Lien not permitted pursuant to Section 6.02 of the DIP Credit Agreement, subject to the rights of such Grantor under Section 9.14 of the DIP Credit Agreement and corresponding provisions of the Security Documents to obtain a release of the Liens created under the Security Documents.

(b)    Each Grantor agrees, at its own expense, to execute, acknowledge, deliver and cause to be duly filed all such further instruments and documents and take all such actions as the Administrative Agent may from time to time reasonably request to better assure, preserve, protect and perfect the Security Interest and the rights and remedies created hereby, including the payment of any fees and Taxes required in connection with the execution and delivery of this Agreement, the granting of the Security Interest and the filing of any financing statements (including fixture filings) or other documents in connection herewith or therewith.

Without limiting the generality of the foregoing, each Grantor hereby authorizes the Administrative Agent to supplement this Agreement by supplementing Schedule III hereto or adding additional schedules hereto to identify specifically any asset or item that may constitute an application or registration for any Copyright, Patent or Trademark.

(c)    At its option, the Administrative Agent may discharge past due taxes, assessments, charges, fees, Liens, security interests or other encumbrances at any time levied or placed on the Article 9 Collateral and not permitted pursuant to Section 6.02 of the DIP Credit Agreement, and may pay for the maintenance and preservation of the Article 9 Collateral to the extent any Grantor fails to do so as required by the DIP Credit Agreement, this Agreement or any other Loan Document, and each Grantor jointly and severally agrees to reimburse the Administrative Agent, immediately upon demand, for any reasonable payment made or any reasonable expense incurred by the Administrative Agent pursuant to the foregoing authorization; provided, that nothing in this paragraph shall be interpreted as excusing any Grantor from the performance of, or imposing any obligation on the Administrative Agent or any Secured Party to cure or perform, any covenants or other promises of any Grantor with respect to taxes, assessments, charges, fees, Liens, security interests or other encumbrances and maintenance as set forth herein or in the other Loan Documents.

(d)    Each Grantor shall remain liable, as between such Grantor and the relevant counterparty under each contract, agreement or instrument relating to the Article 9 Collateral, to observe and perform all the conditions and obligations to be observed and performed by it under such contract, agreement or instrument, all in accordance with the terms and conditions thereof, and each Grantor jointly and severally agrees to indemnify and hold harmless the Administrative Agent and the other Secured Parties from and against any and all liability for such performance.

(e)    Each Grantor irrevocably makes, constitutes and appoints the Administrative Agent (and all officers, employees or agents designated by the Administrative Agent) as such Grantor's true and lawful agent (and attorney-in-fact) for the purpose, upon the occurrence and during the continuance of an Event of Default, of making, settling and adjusting claims in respect of Article 9 Collateral under policies of insurance, endorsing the name of such Grantor on any check, draft, instrument or other item of payment for the proceeds of such policies of insurance and for making all determinations and decisions with respect thereto. In the event that any Grantor at any time or times shall fail to obtain or maintain any of the policies of insurance required hereby or to pay any premium in whole or part relating thereto, the Administrative Agent may, without waiving or releasing any obligation or liability of the Grantors

11

hereunder or any Default or Event of Default, in its sole discretion, obtain and maintain such policies of insurance and pay such premium and take any other actions with respect thereto as the Administrative Agent reasonably deems advisable. All sums disbursed by the Administrative Agent in connection with this paragraph, including reasonable out-of-pocket attorneys' fees, court costs, expenses and other charges relating thereto, shall be payable immediately upon demand by the Grantors to the Administrative Agent and shall be additional Secured Obligations secured hereby.

Section 3.04    Other Actions. In order to further insure the attachment, perfection and priority of, and the ability of the Administrative Agent to enforce, the Security Interest, each Grantor agrees, in each case at such Grantor's own expense, to take the following actions with respect to the following Article 9 Collateral:

(a)    Instruments. If any Grantor shall at any time hold or acquire any Instruments constituting Collateral (other than Instruments with an aggregate face amount of less than $10,000 and other than checks to be deposited in the ordinary course of business), upon the request of the Administrative Agent, such Grantor shall promptly (and in any event within 5 Business Days after receipt by such Grantor of the Administrative Agent's request or such longer period agreed to by the Administrative Agent in its sole discretion) endorse, assign and deliver the same to the Administrative Agent, accompanied by such undated instruments of transfer or assignment duly executed in blank as the Administrative Agent may from time to time reasonably request.

(b)    Investment Property. Except to the extent otherwise provided in Article II, if any Grantor shall at any time hold or acquire any certificated securities, such Grantor shall promptly (and in any event within 5 Business Days after receipt by such Grantor or such longer period agreed to by the Administrative Agent in its sole discretion) endorse, assign and deliver the same to the Administrative Agent, accompanied by such undated instruments of transfer or assignment duly executed in blank as the Administrative Agent may from time to time reasonably request.

(c)    Letter-of-Credit Rights. If any Grantor is at any time a beneficiary under a letter of credit with an aggregate face amount in excess of $10,000 now or hereafter issued in favor of such Grantor that is not a Supporting Obligation with respect to any of the Collateral, such Grantor shall promptly notify the Administrative Agent thereof and, upon request by the Administrative Agent, pursuant to an agreement in form and substance reasonably satisfactory to the Administrative Agent, either (i) use commercially reasonable efforts to arrange for the issuer and any confirmer of such letter of credit to consent to an assignment to the Administrative Agent of the proceeds of any drawing under such letter of credit or (ii) use commercially reasonable efforts to arrange for the Administrative Agent to become the transferee beneficiary of such letter of credit, with the Administrative Agent agreeing, in each case, that the proceeds of any drawing under such letter of credit are to be paid to the applicable Grantor unless an Event of Default has occurred and is continuing.

(d)    Commercial Tort Claims. Each Grantor shall promptly (and in any event within 5 Business Days or such longer period agreed to by the Administrative Agent in its sole discretion) notify the Administrative Agent in a writing signed by such Grantor of any Commercial Tort Claim in respect of which a complaint or counterclaim has been filed by such Grantor seeking damages in an amount reasonably estimated to exceed $10,000, and including a summary description of such claim, and Schedule IV hereto shall be deemed to be supplemented to include such description of such Commercial Tort Claim as set forth in such writing.

(e)    Deposit Accounts, Securities Accounts and Commodity Accounts. Schedule V sets forth (i) all Deposit Accounts, all Securities Accounts and all Commodity Accounts maintained by each Grantor on the Effective Date, (ii) all control agreements with respect to such Deposit Accounts,

12

Securities Accounts or Commodity Accounts in effect as of the Effective Date, (iii) all Excluded Receivables Accounts maintained by each Grantor on the Effective Date and (iv) all Collection Account Agreements with respect to such Excluded Receivables Accounts in effect as of the Effective Date. Subject to Section 5.14 of the DIP Credit Agreement, Grantors shall take all actions necessary to establish the Administrative Agent's control of each Deposit Account (other than the Excluded Receivables Account), Securities Account or Commodity Account owned or established by a Grantor after the Effective Date by obtaining a Control Agreement in respect thereof. A Grantor shall be the sole account holder of each such Deposit Account, Securities Account, Commodity Account or Excluded Receivables Account and shall not allow any other Person (other than the Administrative Agent or as set forth on Schedule V as updated from time to time with respect to such Deposit Account securities Account or Commodity Account) to have control over such Deposit Account, Securities Account or Commodity Account, Excluded Receivables Account or any property deposited therein or held in custody by the securities intermediary or commodity broker. Grantors shall notify the Administrative Agent in writing at least five (5) Business Days prior to any opening or closing of a Deposit Account, Securities Account or Commodity Account and, with the consent of the Administrative Agent, will amend Schedule V to reflect same.

**Section 3.05    Covenants Regarding Patent, Trademark and Copyright Collateral**. (a) Each Grantor agrees (i) to maintain the validity and enforceability of any registered material Intellectual Property (or applications therefor) and to maintain such registrations and applications of Intellectual Property in full force and effect and (ii) to pursue the registration and maintenance of each material Patent, Trademark or Copyright registration or application, now or hereafter included in the Intellectual Property of such Grantor, including the payment of required fees and taxes, the filing of responses to office actions issued by the U.S. Patent and Trademark Office, the U.S. Copyright Office or other governmental authorities, the filing of applications for renewal or extension, the filing of affidavits under Sections 8 and 15 of the U.S. Trademark Act, the filing of divisional, continuation, continuation-in-part, reissue and renewal applications or extensions, the payment of maintenance fees and the participation in interference, reexamination, opposition, cancellation, infringement and misappropriation proceedings.

(b)    No Grantor shall do or permit any act or knowingly omit to do any act whereby any of its material Intellectual Property may lapse, be terminated, or become invalid or unenforceable or placed in the public domain (or in case of a trade secret, lose its competitive value).

(c)    Each Grantor shall take all steps to preserve and protect each item of its material Intellectual Property, including maintaining the quality of any and all products or services used or provided in connection with any of the material Trademarks, consistent with the quality of the products and services as of the date hereof, and taking all steps necessary to ensure that all licensed users of any of the Trademarks abide by the applicable license's terms with respect to the standards of quality.

(d)    Each Grantor agrees that, should it obtain an ownership or other interest in any Intellectual Property after the Effective Date, (i) the provisions of this Agreement shall automatically apply thereto and (ii) any such Intellectual Property and, in the case of Trademarks, the goodwill symbolized thereby, shall automatically become Intellectual Property subject to the terms and conditions of this Agreement.

(e)    Nothing in this Agreement shall prevent any Grantor from disposing of, discontinuing the use or maintenance of, failing to pursue or otherwise allowing to lapse, terminate or put into the public domain any of its Intellectual Property of *de minimis* value to the extent permitted by the DIP Credit Agreement if such Grantor determines in its reasonable business judgment that such discontinuance is desirable in the conduct of its business.

# ARTICLE IV

# REMEDIES

**Section 4.01    Remedies upon Default**. Upon the occurrence and during the continuance of an Event of Default, each Grantor agrees to deliver, on demand, each item of Collateral to the Administrative Agent or any Person designated by the Administrative Agent, and it is agreed that the Administrative Agent shall have the right to take any of or all the following actions at the same or different times: (a) with respect to any Article 9 Collateral consisting of Intellectual Property, on demand, to cause the Security Interest to become an assignment, transfer and conveyance of any of or all such Article 9 Collateral by the applicable Grantors to the Administrative Agent, for the benefit of the Secured Parties, or to license or sublicense, whether on an exclusive or nonexclusive basis, any such Article 9 Collateral throughout the world on such terms and conditions and in such manner as the Administrative Agent shall determine (other than in violation of any then-existing licensing arrangements to the extent that waivers cannot be obtained), and (b) with or without legal process and with or without prior notice of demand for performance, to take possession of the Article 9 Collateral and the Pledged Collateral and without liability for trespass to enter any premises where the Article 9 Collateral or the Pledged Collateral may be located for the purpose of taking possession of or removing the Article 9 Collateral and the Pledged Collateral and, generally, to exercise any and all rights afforded to a secured party under the Uniform Commercial Code or other applicable law. Without limiting the generality of the foregoing, each Grantor agrees that the Administrative Agent shall have the right, subject to the mandatory requirements of applicable law and the notice requirements described below, to sell or otherwise dispose of all or any part of the Collateral at a public or private sale or at any broker's board or on any securities exchange, for cash, upon credit or for future delivery as the Administrative Agent shall deem appropriate. The Administrative Agent shall be authorized at any such sale of securities (if it deems it advisable to do so) to restrict the prospective bidders or purchasers to Persons who will represent and agree that they are purchasing the Collateral for their own account for investment and not with a view to the distribution or sale thereof, and upon consummation of any such sale the Administrative Agent shall have the right to assign, transfer and deliver to the purchaser or purchasers thereof the Collateral so sold. Each such purchaser at any sale of Collateral shall hold the property sold absolutely free from any claim or right on the part of any Grantor, and each Grantor hereby waives (to the extent permitted by law) all rights of redemption, stay and appraisal that such Grantor now has or may at any time in the future have under any rule of law or statute now existing or hereafter enacted.

The Administrative Agent shall give the applicable Grantors no less than 10 days' written notice (which each Grantor agrees is reasonable notice within the meaning of Section 9-611 of the New York UCC or its equivalent in other jurisdictions) of the Administrative Agent's intention to make any sale of Collateral. Such notice, in the case of a public sale, shall state the time and place for such sale and, in the case of a sale at a broker's board or on a securities exchange, shall state the board or exchange at which such sale is to be made and the day on which the Collateral or portion thereof, will first be offered for sale at such board or exchange. Any such public sale shall be held at such time or times within ordinary business hours and at such place or places as the Administrative Agent may fix and state in the notice (if any) of such sale. At any such sale, the Collateral, or portion thereof, to be sold may be sold in one lot as an entirety or in separate parcels, as the Administrative Agent may (in its sole and absolute discretion) determine. The Administrative Agent shall not be obligated to make any sale of any Collateral if it shall determine not to do so, regardless of the fact that notice of sale of such Collateral shall have been given. The Administrative Agent may, without notice or publication, adjourn any public or private sale or cause the same to be adjourned from time to time by announcement at the time and place fixed for sale, and such sale may, without further notice, be made at the time and place to which the same was so adjourned. In case any sale of all or any part of the Collateral is made on credit or for future delivery, the Collateral so sold may be retained by the Administrative Agent until the sale price is paid by the purchaser or

purchasers thereof, but the Administrative Agent and the other Secured Parties shall not incur any liability in case any such purchaser or purchasers shall fail to take up and pay for the Collateral so sold and, in case of any such failure, such Collateral may be sold again upon like notice. At any public (or, to the extent permitted by law, private) sale made pursuant to this Agreement, any Secured Party may bid for or purchase, free (to the extent permitted by law) from any right of redemption, stay, valuation or appraisal on the part of any Grantor (all said rights being also hereby waived and released to the extent permitted by law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to such Secured Party from any Grantor as a credit against the purchase price, and such Secured Party may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to any Grantor therefor. For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Administrative Agent shall be free to carry out such sale pursuant to such agreement and no Grantor shall be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Administrative Agent shall have entered into such an agreement all Events of Default shall have been remedied and the Secured Obligations paid in full. As an alternative to exercising the power of sale herein conferred upon it, the Administrative Agent may proceed by a suit or suits at law or in equity to foreclose this Agreement and to sell the Collateral or any portion thereof pursuant to a judgment or decree of a court or courts having competent jurisdiction or pursuant to a proceeding by a court-appointed receiver. Any sale pursuant to the provisions of this Section 4.01 shall be deemed to conform to the commercially reasonable standards as provided in Section 9-610(b) of the New York UCC or its equivalent in other jurisdictions.

Without prejudice to any of the Administrative Agent's foregoing remedies, it is further agreed that the Administrative Agent may, but is not required to, appoint, subject to the Bankruptcy Court's approval, a chief restructuring officer or other officer to be the debtor-representative for the Chapter 11 Cases, and/or obtain a trustee in the Chapter 11 Cases, which such chief restructuring officer, officer, or trustee must be acceptable to the Administrative Agent in its discretion.

Notwithstanding the foregoing, prior to the exercise of any enforcement or liquidation remedies against the Collateral, the Administrative Agent shall provide three (3) Business Days' prior written notice thereof to the Borrower.

**Section 4.02** **Application of Proceeds**. The Administrative Agent shall apply the proceeds of any collection or sale of Collateral, including any Collateral consisting of cash, as follows:

FIRST, to the payment of all costs and expenses incurred by the Administrative Agent in connection with such collection or sale or otherwise in connection with this Agreement, any other Loan Document or any of the Secured Obligations, including all court costs and the fees and expenses of its agents and legal counsel, the repayment of all advances made by the Administrative Agent hereunder or under any other Loan Document on behalf of any Grantor and any other costs or expenses incurred in connection with the exercise of any right or remedy hereunder or under any other Loan Document;

SECOND, to the payment in full of the Secured Obligations (the amounts so applied to be distributed among the Secured Parties pro rata in accordance with the amounts of the Secured Obligations owed to them on the date of any such distribution); and

THIRD, to the Grantors, their successors or assigns, or as a court of competent jurisdiction may otherwise direct.

15

The Administrative Agent shall have absolute discretion as to the time of application of any such proceeds, moneys or balances in accordance with this Agreement. Upon any sale of Collateral by the Administrative Agent (including pursuant to a power of sale granted by statute or under a judicial proceeding), the receipt of the Administrative Agent or of the officer making the sale shall be a sufficient discharge to the purchaser or purchasers of the Collateral so sold and such purchaser or purchasers shall not be obligated to see to the application of any part of the purchase money paid over to the Administrative Agent or such officer or be answerable in any way for the misapplication thereof. The Administrative Agent shall have no liability to any of the Secured Parties for good faith actions taken in reasonable reliance on information supplied to it as to the amounts of unpaid principal and interest and other amounts outstanding with respect to the Secured Obligations.

Section 4.03    **Grant of License to Use Intellectual Property**. For the purpose of enabling the Administrative Agent to exercise rights and remedies under this Agreement, each Grantor shall, upon request by the Administrative Agent solely during the continuance of an Event of Default, grant to the Administrative Agent an irrevocable, nonexclusive license (exercisable without payment of royalty or other compensation to the Grantors) to use, license or sublicense any of the Collateral consisting of Intellectual Property now owned or hereafter acquired by such Grantor, and wherever the same may be located, and including in such license reasonable access to all media in which any of the licensed items may be recorded or stored and to all computer software and programs used for the compilation or printout thereof to the extent that such non-exclusive license (a) does not violate the express terms of any agreement between a Grantor and a third party governing the applicable Grantor's use of such Collateral consisting of Intellectual Property, or gives such third party any right of acceleration, modification or cancellation therein and (b) is not prohibited by any Requirements of Law. The use of such license by the Administrative Agent may be exercised, at the option of the Administrative Agent, solely during the continuance of an Event of Default.

Section 4.04    **Securities Act**. In view of the position of the Grantors in relation to the Pledged Collateral, or because of other current or future circumstances, a question may arise under the Securities Act of 1933, as now or hereafter in effect, or any similar statute hereafter enacted analogous in purpose or effect (such Act and any such similar statute as from time to time in effect being called the "Federal Securities Laws") with respect to any disposition of the Pledged Collateral permitted hereunder. Each Grantor understands that compliance with the Federal Securities Laws might very strictly limit the course of conduct of the Administrative Agent if the Administrative Agent were to attempt to dispose of all or any part of the Pledged Collateral, and might also limit the extent to which or the manner in which any subsequent transferee of any Pledged Collateral could dispose of the same. Similarly, there may be other legal restrictions or limitations affecting the Administrative Agent in any attempt to dispose of all or part of the Pledged Collateral under applicable blue sky or other state securities laws or similar laws analogous in purpose or effect. Each Grantor recognizes that in light of such restrictions and limitations the Administrative Agent may, with respect to any sale of the Pledged Collateral, limit the purchasers to those who will agree, among other things, to acquire such Pledged Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Each Grantor acknowledges and agrees that in light of such restrictions and limitations, the Administrative Agent, in its sole and absolute discretion, (a) may proceed to make such a sale whether or not a registration statement for the purpose of registering such Pledged Collateral or part thereof shall have been filed under the Federal Securities Laws to the extent the Administrative Agent has determined that such a registration is not required by any Requirement of Law and (b) may approach and negotiate with a limited number of potential purchasers (including a single potential purchaser) to effect such sale. Each Grantor acknowledges and agrees that any such sale might result in prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions. In the event of any such sale, the Administrative Agent and the other Secured Parties shall incur no responsibility or liability for selling all or any part of the Pledged Collateral at a price that the Administrative Agent, in its sole and absolute discretion, may in good faith deem

reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might have been realized if the sale were deferred until after registration as aforesaid or if more than a limited number of purchasers (or a single purchaser) were approached. The provisions of this Section 4.04 will apply notwithstanding the existence of a public or private market upon which the quotations or sales prices may exceed substantially the price at which the Administrative Agent sells.

## ARTICLE V

## MISCELLANEOUS

Section 5.01  __Notices__. All communications and notices hereunder shall (except as otherwise expressly permitted herein) be in writing and given as provided in Section 9.01 of the DIP Credit Agreement. All communications and notices hereunder to any Grantor shall be given to it in care of Holdings as provided in Section 9.01 of the DIP Credit Agreement.

Section 5.02  __Waivers; Amendment__. (a)  No failure or delay by the Administrative Agent, any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the Administrative Agent and the Lenders hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have. No waiver of any provision of this Agreement or consent to any departure by any Loan Party therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section 5.02, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent, any Lender may have had notice or knowledge of such Default at the time. No notice or demand on any Loan Party in any case shall entitle any Loan Party to any other or further notice or demand in similar or other circumstances.

(b)  Neither this Agreement nor any provision hereof may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Administrative Agent and the Grantor or Grantors with respect to which such waiver, amendment or modification is to apply, subject to any consent required in accordance with Section 9.02 of the DIP Credit Agreement; provided, that the Administrative Agent may, without the consent of any Secured Party, consent to a departure by any Grantor from any covenant of such Grantor set forth herein to the extent such departure is consistent with the authority of the Administrative Agent set forth in the definition of the term "Collateral and Guarantee Requirement" in the DIP Credit Agreement.

Section 5.03  __Administrative Agent's Fees and Expenses; Indemnification__. (a)  Each Grantor, jointly with the other Grantors and severally, agrees to reimburse the Administrative Agent for its fees and expenses incurred hereunder as provided in Section 9.03(a) of the DIP Credit Agreement; provided, that each reference therein to the "Borrower" shall be deemed to be a reference to "each Grantor."

(b)  Without limitation of its indemnification obligations under the other Loan Documents, each Grantor, jointly with the other Grantors and severally, agrees to indemnify the Administrative Agent and the other Indemnitees against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and reasonable and documented or invoiced out-of-pocket fees and expenses of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee by any third party or by the Borrower, Holdings or any Subsidiary arising out of, in connection with, or as a result of, the execution,

17

delivery or performance of this Agreement or any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether brought by a third party or by the Borrower, Holdings or any Subsidiary and regardless of whether any Indemnitee is a party thereto; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities, costs or related expenses resulted from the gross negligence, bad faith or willful misconduct of such Indemnitee or its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable judgment).

(c)     To the fullest extent permitted by applicable law, no Grantor shall assert, and each Grantor hereby waives, any claim against any Indemnitee (i) for any direct or actual damages arising from the use by unintended recipients of information or other materials distributed to such unintended recipients by such Indemnitee through telecommunications, electronic or other information transmission systems (including the Internet) in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby; provided, that such indemnity shall not, as to any Indemnitee, be available to the extent that such actual or direct damages are determined by a court of competent jurisdiction in a final and non-appealable judgment to have resulted from the gross negligence, bad faith or willful misconduct of, or a material breach of the Loan Documents by such Indemnitee or its Related Parties (as determined by a court of competent jurisdiction in a final and non-appealable judgment) or (ii) on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any Loan Document or any agreement or instrument contemplated hereby or thereby, the Transactions, any Loan or the use of the proceeds thereof.

(d)     The provisions of this Section 5.03 shall remain operative and in full force and effect regardless of the termination of this Agreement or any other Loan Document, the consummation of the transactions contemplated hereby or thereby, the repayment of any of the Secured Obligations, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of any Secured Party. All amounts due under this Section shall be payable not later than 5 Business Days (or such longer period agreed to by the Administrative Agent in its sole discretion) after written demand therefor. Any such amounts payable as provided hereunder shall be additional Secured Obligations.

Section 5.04     **Successors and Assigns**. Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the permitted successors and assigns of such party; and all covenants, promises and agreements by or on behalf of any Grantor or the Administrative Agent that are contained in this Agreement shall bind and inure to the benefit of their respective successors and assigns.

Section 5.05     **Survival of Agreement**. All covenants, agreements, representations and warranties made by the Loan Parties in this Agreement or any other Loan Document and in the certificates or other instruments delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by the Secured Parties and shall survive the execution and delivery of the Loan Documents and the making of any Loans and issuance of any Letters of Credit, regardless of any investigation made by or on behalf of any Secured Party and notwithstanding that the Administrative Agent, any Lender or any other Secured Party may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended under the DIP Credit Agreement or any other Loan Document, and shall continue in full force and effect until such time as (a) all the Loan Document Obligations have been indefeasibly paid in full in cash, and (b) all Commitments have terminated or expired.

18

**Section 5.06    Counterparts; Effectiveness; Several Agreement**. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Agreement. This Agreement shall become effective as to any Grantor when a counterpart hereof executed on behalf of such Grantor shall have been delivered to the Administrative Agent and a counterpart hereof shall have been executed on behalf of the Administrative Agent, and thereafter shall be binding upon such Grantor and the Administrative Agent and their respective permitted successors and assigns, and shall inure to the benefit of such Grantor, the Administrative Agent and the other Secured Parties and their respective successors and assigns, except that no Grantor shall have the right to assign or transfer its rights or obligations hereunder or any interest herein (and any such assignment or transfer shall be void) except as expressly provided in this Agreement and the DIP Credit Agreement. This Agreement shall be construed as a separate agreement with respect to each Grantor and may be amended, modified, supplemented, waived or released with respect to any Grantor without the approval of any other Grantor and without affecting the obligations of any other Grantor hereunder.

**Section 5.07    Severability**. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

**Section 5.08    Right of Set-Off**. If an Event of Default shall have occurred and be continuing, each Lender and its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Grantor against any of and all the obligations of such Grantor then due and owing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although (i) such obligations may be contingent or unmatured and (ii) such obligations are owed to a branch or office of such Lender different from the branch or office holding such deposit or obligated on such Indebtedness. The applicable Lender shall notify the applicable Grantor and the Administrative Agent of such setoff and application; provided, that any failure to give or any delay in giving such notice shall not affect the validity of any such setoff and application under this Section 5.08. The rights of each Lender and its Affiliates under this Section 5.08 are in addition to other rights and remedies (including other rights of setoff) that such Lender and its Affiliates may have.

**Section 5.09    Governing Law; Jurisdiction; Consent to Service of Process; Appointment of Service of Process Agent**. (a)  This Agreement shall be construed in accordance with and governed by the laws of the State of New York and to the extent applicable, the Bankruptcy Code.

(b)    Each party hereto hereby irrevocably and unconditionally submits for itself and its property in any legal action or proceeding relating to this Agreement and the other Loan Documents  to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the non-exclusive general jurisdiction of the Bankruptcy Court and, if the Bankruptcy Court does not have (or abstains from) jurisdiction, to the non-exclusive general jurisdiction of any State or Federal court of competent jurisdiction sitting in New York County, New York., and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement, or for recognition or enforcement of any judgment. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other

manner provided by law. Nothing in this Agreement shall affect any right that the Administrative Agent or any Secured Party may otherwise have to bring any action or proceeding relating to this Agreement against any Grantor or its respective properties in the courts of any jurisdiction.

(c)     Each party hereto hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection that it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement in any court referred to in paragraph (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in Section 5.01. Nothing in any Loan Document will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(e)     Each Grantor hereby irrevocably designates, appoints and empowers the Borrower as its designee, appointee and agent to receive, accept and acknowledge for and on its behalf, and in respect of its property, service of any and all legal process, summons, notices and documents that may be served in any such action or proceeding.

**Section 5.10     WAIVER OF JURY TRIAL**. EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION 5.10.

**Section 5.11     Headings**. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or to be taken into consideration in interpreting, this Agreement.

**Section 5.12     Security Interest Absolute**. All rights of the Administrative Agent hereunder, the Security Interest, the grant of a security interest in the Pledged Collateral and all obligations of each Grantor hereunder shall be absolute and unconditional irrespective of (a) any lack of validity or enforceability of the DIP Credit Agreement, any other Loan Document, any agreement with respect to any of the Secured Obligations or any other agreement or instrument relating to any of the foregoing, (b) any change in the time, manner or place of payment of, or in any other term of, all or any of the Secured Obligations, or any other amendment or waiver of or any consent to any departure from the DIP Credit Agreement, any other Loan Document or any other agreement or instrument, (c) any exchange, release or non-perfection of any Lien on other collateral, or any release or amendment or waiver of or consent under or departure from any guarantee securing or guaranteeing all or any of the Secured Obligations or (d) any other circumstance that might otherwise constitute a defense available to, or a discharge of, any Grantor in respect of the Secured Obligations or this Agreement.

20

**Section 5.13    Termination or Release**. (a)  This Agreement, the Security Interest and all other security interests granted hereby shall terminate when (i) all the Loan Document Obligations (excluding contingent obligations as to which no claim has been made) have been indefeasibly paid in full in cash, and (ii) all Commitments have terminated or expired.

(b)        The Security Interest and all other security interests granted hereby shall also terminate and be released at the time or times and in the manner set forth in Section 9.14 of the DIP Credit Agreement.

(c)        In connection with any termination or release pursuant to paragraph (a) or (b) of this Section, the Administrative Agent shall execute and deliver to any Loan Party, at such Loan Party's expense, all documents that such Loan Party shall reasonably request to evidence such termination or release so long as the applicable Loan Party shall have provided the Administrative Agent such certifications or documents as the Administrative Agent shall reasonably request in order to demonstrate compliance with this Section 5.13. Any execution and delivery of documents by the Administrative Agent pursuant to this Section shall be without recourse to or warranty by the Administrative Agent.

**Section 5.14    Additional Subsidiaries**. The Grantors shall cause each Subsidiary of Holdings which, from time to time, after the date hereof shall be required to pledge any assets to the Administrative Agent for the benefit of the Secured Parties pursuant to the DIP Credit Agreement to (a) execute and deliver to the Administrative Agent a Supplement and (ii) a Perfection Certificate, in each case, within ten (10) Business Days (or such longer period agreed to by the Administrative Agent in its sole discretion) of the date on which it was acquired, created or otherwise required to become a Grantor hereunder. Upon execution and delivery by the Administrative Agent and a Subsidiary of a Supplement, any such Subsidiary shall become a Grantor hereunder with the same force and effect as if originally named as such herein. The execution and delivery of any such instrument shall not require the consent of any other Grantor hereunder. The rights and obligations of each Grantor hereunder shall remain in full force and effect notwithstanding the addition of any Subsidiary as a party to this Agreement.

**Section 5.15    Administrative Agent Appointed Attorney-in-Fact**. Each Grantor hereby appoints the Administrative Agent the attorney-in-fact of such Grantor for the purpose of carrying out the provisions of this Agreement and taking any action and executing any instrument that the Administrative Agent may deem necessary or advisable to accomplish the purposes hereof at any time after and during the continuance of an Event of Default, which appointment is irrevocable and coupled with an interest. Without limiting the generality of the foregoing, the Administrative Agent shall have the right, but only upon the occurrence and during the continuance of an Event of Default, with full power of substitution either in the Administrative Agent's name or in the name of such Grantor (a) to receive, endorse, assign and/or deliver any and all notes, acceptances, checks, drafts, money orders or other evidences of payment relating to the Collateral or any part thereof; (b) to demand, collect, receive payment of, give receipt for and give discharges and releases of all or any of the Collateral; (c) to sign the name of any Grantor on any invoice or bill of lading relating to any of the Collateral; (d) to send verifications of Accounts Receivable to any Account Debtor; (e) to commence and prosecute any and all suits, actions or proceedings at law or in equity in any court of competent jurisdiction to collect or otherwise realize on all or any of the Collateral or to enforce any rights in respect of any Collateral; (f) to settle, compromise, compound, adjust or defend any actions, suits or proceedings relating to all or any of the Collateral; (g) to notify, or to require any Grantor to notify, Account Debtors to make payment directly to the Administrative Agent; and (h) to use, sell, assign, transfer, pledge, make any agreement with respect to or otherwise deal with all or any of the Collateral, and to do all other acts and things necessary to carry out the purposes of this Agreement, as fully and completely as though the Administrative Agent were the absolute owner of the Collateral for all purposes; provided, that nothing herein contained shall be construed as requiring or obligating the Administrative Agent to make any commitment or to make any inquiry as to the nature or

sufficiency of any payment received by the Administrative Agent, or to present or file any claim or notice, or to take any action with respect to the Collateral or any part thereof or the moneys due or to become due in respect thereof or any property covered thereby. The Administrative Agent and the other Secured Parties shall be accountable only for amounts actually received as a result of the exercise of the powers granted to them herein, and neither they nor their officers, directors, employees or agents shall be responsible to any Grantor for any act or failure to act hereunder, except for their own gross negligence or wilful misconduct or that of any of their Affiliates, directors, officers, employees, counsel, agents or attorneys-in-fact.

       **Section 5.16**   **Conflicts**. In the event of any inconsistency between the terms and conditions of this Agreement and the Interim Order or the Final Order (whichever is then in effect), the provisions of the Interim Order or the Final Order (whichever is then in effect) shall govern and control.

[Signature Pages Follow]

22

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

HOLDINGS:                          **GREEN VALLEY HOSPITAL, LLC**


                                   By: _____
                                   Name:
                                   Title:


BORROWER:                          **GV HOSPITAL MANAGEMENT, LLC**


                                   By: _____
                                   Name:
                                   Title:


OTHER GRANTORS:                    **GV II HOLDINGS, LLC**


                                   By: _____
                                   Name:
                                   Title:

SIGNATURE PAGE TO DIP COLLATERAL AGREEMENT

ADMINISTRATIVE AGENT:          **LATERAL U.S. CREDIT OPPORTUNITIES FUND, L.P.,** as Administrative Agent

By:  Lateral Credit Opportunities, LLC, its General Partner

By:  _____

      Richard de Silva, Manager

SIGNATURE PAGE TO DIP COLLATERAL AGREEMENT

## SCHEDULE I

GRANTORS

## SCHEDULE II

PLEDGED EQUITY INTERESTS

## SCHEDULE III

PLEDGED DEBT SECURITIES

<u>SCHEDULE IV</u>

INTELLECTUAL PROPERTY

<u>COPYRIGHTS</u>

<u>PATENTS</u>

<u>TRADEMARKS</u>

*Trademark Applications*

<u>LICENSES</u>

*Licenses/Sublicensees of Grantors as Licensor on Date Hereof*

*Licensees/Sublicenses of Grantors as Licensee on Date Hereof*

## SCHEDULE V

COMMERCIAL TORT CLAIMS

## SCHEDULE VI

### DEPOSIT ACCOUNTS, SECURITIES ACCOUNTS, COMMODITY ACCOUNTS, EXCLUDED RECEIVABLES ACCOUNTS

Exhibit I to the
DIP Collateral Agreement

SUPPLEMENT NO. __ dated as of _____, 20__ (this "Supplement"), to the Senior Secured Super Priority Debtor in Possession Collateral Agreement dated as of [●], 2017 (the "DIP Collateral Agreement"), among GV HOSPITAL MANAGEMENT, LLC (the "Borrower"), the other GRANTORS from time to time party thereto and LATERAL U.S. CREDIT OPPORTUNITIES FUND, L.P., as Administrative Agent (in such capacity, the "Administrative Agent").

A.	Reference is made to (a) Senior Secured Super Priority Debtor in Possession Credit Agreement dated as of [●], 2017 (as amended, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), among GREEN VALLEY HOSPITAL, LLC, an Arizona limited liability company ("Holdings"), GV HOSPITAL MANAGEMENT, LLC, an Arizona limited liability company (the "Borrower"), the Lenders party thereto and LATERAL U.S. CREDIT OPPORTUNITIES FUND, L.P., as Administrative Agent and (b) the DIP Collateral Agreement.

B.	Capitalized terms used herein and not otherwise defined herein shall have the meanings assigned to such terms in the Credit Agreement and the DIP Collateral Agreement, as applicable.

C.	The Grantors have entered into the DIP Collateral Agreement in order to induce the Lenders to make Loans. Section 5.14 of the DIP Collateral Agreement provides that additional Subsidiaries may become Grantors under the DIP Collateral Agreement by execution and delivery of an instrument in the form of this Supplement. The undersigned Subsidiary (the "New Subsidiary") is executing this Supplement in accordance with the requirements of the DIP Credit Agreement to become a Grantor under the DIP Collateral Agreement in order to induce the Lenders to make additional Loans and as consideration for Loans previously made.

Accordingly, the Administrative Agent and the New Subsidiary agree as follows:

SECTION 1.  In accordance with Section 5.14 of the DIP Collateral Agreement, the New Subsidiary by its signature below becomes a Grantor under the DIP Collateral Agreement with the same force and effect as if originally named therein as a Grantor, and the New Subsidiary hereby (a) agrees to all the terms and provisions of the DIP Collateral Agreement applicable to it as a Grantor thereunder and (b) represents and warrants that the representations and warranties made by it as a Grantor thereunder are true and correct on and as of the date hereof. In furtherance of the foregoing, the New Subsidiary, as security for the payment and performance in full of the Secured Obligations (as defined in the DIP Collateral Agreement), does hereby create and grant to the Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest in and lien on all of the New Subsidiary's right, title and interest in, to and under the Pledged Collateral and the Article 9 Collateral (as each such term is defined in the DIP Collateral Agreement). Each reference to a "Grantor" in the DIP Collateral Agreement shall be deemed to include the New Subsidiary. The DIP Collateral Agreement is hereby incorporated herein by reference.

SECTION 2.  The New Subsidiary represents and warrants to the Administrative Agent and the other Secured Parties that this Supplement has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation, enforceable against it in accordance with its terms, except to the extent that enforceability of such obligations may be limited by applicable bankruptcy, insolvency and other similar laws affecting creditors' rights generally.

SECTION 3.  This Supplement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Supplement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Supplement. This Supplement shall become effective as to the New Subsidiary when a counterpart hereof executed on behalf of the New Subsidiary shall have been delivered to the Administrative Agent and a counterpart hereof shall have been executed on behalf of the Administrative Agent, and thereafter shall be binding upon the New Subsidiary and the Administrative Agent and their respective permitted successors and assigns, and shall inure to the benefit of the New Subsidiary, the Administrative Agent and the other Secured Parties and their respective successors and assigns, except that the New Subsidiary shall not have the right to assign or transfer its rights or obligations hereunder or any interest herein (and any such assignment or transfer shall be void) except as expressly provided in this Supplement, the DIP Collateral Agreement and the DIP Credit Agreement.

SECTION 4.  The New Subsidiary hereby represents and warrants that (a) set forth on Schedule I attached hereto is a schedule with the true and correct legal name of the New Subsidiary, its jurisdiction of formation and the location of its chief executive office, (b) Schedule II sets forth a true and complete list, with respect to the New Subsidiary, of (i) all the Equity Interests owned by the New Subsidiary in any Subsidiary and the percentage of the issued and outstanding units of each class of the Equity Interests of the issuer thereof represented by the Pledged Equity Interests owned by the New Subsidiary and (ii) all the Pledged Debt Securities owned by the New Subsidiary and (c) Schedule III attached hereto sets forth, as of the date hereof, (i) all of the New Subsidiary's Patents, including the name of the registered owner, type, registration or application number and the expiration date (if already registered) of each such Patent owned by the New Subsidiary, (ii) all of the New Subsidiary's Trademarks, including the name of the registered owner, the registration or application number and the expiration date (if already registered) of each such Trademark owned by the New Subsidiary, and (iii) all of the New Subsidiary's Copyrights, including the name of the registered owner, title and, if applicable, the registration number of each such Copyright owned by the New Subsidiary, and (d) Schedule IV attached hereto sets forth, as of the date hereof, each Commercial Tort Claim in respect of which a complaint or counterclaim has been filed by the New Subsidiary seeking damages in an amount of $100,000 or more.

SECTION 5.  Except as expressly supplemented hereby, the DIP Collateral Agreement shall remain in full force and effect.

SECTION 6.  This Supplement shall be construed in accordance with and governed by the laws of the State of New York.

SECTION 7.  Any provision of this Supplement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

SECTION 8.  All communications and notices hereunder shall be in writing and given as provided in Section 5.01 of the DIP Collateral Agreement.

SECTION 9.  The New Subsidiary agrees to reimburse the Administrative Agent for its fees and expenses incurred hereunder and under the DIP Collateral Agreement as provided in Section 9.03(a) of the DIP Credit Agreement; provided, that each reference therein to the "Borrower" shall be deemed to be a reference to "the New Subsidiary."

2

IN WITNESS WHEREOF, the New Subsidiary and the Administrative Agent have duly executed this Supplement to the DIP Collateral Agreement as of the day and year first above written.

[**Name Of New Subsidiary**],

By: _____
      Name:
      Title:

      Legal Name:
      Jurisdiction of Formation:
      Location of Chief Executive Office:

**LATERAL U.S. CREDIT OPPORTUNITIES FUND, L.P.,** as Administrative Agent

By: Lateral Credit Opportunities, LLC, its General Partner

By: _____
      Richard de Silva, Manager

NEW SUBSIDIARY INFORMATION

| Name | Jurisdiction of Formation | Chief Executive Office |
|------|---------------------------|------------------------|

PLEDGED EQUITY INTERESTS

| Grantor | Issuer | Number of Certificate | Number and Class of Equity Interests | Percentage of Equity Interests |
|---------|--------|----------------------|--------------------------------------|-------------------------------|
|         |        |                      |                                      |                               |

PLEDGED DEBT SECURITIES

| Grantor | Issuer | Principal Amount | Date of Note | Maturity Date |
|---------|--------|------------------|--------------|---------------|
|         |        |                  |              |               |

INTELLECTUAL PROPERTY

COMMERCIAL TORT CLAIMS

Exhibit II to the
DIP Collateral Agreement

[FORM OF]

COPYRIGHT SECURITY AGREEMENT

COPYRIGHT SECURITY AGREEMENT dated as of [●], 20[●] (this "Agreement"), among each of the signatories hereto (collectively, the "Grantors") and Lateral U.S. Credit Opportunities Fund, L.P., as administrative agent (in such capacity, the "Administrative Agent").

Reference is made to (a) the Senior Secured Super Priority Debtor in Possession Credit Agreement dated as of [●], 2017 (as amended, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), among Green Valley Hospital, LLC, GV Hospital Management, LLC (the "Borrower"), the lenders from time to time party thereto (the "Lenders") and the Administrative Agent and (b) the Senior Secured Super Priority Debtor in Possession Collateral Agreement dated as of [●], 2017 (as amended, supplemented or otherwise modified from time to time, the "DIP Collateral Agreement"), among the Borrower, the other grantors from time to time party thereto and the Administrative Agent. The Lenders have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the DIP Credit Agreement. Each Grantor is an Affiliate of the Borrower and is willing to execute and deliver this Agreement in order to induce the Lenders to make additional Loans and as consideration for Loans previously made. Accordingly, the parties hereto agree as follows:

SECTION 1.    Terms.    Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the DIP Collateral Agreement or the DIP Credit Agreement, as applicable.  The rules of construction specified in Section 1.01(b) of the DIP Collateral Agreement also apply to this Agreement.

SECTION 2.    Grant of Security Interest. As security for the payment or performance, as the case may be, in full of the Secured Obligations, each Grantor hereby grants to the Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest (the "Security Interest") in all of each such Grantor's right, title and interest in, to and under the Copyrights now owned or at any time hereafter acquired by such Grantor, including those listed on Schedule I and any exclusive Copyright Licenses under which such Grantor is a licensee, including those listed on Schedule II (collectively, the "Copyright Collateral").

SECTION 3.    DIP Collateral Agreement. The Security Interest granted to the Administrative Agent herein is granted in furtherance, and not in limitation, of the security interests granted to the Administrative Agent pursuant to the DIP Collateral Agreement. Each Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Copyright Collateral are more fully set forth in the DIP Collateral Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein. In the event of any conflict between the terms of this Agreement and the DIP Collateral Agreement, the terms of the DIP Collateral Agreement shall govern.

SECTION 4.    Termination. Upon the full performance of the Secured Obligations (other than indemnity obligations under the Loan Documents that are not then due and payable or for which any events or claims that would give rise thereto are not pending), the security interest granted herein shall terminate and the Administrative Agent shall execute, acknowledge, and deliver to the Grantors an instrument in writing in recordable form releasing the collateral pledge, grant, assignment, lien and security interest in the Copyright Collateral under this Agreement.

SECTION 5.  <u>Counterparts</u>. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Agreement.

[Remainder of this page intentionally left blank]

2

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**[●],**

By _____
     Name:
     Title:

SIGNATURE PAGE TO COPYRIGHT SECURITY AGREEMENT

**LATERAL U.S. CREDIT OPPORTUNITIES FUND, L.P.,** as Administrative Agent

By: Lateral Credit Opportunities, LLC, its General Partner

By: _____
    Richard de Silva, Manager

SIGNATURE PAGE TO COPYRIGHT SECURITY AGREEMENT

Schedule I

<u>Schedule II</u>

Exhibit III to the
DIP Collateral Agreement

[FORM OF]

PATENT SECURITY AGREEMENT

PATENT SECURITY AGREEMENT dated as of [●], 20[●] (this "Agreement"), among each of the signatories hereto (collectively, the "Grantors") and Lateral U.S. Credit Opportunities Fund, L.P., as administrative agent (in such capacity, the "Administrative Agent").

Reference is made to (a) the Senior Secured Super Priority Debtor in Possession Credit Agreement dated as of [●], 2017 (as amended, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), among Green Valley Hospital, LLC, GV Hospital Management, LLC (the "Borrower"), the lenders from time to time party thereto (the "Lenders") and the Administrative Agent and (b) the Senior Secured Super Priority Debtor in Possession Collateral Agreement dated as of [●], 2017 (as amended, supplemented or otherwise modified from time to time, the "DIP Collateral Agreement"), among the Borrower, the other grantors from time to time party thereto and the Administrative Agent. The Lenders have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the DIP Credit Agreement. Each Grantor is an Affiliate of the Borrower and is willing to execute and deliver this Agreement in order to induce the Lenders to make additional Loans and as consideration for Loans previously made. Accordingly, the parties hereto agree as follows:

SECTION 1. Terms. Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the DIP Collateral Agreement or the DIP Credit Agreement, as applicable. The rules of construction specified in Section 1.01(b) of the DIP Collateral Agreement also apply to this Agreement.

SECTION 2. Grant of Security Interest. As security for the payment or performance, as the case may be, in full of the Secured Obligations, each Grantor hereby grants to the Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest (the "Security Interest") in all of each such Grantor's right, title and interest in, to and under the Patents now owned or at any time hereafter acquired by such Grantor, including those listed on Schedule I (the "Patent Collateral").

SECTION 3. DIP Collateral Agreement. The Security Interest granted to the Administrative Agent herein is granted in furtherance, and not in limitation, of the security interests granted to the Administrative Agent pursuant to the DIP Collateral Agreement. Each Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Patent Collateral are more fully set forth in the DIP Collateral Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein. In the event of any conflict between the terms of this Agreement and the DIP Collateral Agreement, the terms of the DIP Collateral Agreement shall govern.

SECTION 4. Termination. Upon the full performance of the Secured Obligations (other than indemnity obligations under the Loan Documents that are not then due and payable or for which any events or claims that would give rise thereto are not pending), the security interest granted herein shall terminate and the Administrative Agent shall execute, acknowledge, and deliver to the Grantors an instrument in writing in recordable form releasing the collateral pledge, grant, assignment, lien and security interest in the Patent Collateral under this Agreement.

SECTION 5.     Counterparts. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Agreement.

[Remainder of this page intentionally left blank]

2

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**[●],**

By _____
      Name:
      Title:

**LATERAL U.S. CREDIT OPPORTUNITIES FUND, L.P.,** as Administrative Agent

By: Lateral Credit Opportunities, LLC, its General Partner

By: _____

   Richard de Silva, Manager

SIGNATURE PAGE TO PATENT SECURITY AGREEMENT

<u>Schedule I</u>

Exhibit IV to the
DIP Collateral Agreement

[FORM OF]

TRADEMARK SECURITY AGREEMENT

TRADEMARK SECURITY AGREEMENT dated as of [●], 20[●] (this "Agreement"), among each of the signatories hereto (collectively, the "Grantors") and Lateral U.S. Credit Opportunities Fund, L.P., as administrative agent (in such capacity, the "Administrative Agent").

Reference is made to (a) the Senior Secured Super Priority Debtor in Possession Credit Agreement dated as of [●], 2017 (as amended, supplemented or otherwise modified from time to time, the "DIP Credit Agreement"), among Green Valley Hospital, LLC, GV Hospital Management, LLC (the "Borrower"), the lenders from time to time party thereto (the "Lenders") and the Administrative Agent and (b) the Senior Secured Super Priority Debtor in Possession Collateral Agreement dated as of [●], 2017 (as amended, supplemented or otherwise modified from time to time, the "DIP Collateral Agreement"), among the Borrower, the other grantors from time to time party thereto and the Administrative Agent. The Lenders have agreed to extend credit to the Borrower subject to the terms and conditions set forth in the DIP Credit Agreement. Each Grantor is an Affiliate of the Borrower and is willing to execute and deliver this Agreement in order to induce the Lenders to make additional Loans and as consideration for Loans previously made and Letters of Credit previously issued. Accordingly, the parties hereto agree as follows:

SECTION 1.    Terms. Capitalized terms used in this Agreement and not otherwise defined herein have the meanings specified in the DIP Collateral Agreement or the DIP Credit Agreement, as applicable. The rules of construction specified in Section 1.01(b) of the DIP Collateral Agreement also apply to this Agreement.

SECTION 2.    Grant of Security Interest. As security for the payment or performance, as the case may be, in full of the Secured Obligations, each Grantor hereby grants to the Administrative Agent, its successors and assigns, for the benefit of the Secured Parties, a security interest (the "Security Interest") in all of each such Grantor's right, title and interest in, to and under the Trademarks now owned or at any time hereafter acquired by such Grantor (including all goodwill associated therewith), including those listed on Schedule I (the "Trademark Collateral").

SECTION 3.    DIP Collateral Agreement. The Security Interest granted to the Administrative Agent herein is granted in furtherance, and not in limitation, of the security interests granted to the Administrative Agent pursuant to the DIP Collateral Agreement. Each Grantor hereby acknowledges and affirms that the rights and remedies of the Administrative Agent with respect to the Trademark Collateral are more fully set forth in the DIP Collateral Agreement, the terms and provisions of which are hereby incorporated herein by reference as if fully set forth herein. In the event of any conflict between the terms of this Agreement and the DIP Collateral Agreement, the terms of the DIP Collateral Agreement shall govern.

SECTION 4.    Termination. Upon the full performance of the Secured Obligations (other than indemnity obligations under the Loan Documents that are not then due and payable or for which any events or claims that would give rise thereto are not pending), the security interest granted herein shall terminate and the Administrative Agent shall execute, acknowledge, and deliver to the

Grantors an instrument in writing in recordable form releasing the collateral pledge, grant, assignment, lien and security interest in the Trademark Collateral under this Agreement.

SECTION 5. <u>Counterparts</u>. This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original but all of which when taken together shall constitute a single contract. Delivery of an executed signature page to this Agreement by facsimile or other electronic transmission shall be effective as delivery of a manually signed counterpart of this Agreement.

[Remainder of this page intentionally left blank]

2

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

[●],

By _____
      Name:
      Title:

SIGNATURE PAGE TO TRADEMARK SECURITY AGREEMENT

**LATERAL U.S. CREDIT OPPORTUNITIES FUND, L.P.,** as Administrative Agent

By: Lateral Credit Opportunities, LLC, its General
     Partner

By: _____
     Richard de Silva, Manager

SIGNATURE PAGE TO TRADEMARK SECURITY AGREEMENT

Schedule I

EXHIBIT "C"

**Green Valley Hospital 26 Week Cash Flow**
Projected balances as at week ending 25 Mar 17

Key: per actuals tab / per AP schedule / projections / estimate

Anticipated Bankruptcy Filing

| | Q1 2017 | Q1 2017 | Q1 2017 | Q1 2017 | Q1 2017 | Q1 2017 | Q1 2017 | Q1 2017 | Q1 2017 | Q1 2017 | Q1 2017 | Q1 2017 | Q1 2017 | Q2 2017 | Q2 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | 1/1/2017 | 1/8/2017 | 1/15/2017 | 1/22/2017 | 1/29/2017 | 2/5/2017 | 2/12/2017 | 2/19/2017 | 2/26/2017 | 3/5/2017 | 3/12/2017 | 3/19/2017 | 3/26/2017 | 4/2/2017 | 4/9/2017 |
| Week Ending | 1/7/2017 | 1/14/2017 | 1/21/2017 | 1/28/2017 | 2/4/2017 | 2/11/2017 | 2/18/2017 | 2/25/2017 | 3/4/2017 | 3/11/2017 | 3/18/2017 | 3/25/2017 | 4/1/2017 | 4/8/2017 | 4/15/2017 |
| | ACTUAL* | ACTUAL* | ACTUAL* | ACTUAL* | ACTUAL* | ACTUAL* | ACTUAL* | ACTUAL* | ACTUAL* | ACTUAL* | ACTUAL* | ACTUAL* | PROJ | PROJ | PROJ |
| Week number | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| Weeks from cash flow prep date | -11 | -10 | -9 | -8 | -7 | -6 | -5 | -4 | -3 | -2 | -1 | 0 | 1 | 2 | 3 |
| **Net Revenue** | | | | | | | | | | | | | | | |
| Inpatient | 287,897 | 287,897 | 287,897 | 287,897 | 305,523 | 318,743 | 318,743 | 318,743 | 317,568 | 316,686 | 316,686 | 316,686 | 318,194 | 327,243 | 327,243 |
| Outpatient | 250,566 | 250,566 | 250,566 | 250,566 | 265,907 | 277,412 | 277,412 | 277,412 | 276,390 | 275,623 | 275,623 | 275,623 | 276,935 | 284,810 | 284,810 |
| Hospitalist | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Other revenue | 5,538 | 3,745 | 4,345 | 4,350 | 5,609 | 4,791 | 4,390 | 4,342 | 6,815 | 5,453 | 3,220 | 3,546 | 3,490 | 3,490 | 3,490 |
| Telemedicine (new) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Swing Beds (new) | - | - | - | - | - | - | - | - | - | - | - | - | 125,000 | - | - |
| Wound Care Center (new) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Net Revenue** | 544,001 | 542,207 | 542,808 | 542,813 | 577,039 | 600,946 | 600,546 | 600,497 | 600,772 | 597,762 | 595,529 | 595,855 | 598,619 | 741,243 | 615,543 |
| **Inflows from operations** | | | | | | | | | | | | | | | |
| AR collections | | | | | | | | | | | | | | 516,587 | 600,629 |
| Hospitalist back-billing | | | | | | | | | | | | | | | |
| AR advances | 355,701 | 320,400 | 627,900 | 727,400 | 529,200 | 721,000 | 743,000 | 627,400 | 519,500 | 500,900 | 552,000 | 678,000 | 460,300 | | |
| Restaurant income | 4,874 | 3,668 | 4,207 | 4,250 | 4,492 | 3,654 | 4,229 | 4,263 | 3,733 | 4,823 | 3,125 | 3,490 | 3,490 | 3,490 | 3,490 |
| Medicare capital reimbursement | | | | | | | | | | | | | | 125,000 | |
| Other income | 664 | 77 | 139 | 101 | 1,317 | 1,136 | 162 | 79 | 3,082 | 630 | 94 | 56 | | | |
| Telemedicine (new) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Swing Beds (new) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wound Care Center (new) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total inflows** | 361,239 | 324,145 | 632,245 | 731,750 | 534,809 | 725,791 | 747,390 | 631,742 | 526,315 | 506,353 | 555,220 | 681,546 | 463,790 | 645,777 | 604,119 |
| **Outflows from operations** | | | | | | | | | | | | | | | |
| *Accounts Payable* | | | | | | | | | | | | | | | |
| | (600) | (3,106) | (12,963) | (2,300) | (1,182) | (9,284) | (5,763) | (5,142) | (2,804) | (17) | (5,154) | (1,200) | | (959) | (959) |
| Miscellaneous | - | (46) | 337 | (8,028) | (1,600) | (6,986) | (785) | (2,068) | (2,930) | - | (9,186) | (876) | (26,510) | (1,066) | (1,066) |
| Operating expenses | - | (9,969) | (24,314) | (9,476) | 10,619 | (4,002) | (3,098) | (34,340) | (2,576) | (1,810) | (13,419) | (1,323) | (7,791) | (12,601) | (10,464) |
| Insurance | - | (36,916) | (16,646) | (21,338) | - | (9,847) | - | (30,658) | - | - | - | - | (25,229) | (12,823) | (12,823) |
| Physicians | - | (55,947) | (75,855) | (52,668) | (48,700) | (106,240) | (59,330) | (54,125) | (112,058) | - | (50,556) | (20,000) | (165,280) | (62,769) | (62,769) |
| Taxes | - | (17,751) | - | (29,074) | - | (3,186) | (34,643) | (23,916) | (16,347) | (972) | (18,151) | (10,000) | - | (13,880) | (13,880) |
| Medical supplies | (19,024) | (101,446) | (97,530) | (116,686) | (84,829) | (13,533) | (94,271) | (122,561) | (166,695) | (128,096) | (145,509) | (102,483) | (32,708) | (92,655) | (76,943) |
| Professional fees | - | (16,747) | (20,370) | (161,484) | (2,500) | (85,005) | (10,573) | (17,227) | (46,073) | (0) | (2,159) | (35,516) | - | (19,999) | (19,999) |
| Facilities | - | - | 13,955 | (10,303) | (81) | (8,076) | 4,136 | (5,395) | (23,445) | - | 4,196 | - | - | (3,083) | (3,083) |
| Information technology | - | 15,219 | - | (19,029) | (3,942) | - | (33,101) | (18,224) | 290 | - | (15,980) | 1,150 | - | (8,115) | (8,115) |
| Bank charges | - | - | (2,862) | - | (370) | - | (2,869) | - | (101) | - | (3,015) | - | - | (689) | (689) |
| Utilities | - | - | (3,328) | (55,976) | - | (37,588) | (30,156) | (20,759) | 17,695 | (41,022) | (60) | (3,482) | - | (13,310) | (13,310) |
| Patient refund | - | (519) | (2,997) | (479) | - | (4,832) | - | (211) | 211 | (3,631) | (1,924) | (1,215) | - | (1,374) | (1,374) |
| AHCCCS Assessment Tax | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Telemedicine (new) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wound Care Center (new) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total - Accounts Payable** | (19,624) | (230,555) | (314,249) | (415,777) | (166,231) | (314,249) | (246,177) | (277,879) | (414,565) | (133,911) | (265,630) | (170,247) | (267,517) | (243,323) | (225,241) |
| *Payroll and Related Items* | | | | | | | | | | | | | | | |
| Payroll | (436,692) | (46,332) | (443,846) | (39,945) | (413,412) | (34,617) | (442,874) | (37,538) | (445,659) | (46,148) | (428,050) | (21,899) | (472,584) | (47,740) | (429,661) |
| Contracted labor | - | - | (53,554) | (10,175) | 10,751 | (70,440) | (17,967) | (62,152) | (82,474) | (47,115) | - | (125,491) | (19,450) | (43,386) | (43,386) |
| Payroll- taxes | (602) | (167,794) | - | (158,010) | - | (144,904) | - | (169,679) | - | (155,711) | (50,000) | (130,287) | (171,225) | - | - |
| Employee benefits | - | (18,888) | - | - | (139,307) | (2,484) | (103,811) | (10,775) | (21,652) | (111,510) | - | (6,529) | (36,000) | - | (33,631) |
| **Total - Payroll and Related Items** | (437,294) | (233,014) | (497,400) | (208,130) | (541,968) | (252,444) | (564,652) | (280,145) | (549,784) | (356,484) | (478,050) | (284,207) | (699,259) | (91,126) | (506,678) |
| **Total Outflows** | (456,918) | (463,569) | (811,649) | (623,907) | (708,199) | (566,693) | (810,829) | (558,024) | (964,349) | (490,396) | (743,680) | (454,454) | (966,776) | (334,449) | (731,918) |
| **Net Cash Flow from Operations** | (95,680) | (139,424) | (179,404) | 107,844 | (173,390) | 159,097 | (63,439) | 73,718 | (438,034) | 15,957 | (188,460) | 227,092 | (502,986) | 311,328 | (127,799) |
| **Non other non-financing activities** | | | | | | | | | | | | | | | |
| *Settlements and penalties* | | | | | | | | | | | | | | | |
| Past due payments | - | (36,776) | (81,897) | (83,078) | (99,517) | (150,016) | (94,114) | (34,900) | (28,900) | (38,012) | (16,134) | (66,150) | | | |
| Medicare overpayment | - | (32,440) | - | - | - | - | - | (32,440) | - | - | - | 1 | (32,440) | | |
| Capital expenditure | | | | | | | | | | | | | | | |
| Critical Vendors & Cure Costs | - | - | - | - | - | - | - | - | - | - | - | - | (332,403) | (16,566) | |
| **Net cash flow from Non-financing activities** | - | (36,776) | (114,337) | (83,078) | (99,517) | (150,016) | (94,114) | (67,340) | (28,900) | (38,012) | (16,134) | (66,149) | (32,440) | (332,403) | (16,566) |
| **Financing & Restructuring activities** | | | | | | | | | | | | | | | |
| *Debt service and interest payments* | | | | | | | | | | | | | | | |
| Leases | (17,180) | - | (9,675) | - | (53,786) | (6,258) | 9,634 | (22,137) | (49,233) | - | 9,634 | - | - | | |
| DIP | | | | | | | | | | | | | | | |
| YAM | - | - | - | - | (30,250) | - | - | - | (30,250) | - | - | - | | (32,250) | |
| SCM | | | | | | | | | | | | | | | |
| Western | - | - | - | - | - | - | - | - | (5,000) | - | - | - | | | |
| SQM | | | | | | | | | | | | | | | |
| Artemis | | | | | | | | | | | | | | | |
| Wound Care - Healogics Loan | | | | | | | | | | | | | | | |
| Term loan | | | | | | | | | | | | | | | |
| Debt service and interest payments | (17,180) | - | (9,675) | - | (53,786) | (36,508) | 9,634 | (22,137) | (84,483) | - | 9,634 | - | - | (32,250) | |
| *Finance inflows* | | | | | | | | | | | | | | | |
| Artemis Funding | 318,799 | - | 355,000 | 61,000 | 279,000 | 185,062 | - | - | 350,000 | - | 350,000 | - | 350,000 | | |
| DIP funding | | | | | | | | | | | | | | 20,000,000 | |
| Term loan funding | | | | | | | | | | | | | | | |
| Wound Care - Healogics Loan | | | | | | | | | | | | | | | |
| *Repayment of Loans Outstanding:* | | | | | | | | | | | | | | | |
| DIP | | | | | | | | | | | | | | | |
| Artemis - Net | | | | | | | | | | | | | | (8,868,353) | |
| SCM | | | | | | | | | | | | | | (1,889,868) | |
| SQN | | | | | | | | | | | | | | | |
| Med One Financial | | | | | | | | | | | | | | | |
| YAM - MOB I and II | | | | | | | | | | | | | | | |
| Western - MOB III | | | | | | | | | | | | | | | |
| GVMI Hope Note Amortization | | | | | | | | | | | | | | | |
| **Net financing inflows and repayments** | 318,799 | - | 355,000 | 61,000 | 279,000 | 185,062 | - | - | 350,000 | - | 350,000 | - | 350,000 | 9,241,779 | - |
| *Fees and Professionals* | | | | | | | | | | | | | | | |
| Lender Structuring Fee | | | | | | | | | | | | | | (800,000) | |
| DIP Loan Exit Fee | | | | | | | | | | | | | | (400,000) | |
| Lenders Professional Fees, etc. | | | | | | | | | | | | | | | |
| Professional Fees (Case Costs) | - | - | - | - | - | - | - | - | - | - | - | (50,000) | (31,250) | (31,250) | (31,250) |
| Subordination Fees | | | | | | | | | | | | | | | |
| **Total Fees & Professionals** | - | - | - | - | - | - | - | - | - | - | - | (50,000) | (1,231,250) | | (31,250) |
| **Net cash flow from Financing & restructuring activities** | 301,619 | - | 345,325 | 61,000 | 225,214 | 148,554 | 9,634 | (22,137) | 265,517 | - | 359,634 | - | 300,000 | 7,978,279 | (31,250) |
| **Net Cash Flow** | 205,939 | (176,200) | 51,584 | 85,766 | (47,693) | 157,635 | (147,919) | (15,760) | (201,417) | (22,055) | 155,040 | 160,942 | (235,426) | 7,957,204 | (175,615) |
| **Cash Balance (Total)** | | | | | | | | | | | | | | | |
| Beginning Cash Balance | 408,730 | 586,129 | 409,929 | 461,513 | 547,279 | 499,586 | 657,221 | 509,302 | 493,542 | 292,125 | 270,070 | 425,110 | 586,053 | 350,627 | 8,307,831 |
| Net Cash Flow from Operations | (95,680) | (139,424) | (179,404) | 107,844 | (173,390) | 159,097 | (63,439) | 73,718 | (438,034) | 15,957 | (188,460) | 227,092 | (502,986) | 311,328 | (127,799) |
| Net cash flow from Non-financing activities | - | (36,776) | (114,337) | (83,078) | (99,517) | (150,016) | (94,114) | (67,340) | (28,900) | (38,012) | (16,134) | (66,149) | (32,440) | (332,403) | (16,566) |
| Net cash flow from Financing & restructuring activities | 301,619 | - | 345,325 | 61,000 | 225,214 | 148,554 | 9,634 | (22,137) | 265,517 | - | 359,634 | - | 300,000 | 7,978,279 | (31,250) |
| Reconciliation | (28,541) | | | | | | | | | | | | 1 | | |
| **Ending Cash Balance** | 586,129 | 409,929 | 461,513 | 547,279 | 499,586 | 657,221 | 509,302 | 493,542 | 292,125 | 270,070 | 425,110 | 586,053 | 350,627 | 8,307,831 | 8,132,216 |
| ACTUAL* = Actual cash but estimated revenue | | | | | | | | | | | | | | | |
| | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE |
| | | | | | | | | | | | | | | Last week | |
| Actuals tab Net Cash Flow | 205,939 | (176,200) | 51,584 | 85,766 | (47,693) | 157,635 | (147,919) | (15,760) | (201,417) | (22,055) | 155,040 | 160,942 | | | |
| Actuals tab Ending Cash | 586,129 | 409,929 | 461,513 | 547,279 | 499,586 | 657,221 | 509,302 | 493,542 | 292,125 | 270,070 | 425,110 | 586,052 | 1 | | |
| *Reconciling items* | | | | | | | | | | | | | | | |
| TBC | | | | | | | | | | | | | | | |
| B/F | | | | | | | | | | | | | | | |
| Internal transfer | | | | | | | | | | | | | | | |

**Green Valley Hospital 26 Week Cash Flow**  Key:

*Projected balances as at week ending 25 Mar 17*

| | Q2 2017 | Q2 2017 | Q2 2017 | Q2 2017 | Q2 2017 | Q2 2017 | Q2 2017 | Q2 2017 | Q2 2017 | Q2 2017 | Q2 2017 | Q3 2017 | Q3 2017 | Q3 2017 | Q3 2017 | Q3 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | 4/16/2017 | 4/23/2017 | 4/30/2017 | 5/7/2017 | 5/14/2017 | 5/21/2017 | 5/28/2017 | 6/4/2017 | 6/11/2017 | 6/18/2017 | 6/25/2017 | 7/2/2017 | 7/9/2017 | 7/16/2017 | 7/23/2017 | 7/30/2017 |
| Week Ending | 4/22/2017 | 4/29/2017 | 5/6/2017 | 5/13/2017 | 5/20/2017 | 5/27/2017 | 6/3/2017 | 6/10/2017 | 6/17/2017 | 6/24/2017 | 7/1/2017 | 7/8/2017 | 7/15/2017 | 7/22/2017 | 7/29/2017 | 8/5/2017 |
| | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ |
| Week number | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 |
| Weeks from cash flow prep date | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| **Net Revenue** | | | | | | | | | | | | | | | | |
| Inpatient | 327,243 | 327,243 | 318,194 | 316,686 | 316,686 | 316,686 | 314,198 | 310,880 | 310,880 | 310,880 | 309,448 | 300,852 | 300,852 | 300,852 | 300,852 | 261,842 |
| Outpatient | 284,810 | 284,810 | 276,935 | 275,623 | 275,623 | 275,623 | 273,457 | 270,570 | 270,570 | 270,570 | 269,323 | 261,842 | 261,842 | 261,842 | 261,842 | 261,842 |
| Hospitalist | - | - | 12,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 |
| Other revenue | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 |
| Medicare capital reimbursement | 125,700 | - | - | 125,700 | - | 125,700 | - | - | 125,700 | - | - | 125,700 | - | - | 125,700 | - |
| Telemedicine | - | - | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 3,462 | 3,462 | 3,462 | 3,462 | 4,615 |
| Swing Beds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wound Care Center | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Net Revenue** | 741,243 | 615,543 | 612,927 | 737,807 | 612,107 | 737,807 | 607,453 | 601,248 | 726,948 | 601,248 | 725,422 | 583,645 | 709,345 | 583,645 | 709,345 | 584,799 |
| **Inflows from operations** | | | | | | | | | | | | | | | | |
| AR collections | 600,629 | 472,098 | 472,098 | 496,152 | 500,161 | 500,161 | 500,161 | 518,064 | 541,934 | 541,934 | 541,934 | 540,093 | 529,048 | 529,048 | 529,048 | 529,048 |
| Hospitalist back-billing | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| AR advances | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Restaurant income | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 |
| Medicare capital reimbursement | 125,700 | - | - | 125,700 | - | 125,700 | - | - | 125,700 | - | - | 125,700 | - | - | 125,700 | - |
| Telemedicine | - | - | - | - | - | - | - | - | - | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 | 2,308 |
| Swing Beds | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wound Care Center | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total inflows | 729,819 | 475,588 | 475,588 | 625,342 | 503,651 | 629,351 | 503,651 | 521,554 | 671,124 | 547,732 | 673,432 | 545,891 | 660,545 | 534,845 | 660,545 | 534,845 |
| **Outflows from operations** | | | | | | | | | | | | | | | | |
| *Accounts Payable* | | | | | | | | | | | | | | | | |
| Administrative expenses | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) |
| Miscellaneous | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) |
| Operating expenses | (12,601) | (10,464) | (10,420) | (12,543) | (10,406) | (12,543) | (10,327) | (10,211) | (12,358) | (10,211) | (12,332) | (9,922) | (12,059) | (9,922) | (12,059) | (9,942) |
| Insurance | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) |
| Physicians | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) |
| Taxes | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) |
| Medical supplies | (92,655) | (76,914) | (76,616) | (92,226) | (76,516) | (92,226) | (75,932) | (75,156) | (90,988) | (75,156) | (90,678) | (72,956) | (88,668) | (72,956) | (88,668) | (73,100) |
| Professional fees | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) |
| Facilities | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) |
| Information technology | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) |
| Bank charges | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) |
| Utilities | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) |
| Patient refund | (1,374) | (1,141) | (1,136) | (1,368) | (1,135) | (1,368) | (1,126) | (1,115) | (1,348) | (1,115) | (1,345) | (1,082) | (1,315) | (1,082) | (1,315) | (1,084) |
| Telemedicine | - | - | (173) | (173) | (173) | (173) | (173) | (173) | (173) | (173) | (173) | (259) | (259) | (259) | (259) | (217) |
| AHCCCS Assessment Tax | - | - | - | - | - | - | - | - | - | - | (233,883) | - | - | - | - | - |
| Wound Care Center | - | - | - | - | - | - | - | - | - | - | - | (259) | (259) | (259) | (259) | (217) |
| **Total - Accounts Payable** | (243,323) | (225,241) | (225,037) | (243,002) | (224,919) | (243,002) | (224,250) | (223,357) | (241,499) | (223,357) | (475,190) | (220,911) | (238,994) | (220,911) | (238,994) | (212,530) |
| *Payroll and Related Items* | | | | | | | | | | | | | | | | |
| Payroll | (47,740) | (429,661) | (46,425) | (417,826) | (46,425) | (417,826) | (42,962) | (386,655) | (42,962) | (386,655) | (42,962) | (386,959) | (42,995) | (386,959) | (42,995) | (396,470) |
| Contracted labor | (43,386) | (43,386) | (44,411) | (44,411) | (44,411) | (44,411) | (42,209) | (42,209) | (42,209) | (42,209) | (42,209) | (42,209) | (42,242) | (42,242) | (42,242) | (43,280) |
| Payroll- taxes | (174,251) | - | (134,523) | (169,932) | - | (169,452) | - | (158,074) | - | (156,810) | - | (158,074) | - | (156,933) | - | (156,921) |
| Employee benefits | - | (134,523) | (131,627) | - | (32,907) | - | (122,212) | - | (30,553) | - | (122,212) | - | (30,577) | - | (122,308) | (125,314) |
| Total - Payroll and Related Items | (265,377) | (607,570) | (392,395) | (462,237) | (293,195) | (462,237) | (365,457) | (428,864) | (272,534) | (428,864) | (365,457) | (429,201) | (272,747) | (429,201) | (364,466) | (565,064) |
| **Total Outflows** | (508,701) | (832,811) | (617,432) | (705,239) | (518,114) | (705,239) | (589,707) | (652,221) | (513,973) | (652,221) | (840,647) | (650,112) | (511,741) | (650,112) | (603,459) | (788,594) |
| **Net Cash Flow from Operations** | 221,119 | (357,223) | (141,844) | (79,897) | (14,463) | (75,888) | (86,056) | (130,668) | 157,151 | (104,489) | (167,215) | (104,221) | 148,804 | (115,266) | 57,086 | (253,749) |
| **Other non-financing activities** | | | | | | | | | | | | | | | | |
| *Settlements and penalties* | | | | | | | | | | | | | | | | |
| Past due payments | (110,000) | - | - | - | (110,000) | - | - | - | (88,590) | - | - | - | (28,590) | (60,000) | - | - |
| Medicare overpayment | (32,440) | - | - | - | (32,440) | - | - | - | - | (32,440) | - | - | - | (32,440) | - | - |
| Capital expenditure | - | - | (10,000) | - | - | (10,000) | - | - | - | (10,000) | - | - | (10,000) | - | - | - |
| Critical Vendors & Cure Costs | (27,403) | (16,566) | (27,403) | (16,566) | (27,403) | (16,566) | (27,403) | (16,566) | (27,403) | (16,566) | (27,403) | (16,566) | (27,403) | (16,566) | (27,403) | (16,566) |
| **Net cash flow from Non-financing activities** | (169,844) | (16,566) | (37,403) | (16,566) | (169,844) | (26,566) | (27,403) | (16,566) | (125,993) | (49,006) | (27,403) | (26,566) | (55,993) | (109,006) | (37,403) | (16,566) |
| **Financing & Restructuring payments** | | | | | | | | | | | | | | | | |
| *Debt service and interest payments* | | | | | | | | | | | | | | | | |
| Leases | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP | - | (200,000) | - | - | - | (200,000) | - | - | - | (200,000) | - | - | - | (200,000) | - | - |
| YAM | - | - | (32,250) | - | - | - | (32,250) | - | - | - | (32,250) | - | - | - | - | - |
| SCM | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Western | - | - | (10,100) | - | - | - | (10,100) | - | - | - | (10,100) | - | - | - | (10,100) | - |
| SQM | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Artemis | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wound Care - Healogics Loan | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term loan | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Debt service and interest payments | - | (210,100) | - | (32,250) | - | (210,100) | (32,250) | - | - | (210,100) | (32,250) | - | - | (210,100) | - | - |
| **Finance inflows** | | | | | | | | | | | | | | | | |
| Artemis Funding | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP funding | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term loan funding | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wound Care - Healogics Loan | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Repayment of Loans Outstanding: | | | | | | | | | | | | | | | | |
| DIP | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Artemis - Net | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| SCM | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| SQN | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Med One Financial | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| YAM - MOB I and II | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Western - MOB III | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| GVMI Hope Note Amortization | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Net financing inflows and repayments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Fees and Professionals** | | | | | | | | | | | | | | | | |
| Lender Structuring Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP Loan Exit Fee | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Lenders Professional Fees, etc. | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees (Case Costs) | (31,250) | (31,250) | (18,750) | (18,750) | (18,750) | (18,750) | (25,000) | (25,000) | (25,000) | - | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) |
| Subordination Fees | - | (100,000) | - | - | - | - | (100,000) | - | - | - | (100,000) | - | - | - | (100,000) | - |
| **Total Fees & Professionals** | (31,250) | (131,250) | (18,750) | (18,750) | (18,750) | (18,750) | (125,000) | (25,000) | (25,000) | (100,000) | (25,000) | (25,000) | (25,000) | (125,000) | (25,000) | |
| **Net cash flow from Financing & restructuring activities** | (31,250) | (341,350) | (18,750) | (51,000) | (18,750) | (18,750) | (335,100) | (57,250) | (25,000) | (25,000) | (310,100) | (57,250) | (25,000) | (25,000) | (335,100) | (25,000) |
| **Net Cash Flow (Total)** | 20,025 | (715,139) | (197,997) | (147,463) | (203,057) | (121,204) | (448,559) | (204,484) | 6,158 | (178,496) | (504,718) | (188,037) | 67,811 | (249,273) | (315,417) | (295,315) |

**Cash Balance (Total)**

| | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 8,132,216 | 8,152,241 | 7,437,102 | 7,239,106 | 7,091,643 | 6,888,586 | 6,767,382 | 6,318,823 | 6,114,339 | 6,120,496 | 5,942,000 | 5,437,283 | 5,249,246 | 5,317,057 | 5,067,784 | 4,752,367 |
| Net Cash flow from Operations | 221,119 | (357,223) | (141,844) | (79,897) | (14,463) | (75,888) | (86,056) | (130,668) | 157,151 | (104,489) | (167,215) | (104,221) | 148,804 | (115,266) | 57,086 | (253,749) |
| Net Cash flow from Non-financing activities | (169,844) | (16,566) | (37,403) | (16,566) | (169,844) | (26,566) | (27,403) | (16,566) | (125,993) | (49,006) | (27,403) | (26,566) | (55,993) | (109,006) | (37,403) | (16,566) |
| Net Cash flow from Financing & restructuring activities | (31,250) | (341,350) | (18,750) | (51,000) | (18,750) | (18,750) | (335,100) | (57,250) | (25,000) | (25,000) | (310,100) | (57,250) | (25,000) | (25,000) | (335,100) | (25,000) |
| Reconciliation | | | | | | | | | | | | | | | | |
| Ending Cash Balance | 8,152,241 | 7,437,102 | 7,239,106 | 7,091,643 | 6,888,586 | 6,767,382 | 6,318,823 | 6,114,339 | 6,120,496 | 5,942,000 | 5,437,283 | 5,249,246 | 5,317,057 | 5,067,784 | 4,752,367 | 4,457,051 |

**ACTUAL* = Actual cash but estimated revenue**

| | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | Last week | | | | | |

Actuals tab Net Cash Flow

Actuals tab Ending Cash

*Reconciling items*
TBC
B/F
Internal transfer

# Green Valley Hospital 26 Week Cash Flow

*Projected balances as at week ending 25 Mar 17*

Key:

**Anticipated Bankruptcy Exit**

| | Q3 2017 | Q3 2017 | Q3 2017 | Q3 2017 | Q3 2017 | Q3 2017 | Q3 2017 | Q3 2017 | Q4 2017 | Q4 2017 | Q4 2017 | Q4 2017 | Q4 2017 | Q4 2017 | Q4 2017 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Beginning** | 8/6/2017 | 8/13/2017 | 8/20/2017 | 8/27/2017 | 9/3/2017 | 9/10/2017 | 9/17/2017 | 9/24/2017 | 10/1/2017 | 10/8/2017 | 10/15/2017 | 10/22/2017 | 10/29/2017 | 11/5/2017 | 11/12/2017 |
| **Week Ending** | 8/12/2017 | 8/19/2017 | 8/26/2017 | 9/2/2017 | 9/9/2017 | 9/16/2017 | 9/23/2017 | 9/30/2017 | 10/7/2017 | 10/14/2017 | 10/21/2017 | 10/28/2017 | 11/4/2017 | 11/11/2017 | 11/18/2017 |
| Week number | 32 | 33 | 34 | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 |
| Weeks from cash flow prep date | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 |
| | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ |
| **Net Revenue** | | | | | | | | | | | | | | | |
| Inpatient | 300,852 | 300,852 | 300,852 | 312,600 | 341,969 | 341,969 | 341,969 | 341,969 | 364,031 | 364,031 | 364,031 | 364,031 | 370,965 | 376,165 | 376,165 |
| Outpatient | 261,842 | 261,842 | 261,842 | 272,066 | 297,627 | 297,627 | 297,627 | 297,627 | 316,828 | 316,828 | 316,828 | 316,828 | 322,863 | 327,389 | 327,389 |
| Hospitalist | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 |
| Other revenue | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 |
| Medicare capital reimbursement | | | 125,700 | | | | 125,700 | | | | 125,700 | | | | 125,700 |
| Telemedicine *(new)* | 4,615 | 4,615 | 4,615 | 4,615 | 4,615 | 4,615 | 4,615 | 4,615 | 4,615 | 4,615 | 4,615 | 4,615 | 6,923 | 6,923 | 6,923 |
| Swing Beds *(new)* | 14,175 | 14,175 | 14,175 | 14,175 | 18,900 | 18,900 | 18,900 | 18,900 | 28,350 | 28,350 | 28,350 | 28,350 | 37,800 | 37,800 | 37,800 |
| Wound Care Center | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Net Revenue** | 724,674 | 598,974 | 724,674 | 620,946 | 680,600 | 806,300 | 680,600 | 806,300 | 731,314 | 857,014 | 731,314 | 857,014 | 746,591 | 765,767 | 765,767 |
| **Inflows from operations** | | | | | | | | | | | | | | | |
| AR collections | 530,924 | 531,674 | 531,674 | 531,674 | 539,574 | 559,323 | 559,323 | 559,323 | 559,323 | 567,194 | 567,194 | 567,194 | 567,194 | 600,987 | 626,331 |
| Hospitalist back-billing | | | | | | 200,000 | | | | | | | | | |
| AR advances | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Restaurant income | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 |
| Medicare capital reimbursement | | | 125,700 | | | | 125,700 | | | | 125,700 | | | | 125,700 |
| Other income | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Telemedicine *(new)* | 2,308 | 3,462 | 3,462 | 3,462 | 3,462 | 4,615 | 4,615 | 4,615 | 4,615 | 4,615 | 4,615 | 4,615 | 4,615 | 4,615 | 4,615 |
| Swing Beds *(new)* | 484 | 484 | 484 | 484 | 9,004 | 9,004 | 9,004 | 9,004 | 14,914 | 14,914 | 14,914 | 14,914 | 23,791 | 23,791 | 23,791 |
| Wound Care Center | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total inflows | 662,906 | 539,110 | 664,810 | 539,110 | 555,530 | 700,979 | 576,433 | 902,133 | 582,342 | 715,914 | 590,214 | 715,914 | 590,214 | 632,883 | 658,228 |
| **Outflows from operations** | | | | | | | | | | | | | | | |
| *Accounts Payable* | | | | | | | | | | | | | | | |
| Administrative expenses | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) |
| Miscellaneous | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) |
| Operating expenses | (12,319) | (10,183) | (12,319) | (10,556) | (11,570) | (13,707) | (11,570) | (13,707) | (12,432) | (14,569) | (12,432) | (14,569) | (12,692) | (13,018) | (13,018) |
| Insurance | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) |
| Physicians | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) |
| Taxes | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) |
| Medical supplies | (90,584) | (74,872) | (90,584) | (77,618) | (85,075) | (100,788) | (85,075) | (100,788) | (91,414) | (107,127) | (91,414) | (107,127) | (93,324) | (95,721) | (95,721) |
| Professional fees | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) |
| Facilities | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) |
| Information technology | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) |
| Bank charges | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) |
| Utilities | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) |
| Patient refund | (1,343) | (1,110) | (1,343) | (1,151) | (1,262) | (1,495) | (1,262) | (1,495) | (1,356) | (1,589) | (1,356) | (1,589) | (1,384) | (1,420) | (1,420) |
| AHCCCS Assessment Tax | - | - | - | - | - | - | - | - | (233,487) | - | - | - | - | - | - |
| Telemedicine *(new)* | (345) | (345) | (345) | (2,712) | (345) | (345) | (345) | (2,712) | (345) | (345) | (345) | (2,885) | (518) | (518) | (518) |
| Wound Care Center | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total - Accounts Payable** | (241,285) | (223,203) | (241,285) | (228,730) | (234,945) | (253,027) | (234,945) | (486,514) | (244,607) | (260,323) | (242,240) | (260,323) | (246,977) | (247,369) | (247,369) |
| *Payroll and Related Items* | | | | | | | | | | | | | | | |
| Payroll | (44,052) | (396,470) | (44,052) | (424,882) | (47,209) | (424,882) | (47,209) | (424,882) | (52,462) | (472,154) | (52,462) | (472,154) | (51,553) | (463,977) | (51,553) |
| Contracted labor | (43,280) | (43,280) | (43,280) | (47,670) | (47,670) | (47,670) | (47,670) | (47,670) | (52,974) | (52,974) | (52,974) | (52,974) | (53,544) | (53,544) | (53,544) |
| Payroll- taxes | (160,791) | - | (160,405) | - | (134,764) | - | (172,313) | - | (171,161) | - | (191,485) | - | (188,568) | - | (188,500) |
| Employee benefits | - | (31,328) | - | (134,764) | - | (33,691) | - | (134,764) | - | (37,439) | - | (189,568) | - | (149,757) | (147,706) / (36,926) |
| Total - Payroll and Related Items | (248,123) | (471,079) | (247,737) | (607,316) | (297,193) | (506,244) | (607,316) | (296,921) | (562,568) | (295,003) | (674,886) | (440,971) | (517,520) | (330,523) |
| **Total Outflows** | (489,408) | (694,281) | (489,022) | (836,047) | (502,138) | (759,271) | (500,985) | (1,093,831) | (541,528) | (822,891) | (537,244) | (935,209) | (687,948) | (764,889) | (577,892) |
| **Net Cash Flow from Operations** | 173,498 | (155,171) | 175,788 | (296,937) | 53,392 | (58,292) | 75,447 | (191,698) | 40,814 | (106,977) | 52,970 | (219,295) | (97,734) | (132,006) | 80,335 |
| **Other non-financing activities** | | | | | | | | | | | | | | | |
| *Settlements and penalties* | | | | | | | | | | | | | | | |
| Past due payments | - | - | (88,590) | - | - | - | (88,590) | - | - | (88,590) | - | - | - | - | - |
| Medicare overpayment | - | (32,440) | - | - | - | (32,440) | - | - | (32,440) | - | - | - | - | - | (32,440) |
| Capital expenditure | (10,000) | - | (10,000) | (10,000) | - | (32,440) | (10,000) | (285,000) | - | - | - | - | - | - | - |
| Critical Vendors & Cure Costs | (27,403) | (16,566) | (27,403) | (16,566) | (27,403) | (16,566) | - | - | - | - | - | - | - | - | - |
| **Net cash flow from Non-financing activities** | (37,403) | (147,597) | (27,403) | (26,566) | (37,403) | (105,156) | (59,844) | (26,566) | (285,000) | - | (61,031) | - | - | - | (32,440) |
| **Financing & Restructuring activities** | | | | | | | | | | | | | | | |
| *Debt service and interest payments* | | | | | | | | | | | | | | | |
| Leases | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP | - | - | (200,000) | - | - | (200,000) | - | - | - | - | - | - | - | - | - |
| YAM | (32,250) | - | - | (32,250) | - | - | - | - | - | - | - | - | - | - | - |
| SCM | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Western | - | - | (10,100) | - | - | (10,100) | - | - | - | - | - | - | - | - | - |
| SQM | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Artemis | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Wound Care - Healogics Loan | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term loan | - | - | - | - | - | - | - | - | (240,305) | - | - | - | (240,305) | - | - |
| Debt service and interest payments | (32,250) | - | (210,100) | (32,250) | - | (210,100) | - | - | (240,305) | - | - | - | (240,305) | - | - |
| *Finance inflows* | | | | | | | | | | | | | | | |
| Artemis Funding | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| DIP funding | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Term loan funding | - | - | - | - | - | 34,000,000 | - | - | - | - | - | - | - | - | - |
| Wound Care - Healogics Loan | - | - | - | - | - | - | - | 250,000 | - | - | - | - | - | - | - |
| *Repayment of Loans Outstanding:* | | | | | | | | | | | | | | | |
| DIP | - | - | - | - | - | (20,000,000) | - | - | - | - | - | - | - | - | - |
| Artemis - Net | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| SCM | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| SQN | - | - | - | - | - | (6,000,000) | - | - | - | - | - | - | - | - | - |
| Med One Financial | - | - | - | - | - | (150,000) | - | - | - | - | - | - | - | - | - |
| YAM - MOB I and II | - | - | - | - | - | (3,000,000) | - | - | - | - | - | - | - | - | - |
| Western - MOB III | - | - | - | - | - | (1,500,000) | - | - | - | - | - | - | - | - | - |
| GVMI Hope Note Amortization | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net financing inflows and repayments** | - | - | - | - | - | 3,350,000 | 250,000 | - | - | - | - | - | - | - | - |
| *Fees and Professionals* | | | | | | | | | | | | | | | |
| Lender Structuring Fee | - | - | - | - | - | (510,000) | - | - | - | - | - | - | - | - | - |
| DIP Loan Exit Fee | - | - | - | - | - | (1,500,000) | - | - | - | - | - | - | - | - | - |
| Lenders Professional Fees, etc. | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Professional Fees (Case Costs) | (25,000) | (25,000) | (25,000) | (125,000) | (25,000) | (25,000) | (25,000) | (100,000) | - | - | - | - | - | - | - |
| Subordination Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Fees & Professionals** | (25,000) | (25,000) | (25,000) | (125,000) | (25,000) | (25,000) | (25,000) | (2,110,000) | - | - | - | - | - | - | - |
| **Net cash flow from Financing & restructuring activities** | (57,250) | (25,000) | (235,100) | (157,250) | (25,000) | 1,029,900 | 9,695 | - | - | - | - | - | (240,305) | - | (32,440) |
| **Net Cash Flow** | 78,845 | (327,768) | 123,385 | (658,603) | (41,261) | (188,448) | (9,396) | 811,636 | (234,491) | (106,977) | (8,061) | (219,295) | (338,039) | (132,006) | 47,895 |
| **Cash Balance (Total)** | | | | | | | | | | | | | | | |
| Beginning Cash Balance | 4,457,051 | 4,535,896 | 4,208,128 | 4,331,512 | 3,672,910 | 3,631,649 | 3,443,200 | 3,433,804 | 4,245,440 | 4,010,950 | 3,903,973 | 3,895,912 | 3,676,617 | 3,338,578 | 3,206,572 |
| Net cash flow from Operations | 173,498 | (155,171) | 175,788 | (296,937) | 53,392 | (58,292) | 75,447 | (191,698) | 40,814 | (106,977) | 52,970 | (219,295) | (97,734) | (132,006) | 80,335 |
| Net cash flow from Non-financing activities | (37,403) | (147,597) | (27,403) | (26,566) | (37,403) | (105,156) | (59,844) | (26,566) | (285,000) | - | (61,031) | - | - | - | (32,440) |
| Net cash flow from Financing & restructuring activities | (57,250) | (25,000) | (25,000) | (335,100) | (25,000) | (25,000) | 1,029,900 | 9,695 | - | - | - | - | (240,305) | - | - |
| Reconciliation | | | | | | | | | | | | | | | |
| **Ending Cash Balance** | 4,535,896 | 4,208,128 | 4,331,512 | 3,672,910 | 3,631,649 | 3,443,200 | 3,433,804 | 4,245,440 | 4,010,950 | 3,903,973 | 3,895,912 | 3,676,617 | 3,338,578 | 3,206,572 | 3,254,467 |

**ACTUAL\* = Actual cash but estimated revenue**

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE (Last week) | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE |
| Actuals tab Net Cash Flow | | | | | | | | | | | | | | | |
| Actuals tab Ending Cash | | | | | | | | | | | | | | | |

*Reconciling items*

- TBC
- B/F
- Internal transfer

Green Valley Hospital 26 Week Cash Flow   Key:

Projected balances as at week ending 25 Mar 17

| | Q4 2017 | Q4 2017 | Q4 2017 | Q4 2017 | Q4 2017 | Q4 2017 | Q1 2018 | Q1 2018 | Q1 2018 | Q1 2018 | Q1 2018 | Q1 2018 | Q1 2018 | Q1 2018 | Q1 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Beginning** | 11/19/2017 | 11/26/2017 | 12/3/2017 | 12/10/2017 | 12/17/2017 | 12/24/2017 | 12/31/2017 | 1/7/2018 | 1/14/2018 | 1/21/2018 | 1/28/2018 | 2/4/2018 | 2/11/2018 | 2/18/2018 | 2/25/2018 |
| **Week Ending** | 11/25/2017 | 12/2/2017 | 12/9/2017 | 12/16/2017 | 12/23/2017 | 12/30/2017 | 1/6/2018 | 1/13/2018 | 1/20/2018 | 1/27/2018 | 2/3/2018 | 2/10/2018 | 2/17/2018 | 2/24/2018 | 3/3/2018 |
| Week number | 47 | 48 | 49 | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 | 60 | 61 |
| Weeks from cash flow prep date | 35 | 36 | 37 | 38 | 39 | 40 | 41 | 42 | 43 | 44 | 45 | 46 | 47 | 48 | 49 |
| | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ |
| **Net Revenue** | | | | | | | | | | | | | | | |
| Inpatient | 376,165 | 372,698 | 364,031 | 364,031 | 364,031 | 364,031 | 382,714 | 385,828 | 385,828 | 385,828 | 403,544 | 427,166 | 427,166 | 427,166 | 404,981 |
| Outpatient | 327,389 | 324,372 | 316,828 | 316,828 | 316,828 | 316,828 | 377,472 | 387,579 | 387,579 | 387,579 | 405,376 | 429,105 | 429,105 | 429,105 | 406,819 |
| Hospitalist | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 |
| Other revenue | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 |
| Medicare capital reimbursement | | | | | | | | | | | | | | | |
| Telemedicine | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 |
| Swing Beds | 37,800 | 37,800 | 47,250 | 47,250 | 47,250 | 47,250 | 52,500 | 52,500 | 52,500 | 52,500 | 62,250 | 61,250 | 61,250 | 61,250 | 61,250 |
| Wound Care Center | | | | | | | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 |
| **Total Net Revenue** | 765,767 | 759,283 | 752,522 | 752,522 | 752,522 | 752,522 | 859,637 | 878,108 | 878,108 | 878,108 | 913,622 | 969,723 | 969,723 | 969,723 | 925,251 |
| **Inflows from operations** | | | | | | | | | | | | | | | |
| AR collections | 626,331 | 626,331 | 626,058 | 625,374 | 625,374 | 625,374 | 625,374 | 638,463 | 640,645 | 640,645 | 640,645 | 691,033 | 758,216 | 758,216 | 758,216 |
| Hospitalist back-billing | | | | | | | | | | | | | | | |
| AR advances | | | | | | | | | | | | | | | |
| Restaurant income | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 |
| Medicare capital reimbursement | | | | | | | | | | | | | | | |
| Other income | | | | | | | | | | | | | | | |
| Telemedicine | 4,615 | 4,615 | 4,615 | 4,615 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 |
| Swing Beds | 23,791 | 23,791 | 31,405 | 31,405 | 31,405 | 31,405 | 31,405 | 41,124 | 41,124 | 41,124 | 41,124 | 53,135 | 53,135 | 53,135 | 53,135 |
| Wound Care Center | | | | | | | | | | | | | | | 27,788 |
| Total inflows | 658,228 | 658,228 | 665,568 | 664,884 | 667,192 | 667,192 | 667,192 | 690,000 | 692,182 | 692,182 | 692,182 | 754,581 | 821,764 | 849,552 | 849,552 |
| **Outflows from operations** | | | | | | | | | | | | | | | |
| *Accounts Payable* | | | | | | | | | | | | | | | |
| | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) |
| Miscellaneous | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) |
| Operating expenses | (13,018) | (12,908) | (12,793) | (12,793) | (12,793) | (12,793) | (14,614) | (14,928) | (14,928) | (14,928) | (15,532) | (16,485) | (16,485) | (16,485) | (15,729) |
| Insurance | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) |
| Physicians | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) |
| Taxes | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) |
| Medical supplies | (95,721) | (94,910) | (94,065) | (94,065) | (94,065) | (94,065) | (107,455) | (109,763) | (109,763) | (109,763) | (114,203) | (121,215) | (121,215) | (121,215) | (115,656) |
| Professional fees | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) |
| Facilities | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) |
| Information technology | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) |
| Bank charges | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) |
| Utilities | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) |
| Patient refund | (1,420) | (1,408) | (1,395) | (1,395) | (1,395) | (1,395) | (1,594) | (1,628) | (1,628) | (1,628) | (1,694) | (1,798) | (1,798) | (1,798) | (1,715) |
| AHCCCS Assessment Tax | | | | | | (273,406) | | | | | | | | | |
| Telemedicine | (518) | (2,885) | (518) | (518) | (518) | (518) | (2,885) | (518) | (518) | (518) | (518) | (2,885) | (518) | (518) | (2,885) |
| Wound Care Center | | | | | | | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) |
| **Total - Accounts Payable** | (247,369) | (248,803) | (245,464) | (245,464) | (245,464) | (518,869) | (283,412) | (283,412) | (283,412) | (283,412) | (290,888) | (296,592) | (296,592) | (296,592) | (292,561) |
| *Payroll and Related Items* | | | | | | | | | | | | | | | |
| Payroll | (463,977) | (50,842) | (457,577) | (50,842) | (457,577) | (50,842) | (502,646) | (55,850) | (502,646) | (55,850) | (488,266) | (54,252) | (488,266) | (54,252) | (470,270) |
| Contracted labor | (53,544) | (54,359) | (54,359) | (54,359) | (54,359) | (54,359) | (61,522) | (61,522) | (61,522) | (61,522) | (50,861) | (50,861) | (50,861) | (50,861) | (50,567) |
| Payroll- taxes | | | (185,573) | | (185,573) | | | (202,023) | | (201,851) | | (198,602) | | (198,019) | |
| Employee benefits | | (146,234) | | (36,559) | | (146,234) | (161,297) | | (40,324) | | (153,439) | | (38,360) | | (148,360) |
| Total - Payroll and Related Items | (517,520) | (437,008) | (511,936) | (327,591) | (511,936) | (437,008) | (725,465) | (319,395) | (604,493) | (321,223) | (692,567) | (303,715) | (677,487) | (303,132) | (669,196) |
| **Total Outflows** | (764,889) | (685,811) | (757,399) | (573,055) | (757,399) | (955,877) | (1,008,587) | (602,807) | (887,905) | (604,635) | (983,455) | (600,307) | (874,079) | (599,724) | (961,757) |
| **Net Cash Flow from Operations** | (106,662) | (27,583) | (91,831) | 91,829 | (90,207) | (288,685) | (341,396) | 87,193 | (195,723) | 87,547 | (291,273) | 154,274 | (52,315) | 249,829 | (112,205) |
| **Non other non-financing activities** | | | | | | | | | | | | | | | |
| *Settlements and penalties* | | | | | | | | | | | | | | | |
| Past due payments | | | | | | | | | | | | | | | |
| Medicare overpayment | | | | | (32,440) | | | (32,440) | | | | | (32,440) | | |
| Capital expenditure | | | | | | | (50,000) | | | | | | | | |
| Critical Venture & Cure Costs | | | | | | | | | | | | | | | |
| **Net cash flow from Non-financing activities** | - | - | - | - | (32,440) | - | (50,000) | (32,440) | - | - | - | - | (32,440) | - | - |
| **Financing & Restructuring activities** | | | | | | | | | | | | | | | |
| *Debt service and interest payments* | | | | | | | | | | | | | | | |
| Leases | | | | | | | | | | | | | | | |
| DIP | | | | | | | | | | | | | | | |
| YAM | | | | | | | | | | | | | | | |
| SCM | | | | | | | | | | | | | | | |
| Western | | | | | | | | | | | | | | | |
| SQM | | | | | | | | | | | | | | | |
| Artemis | | | | | | | | | | | | | | | |
| Wound Care - Healogics Loan | | | | | | | | | | | | | | | |
| Term loan | | (240,305) | | | | | (240,305) | | | | (240,305) | | | | (240,305) |
| Debt service and interest payments | - | (240,305) | - | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - | (240,305) |
| *Finance inflows* | | | | | | | | | | | | | | | |
| Artemis Funding | | | | | | | | | | | | | | | |
| DIP funding | | | | | | | | | | | | | | | |
| Term loan funding | | | | | | | | | | | | | | | |
| Wound Care - Healogics Loan | | | | | | | | | | | | | | | |
| *Repayment of Loans Outstanding:* | | | | | | | | | | | | | | | |
| DIP | | | | | | | | | | | | | | | |
| Artemis - Net | | | | | | | | | | | | | | | |
| SCM | | | | | | | | | | | | | | | |
| SQN | | | | | | | | | | | | | | | |
| Med One Financial | | | | | | | | | | | | | | | |
| YAM - MOB I and II | | | | | | | | | | | | | | | |
| Western - MOB III | | | | | | | | | | | | | | | |
| GVMI Hope Note Amortization | | | | | | | | | | | | | | | |
| **Net financing inflows and repayments** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| *Fees and Professionals* | | | | | | | | | | | | | | | |
| Lender Structuring Fee | | | | | | | | | | | | | | | |
| DIP Loan Exit Fee | | | | | | | | | | | | | | | |
| Lenders Professional Fees, etc. | | | | | | | | | | | | | | | |
| Professional Fees (Case Costs) | | | | | | | | | | | | | | | |
| Subordination Fees | | | | | | | | | | | | | | | |
| **Total Fees & Professionals** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net cash flow from Financing & restructuring activities** | - | (240,305) | - | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - | (240,305) |
| **Net Cash Flow** | (106,662) | (267,888) | (91,831) | 91,829 | (122,648) | (288,685) | (631,700) | 87,193 | (228,163) | 87,547 | (531,578) | 154,274 | (84,755) | 249,829 | (352,510) |
| **Cash Balance (Total)** | | | | | | | | | | | | | | | |
| Beginning Cash Balance | 3,254,467 | 3,147,805 | 2,879,917 | 2,788,085 | 2,879,914 | 2,757,266 | 2,468,581 | 1,836,881 | 1,924,074 | 1,695,911 | 1,783,458 | 1,251,880 | 1,406,154 | 1,321,398 | 1,571,227 |
| Net Cash Flow from Operations | (106,662) | (27,583) | (91,831) | 91,829 | (90,207) | (288,685) | (341,396) | 87,193 | (195,723) | 87,547 | (291,273) | 154,274 | (52,315) | 249,829 | (112,205) |
| Net Cash Flow from Non-financing activities | | | | | (32,440) | | (50,000) | (32,440) | | | | | (32,440) | | |
| Net cash flow from Financing & restructuring activities | | (240,305) | | | | | (240,305) | | | | (240,305) | | | | (240,305) |
| Reconciliation | | | | | | | | | | | | | | | |
| Ending Cash Balance | 3,147,805 | 2,879,917 | 2,788,085 | 2,879,914 | 2,757,266 | 2,468,581 | 1,836,881 | 1,924,074 | 1,695,911 | 1,783,458 | 1,251,880 | 1,406,154 | 1,321,398 | 1,571,227 | 1,218,717 |

ACTUAL* = Actual cash but estimated revenue

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE |
| | | | | | | Last week | | | | | | | | | |

Actuals tab Net Cash Flow

Actuals tab Ending Cash

*Reconciling items*
TBC
B/F
Internal transfer

# Green Valley Hospital 26 Week Cash Flow   Key:

Projected balances as at week ending 25 Mar 17

| | Q1 2018 | Q1 2018 | Q1 2018 | Q1 2018 | Q2 2018 | Q2 2018 | Q2 2018 | Q2 2018 | Q2 2018 | Q2 2018 | Q2 2018 | Q2 2018 | Q2 2018 | Q2 2018 | Q2 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Beginning** | 3/4/2018 | 3/11/2018 | 3/18/2018 | 3/25/2018 | 4/1/2018 | 4/8/2018 | 4/15/2018 | 4/22/2018 | 4/29/2018 | 5/6/2018 | 5/13/2018 | 5/20/2018 | 5/27/2018 | 6/3/2018 | 6/10/2018 |
| **Week Ending** | 3/10/2018 | 3/17/2018 | 3/24/2018 | 3/31/2018 | 4/7/2018 | 4/14/2018 | 4/21/2018 | 4/28/2018 | 5/5/2018 | 5/12/2018 | 5/19/2018 | 5/26/2018 | 6/2/2018 | 6/9/2018 | 6/16/2018 |
| Week number | 62 | 63 | 64 | 65 | 66 | 67 | 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 | 76 |
| Weeks from cash flow prep date | 50 | 51 | 52 | 53 | 54 | 55 | 56 | 57 | 58 | 59 | 60 | 61 | 62 | 63 | 64 |
| | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ |
| **Net Revenue** | | | | | | | | | | | | | | | |
| Inpatient | 375,400 | 375,400 | 375,400 | 375,400 | 323,261 | 323,261 | 323,261 | 323,261 | 315,813 | 312,833 | 312,833 | 312,833 | 315,813 | 323,261 | 323,261 |
| Outpatient | 377,104 | 377,104 | 377,104 | 377,104 | 324,728 | 324,728 | 324,728 | 324,728 | 317,246 | 314,253 | 314,253 | 314,253 | 317,246 | 324,728 | 324,728 |
| Hospitalist | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 |
| Other revenue | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 |
| Telemedicine | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 |
| Swing Beds | 70,000 | 70,000 | 70,000 | 70,000 | 74,375 | 74,375 | 74,375 | 74,375 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 74,375 | 74,375 |
| Wound Care Center | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 |
| **Total Net Revenue** | 874,705 | 874,705 | 874,705 | 874,705 | 774,566 | 774,566 | 774,566 | 774,566 | 759,635 | 758,038 | 758,038 | 758,038 | 764,010 | 778,941 | 778,941 |
| **Inflows from operations** | | | | | | | | | | | | | | | |
| AR collections | 735,686 | 705,647 | 705,647 | 705,647 | 705,647 | 726,135 | 726,135 | 726,135 | 726,135 | 673,033 | 651,793 | 651,793 | 651,793 | 650,205 | 646,235 |
| Hospitalist back-billing | | | | | | | | | | | | | | | |
| AR advances | | | | | | | | | | | | | | | |
| Restaurant income | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 |
| Medicare capital reimbursement | | | | | | | | | | | | | | | |
| Other income | | | | | | | | | | | | | | | |
| Telemedicine | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 |
| Swing Beds | 52,869 | 52,869 | 52,869 | 52,869 | 65,194 | 65,194 | 65,194 | 65,194 | 68,868 | 68,868 | 68,868 | 68,868 | 68,868 | 77,018 | 77,018 |
| Wound Care Center | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 |
| Total inflows | 826,757 | 796,717 | 796,717 | 796,717 | 809,042 | 829,531 | 829,531 | 829,531 | 829,531 | 780,102 | 758,862 | 758,862 | 758,862 | 765,424 | 761,455 |
| **Outflows from operations** | | | | | | | | | | | | | | | |
| *Accounts Payable* | | | | | | | | | | | | | | | |
| Salaries/expenses | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) |
| Miscellaneous | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) |
| Operating expenses | (14,870) | (14,870) | (14,870) | (14,870) | (13,168) | (13,168) | (13,168) | (13,168) | (12,914) | (12,887) | (12,887) | (12,887) | (12,988) | (13,242) | (13,242) |
| Insurance | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) |
| Physicians | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) |
| Taxes | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) |
| Medical supplies | (109,338) | (109,338) | (109,338) | (109,338) | (96,821) | (96,821) | (96,821) | (96,821) | (94,954) | (94,755) | (94,755) | (94,755) | (95,501) | (97,368) | (97,368) |
| Professional fees | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) |
| Facilities | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) |
| Information technology | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) |
| Bank charges | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) |
| Utilities | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) |
| Patient refund | (1,622) | (1,622) | (1,622) | (1,622) | (1,436) | (1,436) | (1,436) | (1,436) | (1,408) | (1,405) | (1,405) | (1,405) | (1,416) | (1,444) | (1,444) |
| AHCCCS Assessment Tax | | | | | | | | | | | | | | | |
| Telemedicine | (518) | (518) | (518) | (518) | (2,885) | (518) | (518) | (518) | (2,885) | (518) | (518) | (518) | (7,685) | (518) | (518) |
| Wound Care Center | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) |
| **Total - Accounts Payable** | (282,923) | (282,923) | (282,923) | (570,088) | (270,884) | (268,517) | (268,517) | (268,517) | (268,737) | (266,140) | (266,140) | (266,140) | (274,166) | (269,147) | (269,147) |
| *Payroll and Related Items* | | | | | | | | | | | | | | | |
| Payroll | (52,252) | (470,270) | (52,252) | (470,270) | (43,077) | (387,696) | (43,077) | (387,696) | (43,514) | (391,627) | (43,514) | (391,627) | (43,333) | (389,999) | (43,333) |
| Contracted labor | (50,567) | (50,567) | (50,567) | (50,567) | (43,077) | (43,077) | (43,077) | (43,077) | (43,514) | (43,514) | (43,514) | (43,514) | (43,333) | (43,333) | (43,333) |
| Payroll- taxes | (191,450) | - | (190,721) | (148,360) | (160,581) | - | (30,704) | - | (157,232) | - | (122,816) | (124,061) | - | (158,827) | - |
| Employee benefits | - | (37,090) | - | - | - | - | - | - | - | - | (31,015) | - | (123,545) | - | (30,886) |
| Total - Payroll and Related Items | (294,269) | (557,926) | (293,539) | (669,196) | (246,734) | (461,477) | (86,154) | (430,773) | (553,589) | (369,756) | (435,141) | (276,870) | (435,141) | (368,444) | (433,332) | (275,719) |
| **Total Outflows** | (577,192) | (840,849) | (576,462) | (1,239,284) | (517,620) | (729,994) | (511,904) | (822,106) | (638,493) | (701,281) | (543,010) | (701,281) | (642,610) | (702,479) | (544,866) |
| **Net Cash Flow from Operations** | 249,565 | (44,132) | 220,255 | (442,567) | 291,422 | 99,536 | 317,626 | 7,424 | 191,038 | 78,822 | 215,852 | 57,581 | 116,252 | 62,945 | 216,589 |
| **Non other financing activities** | | | | | | | | | | | | | | | |
| *Settlements and penalties* | | | | | | | | | | | | | | | |
| Past due payments | | | | | | | | | | | | | | | |
| Medicare overpayment | - | (32,440) | - | - | - | (32,440) | - | - | - | (32,440) | - | - | - | - | (32,440) |
| Capital expenditure | - | - | - | (50,000) | - | - | - | - | - | - | - | - | - | - | - |
| Critical Vendors & Cure Costs | | | | | | | | | | | | | | | |
| **Net cash flow from Non-financing activities** | - | (32,440) | - | (50,000) | - | (32,440) | - | - | - | (32,440) | - | - | - | - | (32,440) |
| **Financing & Restructuring activities** | | | | | | | | | | | | | | | |
| *Debt service and interest payments* | | | | | | | | | | | | | | | |
| Leases | | | | | | | | | | | | | | | |
| DIP | | | | | | | | | | | | | | | |
| YAM | | | | | | | | | | | | | | | |
| SCM | | | | | | | | | | | | | | | |
| Western | | | | | | | | | | | | | | | |
| SQM | | | | | | | | | | | | | | | |
| Artemis | | | | | | | | | | | | | | | |
| Wound Care - Healogics Loan | | | | | | | | | | | | | | | |
| Term loan | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - |
| Debt service and interest payments | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - |
| *Finance inflows* | | | | | | | | | | | | | | | |
| Artemis Funding | | | | | | | | | | | | | | | |
| DIP funding | | | | | | | | | | | | | | | |
| Term loan funding | | | | | | | | | | | | | | | |
| Wound Care - Healogics Loan | | | | | | | | | | | | | | | |
| *Repayment of Loans Outstanding:* | | | | | | | | | | | | | | | |
| DIP | | | | | | | | | | | | | | | |
| Artemis - Net | | | | | | | | | | | | | | | |
| SCM | | | | | | | | | | | | | | | |
| SQN | | | | | | | | | | | | | | | |
| Med One Financial | | | | | | | | | | | | | | | |
| YAM - MOB I and II | | | | | | | | | | | | | | | |
| Western - MOB III | | | | | | | | | | | | | | | |
| GVMI Hope Note Amortization | | | | | | | | | | | | | | | |
| **Net financing inflows and repayments** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| *Fees and Professionals* | | | | | | | | | | | | | | | |
| Lender Structuring Fee | | | | | | | | | | | | | | | |
| DIP Loan Exit Fee | | | | | | | | | | | | | | | |
| Lenders Professional fees, etc. | | | | | | | | | | | | | | | |
| Professional Fees (Case Costs) | | | | | | | | | | | | | | | |
| Subordination Fees | | | | | | | | | | | | | | | |
| **Total Fees & Professionals** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net cash flow from Financing & restructuring activities** | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - |
| **Net Cash Flow** | 249,565 | (76,573) | 220,255 | (442,567) | 1,117 | 99,536 | 285,186 | 7,424 | (49,267) | 78,822 | 183,412 | 57,581 | (124,053) | 62,945 | 184,148 |
| **Cash Balance (Total)** | | | | | | | | | | | | | | | |
| Beginning Cash Balance | 1,218,717 | 1,468,282 | 1,391,709 | 1,611,964 | 1,169,397 | 1,170,514 | 1,270,051 | 1,555,237 | 1,562,661 | 1,513,394 | 1,592,216 | 1,775,627 | 1,833,208 | 1,709,155 | 1,772,100 |
| Net cash flow from Operations | 249,565 | (44,132) | 220,255 | (442,567) | 291,422 | 99,536 | 317,626 | 7,424 | 191,038 | 78,822 | 215,852 | 57,581 | 116,252 | 62,945 | 216,589 |
| Net cash flow from Non-financing activities | - | (32,440) | - | (50,000) | - | (32,440) | - | - | - | (32,440) | - | - | - | - | (32,440) |
| Net cash flow from Financing & restructuring activities | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - |
| *Reconciliation* | | | | | | | | | | | | | | | |
| Ending Cash Balance | 1,468,282 | 1,391,709 | 1,611,964 | 1,169,397 | 1,170,514 | 1,270,051 | 1,555,237 | 1,562,661 | 1,513,394 | 1,592,216 | 1,775,627 | 1,833,208 | 1,709,155 | 1,772,100 | 1,956,248 |

ACTUAL* = Actual cash but estimated revenue

| | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE |
| Last week | | | | | | | | | | | | | | | |

Actuals tab Net Cash Flow

Actuals tab Ending Cash

*Reconciling items*
TBC
B/F
Internal transfer

# Green Valley Hospital 26 Week Cash Flow    Key:

Projected balances as at week ending 25 Mar 17

| | Q2 2018 | Q2 2018 | Q3 2018 | Q3 2018 | Q3 2018 | Q3 2018 | Q3 2018 | Q3 2018 | Q3 2018 | Q3 2018 | Q3 2018 | Q3 2018 | Q3 2018 | Q3 2018 | Q3 2018 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | 6/17/2018 | 6/24/2018 | 7/1/2018 | 7/8/2018 | 7/15/2018 | 7/22/2018 | 7/29/2018 | 8/5/2018 | 8/12/2018 | 8/19/2018 | 8/26/2018 | 9/2/2018 | 9/9/2018 | 9/16/2018 | 9/23/2018 |
| Week Ending | 6/23/2018 | 6/30/2018 | 7/7/2018 | 7/14/2018 | 7/21/2018 | 7/28/2018 | 8/4/2018 | 8/11/2018 | 8/18/2018 | 8/25/2018 | 9/1/2018 | 9/8/2018 | 9/15/2018 | 9/22/2018 | 9/29/2018 |
| | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ |
| Week number | 77 | 78 | 79 | 80 | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 |
| Weeks from cash flow prep date | 65 | 66 | 67 | 68 | 69 | 70 | 71 | 72 | 73 | 74 | 75 | 76 | 77 | 78 | 79 |
| **Net Revenue** | | | | | | | | | | | | | | | |
| Inpatient | 323,261 | 323,261 | 291,978 | 291,978 | 291,978 | 291,978 | 303,895 | 312,833 | 312,833 | 312,833 | 320,480 | 366,362 | 366,362 | 366,362 | 366,362 |
| Outpatient | 324,728 | 324,728 | 293,303 | 293,303 | 293,303 | 293,303 | 305,275 | 314,253 | 314,253 | 314,253 | 321,935 | 368,025 | 368,025 | 368,025 | 368,025 |
| Hospitalist | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 |
| Other revenue | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 |
| Medicare capital reimbursement | | | | | | | | | | | | | | | |
| new Telemedicine | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 |
| new Swing Beds | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 |
| Wound Care Center | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 |
| **Total Net Revenue** | 778,941 | 778,941 | 716,232 | 716,232 | 716,232 | 716,232 | 740,121 | 758,038 | 758,038 | 758,038 | 773,367 | 865,339 | 865,339 | 865,339 | 865,339 |
| **Inflows from operations** | | | | | | | | | | | | | | | |
| AR collections | 646,235 | 646,235 | 646,235 | 609,786 | 609,786 | 609,786 | 609,786 | 597,226 | 587,805 | 587,805 | 587,805 | 592,174 | 618,387 | 618,387 | 618,387 |
| Hospitalist back-billing | | | | | | | | | | | | | | | |
| AR advances | | | | | | | | | | | | | | | |
| Restaurant income | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 |
| Medicare capital reimbursement | | | | | | | | | | | | | | | |
| Other income | | | | | | | | | | | | | | | |
| new Telemedicine | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 |
| new Swing Beds | 77,018 | 77,018 | 75,634 | 75,634 | 75,634 | 75,634 | 75,634 | 77,561 | 77,561 | 77,561 | 77,561 | 80,838 | 80,838 | 80,838 | 80,838 |
| Wound Care Center | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 |
| Total inflows | 761,455 | 761,455 | 760,071 | 723,622 | 723,622 | 723,622 | 723,622 | 712,988 | 703,568 | 703,568 | 703,568 | 711,214 | 737,427 | 737,427 | 737,427 |
| **Outflows from operations** | | | | | | | | | | | | | | | |
| _Accounts Payable_ | | | | | | | | | | | | | | | |
| Employee expenses | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) |
| Miscellaneous | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) |
| Operating expenses | (13,242) | (13,242) | (12,176) | (12,176) | (12,176) | (12,176) | (12,582) | (12,887) | (12,887) | (12,887) | (13,147) | (14,711) | (14,711) | (14,711) | (14,711) |
| Insurance | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) |
| Physicians | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) |
| Taxes | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) |
| Medical supplies | (97,368) | (97,368) | (89,529) | (89,529) | (89,529) | (89,529) | (92,532) | (94,755) | (94,755) | (94,755) | (96,671) | (108,167) | (108,167) | (108,167) | (108,167) |
| Professional fees | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) |
| Facilities | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) |
| Information technology | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) |
| Bank charges | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) |
| Utilities | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) |
| Patient refund | (1,444) | (1,444) | (1,328) | (1,328) | (1,328) | (1,328) | (1,372) | (1,405) | (1,405) | (1,405) | (1,434) | (1,604) | (1,604) | (1,604) | (1,604) |
| AHCCS Assessment Tax | | | | | | | | | | | | | | | (240,175) |
| new Telemedicine | (518) | (518) | (2,885) | (518) | (518) | (518) | (2,885) | (518) | (518) | (518) | (2,885) | (518) | (518) | (518) | (518) |
| new Wound Care Center | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) |
| **Total - Accounts Payable** | (269,147) | (504,100) | (262,493) | (260,126) | (260,126) | (260,126) | (265,529) | (266,140) | (266,140) | (266,140) | (270,712) | (281,576) | (281,576) | (281,576) | (521,750) |
| _Payroll and Related Items_ | | | | | | | | | | | | | | | |
| Payroll | (389,999) | (43,333) | (368,883) | (40,987) | (368,883) | (40,987) | (391,627) | (43,514) | (391,627) | (43,514) | (420,972) | (46,775) | (420,972) | (46,775) | (420,972) |
| Contracted labor | (43,333) | (43,333) | (40,987) | (40,987) | (40,987) | (40,987) | (43,514) | (43,514) | (43,514) | (43,514) | (48,388) | (48,388) | (48,388) | (48,388) | (48,388) |
| Payroll- taxes | | (158,232) | | (149,602) | | (150,459) | | (158,827) | | (157,904) | | (170,727) | | (169,537) | |
| Employee benefits | | (123,545) | | (29,214) | | (116,856) | | (124,061) | | (31,015) | | (133,945) | | (33,486) | | (133,945) |
| Total - Payroll and Related Items | (433,332) | (368,444) | (409,870) | (260,790) | (409,870) | (349,289) | (435,141) | (245,855) | (466,156) | (244,932) | (603,304) | (265,890) | (603,304) | (264,700) | (603,304) |
| **Total Outflows** | (702,479) | (872,544) | (672,362) | (520,916) | (669,995) | (609,414) | (825,131) | (511,994) | (732,296) | (511,072) | (874,016) | (547,465) | (784,421) | (546,275) | (1,125,054) |
| **Net Cash Flow from Operations** | 58,975 | (111,090) | 87,709 | 202,706 | 53,627 | 114,208 | (101,510) | 200,994 | (28,728) | 192,496 | (170,448) | 163,748 | (46,994) | 191,152 | (387,627) |
| **Other non-financing activities** | | | | | | | | | | | | | | | |
| _Settlements and penalties_ | | | | | | | | | | | | | | | |
| Past due payments | | | | | | | | | | | | | | | |
| Medicare overpayment | | | | (32,440) | | | | (32,440) | | | | (32,440) | | | |
| Capital expenditure | | | (50,000) | | | | | | | | | | | | |
| Critical Vendors & Cure Costs | | | | | | | | | | | | | | | |
| **Net cash flow from Non-financing activities** | - | - | (50,000) | - | (32,440) | - | - | (32,440) | - | - | - | (32,440) | - | - | - |
| **Financing & Restructuring activities** | | | | | | | | | | | | | | | |
| _Debt service and interest payments_ | | | | | | | | | | | | | | | |
| Leases | | | | | | | | | | | | | | | |
| DIP | | | | | | | | | | | | | | | |
| YAM | | | | | | | | | | | | | | | |
| SCM | | | | | | | | | | | | | | | |
| Western | | | | | | | | | | | | | | | |
| SQM | | | | | | | | | | | | | | | |
| Artemis | | | | | | | | | | | | | | | |
| Wound Care - Healogics Loan | | | | | | | | | | | | | | | |
| Term loan | | | (240,305) | | | | (240,305) | | | | (240,305) | | | | |
| Debt service and interest payments | - | - | (240,305) | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - | - |
| _Finance inflows_ | | | | | | | | | | | | | | | |
| Artemis Funding | | | | | | | | | | | | | | | |
| DIP funding | | | | | | | | | | | | | | | |
| Term loan funding | | | | | | | | | | | | | | | |
| Wound Care - Healogics Loan | | | | | | | | | | | | | | | |
| _Repayment of Loans Outstanding:_ | | | | | | | | | | | | | | | |
| DIP | | | | | | | | | | | | | | | |
| Artemis - Net | | | | | | | | | | | | | | | |
| SCM | | | | | | | | | | | | | | | |
| SQN | | | | | | | | | | | | | | | |
| Med One Financial | | | | | | | | | | | | | | | |
| YAM - MOB I and II | | | | | | | | | | | | | | | |
| Western - MOB III | | | | | | | | | | | | | | | |
| GVMI Hope Note Amortization | | | | | | | | | | | | | | | |
| **Net financing inflows and repayments** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| _Fees and Professionals_ | | | | | | | | | | | | | | | |
| Lender Structuring Fee | | | | | | | | | | | | | | | |
| DIP Loan Exit Fee | | | | | | | | | | | | | | | |
| Lenders Professional Fees, etc. | | | | | | | | | | | | | | | |
| Professional Fees (Case Costs) | | | | | | | | | | | | | | | |
| Subordination Fees | | | | | | | | | | | | | | | |
| **Total Fees & Professionals** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net cash flow from Financing & restructuring activities** | - | - | (240,305) | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - | - |
| **Net Cash Flow** | 58,975 | (111,090) | (202,596) | 202,706 | 21,186 | 114,208 | (341,814) | 200,994 | (61,169) | 192,496 | (410,753) | 163,748 | (79,435) | 191,152 | (387,627) |
| **Cash Balance (Total)** | | | | | | | | | | | | | | | |
| Beginning Cash Balance | 1,956,248 | 2,015,223 | 1,904,134 | 1,701,538 | 1,904,243 | 1,925,430 | 2,039,637 | 1,697,823 | 1,898,817 | 1,837,648 | 2,030,144 | 1,619,391 | 1,783,139 | 1,703,704 | 1,894,856 |
| Net Cash Flow from Operations | 58,975 | (111,090) | 87,709 | 202,706 | 53,627 | 114,208 | (101,510) | 200,994 | (28,728) | 192,496 | (170,448) | 163,748 | (46,994) | 191,152 | (387,627) |
| Net cash flow from Non-financing activities | - | - | (50,000) | - | (32,440) | - | - | (32,440) | - | - | - | (32,440) | - | - | - |
| Net cash flow from Financing & restructuring activities | - | - | (240,305) | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - | - |
| Reconciliation | | | | | | | | | | | | | | | |
| Ending Cash Balance | 2,015,223 | 1,904,134 | 1,701,538 | 1,904,243 | 1,925,430 | 2,039,637 | 1,697,823 | 1,898,817 | 1,837,648 | 2,030,144 | 1,619,391 | 1,783,139 | 1,703,704 | 1,894,856 | 1,507,229 |
| ACTUAL* = Actual cash but estimated revenue | | | | | | | | | | | | | | | |
| | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE |
| | | Last week | | | | | | | | | | | | | Last week |
| Actuals tab Net Cash Flow | | | | | | | | | | | | | | | |
| Actuals tab Ending Cash | | | | | | | | | | | | | | | |
| _Reconciling items_ | | | | | | | | | | | | | | | |
| TBC | | | | | | | | | | | | | | | |
| B/F | | | | | | | | | | | | | | | |
| Internal transfer | | | | | | | | | | | | | | | |

# Green Valley Hospital 26 Week Cash Flow   Key:

*Projected balances as at week ending 25 Mar 17*

| | Q4 2018 | Q4 2018 | Q4 2018 | Q4 2018 | Q4 2018 | Q4 2018 | Q4 2018 | Q4 2018 | Q4 2018 | Q4 2018 | Q4 2018 | Q4 2018 | Q4 2018 | Q1 2019 | Q1 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | 9/30/2018 | 10/7/2018 | 10/14/2018 | 10/21/2018 | 10/28/2018 | 11/4/2018 | 11/11/2018 | 11/18/2018 | 11/25/2018 | 12/2/2018 | 12/9/2018 | 12/16/2018 | 12/23/2018 | 12/30/2018 | 1/6/2019 |
| Week Ending | 10/6/2018 | 10/13/2018 | 10/20/2018 | 10/27/2018 | 11/3/2018 | 11/10/2018 | 11/17/2018 | 11/24/2018 | 12/1/2018 | 12/8/2018 | 12/15/2018 | 12/22/2018 | 12/29/2018 | 1/5/2019 | 1/12/2019 |
| | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ |
| Week number | 92 | 93 | 94 | 95 | 96 | 97 | 98 | 99 | 100 | 101 | 102 | 103 | 104 | 105 | 106 |
| Weeks from cash flow prep date | 80 | 81 | 82 | 83 | 84 | 85 | 86 | 87 | 88 | 89 | 90 | 91 | 92 | 93 | 94 |
| **Net Revenue** | | | | | | | | | | | | | | | |
| Inpatient | 365,171 | 364,972 | 364,972 | 364,972 | 374,804 | 387,913 | 387,913 | 387,913 | 387,615 | 385,828 | 385,828 | 385,828 | 385,828 | 407,875 | 416,694 |
| Outpatient | 366,828 | 366,629 | 366,629 | 366,629 | 376,505 | 389,674 | 389,674 | 389,674 | 389,375 | 387,579 | 387,579 | 387,579 | 387,579 | 415,263 | 426,337 |
| Hospitalist | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 |
| Other revenue | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 |
| Medicare capital reimbursement | | | | | | | | | | | | | | | |
| *(new)* Telemedicine | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 |
| *(new)* Swing Beds | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 | 78,750 |
| *(new)* Wound Care Center | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 |
| **Total Net Revenue** | 862,950 | 862,552 | 862,552 | 862,552 | 882,261 | 908,539 | 908,539 | 908,539 | 907,941 | 908,733 | 908,733 | 908,733 | 908,733 | 961,714 | 978,282 |
| **Inflows from operations** | | | | | | | | | | | | | | | |
| AR collections | 618,387 | 633,849 | 636,426 | 636,426 | 636,426 | 658,260 | 687,373 | 687,373 | 687,373 | 687,498 | 688,250 | 688,250 | 688,250 | 688,250 | 705,671 |
| Hospitalist back-billing | | | | | | | | | | | | | | | |
| AR advances | | | | | | | | | | | | | | | |
| Restaurant income | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 |
| Medicare capital reimbursement | | | | | | | | | | | | | | | |
| *(new)* Telemedicine | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 |
| *(new)* Swing Beds | 80,838 | 77,207 | 77,207 | 77,207 | 77,207 | 80,542 | 80,542 | 80,542 | 80,542 | 80,542 | 77,258 | 77,258 | 77,258 | 77,258 | 80,561 |
| *(new)* Wound Care Center | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 | 27,788 |
| Total inflows | 737,427 | 749,257 | 751,834 | 751,834 | 751,834 | 777,004 | 806,117 | 806,117 | 806,117 | 802,958 | 803,709 | 803,709 | 803,709 | 803,709 | 824,433 |
| **Outflows from operations** | | | | | | | | | | | | | | | |
| *Accounts Payable* | | | | | | | | | | | | | | | |
| Administrative expenses | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) |
| Miscellaneous | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) |
| Operating expenses | (14,670) | (14,663) | (14,663) | (14,663) | (14,998) | (15,445) | (15,445) | (15,445) | (15,435) | (15,448) | (15,448) | (15,448) | (15,448) | (16,349) | (16,631) |
| Insurance | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) |
| Physicians | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) |
| Taxes | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) |
| Medical supplies | (107,869) | (107,819) | (107,819) | (107,819) | (110,283) | (113,567) | (113,567) | (113,567) | (113,493) | (113,493) | (113,592) | (113,592) | (113,592) | (120,214) | (122,285) |
| Professional fees | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) |
| Facilities | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) |
| Information technology | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) |
| Bank charges | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) |
| Utilities | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) |
| Patient refund | (1,600) | (1,599) | (1,599) | (1,599) | (1,636) | (1,684) | (1,684) | (1,684) | (1,683) | (1,683) | (1,685) | (1,685) | (1,685) | (1,783) | (1,814) |
| AHCCS Assessment Tax | - | - | - | - | - | - | - | - | - | - | - | - | (281,944) | - | - |
| *(new)* Telemedicine | (2,885) | (518) | (518) | (518) | (2,885) | (518) | (518) | (518) | (2,885) | (518) | (518) | (518) | (518) | (2,885) | (518) |
| *(new)* Wound Care Center | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (19,883) | (21,260) | (21,260) |
| **Total - Accounts Payable** | (283,599) | (281,175) | (281,175) | (281,175) | (286,377) | (287,790) | (287,790) | (287,790) | (290,071) | (287,818) | (287,818) | (287,818) | (569,762) | (299,183) | (299,200) |
| *Payroll and Related Items* | | | | | | | | | | | | | | | |
| Payroll | (46,510) | (418,589) | (46,510) | (418,589) | (45,823) | (412,409) | (45,823) | (412,409) | (45,607) | (410,464) | (45,607) | (410,464) | (45,607) | (441,725) | (49,081) |
| Contracted labor | (49,832) | (49,832) | (49,832) | (49,832) | (50,915) | (50,915) | (50,915) | (50,915) | (52,624) | (52,624) | (52,624) | (52,624) | (52,624) | (47,193) | (47,193) |
| Payroll taxes | (169,761) | - | (169,858) | - | (167,255) | - | (167,505) | - | (166,466) | - | (166,545) | - | (166,466) | - | - |
| Employee benefits | (133,812) | - | (33,453) | - | (132,500) | - | (33,125) | - | (132,585) | - | (33,146) | - | (132,585) | (139,243) | (177,876) |
| Total - Payroll and Related Items | (399,915) | (468,421) | (299,653) | (468,421) | (396,493) | (463,324) | (297,368) | (463,324) | (397,282) | (463,088) | (297,922) | (463,088) | (397,282) | (628,161) | (274,150) |
| **Total Outflows** | (683,514) | (749,595) | (580,827) | (749,595) | (682,869) | (751,114) | (585,158) | (751,114) | (687,353) | (750,906) | (585,740) | (750,906) | (967,044) | (927,345) | (573,349) |
| **Net Cash flow from Operations** | 53,912 | (338) | 171,007 | 2,239 | 68,965 | 25,890 | 220,958 | 55,003 | 118,764 | 52,052 | 217,969 | 52,803 | (163,334) | (123,635) | 251,084 |
| **Non other-financing activities** | | | | | | | | | | | | | | | |
| *Settlements and penalties* | | | | | | | | | | | | | | | |
| Past due payments | | | | | | | | | | | | | | | |
| Medicare overpayment | - | - | (32,440) | - | - | - | (32,440) | - | - | - | (32,440) | - | - | - | - |
| Capital expenditure | (50,000) | - | - | - | - | - | - | - | - | - | - | - | - | (50,000) | - |
| Critical Vendors & Cure Costs | | | | | | | | | | | | | | | |
| **Net cash flow from Non-financing activities** | (50,000) | - | (32,440) | - | - | - | (32,440) | - | - | - | (32,440) | - | - | (50,000) | - |
| **Financing & Restructuring activities** | | | | | | | | | | | | | | | |
| *Debt service and interest payments* | | | | | | | | | | | | | | | |
| Leases | | | | | | | | | | | | | | | |
| DIP | | | | | | | | | | | | | | | |
| YAM | | | | | | | | | | | | | | | |
| SCM | | | | | | | | | | | | | | | |
| Western | | | | | | | | | | | | | | | |
| SQM | | | | | | | | | | | | | | | |
| Artemis | | | | | | | | | | | | | | | |
| Wound Care - Healogics Loan | | | | | | | | | | | | | | | |
| Term loan | (240,305) | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - | - | (240,305) | - |
| Debt service and interest payments | (240,305) | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - | - | (240,305) | - |
| *Finance inflows* | | | | | | | | | | | | | | | |
| Artemis Funding | | | | | | | | | | | | | | | |
| DIP funding | | | | | | | | | | | | | | | |
| Term loan funding | | | | | | | | | | | | | | | |
| Wound Care - Healogics Loan | | | | | | | | | | | | | | | |
| *Repayment of Loans Outstanding:* | | | | | | | | | | | | | | | |
| DIP | | | | | | | | | | | | | | | |
| Artemis - Net | | | | | | | | | | | | | | | |
| SCM | | | | | | | | | | | | | | | |
| SQN | | | | | | | | | | | | | | | |
| Med One Financial | | | | | | | | | | | | | | | |
| YAM - MOB I and II | | | | | | | | | | | | | | | |
| Western - MOB III | | | | | | | | | | | | | | | |
| GVMI Hope Note Amortization | | | | | | | | | | | | | | | |
| Net financing inflows and repayments | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| *Fees and Professionals* | | | | | | | | | | | | | | | |
| Lender Structuring Fee | | | | | | | | | | | | | | | |
| DIP Loan Exit Fee | | | | | | | | | | | | | | | |
| Lenders Professional Fees, etc. | | | | | | | | | | | | | | | |
| Professional Fees (Case Costs) | | | | | | | | | | | | | | | |
| Subordination Fees | | | | | | | | | | | | | | | |
| **Total Fees & Professionals** | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Net cash flow from Financing & restructuring activities** | (240,305) | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - | - | (240,305) | - |
| **Net Cash Flow** | (236,392) | (338) | 138,567 | 2,239 | (171,340) | 25,890 | 188,518 | 55,003 | (121,541) | 52,052 | 185,529 | 52,803 | (163,334) | (413,940) | 251,084 |

## Cash Balance (Total)

| | 10/6/18 | 10/13/18 | 10/20/18 | 10/27/18 | 11/3/18 | 11/10/18 | 11/17/18 | 11/24/18 | 12/1/18 | 12/8/18 | 12/15/18 | 12/22/18 | 12/29/18 | 1/5/19 | 1/12/19 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | 1,507,229 | 1,270,836 | 1,270,498 | 1,409,065 | 1,411,303 | 1,239,964 | 1,265,854 | 1,454,371 | 1,509,374 | 1,387,833 | 1,439,885 | 1,625,414 | 1,678,217 | 1,514,883 | 1,100,942 |
| Net Cash flow from Operations | 53,912 | (338) | 171,007 | 2,239 | 68,965 | 25,890 | 220,958 | 55,003 | 118,764 | 52,052 | 217,969 | 52,803 | (163,334) | (123,635) | 251,084 |
| Net cash flow from Non-financing activities | (50,000) | - | (32,440) | - | - | - | (32,440) | - | - | - | (32,440) | - | - | (50,000) | - |
| Net cash flow from Financing & restructuring activities | (240,305) | - | - | - | (240,305) | - | - | - | (240,305) | - | - | - | - | (240,305) | - |
| Reconciliation | | | | | | | | | | | | | | | |
| **Ending Cash Balance** | 1,270,836 | 1,270,498 | 1,409,065 | 1,411,303 | 1,239,964 | 1,265,854 | 1,454,371 | 1,509,374 | 1,387,833 | 1,439,885 | 1,625,414 | 1,678,217 | 1,514,883 | 1,100,942 | 1,352,026 |

ACTUAL* = Actual cash but estimated revenue

| | | | | | | | | | | | | | Last week | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE |
| Actuals tab Net Cash Flow | | | | | | | | | | | | | | | |
| Actuals tab Ending Cash | | | | | | | | | | | | | | | |

*Reconciling items*
- TBC
- B/F
- Internal transfer

# Green Valley Hospital 26 Week Cash Flow

*Projected balances as at week ending 25 Mar 17*

Key:

| | Q1 2019 | Q1 2019 | Q1 2019 | Q1 2019 | Q1 2019 | Q1 2019 | Q1 2019 | Q1 2019 | Q1 2019 | Q1 2019 | Q1 2019 | Q2 2019 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Week Beginning** | 1/13/2019 | 1/20/2019 | 1/27/2019 | 2/3/2019 | 2/10/2019 | 2/17/2019 | 2/24/2019 | 3/3/2019 | 3/10/2019 | 3/17/2019 | 3/24/2019 | 3/31/2019 |
| **Week Ending** | 1/19/2019 | 1/26/2019 | 2/2/2019 | 2/9/2019 | 2/16/2019 | 2/23/2019 | 3/2/2019 | 3/9/2019 | 3/16/2019 | 3/23/2019 | 3/30/2019 | 4/6/2019 |
| | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ | PROJ |
| Week number | 107 | 108 | 109 | 110 | 111 | 112 | 113 | 114 | 115 | 116 | 117 | 118 |
| Weeks from cash flow proj date | 95 | 96 | 97 | 98 | 99 | 100 | 101 | 102 | 103 | 104 | 105 | 106 |
| Other income | | | | | | | | | | | | |
| **Net Revenue** | | | | | | | | | | | | |
| Inpatient | 416,694 | 416,694 | 429,450 | 461,340 | 461,340 | 461,340 | 445,366 | 405,432 | 405,432 | 405,432 | 405,432 | 357,166 |
| Outpatient | 426,337 | 426,337 | 439,388 | 472,016 | 472,016 | 472,016 | 455,673 | 414,814 | 414,814 | 414,814 | 414,814 | 365,432 |
| Hospitalist | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 |
| Other revenue | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 |
| Medicare capital reimbursement | | | | | | | | | | | | |
| Telemedicine [new] | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 |
| Swing Beds [new] | 79,800 | 79,800 | 79,800 | 79,800 | 79,800 | 79,800 | 79,800 | 79,800 | 79,800 | 79,800 | 79,800 | 79,800 |
| Wound Care Center [new] | 31,038 | 31,038 | 31,038 | 31,038 | 31,038 | 31,038 | 31,038 | 31,038 | 31,038 | 31,038 | 31,038 | 31,038 |
| **Total Net Revenue** | 978,282 | 978,282 | 1,004,089 | 1,068,607 | 1,068,607 | 1,068,607 | 1,036,290 | 955,497 | 955,497 | 955,497 | 955,497 | 857,849 |
| | | | | | | | | | | | | |
| **Inflows from operations** | | | | | | | | | | | | |
| AR collections | 712,639 | 712,639 | 712,639 | 747,126 | 833,341 | 833,341 | 833,341 | 815,728 | 771,695 | 771,695 | 771,695 | 771,695 |
| Hospitalist back-billing | | | | | | | | | | | | |
| AR advances | | | | | | | | | | | | |
| Restaurant income | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 | 3,490 |
| Medicare capital reimbursement | | | | | | | | | | | | |
| Other income | | | | | | | | | | | | |
| Telemedicine [new] | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 | 6,923 |
| Swing Beds [new] | 80,561 | 80,561 | 80,561 | 80,561 | 88,485 | 88,485 | 88,485 | 75,475 | 75,475 | 75,475 | 75,475 | 75,475 |
| Wound Care Center [new] | 27,788 | 27,788 | 27,788 | 27,788 | 31,038 | 31,038 | 31,038 | 31,038 | 31,038 | 31,038 | 31,038 | 31,038 |
| **Total inflows** | 831,402 | 831,402 | 831,402 | 873,812 | 960,027 | 963,277 | 963,277 | 932,654 | 888,621 | 888,621 | 888,621 | 888,621 |
| | | | | | | | | | | | | |
| **Outflows from operations** | | | | | | | | | | | | |
| *Accounts Payable* | | | | | | | | | | | | |
| Administrative expenses | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) | (959) |
| Miscellaneous | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) | (1,066) |
| Operating expenses | (16,631) | (16,631) | (17,070) | (18,166) | (18,166) | (18,166) | (17,617) | (16,243) | (16,243) | (16,243) | (16,243) | (14,583) |
| Insurance | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) | (12,823) |
| Physicians | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) | (62,769) |
| Taxes | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) | (13,880) |
| Medical supplies | (122,283) | (122,283) | (125,511) | (133,576) | (133,576) | (133,576) | (129,536) | (119,437) | (119,437) | (119,437) | (119,437) | (107,231) |
| Professional fees | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) | (19,999) |
| Facilities | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) | (3,083) |
| Information technology | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) | (8,115) |
| Bank charges | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) | (689) |
| Utilities | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) | (13,310) |
| Patient refund | (1,814) | (1,814) | (1,861) | (1,981) | (1,981) | (1,981) | (1,921) | (1,771) | (1,771) | (1,771) | (1,771) | (1,590) |
| AHCCCS Assessment Tax | | | | | | | | | | | | |
| Telemedicine [new] | (518) | (518) | (2,885) | (518) | (518) | (518) | (2,885) | (518) | (518) | (518) | (518) | (2,885) |
| Wound Care Center [new] | (21,260) | (21,260) | (21,260) | (21,260) | (21,260) | (21,260) | (21,260) | (21,260) | (21,260) | (21,260) | (21,260) | (21,260) |
| **Total - Accounts Payable** | (299,200) | (299,200) | (305,279) | (312,193) | (312,193) | (312,193) | (309,911) | (295,922) | (295,922) | (295,922) | (606,061) | (284,242) |
| | | | | | | | | | | | | |
| *Payroll and Related Items* | | | | | | | | | | | | |
| Payroll | (441,725) | (49,081) | (437,445) | (48,605) | (437,445) | (48,605) | (430,982) | (47,887) | (430,982) | (47,887) | (430,982) | (40,566) |
| Contracted labor | (47,193) | (47,193) | (46,736) | (46,736) | (46,736) | (46,736) | (46,045) | (46,045) | (46,045) | (46,045) | (46,045) | (39,006) |
| Payroll- taxes | | (179,144) | | (177,582) | | | | (175,049) | | (174,787) | | (150,739) |
| Employee benefits | (34,811) | | (137,894) | | (34,474) | | (135,857) | | (33,964) | | (135,857) | (115,088) |
| **Total - Payroll and Related Items** | (523,729) | (275,417) | (622,075) | (272,922) | (518,654) | (272,749) | (652,076) | (268,981) | (510,991) | (268,719) | (612,884) | (345,399) |
| **Total Outflows** | (822,928) | (574,617) | (927,354) | (585,116) | (830,847) | (584,942) | (922,795) | (564,903) | (806,913) | (564,641) | (1,218,944) | (629,641) |
| **Net Cash Flow from Operations** | 8,473 | 256,785 | (95,952) | 288,696 | 129,180 | 378,335 | 40,482 | 367,751 | 81,708 | 323,980 | (330,323) | 258,980 |
| | | | | | | | | | | | | |
| **Other non-financing activities** | | | | | | | | | | | | |
| *Settlements and penalties* | | | | | | | | | | | | |
| Past due payments | | | | | | | | | | | | |
| Medicare overpayment | (32,440) | | | | (32,440) | | | | (32,440) | | | |
| Capital expenditure | | | | | | | | | | | | |
| Critical Vendors & Cure Costs | | | | | | | | | | | | (50,000) |
| **Net cash flow from Non-financing activities** | (32,440) | - | - | - | (32,440) | - | - | - | (32,440) | - | - | (50,000) |
| | | | | | | | | | | | | |
| **Financing & Restructuring activities** | | | | | | | | | | | | |
| *Debt service and interest payments* | | | | | | | | | | | | |
| Leases | | | | | | | | | | | | |
| DIP | | | | | | | | | | | | |
| YAM | | | | | | | | | | | | |
| SCM | | | | | | | | | | | | |
| Western | | | | | | | | | | | | |
| SQM | | | | | | | | | | | | |
| Artemis | | | | | | | | | | | | |
| Wound Care - Healogics Loan | | | | | | | | | | | | |
| Term loan | | | (240,305) | | | | (240,305) | | | | | (240,305) |
| Debt service and interest payments | | | (240,305) | | | | (240,305) | | | | | (240,305) |
| | | | | | | | | | | | | |
| *Finance inflows* | | | | | | | | | | | | |
| Artemis Funding | | | | | | | | | | | | |
| DIP funding | | | | | | | | | | | | |
| Term loan funding | | | | | | | | | | | | |
| Wound Care - Healogics Loan | | | | | | | | | | | | |
| *Repayment of Loans Outstanding:* | | | | | | | | | | | | |
| DIP | | | | | | | | | | | | |
| Artemis - Net | | | | | | | | | | | | |
| SCM | | | | | | | | | | | | |
| SQN | | | | | | | | | | | | |
| Med One Financial | | | | | | | | | | | | |
| YAM - MOB I and II | | | | | | | | | | | | |
| Western - MOB III | | | | | | | | | | | | |
| GVMH Hope Note Amortization | | | | | | | | | | | | |
| **Net financing inflows and repayments** | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | |
| *Fees and Professionals* | | | | | | | | | | | | |
| Lender Structuring Fee | | | | | | | | | | | | |
| DIP Loan Exit Fee | | | | | | | | | | | | |
| Lenders Professional Fees, etc. | | | | | | | | | | | | |
| Professional Fees (Case Costs) | | | | | | | | | | | | |
| Subordination Fees | | | | | | | | | | | | |
| **Total Fees & Professionals** | - | - | - | - | - | - | - | - | - | - | - | - |
| | | | | | | | | | | | | |
| **Net cash flow from Financing & restructuring activities** | - | - | (240,305) | - | - | - | (240,305) | - | - | - | - | (240,305) |
| | | | | | | | | | | | | |
| **Net Cash Flow** | (23,967) | 256,785 | (336,257) | 288,696 | 96,740 | 378,335 | (199,823) | 367,751 | 49,268 | 323,980 | (330,323) | (31,324) |
| | | | | | | | | | | | | |
| **Cash Balance (Total)** | | | | | | | | | | | | |
| Beginning Cash Balance | 1,352,026 | 1,328,059 | 1,584,844 | 1,248,586 | 1,537,283 | 1,634,022 | 2,012,358 | 1,812,535 | 2,180,286 | 2,229,554 | 2,553,534 | 2,223,211 |
| Net Cash Flow from Operations | 8,473 | 256,785 | (95,952) | 288,696 | 129,180 | 378,335 | 40,482 | 367,751 | 81,708 | 323,980 | (330,323) | 258,980 |
| Net cash flow from Non-financing activities | (32,440) | - | - | - | (32,440) | - | - | - | (32,440) | - | - | (50,000) |
| Net cash flow from Financing & restructuring activities | - | - | (240,305) | - | - | - | (240,305) | - | - | - | - | (240,305) |
| Reconciliation | | | | | | | | | | | | |
| Ending Cash Balance | 1,328,059 | 1,584,844 | 1,248,586 | 1,537,283 | 1,634,022 | 2,012,358 | 1,812,535 | 2,180,286 | 2,229,554 | 2,553,534 | 2,223,211 | 2,191,886 |

ACTUAL* = Actual cash but estimated revenue

| | | | | | | | | | | | Last week | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actuals tab Net Cash Flow | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE | TRUE |
| Actuals tab Ending Cash | | | | | | | | | | | | |

*Reconciling items*
TBC
B/F
Internal transfer

# EXHIBIT "D"

**FORRESTER & WORTH, PLLC**
3636 NORTH CENTRAL AVENUE, SUITE 700
PHOENIX, ARIZONA 85012
602.258.2729 — MAIN
602.271.4300 — FAX
S. CARY FORRESTER (006342)
JOHN R. WORTH (012950)
SCF@FORRESTERANDWORTH.COM
JRW@FORRESTERANDWORTH.COM

COUNSEL FOR THE DEBTOR

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| In re: | Chapter 11 |
| **GV HOSPITAL MANAGEMENT, LLC**, | Case No. 4:17-bk-03351-SHG |
| Debtor. | **DECLARATION OF GRANT LYON IN SUPPORT OF EMERGENCY *EX PARTE* MOTION FOR ORDER (1) AUTHORIZING DEBTORS TO OBTAIN POST-PETITION FINANCING PURSUANT TO 11 U.S.C. § 364; (2) GRANTING LIENS AND SUPERPRIORITY CLAIMS PURSUANT TO 11 U.S.C. § 364; (3) AUTHORIZING THE USE OF CASH COLLATERAL PURSUANT TO 11 U.S.C. § 363; (4) SCHEDULING A FINAL HEARING; AND (5) GRANTING RELATED RELIEF** |

I, G. Grant Lyon, make this Declaration in support of Green Valley Hospital, LLC ("**GVH**"), GV Hospital Management, LLC ("**Management**") and GV II Holdings LLC's ("**GVII**"), debtors and debtors-in-possession (collectively, "**Debtors'**") Emergency Ex Parte Motion for Order: (1) Authorizing Debtors to Obtain Post-Petition Financing Pursuant to 11 U.S.C. § 364; (2) Granting Liens and Superpriority Claims Pursuant to 11 U.S.C. § 364; (3) Authorizing the Use of Cash

Collateral Pursuant to 11 U.S.C. § 363; (4) Scheduling a Final Hearing; and (5) Granting Related Relief (the "**DIP Lending Motion**") and state as follows:

1.      I am the Chairman of the Board of GVH, which owns all of the equity interests in Management and is its manager. Management owns and operates the Green Valley Hospital;

2.      I am over the age of 18, am competent to testify, and if called to do so would testify as set forth in this Declaration;

3.      Unless otherwise indicated, all facts set forth in this Declaration are based on: (1) my personal knowledge; (2) my discussions with Debtors' senior management; (3) my review of relevant documents; or (4) my opinion based upon my experience, knowledge, and information concerning Debtors' operations and financial affairs;

4.      I am a Managing Director of KRyS Global USA ("**KRyS**"). I am also the current Chairman of the GVH's Board of Managers.

5.      KRyS is a leading insolvency firm and its professionals have extensive experience in the reorganization and restructuring of distressed companies, both out of court and in Chapter 11 proceedings.  I have over 25 years of extensive experience in providing financial advisory services to financially distressed companies, representing both debtors and lenders in the procurement and provision of post-petition financing.  I attach a true and correct copy of my CV as Exhibit "A" to this Declaration and incorporate it herein by this reference.

6.      I have worked on a broad range of restructuring and reorganization assignments for companies, creditor groups, corporate parents of troubled entities, and acquirers of distressed assets.  Over the course of my career, I have advised senior management and boards of directors of companies in a wide variety of industries in connection with restructurings, mergers and acquisitions, and financing transactions.  I have served on the boards of numerous private and

public companies such as Tickets.com, Mesa Airlines, Marietta Products, and Vitesse Semiconductor, among others. I have served as a trustee, chief restructuring officer, and court appointed receiver in numerous state and federal cases including the liquidations and restructuring of Skymall, LLC, Apache Junction Hospital, Madison Hotel, LLC, Shuburg Holstein's LLC (a dairy farm), and Armorworks, Enterprises, LLC.

### The Need for Debtor-in-Possession Financing

7.      In connection with their bankruptcy cases, Debtors are in need of post-petition financing to fund their business operations during the pendency of their bankruptcy cases.

8.      In light of the foregoing, Debtors sought debtor in possession financing from 22 other entities and individuals, not including Lateral U.S. Credit Opportunities Fund ("**Lateral**") or its designee (collectively with Lateral, "**Lender**").

9.      Ultimately, Debtors decided that Lender was the best party to provide the required financing on the expedited basis required by Debtors.

10.     Lender agreed to provide Debtors with a post-petition debtor-in-possession loan (the "**DIP Loan**") of up to $20,000,000 and to allow them to use Lender's cash collateral subject to the terms of the DIP Loan Documents and the Budget.

11.     Based on Debtors' Budget, which sets forth their projected cash receipts and cash disbursements through the Maturity Date of the DIP Loan, Debtors believe the proposed DIP Loan will provide them with sufficient funds to maintain their operations during the pendency of these bankruptcy cases.

12.     Debtors were unable to obtain sufficient interim and long-term financing in a timely manner from sources other than Lender on terms and subject to conditions more favorable to Debtors than under the DIP Loan Documents

3

because lenders are not willing to lend to debtors in financial distress without obtaining superpriority claims and liens to protect and secure claims arising from post-petition financing.

13.     Accordingly, Lender requested that Debtors provide, and Debtors agreed to provide, Lender with the DIP Superpriority Claims and the DIP Liens pursuant to Sections 364(c) and (d).  In consideration of other terms and conditions obtained by other debtors in possession borrowers in similar circumstances, Debtors believe that the proposed terms and conditions of the DIP Loan are reasonable.

14.     After considering the lack of better alternatives, Debtors concluded, in the exercise of their sound business judgment, that the DIP Loan proposed to be provided by Lender, when coupled with the authorization to use Cash Collateral to be provided by Lender, represents the best financing presently available to them.

15.     The DIP Loan is the product of protracted arms' length negotiations between Debtors and Lender (which is not affiliated with, or an insider of Debtors).

16.     The orderly continuation of Debtors' operations and the preservation of their going concern value are largely dependent on their ability to access the DIP Loan.  For example, the DIP Loan will be used to refinance Debtors' pre-petition creditors, to fund Debtors' payments to vendors and employees, and to satisfy other ordinary costs of operation, including payroll and taxes.  Absent access to the DIP Loan, the continued operation of Debtors' businesses would suffer, causing immediate and irreparable harm to Debtors' respective estates, their employees, patients, and their creditors.

17.     Given the immediate need for financing and the flexible and favorable economic terms of the DIP Loan, I recommended that Debtors enter into the DIP

Loan. Based on my professional experience and my involvement in this matter, I believe the marketing and negotiation process was fair, comprehensive, and produced the best available financing option for Debtors. The negotiations with prospective lenders (as well as Lateral) were conducted in good faith and at arm's length.

18.     The DIP Loan is favorably priced, superior to the proposals provided by all other potential lenders, and represents the best financing available to Debtors.   By entering into the DIP Loan, Debtors will be able to, among other things, permit the orderly continuation of their business and preserve the going concern value of their business.  Accordingly, entering into the DIP Loan is in the best interest of Debtors' estates.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

DATED March 31, 2017

_____

G. Grant Lyon

5

**Curriculum Vitae**
**G. Grant Lyon**

## EDUCATIONAL BACKGROUND:

| | |
|---|---|
| 1987 | Bachelor of Science Degree in Accounting, Magna Cum Laude<br>Brigham Young University<br>Provo, Utah |
| 1989 | Masters of Business Administration, High Distinction<br>Brigham Young University<br>Provo, Utah |
| 1994 | Certified Public Accountant (Arizona) |

## EMPLOYMENT:

| | |
|---|---|
| 2014-Present | KRyS Global USA<br>Managing Director |
| 1998-2002, 2004-2014 | Odyssey Capital Group, LLC<br>President |
| 2005 | Interim Chief Financial Officer<br>Hypercom Corporation (NYSE:HYC) |
| 2002- 2004 | Ernst &Young Corporate Finance, LLC<br>Managing Director |
| 1999-2001 | Golf Equity, LLC<br>Managing Member (Golf Management) |
| 1997 | Evans Withycombe Residential, Inc.<br>Vice President - Capital Markets (NYSE) |
| 1989-1997 | Arthur Andersen LLP |

## BOARD OF DIRECTORS EXPERIENCE:

- ☐ Tickets.com (Public - Terminated when company sold in 2005)

- ☐ Norwood Promotional Products (Private –Audit Committee Head, Resigned in 2006)

- ☐ Trussway, LTD. (Private - Terminated when company sold in 2005)

- ☐ Three Five Systems (Public, Chairman 2006-2011)

- Fairfield Properties, LLC (2009 – 2010 Terminated when company sold in 2011)

- Marietta Products (2009 – Terminated when company sold in 2010)

- Vitesse Semiconductor (Public, 2009 – 2013)

- Mesa Airlines (Private, 2011 – Present)

- Ultura (Private, 2014 –2016)

- Capital Contractors (Private, 2015 – Present)

- Jumio (Private, 2016 )

## TRUSTEE/CRO/RECEIVERSHIP EXPERIENCE

- Liquidation Trustee for Skymall, LLC - (Skymall LLC, Case # 2:15-bk-00679-BKM D. Ariz. 2015)

- Family Real Estate Trust - (Receiver for Arizona based real estate trust with assets of approximately $300 million).

- Hospital – Pre and post-petition CRO (Apache Junction Hospital, LLC, Case #4-13-bk-18188-EWH Bankr. D. Ariz. 2013)

- Hotel – Post Confirmation Liquidation Trustee (Madison Hotel, LLC, Case #11-bk-12560-MG Bankr. S.D. N.Y. 2011)

- Real Estate Resort Operation CRO (CSD, LLC, Case #12-21668-BAM Bankr. D. Nev. 2012)

- Real Estate Portfolio Sale – Chapter 11 CRO (Nesbitt Portland Property LLC, Case #12-bk-12883-RR Bankr. C.D. Cal. 2012)

- Defense Contractor Asset Sale – Independent Debtor Representative (Armorworks Enterprises, LLC Case # 2:13-bk-10332-BMW Bankr. D. Ariz. 2013)

- Dairy Farm – Chapter 11 Trustee (Schuburg Holstein's LLC, Case #384 B.R.263 (D. Ariz. 2008)

- Golf Community – Chapter 11 Trustee (FRGC Development, LLC, Case #06-bk-00842-RTBP Bankr. D. Ariz. 2006)

- Mortgage/Real Estate Fraud – Chapter 11 Trustee (Greenbelt Property Management, LLC Case #2:07-bk-00790-RTB Bankr. D. Ariz. 2007)

☐ Commercial Mortgage Real Estate Fund – Chapter 11 Trustee (Radical Bunny, LLC, Case #2:08-bk-13884-CGC Bankr. D. Ariz. 2008)

☐ Residential Mortgage Servicer – Chapter 11 Trustee (First Magnus Financial Corporation, Case #4:07-bk-01578-JMM Bankr. D. Ariz. 2007)

☐ Mezzanine Real Estate Lender – Chapter 11 CRO (Specialty Trust, Case #10-bk-51432-GWZ Bankr. D. Nev. 2010)


OTHER ENGAGEMENTS 2016-2009:


☐ Advisor to unsecured creditors committee in bankruptcy case of a Arizona based wire mesh manufacturing company. (ITC, Case # 15-14709 (MCW) Bankr. D. Ariz.)

☐ Financial advisor and investment banker to California based tech company. Oversaw marketing and sale of company for over 2x stalking horse bid. (Fuhu, Case # 15-12465 (CSS) Bankr. D. Delaware).

☐ Expert witness for ad hoc committee of unsecured noteholders in the Caesars Entertainment Operating Company's chapter 11 case. Testified in the bankruptcy court in the Northern District of Illinois. Testimony resulted in positive outcome for client. (Caesars Entertainment, Case # 15-00149 Bankr. N.D. Illinois).

☐ Served as Interim CEO and Board member for a water treatment company based in California with subsidiaries in Europe. Assisted in stabilizing the company, executing a strategy to sell certain assets and wind down other operations to maximize the recovery of creditors. Involved a court sanctioned 363 process in Delaware bankruptcy court and an out of court sale process in CA and Europe. (Ultura (LA) Inc., Case # 2-14-bk-12382 Bankr. D. Del. 2014).

☐ Expert witness for plaintiff in an admiralty law "alter ego" and fraudulent transfer case in the United States District Court, Norfolk Virginia. (Glory Wealth v. Vista Shipping, Case # 2:13cv658-RGD-LRL).

☐ Expert witness for stalking horse bidder in asset sale in United States Bankruptcy Court District of Columbia. Provided expert report regarding valuation and fair value analysis of certain healthcare provider assets and liabilities. Valuation dispute settled in June 2014 prior to trial. (Specialty Hospital, Case #14-00298 Bankr. D.C. 2014).

☐ Financial advisor to a consumer products company in bankruptcy in the United States Bankruptcy Court District of Arizona. Assisting in bankruptcy advisory as well as plan

confirmation and asset sale. (Prime Time International Company Case # 2:14-bk-03518 Bankr. D. Ariz. 2014).

☐ Expert witness for Banco Popular de Puerto Rico in fraudulent transfer litigation in the United States Bankruptcy Court, United States Virgin Islands Division. Provided expert report addressing solvency and other fraudulent transfer issues. Expert report produced January 2014, deposition and trial pending. (Banco Popular De Puerto Rico Case #07-30012 (MFW); adv. Pro. No. 09-03090 (MFW) Bankr. USVI 2009).

☐ Court appointed independent debtor representative for defense contractor in bankruptcy in United States Bankruptcy Court Division of Arizona. Responsible for all Debtor bankruptcy decisions including asset sales and plan execution. Plan proposed in June 2014, awaiting confirmation. (Armorworks Enterprises, LLC Case # 2:13-bk-10332-BMW Bankr. D. Ariz. 2013).

☐ Expert witness for American Express in a fraudulent transfer in the United States District Court for the Southern District of Florida. Provided an expert report including forensic accounting and fraudulent transfer analysis. Was deposed in March of 2014, trial pending. (Perlman v. Amex, Case # 13-20515-CIV-Martinez S.D. Flor. 2013).

☐ Expert witness for secured lender in a hotel bankruptcy case in Arizona. Opined and testified regarding interest rate and feasibility. (Lodge Partners, LLC Case #4:13-bk-7952 Bankr. D. Ariz. 2013).

☐ Financial advisor to Unsecured Creditor's Committee of a digital media production company. Provided valuation and other financial advisory services. (Kit Digital, Inc., Case #13-bk-11298-REG Bankr. S.D. N.Y. 2013.

☐ Served as financial advisor and financial expert for the unsecured creditor's committee in its $1.2 billion fraudulent transfer litigation. Provided in depth financial, accounting and valuation analysis. The case settled after mediation prior to trial. (Mervyn's Holdings, LLC, Case # 08-bk-11586-KG Bankr. D. Del. 2008).

☐ Financial advisor and investment banker for Debtor of 1300 acres of master planned, undeveloped land in North Las Vegas. Marketed and conducted a section 363 sale of the Debtor's assets. (November 2005 Land Investors, LLC, Case #11-20704-MKN Bankr. D. Nev. 2011).

☐ Financial advisor to the debtor involved in the distribution of frozen meats. Provided financial, accounting and feasibility analysis throughout the bankruptcy proceeding. (N'Genuity Enterprises Co., Case #11-bk-28705-GBN Bankr. D. Ariz. 2011).

☐ Financial advisor to a $3 billion commercial office-building fund. Services included valuation, feasibility, capital acquisition and negotiations with creditors.

- Financial advisor to a $500 million retail shopping-mall developer. Services included valuation, cash flow analysis, structuring of reorganization strategy and negotiations with creditors.

- Expert witness for lender in a single asset real estate case. Opined on interest rates and refinancing. (Carefree Willows, LLC, Case #10-29932-MKN Bankr. D. Nev. 2010).

- Financial advisor to the Unsecured Creditor's Committee of a large dairy farm. Assisted in the formulation of a competing Chapter 11 plan and provided other advisory services. (Dairy Production Systems-Georgia, Case #10-bk-11752-JDW Bankr. M.D. Ga. 2010).

- Expert witness for lender in a machinery and equipment company chapter 11 case. Provided expert testimony on interest rates and feasibility. (Red Mountain Machinery Company, Case # 09-bk-19166-RJH Bankr. D. Ariz. 2009).

- Financial advisor to the special committee of the board for a $5B casino company. Services included review of LBO transaction, valuation and opine on validity of potential fraudulent conveyance claims. (Stations Casinos, Inc., Case #09-bk-52477-GWZ Bankr. D. Nev 2009).

- Financial advisor to $400 million Florida based residential homebuilder. Services include analysis of company operations and development of strategic plan, cash flow analysis and liquidity alternatives, negotiation with secured lenders, and restructuring alternatives. (Mercedes Homes Inc., Case #09-bk-11191-PGH Bankr. S.D. Fl. 2009).

- Financial advisor to the Debtor and expert witness in the chapter 11 bankruptcy of the largest privately held homebuilder in Arizona. Restructured $190 million of debt. (Fulton Homes Corporation, Case #09-bk-01298-GBN Bankr. D. Ariz. 2009).

TESTIMONY EXPERIENCE:

Bankruptcy Court in the Districts of:

- Arizona (Feasibility, Interest Rates, Liquidation, Sale Process)

- Southern Texas (Feasibility, Liquidation)

- Northern Ohio (Feasibility, Liquidation, Sale Process)

- Florida (Feasibility, Valuation)

- Northern Illinois (Feasibility)

- Nevada (Valuation, Fraudulent Conveyance, Interest Rates)

District Court in the District of:

☐ Virginia (Forensic Accounting, Fraud/Fraudulent Transfer, Avoidance Actions, Fiduciary Duties, Zone of Insolvency, Money Laundering)

State Court in:

☐ Arizona (Valuation, Damages, Fraudulent Transfer, Fraud, and Related Financial Issues)

SPEECHES/PUBLICATIONS:

Panel Member - Association of Insolvency Accountants
Topic: Solvency Issues

Panel Member - Arizona Bar Association, Bankruptcy Chapter (Multiple Panels)
Topics: Lender Liability, Business Analysis

Panel Member – American Bankruptcy Institute
Topic: Current Issues in the Airline Industry

Panel Member – International Airline Finance Conference
Topic: Review of Airline Industry

Panel Member - Maricopa County Bar Association
Topic: Preference Payments
Author - Fraudulent Transfer - What Do the Numbers Say - Published in:
    ☐ State Bar of Arizona Bankruptcy Journal - December 1995

    ☐ American Bankruptcy Institute Journal - March 1996

DISTRESSED COMPANY/FINANCIAL SERVICES EXPERIENCE:

☐ Capital Acquisition

☐ Out-of-court Restructuring

☐ Liquidation Trustee

☐ Claims Agent

☐ Acquisitions and Mergers

☐ Securities Valuation

☐ Plan Feasibility (Debtor and Creditor)

- ☐ Debtor-in-Possession Financing

- ☐ Business Valuation

- ☐ Solvency Analysis

- ☐ Liquidation Analysis

- ☐ Single Asset Bankruptcy Analysis

- ☐ Preference Payment Analysis

- ☐ Fraudulent Transfer Actions

LITIGATION CONSULTING EXPERIENCE:

- ☐ Lender Liability

- ☐ Franchise Infringement

- ☐ Patent Infringement

- ☐ Insurance Claims

- ☐ Contract Disputes

- ☐ Lost Profits

- ☐ Fraudulent Transfer